**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| Aljanal Carroll, Claudia Provost Charles, and Tiffany Fair, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:22-cv-00051-ELH |
| Walden University, LLC, and Walden e-Learning, LLC, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................ iv

**I.    INTRODUCTION** ................................................................................ 1

**II.   FACTUAL ALLEGATIONS** ................................................................ 4

    A.   Walden Engages in Fraudulent and Predatory Tactics to Enroll Students in its DBA Program ................................................................ 4

    B.   Walden Does Not Dispute That it Intentionally—and Successfully—Targets Black and Female Students for This Scheme ........................................ 5

    C.   Walden Also Targets Nontraditional Students, Who Are Disproportionately Black and Female ................................................................ 6

**III.  STANDARD OF REVIEW** ................................................................ 7

**IV.   ARGUMENT** ................................................................................ 7

    A.   Plaintiffs' Class Claims State Causes of Action Under ECOA and Title VI ........ 8

    1.   Reverse Redlining is Not Limited to Housing ................................ 8

    2.   Plaintiffs Have Adequately Alleged That Defendants' DBA Practices Constitute Unlawful Reverse Redlining ........................................ 10

        a)   The DBA Program is Predatory ................................................ 11

        b)   The DBA Program is Targeted in a Discriminatory Manner ............ 12

            (1)   Defendants Intentionally Target Students Based on Race ........... 12

            (2)   Defendants' Targeting of Nontraditional Students Has a Disparate Impact Based on Race and Gender .................................... 13

    3.   Defendants' Predatory Practices Were Part of a Credit Transaction and Are Therefore Covered by ECOA .......................................... 14

    4.   Reverse Redlining Violates Title VI ............................................ 18

        a)   Application of Reverse Redlining Under Title VI is not Novel .......... 18

        b)   Reverse Redlining Doctrine is Consistent with Longstanding Interpretation of Intent Requirements Under Title VI .......................................... 20

    B.   Plaintiffs Have Adequately Pled State-Law Claims Over Which This Court Has Jurisdiction ................................................................................ 25

    1.   The Court Has Jurisdiction Over Plaintiffs' State-Law Claims ............ 25

    2.   Minnesota Law Governs Plaintiffs' State-Law Claims ...................... 26

3.    Plaintiffs' Fraud Claims are Pled with Specificity ............................................ 28

a) Counts III, IV, and V Serve a "Public Benefit" and Are Therefore Actionable Under Minnesota's Private Attorney General Statute ...................................... 29

b)  Plaintiffs May Seek Damages Under MUDTPA ........................................... 32

C.   None of Plaintiffs' Claims Are Barred by the "Educational Malpractice" Doctrine ........................................................................................................... 33

**V.    CONCLUSION** ............................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975).................................................. 12

*Alexander v. Sandoval*, 532 U.S. 275 (2001).............................................................. 12

*Almendares v. Palmer*, 284 F. Supp. 2d 799 (N.D. Ohio 2003).................................. 21

*Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468 (Minn. Ct. App. 1999)................................... 34, 35

*Arnold v. Univ. of N.C. at Chapel Hill*, 798 S.E.2d 442 (N.C. App. 2017)................................ 35

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017 (4th Cir. 1997) ......................... 27

*Banks v. McIntosh Cty.*, 530 F. Supp. 3d 1335 (S.D. Ga. 2021). ..................................... 20, 23, 24

*Barkley v. Olympia Mortgage Co.*, 2007 WL 2437810 (E.D.N.Y. 2007) ..................................... 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 54 (2007) ............................................................ 7

*Blake v. Career Educ. Corp.*, No. 08-CV-00821, 2009 WL 2567011 (E.D. Mo. Aug. 18, 2009)34

*Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 2d 749 (E.D. Pa. 2011) ..................................... 21

*Bowman v. Bank of Am. N.A.*, No. 13-CV-3436, 2016 WL 8943266 (D.S.C. June 16, 2016)..... 14

*Brewer v. Bd. of Trustees of Univ. of IL*, 479 F.3d 908 (7th Cir. 2007) …………………… ……..21

*Brook v. Sistema Universitario Ana G. Mendez, Inc.*, No. 17-CV-171-T-30AAS, 2017 WL 1743500 (M.D. Fla. 2017) ................................................................. 9, 10, 17, 19

*Buetow v. A.L.S. Enters., Inc.*, 888 F. Supp. 2d 956 (D. Minn. 2012)......................................... 31

*Campbell v. Restaurants First/Neighborhood Restaurant, Inc.*, 303 F. Supp. 2d 797 (S.D.W. Va. 2004) ................................................................................................... 26

*Capitol Indemnity Corp. v. Aulakh*, 313 F.3d 200 (4th Cir. 2002),............................................. 18

*Carlson v. A.L.S. Enters., Inc.*, Civ. No. 07-3970, 2008 WL 185710 (D. Minn. Jan. 18, 2008).. 28

*Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, No. 10-CV-00007, 2011 WL 285694 (W.D. Va. Jan. 27, 2011) ........................................................... 24

*Collins v. Minn. Sch. of Bus., Inc.*, 655 N.W.2d 320 (Minn. 2003)................................... 30, 31, 32

*Commercial Prop. Inv., Inc. v. Quality Ins. Int'l, Inc.*, 61 F.3d 639 (8th Cir. 1995). .................. 28

*Contract Buyers League v. F & F Inv.*, 300 F. Supp. 210 (N.D. Ill. 1969) ........................... 10, 19

*Cremi v. Brown*, 955 F. Supp. 49 (D. Md. 1997)....................................................................... 27

*Cross v. Prospect Mortg.*, *LLC*, 986 F. Supp. 2d 688 (E.D. Va. 2013) .................................. 15, 17

*Curtis v. Altria Grp*., *Inc*., 792 N.W.2d 836 (Minn. Ct. App. 2010) ........................................... 31

*Dell v. DeTar*, Civ. No. 16-00887, 2017 WL 3835679 (D. Md. Aug. 31, 2017) ........................ 27

*Diamond v. Bea Maurer, Inc.*, 128 F. App'x 968 (4th Cir. 2005)................................................ 24

*Doe v. Indep. Sch. Dist. 31*, No. 20-CV-226, 2020 WL 4735503 (D. Minn. Aug. 14, 2020) ...... 34

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999)....................................................... 7

*Evans v. 7520 Surratts Rd. Operations, LLC*, No. 21-CV-01637, 2021 WL 5326463 (D. Md. Nov. 16, 2021) .................................................................................................................. 22

*Faulkner v. Glickman*, 172 F. Supp. 2d 732 (D. Md. 2001) ........................................................ 12

*Feminist Majority Found. v. Hurley*, 911 F.3d 674 (4th Cir. 2018) ......................................... 7, 34

*Fidelity & Guar. Life Ins. Co. v. United Advisory Grp., Inc., Civ. No. 13-0040, 2014 WL 346630 (D. Md. Jan. 29, 2014)* ................................................................................................... 26

*Ford v. Rensselaer Polytechnic Inst.*, 507 F. Supp. 3d 406 (N.D.N.Y. 2020)............................. 34

*Forde v. Empire State Coll.*, No. 10 CIV. 9446, 2011 WL 4376499 (S.D.N.Y. Sept. 19, 2011). 21

*Franks v. Ross*, 293 F. Supp. 2d 599 (E.D.N.C. 2003)........................................................... 10, 23

*Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006)........................................................... 14, 17, 18

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ........................................................................ 12

*Gwanjun Kim v. Grand Valley State Univ., No. 11-CV-233, 2012 WL 1033985 (W.D. Mich. Feb. 2, 2012)* ............................................................................................................................. 22

*Hall v. Capella Univ*., Civ. No. 18-27, 2018 WL 3429934 (D. Minn. Jul. 16, 2018) ................. 29

*Hamilton v. O'Connor Chevrolet, Inc., No. 02-CV-1897, 2004 WL 1403711 (N.D. Ill. June 23, 2004)* ............................................................................................................................. 17

*Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000) ........ 2, 8, 9, 10, 11, 13

*Harris v. Dutchess Cty. Bd. of Co-op. Educ. Servs.*, 50 Misc. 3d 750 (N.Y. Sup. Ct. 2015)....... 34

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (4th Cir. 2004) ............................ 24

*Hodge v. Coll. of S. Maryland*, 121 F. Supp. 3d 486 (D. Md. 2015)............................................ 22

*Holloway v. Maryland*, — F.4th —, 2022 WL 1207165 (4th Cir. Apr. 25, 2022)....................... 23

*HomeStar Prop. Sols., LLC v. Safeguard Props., LLC, No. 14-CV-4531, 2016 WL 526213 (D. Minn. Feb. 9, 2016)*................................................................................................................. 32

*Horne v. Harbour Portfolio VI, LP*, 304 F. Supp. 3d 1332 (N.D. Ga. 2018) .................... 9, 10, 13

*In re Nat'l Arb. F. Trade Pracs. Litig.*, 704 F. Supp. 2d 832 (D. Minn. 2010) ........................... 31

*In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177 (D. Kan. 2015) ........................ 28

*Jackson v. Novastar Mortg. Inc.*, 645 F. Supp. 2d 636 (W.D. Tenn. 2007) ................................ 16

*Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931 (D. Minn. 2020),............................. 28

*Johnson v. Oroweat Foods Co.*, 785 F.2d 503 (4th Cir. 1986)..................................................... 27

*Joy Family Ltd. P'ship v. United Financial Banking Cos., Inc., Civ. No. 12-3741, 2013 WL 4647321 (D. Md. Aug. 28, 2013)* ............................................................................................. 26

*Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004 (D. Minn. 2012) ......................... 28, 30, 31, 32

*Klinge v. Gem Shopping Network, Inc., No. 12-CV-2392, 2014 WL 7409580 (D. Minn. Dec. 31, 2014)* ...................................................................................................................................... 30

*Koumantaros v. City of New York, No. 03 CIV 10170, 2007 WL 840115 (S.D.N.Y. Mar. 19, 2007)* ...................................................................................................................................... 22

*Kwiatkowski v. Polish & Slavic Fed. Credit Union, No. 11-CV-3947, 2011 WL 6225390 (E.D.N.Y. Dec. 12, 2011)* ...................................................................................................... 22

*Love v. Johanns*, 439 F.3d 723 (D.C. Cir. 2006). .................................................................. 17, 18

*Ly v. Nystrom*, 615 N.W.2d 302 (Minn. 2000) ..................................................................... 29, 30

*M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538 (E.D.N.Y. 2010) ..................................... 8, 11

*Maher v. Sempris*, LLC, Civ. No. 13-2202, 2014 WL 4749186 (D. Minn. 2014) ...................... 29

*Martinez Garcia v. Mega Auto Outlet, No. 20-CV-945, 2021 WL 1015816 (E.D. Va. Feb. 23, 2021)* ...................................................................................................................................... 16

*Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874 (S.D. Ohio 2002)................... 9, 16

*Maya v. Bronx Community College, No. 09 CIV 3605, 2011 WL 2732519 (S.D.N.Y. Jul. 6, 2011)*
.................................................................................................................................... 22

*Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A., 631 F. Supp. 2d 702, 704 (D. Md. 2009)*...................................................................................................13, 14

*McClean v. Duke Univ.*, 376 F. Supp. 3d 585 (M.D.N.C. 2019)............................................ 33, 35

*McGregor v. Uponer, Inc.*, Civ. No. 09-1136, 2010 WL 55985 (D. Minn. Jan. 4, 2010)........... 29

*Mejia v. EMC Mortg. Corp.*, No. CV 09-9701, 2011 WL 2470060 (C.D. Cal. June 16, 2011)... 10

*Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223 (W.D.N.Y. 2021)..................... 32

*Miller v. Loyola University of New Orleans*, 829 So. 2d 1057 (La. App. 4th Cir. 2002)............. 35

*Mills v. Tarver,* — So.3d —, 2021 WL 6328320 (La. App. 1 Cir. 2021) .................................... 35

*Montgomery Cty. v. Bank of Am. Corp.*, 421 F. Supp. 3d 170 (D. Md. 2019) ............................ 13

*Mooney v. Allianz Life Ins. Co. of N. Am.*, 244 F.R.D. 531 (D. Minn. 2007)............................. 28

*Mumid v. Abraham Lincoln High Sch., Civ. No. 05-2176, 2006 WL 640510 (D. Minn. Mar. 13, 2006)* ................................................................................................................................ 34

*Muthukumar Nachiappan Subbiah v. The Univ. of Tex. at Dallas, No. 10-CV-115-B, 2011 WL 1771806 (N.D. Tex. May 10, 2011)* .................................................................................. 22

*Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP, 394 F. Supp. 2d 762 (M.D.N.C. 2005)* ................................................................................................................................ 27

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) ........................................................... 29

*Ohio Civil Rights Comm'n v. Wells Fargo Bank, N.A., No. 11-CV-623, 2012 WL 1288489 (N.D Ohio Apr. 16, 2012)* ............................................................................................................ 10

*Overen v. Hasbro, Inc.*, Civ. No. 07-1430, 2007 WL 2695792 (D. Minn. Sept. 12, 2007) ......... 31

*Pace v. Hurst Boilers & Welding Co., No. 10-CV-116, 2011 WL 4915493 (M.D. Ga. Oct. 17, 2011)* ................................................................................................................................ 24

*Paragon Syst., Inc. v. Hughes*, Civ. No. 20-1209, 2020 WL 6292728 (D. Md. Oct. 27, 2020)... 26

*Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95 (4th Cir. 2013) ...................... 26

*Powell v. Am. Gen. Fin., Inc.*, 310 F. Supp. 2d 481 (N.D.N.Y. 2004) .......................................... 14

*Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018) ......................................................... 21

*Retfalvi v. United States*, 930 F.3d 600 (4th Cir. 2019)................................................................ 7

*S. Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, 254 F. Supp. 2d 486 (D.N.J. 2003) ...................................................................................................................... 10, 23

*Saint-Jean v. Emigrant Mortg. Co.*, 337 F. Supp. 3d 186 (E.D.N.Y. 2018)................................ 13

*Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300 (E.D.N.Y., 2014)............................. 9, 12

*Saqr v. Univ. of Cincinnati*, No. 18-CV-542, 2019 WL 699347 (S.D. Ohio Feb. 20, 2019) ....... 24

*Schweikert v. Bank of America, N.A.*, 521 F.3d 285 (4th Cir. 2008) ............................................ 7

*Clark v. Universal Builders, Inc.*, 501 F.2d 324 (7th Cir. 1974) .................................................. 18

*Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979).................................................. 22

*U.S. ex rel. Cooper v. Auto Fare, Inc.*, No. 14-CV-0008, 2014 WL 2889993 (W.D.N.C. June 25, 2014) ....................................................................................... 2, 8, 9, 11, 13, 16

*Sellers by Sellers v. Sch. Bd. of City of Mannassas, Va.*, 141 F.3d 524 (4th Cir. 1998)......... 33, 35

*Sellers v. Sch. Bd. of the City of Manassas*, 960 F. Supp. 1006 (E.D. Va. 1997),.................. 34, 35

*Sirpal v. Univ. of Miami*, 684 F. Supp. 2d 1349 (S.D. Fla. 2010) ............................................... 21

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011)............................................... 21

*Solvay Pharms., Inc. v. Global Pharms.*, 298 F. Supp. 2d 880 (D. Minn. Sept. 24, 2004) .......... 29

*Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109 (4th Cir. 1981) .................................................... 24

*Special Force Ministries v. WCCO Television*, 584 N.W.2d 789 (Minn. App. 1998) ................. 25

*State v. Juul Labs, Inc.*, No. 27-CV-19-19888, 2021 WL 2692131 (Minn. Dist. Ct., June 21, 2021) ...................................................................................................................... 32

*Sullivan v. Ouimet*, 377 N.W.2d 24 (Minn. App. 1985)............................................................... 26

*Summit Recovery, LLC v. Credit Card Reseller, LLC*, Civ. No. 08-5273, 2010 WL 1427322 (D. Minn. Apr. 9, 2010)........................................................................................................ 30

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)............................................................... 23, 24

*Tuttle v. Lorillard Tobacco Co.*, Civ. No. 99-1550, 2003 WL 1571584 (D. Minn. Mar. 3, 2003).... ....................................................................................................................................... 31

*Weller v. Accredited Home Lenders, Inc.*, Civ. No. 08-2798, 2009 WL 928522 (D. Minn. March 31, 2009) ........................................................................................................... 32

*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999).............................................................. 27

*Wells v. One2One Learning Found.*, 39 Cal. 4th 1164 (2006) ...................................... 34

*Whayne v. U.S. Dep't of Educ.*, 915 F. Supp. 1143 (D. Kan. 1996) ............................. 35

*Wright v. Capella Univ., Inc.*, 378 F. Supp. 3d 760 (D. Minn. 2019). .................... 34, 35

*Zutz v. Case Corp.*, Civ. No. 02-1776, 2003 WL 22848943 (D. Minn. Nov. 21, 2003)……..…31

**Statutes**

Minn. Stat. § 325D.43, *et seq*..................................................................................... 32

Minn. Stat. Ann. § 8.31, subdiv. 3a ............................................................... 29, 30, 32

 15 U.S.C. § 1691(a)……….……………………………………………………….1,15,17

42 U.S.C. § 2000d *et seq*............................................................................................ 1

**Other Authorities**

*Ctr. For Microeconomic Data, Fed. Reserve Bank of N.Y.*, Quarterly Report on Household Debt and Credit (May 2021). ........................................................................................... 9

**Regulations**

12 C.F.R. § 1002.2(l)……………………………………………………………………14

12 C.F.R. § 1002.6(a).................................................................................................. 12

12 C.F.R. § 202.2(m). .................................................................................................. 15

34 C.F.R. § 685.207…………………………………………………………...…..16

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................................... 28

## I.      INTRODUCTION

The detailed allegations in Plaintiffs' Complaint paint a disturbing picture: Defendants Walden University, LLC and Walden e-Learning, LLC (collectively "Walden") targeted Black and female prospective students for enrollment in their Doctor of Business Administration ("DBA") program, as part of a predatory scheme in which they flagrantly misrepresented the cost to earn a degree. Walden captured millions in excess tuition from students as a result. That scheme constitutes both consumer fraud and a form of illegal discrimination known as reverse redlining. Defendants ask this Court to bar Plaintiffs' well-pled claims by becoming the first court to hold that college and graduate students victimized by reverse redlining—the targeting of protected classes for predatory products—have no recourse under law. There is no basis in statute or case law to treat reverse redlining differently than other methods of discrimination, or to artificially apply it to one type of transaction and not another, and this Court should decline that invitation. Plaintiffs have alleged facts sufficient to state claims of discrimination based on race and gender under the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, discrimination based on race under Title VI, 42 U.S.C. § 2000d *et seq.*, and violations of Minnesota state consumer protection laws. All their claims should proceed.

Defendants make four primary arguments for dismissing Plaintiffs' federal claims: Defendants argue that (1) reverse redlining does not apply outside the housing context; (2) Plaintiffs have not properly alleged a reverse redlining claim; (3) Plaintiffs' allegations do not relate to a credit transaction; and (4) Plaintiffs have not satisfied the intent requirements of Title VI. Each argument fails.

First, while the concept of reverse redlining emerged in the housing context, it is not confined to that sphere. Reverse redlining was coined in housing discrimination cases, in recognition of the interrelationship between the practice of targeting predatory products at

1

protected classes and the histories of exclusion of those same groups from beneficial products, the latter known as redlining. But the term simply describes one way in which discrimination occurs: the exploitation of a community based on protected class. There is no basis for holding that this is illegal only when it happens to involve mortgage lending. Reverse redlining is discrimination and is unlawful under both ECOA and Title VI.

Plaintiffs state claims for reverse redlining based on both race and gender. A claim of reverse redlining has two components: 1) unfair and predatory practices; 2) that are targeted on the basis of a protected class. *See U.S. ex rel. Cooper v. Auto Fare, Inc.*, No. 14-CV-0008, 2014 WL 2889993, at *3 (W.D.N.C. June 25, 2014) (quoting *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000). Plaintiffs have amply alleged that Walden intentionally targeted Black and female students for enrollment in its scheme. *Infra* at 5–6. Plaintiffs also allege that Walden's facially neutral policy of targeting the program at "nontraditional students" disproportionately ensnares Black and female students. *Infra* at 6. Either satisfies the second prong, showing targeting.

As to the first prong, while recruiting women and students of color is not in and of itself problematic, it becomes unlawful when what they are recruited for is predatory. Here, Walden's recruitment for the DBA program was predatory because it relied on pervasive, material misrepresentations regarding the cost of the degree. *See infra* at 4–5. Defendants continuously represented that the total price of the program was tens of thousands of dollars less than what students actually paid, and that the program had a set credit requirement, the successful completion of which would result in the granting of a DBA degree. These representations, which Walden knew to be false, had the purpose and effect of enticing students to enroll and facilitated Walden's scheme of extracting millions in excess tuition from students.

2

Defendants seek to sidestep Plaintiffs' well-pled allegations of reverse redlining by invoking an inapplicable legal framework and misconstruing Plaintiffs' allegations in the process. First, Defendants repeatedly stress that Plaintiffs have not pled that Black and female students were treated differently during their time in the DBA program than white or male students. This is irrelevant. Plaintiffs are not required to show that white or male students received better treatment once enrolled in the program. As explained below, *infra* at 20–24, the relevant civil rights statutes do not require similarly situated comparators. Rather, intentional discrimination may be established through evidence that a defendant has intentionally targeted a community for exploitation based on protected class. And, contrary to Defendants' representations, the fact that a scheme also ensnares and affects some students outside the targeted groups does not undermine the claim.

Defendants next assert that the discrimination Plaintiffs experienced was not tethered to a "credit transaction" as required by ECOA. Defendants' Mem. in Supp. of Mot. To Dismiss ("Defs.' Br.") (Dkt. 35-1) at 19–21. This again misunderstands Plaintiffs' allegations. As Plaintiffs allege, the central aspect of Walden's predatory scheme was the misrepresentation of the total cost of the degree, and thus the principal balance of the federal student loans that most students obtained, with Walden's facilitation, to pay for the program. But few aspects of a loan are more integral to the credit transaction than the total amount of money borrowed. *See infra* at 14–18. Holding that ECOA does not apply to discrimination relating to the total cost and loan balance of a transaction would significantly depart from established case law and drastically narrow the intended coverage of the statute.

Moving to Plaintiffs' state-law claims, Defendants argue that Plaintiffs' state-law claims should be dismissed because, they claim, (1) the Court does not have independent jurisdiction

3

over Plaintiffs' state-law claims; (2) Minnesota law does not apply; (3) Plaintiffs' fraud claims are not pled with sufficient specificity; (4) Plaintiffs' state-law claims do not serve a "public benefit;" and (5) damages are not available under MUDTPA. Finally, Defendants argue that all of Plaintiffs' claims are barred by the "educational malpractice" doctrine. Each of these arguments is without merit, as described *infra* at 25–35.

## II.   FACTUAL ALLEGATIONS

### A.   Walden Engages in Fraudulent and Predatory Tactics to Enroll Students in its DBA Program

Plaintiffs' Complaint describes Walden's discriminatory scheme of targeting Black and female students for a program that exploits students by enrolling them based on gross and knowing misrepresentations of the true cost. Walden knew that these representations were false and understated the true cost of the program by approximately $34,300 for the average graduate, allowing it to unjustly extract over $28.5 million in excess tuition from the classes of Black and female graduates Plaintiffs seek to represent. Compl. (Dkt. 1) ¶¶ 22–23, 58–59, 71–72, 112–114.

Walden for years told prospective students that its DBA program required a set total number of credits for completion, including (in different years) either 19 or 20 credits within the "capstone" phase, during which students develop a final capstone research project. Compl. ¶¶ 58–59, 62–69, 71–72. Prospective students, including the Named Plaintiffs, enrolled based on these representations. Yet in reality, Walden's DBA program entrapped them in a long and costly scheme to extract revenue from a captive audience of enrolled students. Compl. ¶¶ 24, 152. Rather than the advertised nineteen or twenty capstone credits, the average Walden DBA graduate was obligated to complete—and pay for—fifty-four capstone credits, at an average of $34,300 above and beyond the program's stated price. Compl. ¶¶ 22, 59, 72, 112–114. The experiences of the Named Plaintiffs exemplify this scheme. Walden falsely represented to each

of them the total cost, credits, and time requirements of the DBA program, and knew those representations to be false. *See* Compl. ¶¶ 78–93, 194–96, 209, 215–217, 229, 232, 234, 237. It signed each of them up based on these false representations, entrapping them in a program it knew the vast majority of students would not complete in the stated time or at the stated price. Compl. ¶¶ 9–10, 12–22. As with other DBA students, by the time they each discovered the fraud, they were in too deep to quit. Compl. ¶¶ 9–18, 68, 73.

**B.     Walden Does Not Dispute That it Intentionally—and Successfully—Targets Black and Female Students for This Scheme**

As Plaintiffs' Complaint alleges—and as Defendants all but admit in their brief—Walden intentionally targeted this predatory scheme at Black and female students. *See e.g.,* Defs.' Br. at 16 (agreeing that "a reasonable inference to be drawn from the pleadings is that Walden sought to succeed in its mission to educate underserved communities by advertising in those communities" and "enrolling students from those communities" (cleaned up)). Walden accomplished this targeting through several avenues. First, it purposefully directed its advertising budget almost exclusively to cities with higher-than-average Black populations. Compl. ¶¶ 140–148. In 2015, for example, it directed 99.8% of its local advertising budget to areas with an above-median percentage of Black residents. Compl. ¶¶ 146. It likewise targeted Black and female students through its social media and online advertising, which consistently and overwhelmingly featured depictions of models or students who were Black, female, or both. Compl. ¶¶ 149, 163–164.

This intentional targeting has been successful, and Walden's DBA student body is, as a result, disproportionately Black and female. *See id.* ¶¶ 132–137, 155–160. In fact, Walden confers the largest number of doctoral degrees on Black students of any institution in the U.S., produces five times more Black doctorates than the next school (HBCU Howard University), and

accounts for 11.4% of all Black doctorates in the country. S*ee id.* ¶¶ 138–139. *See also* Defs.' Br. at 1 (touting that in 2020 Walden "awarded doctorates to more Black and female students than any other institution in the country").

### C.  Walden Also Targets Nontraditional Students, Who Are Disproportionately Black and Female

Walden also targets certain types of "nontraditional" students, including students who are employed while pursuing their degree, students who have children, and students over thirty years of age. Compl. ¶ 166. This policy is manifest in Walden's promotional materials, which tout Walden's goal of "creat[ing] opportunities for working professionals where there previously were none." *Id.* ¶ 169–172 (quoting Walden's website and advertisements). Plaintiffs also allege examples of Walden targeting students over thirty and students who have children. *See id.* ¶¶ 164, 173–174 (describing ads featuring or directed to older adults, parents with young children, and mothers).

The nontraditional students this policy targets are disproportionately Black and female. As explained in the Complaint, nontraditional students are more likely to be women and to belong to a racial-ethnic minority group. *Id.* ¶ 167. Twice as many Black doctorate recipients relied on their own resources (i.e., worked through school) as did white doctorate recipients (40.8% v. 20.4%); additionally, 19.8% of female doctorate recipients relied on their own resources as compared to only 11.3% of male doctorate recipients. *Id.* ¶ 175. Nearly two thirds of graduate students with dependents are female (62.9% female, 37.1% male). *Id.* ¶ 176. And Black doctorate students, whose median age is 36.2, are significantly more likely to be over the age of thirty than white doctorate students, whose median age is 31.6. *Id.* ¶¶ 177–178. Walden's policy of targeting nontraditional students thus disproportionately subjects Black and female students to its predatory and unfair misrepresentations about the cost of the DBA program.

6

## III.    STANDARD OF REVIEW

In reviewing a Rule 12(b)(6) motion, the Court must "accept the complaint's factual allegations as true," *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 685 (4th Cir. 2018), "construe the factual allegations of the complaint in the light most favorable to the plaintiff," *Schweikert v. Bank of America, N.A.*, 521 F.3d 285, 288 (4th Cir. 2008) (quotation omitted), and "draw all reasonable inferences from those facts in favor of the plaintiff," *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration adopted) (quotation omitted). The factual allegations must "state[] a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), but this standard is not intended to be onerous, *id.* at 556, 563 n.8. Where a motion to dismiss involves a civil rights complaint, as this one does, a court "must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief *under any legal theory which might plausibly be suggested by the facts alleged.*" *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (emphasis in original) (cleaned up).

## IV.    ARGUMENT

Under these standards, Plaintiffs' Complaint successfully states causes of action for race and gender discrimination under ECOA and race discrimination under Title VI, as well as causes of action under Minnesota state law. Defendants' arguments to the contrary are unavailing. Section IV.A., *infra* at 8–24, addresses the support for Plaintiffs' ECOA and Title VI claims. Second, Section IV.B., *infra* at 25–33, addresses Plaintiffs' state-law claims. Finally, Section IV.C., *infra* at 33–35, responds to Defendants' argument that Plaintiffs' claims generally are barred by the educational malpractice doctrine.

A.      **Plaintiffs' Class Claims State Causes of Action Under ECOA and Title VI**

Defendants seek to defeat Plaintiffs' federal claims with four primary arguments: first, that reverse redlining does not apply in the educational context; second, that Plaintiffs have not properly alleged a reverse redlining claim; third, that Plaintiffs' allegations do not relate to a credit transaction; and fourth, that reverse redlining is not cognizable under Title VI. Each of these arguments should be rejected.

1.      **Reverse Redlining is Not Limited to Housing**

Plaintiffs allege that Defendants impermissibly engaged in reverse redlining, the practice of targeting a predatory product or scheme either directly at members of a protected class (intentional discrimination) or using facially neutral policies that have a disproportionate effect on members of a protected class (disparate impact). Defendants argue that liability for reverse redlining is "traditionally reserved for Fair Housing Act litigation," Defs.' Br. at 3, and suggest that otherwise it is perfectly legal to target a predatory practice or product at people of color or women. It is not. Reverse redlining simply describes a form of discrimination that is particularly common in, but not exclusive to, the housing context. Regardless of nomenclature or doctrinal origins, Defendants' conduct amounts to unlawful discrimination in any context, full stop.

There are two elements of a reverse redlining claim: a plaintiff must allege (1) that the defendant's practices were "unfair and predatory" and (2) "that the defendant either intentionally targeted on the basis of race, or that there is a disparate impact on the basis of race." *Cooper*, 2014 WL 2889993 at *3 (quoting *Hargraves*, 140 F. Supp. 2d at 20). In other words, like many discrimination claims, reverse redlining addresses harmful treatment on the basis of a protected status.[1] Here, Plaintiffs allege both that Walden expressly targeted Black and female students for

---

[1] Although the two-prong analysis in *Hargraves* is commonly used, other courts have articulated slightly different reverse redlining frameworks. *See, e.g.*, *M & T Mortg. Corp. v. White*, 736 F.

predatory enrollment practices in violation of Title VI and ECOA and that Walden's targeting of nontraditional students disproportionately subjected Black and female students to those same predatory practices in violation of ECOA. *See, e.g.*, Compl. ¶¶ 25–34, 128–179.

Reverse redlining is a well-established method of proving discrimination under federal civil rights statutes, one that "has been found cognizable as a claim in the federal courts." *Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300, 306 (E.D.N.Y., 2014) ("*Emigrant I*") (ECOA and Fair Housing Act ("FHA") claims). Courts have recognized reverse redlining under many federal antidiscrimination statutes, including those at issue here. *See, e.g.*, *Brook v. Sistema Universitario Ana G. Mendez, Inc.*, No. 17-CV-171-T-30AAS, 2017 WL 1743500, at *4 (M.D. Fla. 2017) (Title VI); *Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874, 885–88 (S.D. Ohio 2002) (ECOA); *see also Hargraves*, 140 F. Supp. 2d at 19–20 (FHA; 42 U.S.C. §§ 1981, 1982). The doctrine was first articulated in the mortgage context, but has been applied to higher education, auto loans, and other contexts. *See Brook*, 2017 WL 1743500 at *4 (education); *Cooper*, 2014 WL 2889993 at *3 (auto loans); *Horne v. Harbour Portfolio VI, LP*, 304 F. Supp. 3d 1332, 1339–42 (N.D. Ga. 2018) (rent-to-own). There is nothing particular about mortgage lending that constrains reverse redlining to that arena, and doing so would prevent the same discriminatory practices from being actionable when they occur in student lending—now the second largest category of household debt in the country.[2]

---

Supp. 2d 538, 575 (E.D.N.Y. 2010) (describing a reverse redlining claim as including "grossly unfavorable" treatment, as opposed to "predatory" practices). To the extent there are differences, they are semantic, not substantive—the inquiry ultimately turns on whether a protected group has been targeted for harmful treatment.

[2] *See Ctr. For Microeconomic Data, Fed. Reserve Bank of N.Y.*, Quarterly Report on Household Debt and Credit, at 3 (May 2021), https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/pdf/HHDC_2021Q1.pdf.

Construing either ECOA or Title VI to bar liability for reverse redlining outside limited circumstances—the extreme result that Defendants seek here, *see* Defs'. Br. at 18–19; *id.* at 22—would warp statutes designed to eradicate discrimination into laws that permit it so long as the practice at issue employs targeting instead of exclusion. *Brook*, 2017 WL 1743500 at *4 (quoting *Contract Buyers League v. F & F Inv.*, 300 F. Supp. 210, 216 (N.D. Ill. 1969)); *Franks v. Ross*, 293 F. Supp. 2d 599, 605–07 (E.D.N.C. 2003) (allowing Title VI claim to proceed based on targeting); *S. Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, 254 F. Supp. 2d 486, 497 (D.N.J. 2003) (same). None of the language, the purpose, or the application of ECOA or Title VI countenance this result, and the Court should decline Defendants' invitation to be the first to narrow reverse redlining doctrine in this manner.[3]

### 2. Plaintiffs Have Adequately Alleged That Defendants' DBA Practices Constitute Unlawful Reverse Redlining

Plaintiffs have adequately alleged that the DBA program is predatory, and that it is targeted in a discriminatory manner—both because it is intentionally targeted at students based on race and gender, and because the facially neutral policy of targeting nontraditional students disproportionately entraps Black and female students. Accordingly, Plaintiffs have stated claims for unlawful reverse redlining under Title VI (for Walden's intentional targeting based on race) and ECOA (both for Walden's intentional targeting based on race and gender and for its neutral

---

[3] The Court should likewise reject Defendants' baseless argument that Plaintiffs do not adequately allege reverse redlining because they do not claim that, once enrolled, Black and female students are treated worse than other students. Defs.' Br. at 19. Courts have repeatedly held that where a plaintiff "ha[s] sufficiently alleged intentional targeting" on the basis of a protected class, "they need not allege that they were treated differently than white [students]." *Horne*, 304 F.3d at 1342; *see also, e.g., Hargraves*, 140 F. Supp. 2d at 20; *Mejia v. EMC Mortg. Corp.*, No. CV 09-9701, 2011 WL 2470060, at *4 (C.D. Cal. June 16, 2011); *Ohio Civil Rights Comm'n v. Wells Fargo Bank, N.A.*, No. 11-CV-623, 2012 WL 1288489 at *6 (N.D Ohio Apr. 16, 2012).

targeting of nontraditional students that caused an adverse disparate impact based on race and gender).

###### a)      The DBA Program is Predatory

Plaintiffs allege that Defendants knowingly misrepresented the cost and required credits of the DBA degree, providing prospective students a price that was on average $34,300 lower than what it knew the true cost would be. Compl. ¶¶ 70–105. These false statements rendered Walden's enrollment practices predatory within the meaning of ECOA and Title VI. Courts determine whether a practice is predatory based on a fact-specific analysis of the practice's features and effects. Precedent confirms that inflating and hiding the true cost of a product is predatory. In *Barkley v. Olympia Mortgage Co.*, the court held that a loan product was predatory in large part because its terms were "based on a grossly inflated appraisal" of the properties. 2007 WL 2437810, at *15 (E.D.N.Y. 2007); *see also M & T Mortg. Corp.*, 736 F. Supp. 2d at 575 (jury should determine "whether and how the appraisals were grossly and fraudulently inflated"). Similarly, in *Cooper* the court found relevant "the high sale prices" of the defendant's car installment sale contracts, 2014 WL 2889993 at *3, and in *Hargraves* whether the loans at issue entailed "excessive fees," 140 F. Supp. 2d at 20–21.

Plaintiffs have alleged sufficient facts to establish that Defendants' DBA practices were predatory. Plaintiffs' allegations regarding Defendants' knowing misrepresentations about the necessary capstone credits and program costs are analogous to the inflated appraisals in *Barkley* and *M & T Mortgage*. Just as inflated appraisals in those cases reflected a deliberate effort to mislead consumers and extract greater profit, Defendants' purposeful lowballing of the cost and credits required to complete the DBA program was predatory because it lured students to enroll by masking the true price of the degree. The excess capstone credits, which cost DBA students tens of thousands of dollars in unanticipated tuition and fees, often paid for with loans, *see, e.g.*,

11

Compl. ¶¶ 24–25, 130, are comparable to the excessive fees and high prices that were deemed predatory in *Hargraves* and *Cooper*.

### b)      The DBA Program is Targeted in a Discriminatory Manner

Plaintiffs have likewise met the second element of a reverse redlining claim: discriminatory targeting. Discriminatory targeting in a reverse redlining claim can be demonstrated through intentional targeting based on protected class, or a facially neutral policy that disproportionately ensnares people within the protected class.[4] Plaintiffs have shown both.

### (1)      Defendants Intentionally Target Students Based on Race

Plaintiffs' Complaint presents detailed allegations that Walden intentionally targeted Black and female students for its predatory scheme. Compl. ¶¶ 52–55, 59, 69, 70–116, 128–165. Walden's protestations that Plaintiffs fail to allege intent to discriminate require a fundamental misunderstanding of Plaintiffs' claims. Plaintiffs do not allege that Walden adopted its DBA capstone program because Plaintiffs are Black. *Contra* Defs.' Br. at 16. Rather, Plaintiffs allege that Walden ran a program that was predatory and intentionally targeted Black and Female students for enrollment.

Plaintiffs' targeting allegations include that the vast majority of Walden's local advertising is in markets with higher-than-average Black populations, which courts have found to constitute intentional targeting. Compl. ¶¶ 140–148; *see also, e.g.*, *Emigrant I*, 50 F. Supp. 3d at 308–09 (intentional targeting satisfied by allegations that advertising was "targeted to

---

[4] Both intentional targeting and disparate impact are actionable under ECOA. *See* 12 C.F.R. § 1002.6(a) (codifying the "effects test" from *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) as applicable under ECOA); *see also Faulkner v. Glickman*, 172 F. Supp. 2d 732, 737 (D. Md. 2001) (discrimination under ECOA may be shown via "(1) direct evidence of discrimination; (2) disparate impact analysis; [or] (3) disparate treatment analysis"). Only intentional targeting is cognizable under Title VI. *See Alexander v. Sandoval*, 532 U.S. 275, 280, 293 (2001).

locations with significant or predominantly Black and Latino populations by design"); *Cooper*, 2014 WL 2889993 at *3 (locating dealerships in areas where majority of residents were African American constituted intentional targeting); *Hargraves*, 140 F. Supp. 2d at 21 (offices located in African American neighborhoods were evidence of targeting). Plaintiffs also allege that Walden targets prospective Black and female DBA students by featuring Black and female models and using language targeting Black and female students in its advertisements. Compl. ¶¶ 149–151, 161–64. *See, e.g. Saint-Jean v. Emigrant Mortg. Co*., 337 F. Supp. 3d 186, 196–97 (E.D.N.Y. 2018) (targeting evidence included that the vast majority of human images in advertisements were Black or Latino individuals); *Hargraves*, 140 F. Supp. 2d at 21–22 (targeted advertising satisfied targeting element of reverse redlining); *Montgomery Cty. v. Bank of Am. Corp.,* 421 F. Supp. 3d 170, 184 (D. Md. 2019) (denying motion to dismiss where complaint included allegations of targeted marketing practices). Walden tacitly concedes Plaintiffs' allegations: "Plaintiffs . . . argu[e] that Walden's effort to educate diverse and under-represented communities somehow equates to discrimination." Defs.' Br. at 1; *see also id.* at 16.

### (2)   Defendants' Targeting of Nontraditional Students Has a Disparate Impact Based on Race and Gender

In addition to intentional targeting, Plaintiffs allege that Walden employed a facially neutral practice—targeting "nontraditional" doctoral students—which had a disparate impact on Black people and women. These allegations independently satisfy the discriminatory targeting element of reverse redlining under ECOA[5]—indeed, Defendants do not argue otherwise, outside of their general argument that ECOA as a whole is not applicable. *See* Defs.' Br. at 22.

---

[5] Reverse redlining claims under ECOA can be established using either intentional discrimination or disparate impact theories of liability. *See e.g., Hargraves*, 140 F. Supp. 2d at 21 (holding that plaintiffs successfully stated reverse redlining claims under both intentional and disparate impact theories); *Horne*, 304 F. Supp. 3d at 1342 (same); *see also Mayor & City*

To establish a disparate impact claim under ECOA, a plaintiff must "identify a specific policy or practice . . . and must also demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group." *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006) (quotations omitted); *see also Bowman v. Bank of Am. N.A.*, No. 13-CV-3436, 2016 WL 8943266, at *10 (D.S.C. June 16, 2016), *aff'd sub nom. Bowman v. Bank of Am. NA*, 676 F. App'x 216 (4th Cir. 2017) (ECOA disparate impact plaintiff must "show that [a] facially neutral practice had a significantly discriminatory impact" (cleaned up)).[6]

Here, Plaintiffs identify a facially neutral policy: that of targeting "nontraditional" students. *See supra* at 6. Compared to traditional doctoral students, nontraditional doctoral students are significantly more likely to be Black or female. *Id.* Walden's facially neutral policy of targeting nontraditional students thus disproportionately subjected Black and female students to the predatory practices identified above, constituting reverse redlining.

### 3.    Defendants' Predatory Practices Were Part of a Credit Transaction and Are Therefore Covered by ECOA

Defendants assert that Plaintiffs' allegations of discrimination are "wholly untethered" from a credit transaction because Plaintiffs' claim, they say, is that the protracted capstone process discriminated against Black and female DBA students, and a dissertation is not credit.[7]

---

*Council of Baltimore v. Wells Fargo Bank, N.A.*, 631 F. Supp. 2d 702, 704 (D. Md. 2009) (allowing FHA reverse redlining claim to proceed to discovery under both theories of liability).

[6] Defendants quote *Powell v. Am. Gen. Fin., Inc.* for the proposition that, to state a disparate impact ECOA claim, "plaintiffs must allege that they were 'qualified for the loan [they] requested, and that the lender declined the loan and showed a preference for a non-protected individual.'" Defs.' Br. at 22 (quoting 310 F. Supp. 2d 481, 487 (N.D.N.Y. 2004)). This is the standard *Powell* identifies for a *disparate treatment* ECOA claim. *Powell*'s standard for a disparate impact ECOA claim accords with Plaintiffs' recitation of the law. *Id.*, at 487.

[7] Defendants do not dispute that student loans are credit under ECOA, nor that Walden is a creditor. They argue only that Plaintiffs did "not allege any discrimination in connection with a credit transaction as is required under the statute." Defs.' Br. at 19. There is no question that Walden does qualify as a creditor. *See* 12 C.F.R. § 1002.2(l) (for the purposes of ECOA's

Defs.' Br. at 3, 21. That is not Plaintiffs' claim. Plaintiffs' allegation is that Walden targeted

Black and female students with a predatory scheme centered on its blatant misrepresentations

regarding the cost of the DBA degree, which a large percentage of students paid by taking out

loans facilitated by Walden. Few actions could have larger effects on a credit transaction than

hiding the true cost of the product for which debt is being incurred. By targeting Black and

female prospective students for this predatory scheme, Walden discriminated "with respect to . . .

a credit transaction." 15 U.S.C. § 1691(a).

That a credit transaction necessarily includes the price of the product for which debt is

being incurred is supported by regulation, case law, and common sense. The term "credit

transaction" is broadly defined by ECOA's implementing regulation to include "every aspect of

an applicant's dealings with a creditor regarding an application for credit or an existing extension

of credit (including . . . terms of credit . . . )." 12 C.F.R. § 202.2(m). As one court in this circuit

explained, the phrase "terms of credit" encompasses all "provisions that determine the nature and

scope of an agreement regarding the right granted by a creditor to an applicant to . . . incur debt

and defer its payment, or purchase property or services and defer payment therefor." *Cross v.

Prospect Mortg., LLC*, 986 F. Supp. 2d 688, 694 (E.D. Va. 2013); *see also id.* ("Simply put,

anything that materially affects the lender or borrower's decision to enter into a particular loan

agreement is a term of that loan."). Walden's misrepresentations fit naturally into this

framework. The cost of a DBA degree—the amount of principal students agree to borrow in

exchange for completing the program—is a term of credit integral to the credit transaction

---

antidiscrimination provisions, the term creditor "includes a person who, in the ordinary course of
business, regularly refers applicants or prospective applicants to creditors"); *see also* Compl.
¶¶ 184–186, 188–189 (alleging that Walden regularly refers students and prospective students for
student loans, and facilitates and participates in the extension of credit).

between Walden and its students. One struggles to imagine a provision that has a greater impact on the "nature and scope" of a credit transaction, or that has a greater material effect on a borrower's decision to enter into a loan agreement, than the amount she needs to borrow.[8]

Courts agree that unfair and predatory practices relating to the cost of the product or the amount of debt incurred are grounds for a reverse redlining ECOA claim. In *Cooper*, a court in this circuit held that the plaintiffs stated a reverse redlining claim based on predatory installment loan terms, including inflated sales prices. 2014 WL 2889993, at *3; *see also Jackson v. Novastar Mortg. Inc.*, 645 F. Supp. 2d 636, 640, 647 (W.D. Tenn. 2007) (plaintiff stated a reverse redlining ECOA claim based on predatory loan terms that included an inflated loan amount); *Matthews*, 185 F. Supp. 2d at 878, 887–88 (plaintiff who thought she was financing $17,325 but was issued a loan for $49,000 stated a reverse redlining ECOA claim). Courts have also held more generally that ECOA applies to disputes over loan balance and price. *See, e.g.*, *Martinez Garcia v. Mega Auto Outlet*, No. 20-CV-945, 2021 WL 1015816, at *3, *5 (E.D. Va. Feb. 23, 2021), *report and recommendation adopted*, No. 20-CV-0945, 2021 WL 982630 (E.D. Va. Mar. 16, 2021) (finding that the price of the car for which debt was incurred was a term of credit under ECOA); *Hamilton v. O'Connor Chevrolet, Inc.,* No. 02-CV-1897, 2004 WL

---

[8] Even worse, the extra time students needed to complete the additional required credits meant that students accrued more interest than they should have—a key component of the credit transaction. Students are generally not obligated to make payments while they are in school and for a six-month grace period thereafter. 34 C.F.R. § 685.207(c)(1). However, student borrowers are responsible for the interest that accrues on Direct Unsubsidized loans during this time, and interest begins to accrue on the day the first installment is disbursed from the Department of Education to Walden. *Id.* § 685.207(c)(3). Thus, the misrepresentations about the number of credits required to complete the program had a material impact not just on the amount of the loans extended to cover tuition, but also on the amount of deferred interest capitalized when the loans entered repayment.

1403711, at *7–8 (N.D. Ill. June 23, 2004) (allowing an ECOA claim to proceed where the plaintiff alleged that a car dealership quoted her a lower trade-in price because of her race).

Plaintiffs' allegations accord with this case law. The amount prospective students had to borrow to complete the DBA program delineates the "nature and scope" of the credit transaction between them and Walden. *See Cross*, 986 F. Supp. 2d at 694. By targeting Black and female prospective students for a predatory scheme centered on misrepresenting the true cost of the DBA program, Walden discriminated on the basis of race and sex with respect to a credit transaction in violation of 15 U.S.C. § 1691(a)(1).[9]

Defendants' cases do not say otherwise.[10] Defendants rely primarily on *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006) and *Love v. Johanns*, 439 F.3d 723 (D.C. Cir. 2006). They call these cases "particularly instructive," Defs.' Br. at 20, but in actuality they are a distraction. In *Garcia* and *Love*, groups of farmers sued the USDA over farm lending programs. In each case, the Plaintiffs separately advanced two ECOA claims: one claiming discrimination in the origination, terms, and servicing of USDA loans, and a second claiming that the USDA

---

[9] Although Defendants make much of the fact that not all Plaintiffs took out loans (and therefore not all have brought claims under ECOA), *see* Defs.' Br. at 21, this is of no moment. For students who pay with loans, the price is a term of a credit transaction such that discrimination therein violates ECOA. For those who pay directly, the price is not part of a credit transaction. It is unremarkable that Walden's misrepresentations about the cost of the DBA program simultaneously support ECOA claims for students who incurred debt to complete the program and Title VI claims for Black students "irrespective of how [they] paid for their tuition." *Id.*

[10] Although Defendants do not cite it—probably because it undermines their arguments with regards to Title VI as explained below, infra at 19—Plaintiffs are aware of just one case addressing the application of ECOA reverse redlining claims in the educational context, *Brook v. Sistema Universitario Ana G. Mendez, Inc.* The court in *Brook* dismissed the plaintiff's ECOA claims while permitting the Title VI claims to move forward, but for reasons that are inapplicable here. 2017 WL 1743500, at *3. There, the plaintiff's allegations were solely focused on educational quality factors unrelated to the terms of the loans the plaintiff obtained—namely that the defendant sold a "worthless" degree. *Id.* at *1. Here, in contrast, Plaintiffs allege predatory practices directly related to a key term of the loan as described above.

failed to investigate complaints of discrimination filed with the agency. *See Love*, 439 F.3d at 725; *see also Garcia*, 444 F.3d at 629–30. In both cases, the D.C. Circuit affirmed the dismissal of Plaintiffs' failure to investigate claim because "the failure to investigate a discrimination complaint is not a 'credit transaction.'" *Garcia*, 444 F.3d at 637; *see also Love* 439 F.3d at 732. The claims alleging discrimination in the terms of loans did not raise this concern. *Love* 439 F.3d at 733 (affirming trial court's order dismissing only plaintiffs' failure to investigate claim and not their discrimination claim); *Garcia*, 444 F.3d at 636–37 (same). This distinction is unhelpful to Defendants, as Plaintiffs' claims concern the terms of a credit transaction, not a failure to investigate credit discrimination. *Garcia* and *Love* are therefore irrelevant.[11]

### 4.    Reverse Redlining Violates Title VI

Walden's argument for dismissing Plaintiffs' Title VI claim, misconstrues both Plaintiffs' claims and the applicable legal framework. Reverse redlining is a cognizable theory of discrimination under Title VI, using traditional standards of proof under the statute. Properly understood, Plaintiffs' claim for intentional discrimination under Title VI must survive.

### a)    Application of Reverse Redlining Under Title VI is not Novel

There is no reason for reverse redlining claims to operate differently under Title VI than under ECOA or other civil rights statutes. The deliberate exploitation of a community on the basis of race constitutes unlawful discrimination. Even before the term "reverse redlining" was coined, courts understood discrimination this way. *See Clark v. Universal Builders, Inc.*, 501 F.2d 324, 330 (7th Cir. 1974) (rejecting notion that discrimination does not encompass race-

---

[11] *Capitol Indemnity Corp. v. Aulakh*, 313 F.3d 200 (4th Cir. 2002), is similarly inapposite. It held that a surety agreement was not a credit transaction because it did not entitle the guarantee to defer payment of an obligation to the guarantor. *Id.* at 203. The credit transactions between Walden and its students did entitle students to defer payment of the inflated cost of the DBA program, so *Capitol Indemnity* does not apply to their claims.

18

based exploitation unless defendants also offered whites more favorable terms and prices);

*Contract Buyers League*, 300 F. Supp. at 216 (same).

Plaintiffs are not aware of any court that has held that reverse redlining is not actionable under Title VI. Defendants engage in a clever sleight-of-hand when they state that they are "aware of no decisions in this District—nor in any Circuit Court of Appeals" that have recognized reverse redlining in the educational context. Defs.' Br. at 19. This notably does not include district courts outside this circuit and therefore conveniently fails to mention that the *only* court to have considered this issue held that reverse redlining is cognizable under Title VI.

In that case, *Brook v. Sistema Universitario Ana G. Mendez, Inc.*, the court held that allegations that a for-profit university intentionally targeted Latino students "for a 'sham' educational program" stated a claim under Title VI, noting that it saw "no reason why Plaintiff cannot pursue her Title VI claim using a theory akin to reverse redlining." 2017 WL 1743500 at *3–4. "[T]he combination of the targeted advertising *and* the allegedly "'sham' educational program . . . allows the Court to infer intentional discrimination." *Id.* at *4 (emphasis in original). The plaintiff in *Brook*, like Plaintiffs here, alleged that the student population was disproportionately from the targeted group, and alleged "facts sufficient to indicate that this disproportionality is due to intentional targeting," including that the university had stated that Latinos were its target market, strategically operated in cities with a large Latino advertising market, and used social media to target prospective Latino students. *Id.* at *3. In affirming the plaintiff's claims, the court rejected the argument that the plaintiff would need to show that she had been treated differently than a similarly situated non-Latino student. *Id*.

Although admittedly there is not a surfeit of cases addressing this issue, it is the *rejection* of a reverse redlining framework under Title VI that would be novel, not its application. This

Court should follow the one court that has considered the issue and permit Plaintiffs' reverse redlining claims under Title VI to move forward.

> **b)**   **Reverse Redlining Doctrine is Consistent with Longstanding Interpretation of Intent Requirements Under Title VI**

Sidelining reverse redlining doctrine, Defendants purport to apply traditional Title VI intent standards. But Defendants' understanding of what is required to prove a Title VI discrimination claim is far too narrow and does not accord with well-established case law. Walden urges this Court to dismiss Plaintiffs' Title VI claim because they did not allege that "similarly situated students outside of their protected Title VI class were treated more favorably," *i.e.*, that white students are getting a better deal than Black students once they are enrolled in the DBA program. Defs.' Br. at 16–17 (cleaned up). But this is not required.[12] Plaintiffs' allegations of intent fit squarely within traditional Title VI standards.

The deliberate exploitation of a community on the basis of race constitutes unlawful discrimination whether or not there is a better-treated similarly situated comparator. This is well understood to be the case across anti-discrimination laws, including Title VI. For example, in *Banks v. McIntosh Cty.*, the plaintiffs alleged that by depriving Sapelo Island—a barrier island off the coast of Georgia with a majority-Black population—of basic municipal services, McIntosh County was discriminating against Sapelo's residents. 530 F. Supp. 3d 1335, 1344 (S.D. Ga. 2021). The court denied defendant's motion for summary judgment, rejecting the argument that plaintiffs' claims failed because they could not point to a similarly situated barrier island that received better municipal services. *Id.* at 1367–69. The court held that a comparator is

---

[12] Walden further misses the point by focusing on how Black and white students are treated once enrolled, thereby picking up the story too late. *See* Defs.' Br. at 16–17. The proper focus of Walden's discriminatory conduct is its targeting of Black DBA candidates to induce them to enroll in a predatory program built around an artificially low representation of cost, knowing full well it will cost them tens of thousands of dollars more.

not required: a Title VI plaintiff need only present evidence, no matter its form, that raises a reasonable inference of discrimination. *Id.* at 1369 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011)).

Courts consistently hold that a similarly situated comparator is not a precondition to surviving a motion to dismiss in a Title VI case. *See, e.g.*, *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1124–25 (N.D. Cal. 2018) ("Our cases clearly establish that plaintiffs . . . need not demonstrate the existence of a similarly situated entity who or which was treated better than the plaintiffs in order to prevail." (cleaned up)); *Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 2d 749, 758 (E.D. Pa. 2011) ("Comparative evidence is just one manner in which a plaintiff can satisfy the prima facie requirement . . . giving rise to an inference of discrimination."); *Almendares v. Palmer*, 284 F. Supp. 2d 799, 805 (N.D. Ohio 2003) (rejecting theory that claim of intentional discrimination required showing that plaintiffs were "treated differently than similarly-situated individuals" because that "is not an accurate statement of the law") (cleaned up); *Sirpal v. Univ. of Miami*, 684 F. Supp. 2d 1349, 1358–59 (S.D. Fla. 2010) (presence of comparators can be irrelevant under different theories of discrimination).[13]

This is further confirmed by the cases cited by Walden, none of which hold that allegations of similarly situated comparators are the only way to prove a Title VI discrimination case. For example, in *Forde v. Empire State Coll.*, the court noted that a plaintiff "need not specifically plead every element of a prima facie case to survive a motion to dismiss," and cited

---

[13] Defendants imply that the similarly situated prong is uniquely required in the educational institution context. Defs.' Br. at 16–18. None of the cases cited by Defendants support this. In fact, *Sawyer* and *Brewer* are both explicit that the standard is taken directly from Title VII employment discrimination cases. *Sawyer v. Columbia Coll.*, 864 F. Supp. 2d 709, 720 (N.D. Ill. 2012) (same burden-shifting framework governing liability under Title VII applies to Title VI claims); *Brewer v. Bd. of Trustees of Univ. of IL*, 479 F.3d 908, 921 (7th Cir. 2007) (same).

to other cases holding that similarly situated comparators are only one way to prove

discrimination. No. 10 CIV. 9446, 2011 WL 4376499, at *2 (S.D.N.Y. Sept. 19, 2011) (citing

*Maya v. Bronx Community College*, No. 09 CIV 3605, 2011 WL 2732519, at *3 (S.D.N.Y. Jul.

6, 2011); *Koumantaros v. City of New York*, No. 03 CIV 10170, 2007 WL 840115, at *8

(S.D.N.Y. Mar. 19, 2007)).[14] Plaintiffs' evidence of discriminatory targeting is no different than

any case alleging direct or indirect evidence of discrimination where the plaintiffs' evidence does

not rely on a similarly situated comparator. The question is simply whether there are sufficient

allegations to make out a claim of intentional discrimination under Title VI. Plaintiffs' detailed

factual allegations regarding the marketing practices of Walden—which must be accepted as true

at the Rule 12(b)(6) stage—present sufficient direct and circumstantial evidence from which a

jury could infer intentional discrimination.

Defendants take their comparator argument one step further, maintaining that even if they

explicitly targeted their fraudulently priced DBA program to Black students, the fact that white

students also suffered requires dismissal of Plaintiffs' claims. This is directly contradicted by

Title VI cases holding that plaintiffs stated claims of intentional discrimination when defendants

---

[14] Defendants' additional cases merely support the proposition that Title VI requires allegations
of intentional discrimination, which Plaintiffs do not dispute and have amply satisfied. *See supra*
at 5–6. In these cases, plaintiffs either did not include any specific allegations regarding
intentional discrimination, only included conclusory statements regarding race, or included in
their complaints documents that disproved race as a reason for the defendants' actions. *See Pers.
Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 278–79 (1979) (no allegations regarding
intent); *Hodge v. Coll. of S. Maryland*, 121 F. Supp. 3d 486, 502 (D. Md. 2015) (conclusory
assertions without support); *Evans v. 7520 Surratts Rd. Operations, LLC*, No. 21-CV-01637,
2021 WL 5326463, at *4 (D. Md. Nov. 16, 2021) (same); *Muthukumar Nachiappan Subbiah v.
The Univ. of Tex. at Dallas*, No. 10-CV-115-B, 2011 WL 1771806, at *6 (N.D. Tex. May 10,
2011) (same); *Gwanjun Kim v. Grand Valley State Univ.*, No. 11-CV-233, 2012 WL 1033985, at
*8 (W.D. Mich. Feb. 2, 2012) (evidence disproving race as motivating factor included in
complaint); *Kwiatkowski v. Polish & Slavic Fed. Credit Union*, No. 11-CV-3947, 2011 WL
6225390, at *4 (E.D.N.Y. Dec. 12, 2011) (same).

targeted neighborhoods with disproportionately minority populations for adverse actions, even though individuals outside the protected class suffered identical harms. *See, e.g.*, *Franks*, 293 F. Supp. 2d at 605–07 (allegations that plaintiffs were subject to intentional discrimination when the defendant funded and approved a landfill situated in "largely African-American communities"); *S. Camden Citizens in Action*, 254 F. Supp. 2d at 497 (allegations that defendants intentionally discriminated by granting permits to industrial plants in "predominantly minority community"); *Banks*, 530 F. Supp. 3d at 1345 (allegations that that Sapelo Island is deprived of municipal services on the basis of the race of its residents, the majority of whom (but not all) are Black); *see also supra* at n.3 (reverse redlining cases acknowledging that whites can get caught up in a predatory scheme targeted at African Americans). A defendant's discriminatory targeting need not have perfect precision to be unlawful.

Although they do not reference it by name, it appears that Defendants have pulled the concept of a similarly situated comparator analysis from the final prong of *McDonnell Douglas's* burden-shifting framework—and attempted to wedge all of Title VI law inside. *See* Defs.' Br. at 16-18. This argument fails for several reasons. First, *McDonnell Douglas* sets out one method of establishing a *prima facie* case of discrimination. But even in cases that ultimately rely on the *McDonnell Douglas* framework, the *McDonnell Douglas* elements need not be pled in a complaint. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002); *Holloway v. Maryland*, — F.4th —, 2022 WL 1207165, at *3 (4th Cir. Apr. 25, 2022). Without doubt, it would be improper to dismiss a claim for failing to allege something that need not even be pled.

Beyond that, however, *McDonnell Douglas* is just one of the options available to a plaintiff to establish discrimination. Where there is direct evidence of discriminatory motive—as alleged here—the *McDonnell Douglas* method of supporting an inference of discrimination does

not come into play. *See, e.g.*, *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004), *overruled on other grounds*, *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009); *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1112–13 (4th Cir. 1981); *Saqr v. Univ. of Cincinnati*, No. 18-CV-542, 2019 WL 699347, at *13 (S.D. Ohio Feb. 20, 2019). As the Court explained in *Swierkiewicz*, "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a [*McDonnell Douglas*] prima facie case." *Swierkiewicz*, 534 U.S. at 511.

Even in cases that rely on indirect evidence of discrimination, the *McDonnell Douglas* framework provides *just one* way to support a discrimination claim. The law is clear that plaintiffs may allege (and prove) discrimination through a variety of different means, so long as they plead facts that could give rise to an inference of intentional discrimination. *See, e.g.*, *Banks*, 530 F. Supp. 3d at 1368–69; *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, No. 10-CV-00007, 2011 WL 285694, at *13 (W.D. Va. Jan. 27, 2011) (plaintiff may proceed with "(1) direct evidence of intentional discrimination, or (2) the 'ordinary principles of proof using any direct or indirect evidence relevant . . . and sufficiently probative'" (quoting *Diamond v. Bea Maurer, Inc.*, 128 F. App'x 968, 971 (4th Cir. 2005)); *Pace v. Hurst Boilers & Welding Co.*, No. 10-CV-116, 2011 WL 4915493, at *3 (M.D. Ga. Oct. 17, 2011) ("A prima facie claim of discrimination can be established through direct evidence, circumstantial evidence, or statistical proof."). Plaintiffs have alleged ample evidence of discriminatory targeting, and under this framework no comparator allegations are required.

**B.      Plaintiffs Have Adequately Pled State-Law Claims Over Which This Court Has Jurisdiction**

Contrary to Defendants' arguments, the Court has subject matter jurisdiction over Plaintiffs' state-law claims[15] and can properly apply Minnesota law. Plaintiffs' allegations also satisfy the pleading standard for fraud claims and satisfy Minnesota's public benefit requirement.

**1.      The Court Has Jurisdiction Over Plaintiffs' State-Law Claims**

Defendants premise their challenge to the Court's subject-matter jurisdiction on the erroneous assumption that Plaintiffs' federal claims will be dismissed, leaving the Court with discretion to decline supplemental jurisdiction over the remaining claims. For the reasons explained above, that assumption is misplaced. Regardless, diversity jurisdiction provides the Court with an independent basis to adjudicate Plaintiffs' state-law claims because the parties are diverse and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332.

There is no dispute the parties are diverse within the meaning of Section 1332(a)(1). *See* Compl. ¶¶ 35–39 (identifying Plaintiffs as residents of North Carolina, Louisiana, and Virginia and Defendants as Delaware and Florida companies, both with their principal place of business in Maryland). Nor is there reason to doubt that Plaintiffs' state-law damages will exceed the $75,000 threshold. Plaintiffs' state-law claims entitle them to economic damages (including excess tuition/fees and any interest paid on loans obtained to cover the costs of the excess capstone credits), non-economic damages (including emotional distress damages), and punitive damages. *See, e.g.*, *Special Force Ministries v. WCCO Television*, 584 N.W.2d 789, 794 (Minn. App. 1998) (allowing claims for emotional distress and humiliation to proceed to trial on fraud

---

[15] Specifically, Plaintiffs bring state-law claims under the Minnesota Prevention of Consumer Fraud Act ("MPCFA"), Minn. Stat. § 325F.68 *et seq.*; the Minnesota False Statements in Advertising Act ("MFSAA"), Minn. Stat. § 325F.67; the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA"), Minn. Stat. § 325D.43 *et seq.*; and common law fraudulent misrepresentation.

claim); *Sullivan v. Ouimet*, 377 N.W.2d 24, 27 (Minn. App. 1985) (affirming punitive damages for fraud claim). Plaintiffs seek all these categories of damages, and all count toward the jurisdictional threshold. *See, e.g.*, *Joy Family Ltd. P'ship v. United Financial Banking Cos., Inc.*, Civ. No. 12-3741, 2013 WL 4647321, at *9 (D. Md. Aug. 28, 2013) (Hollander, J.) ("It is well established that punitive damages may be aggregated with other damages to satisfy the amount-in-controversy requirement." (quotation omitted)); *Campbell v. Restaurants First/Neighborhood Restaurant, Inc.*, 303 F. Supp. 2d 797, 799 (S.D.W. Va. 2004) (same for "pain and suffering and future damages"). When the full array of state-law damages is considered, each Plaintiff surpasses the $75,000 threshold. Accordingly, the Court has both supplemental and diversity jurisdiction.

## 2.    Minnesota Law Governs Plaintiffs' State-Law Claims

Defendants next attempt to avoid Plaintiffs' state-law claims by challenging their invocation of Minnesota law. As a preliminary matter, Defendants have not demonstrated that a choice-of-law analysis is appropriate in this case. *See Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013) (recognizing that "choice of law analysis becomes necessary only if the relevant laws of the different states lead to different outcomes" (cleaned up)). Nor have Defendants explained why the court should engage in the choice-of-law analysis now—courts routinely take up this fact-intensive inquiry after discovery. *Fidelity & Guar. Life Ins. Co. v. United Advisory Grp., Inc.*, Civ. No. 13-0040, 2014 WL 346630, at *4 (D. Md. Jan. 29, 2014) (collecting cases). Deferring the choice-of-law analysis is particularly appropriate in this case, where the outcome may turn on factual evidence about Defendants' centralized scheme. *Paragon Syst., Inc. v. Hughes*, Civ. No. 20-1209, 2020 WL 6292728, at *3 (D. Md. Oct. 27, 2020) ("[T] various choice of law issues . . . which will turn on where any tort wrong occurred, will be better addressed after discovery has occurred and the relevant facts are more

easily ascertained."). The Court can apply Minnesota law to resolve the instant motion and defer final determination of the choice-of-law issues. *See Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP*, 394 F. Supp. 2d 762, 768 n.2 (M.D.N.C. 2005).

Even if Defendants were able to show that a choice-of-law analysis is appropriate at this time, Maryland's choice-of-law rules support the application of Minnesota law. Maryland courts generally apply the law of the place where the wrong occurs, but have expressly noted the complexity of determining "where the 'wrong' occurs in cases of pecuniary injury resulting from fraud, negligent misrepresentation or commercial negligence, when the alleged wrongful act or omission occurred in one jurisdiction and the 'loss' by plaintiff in another jurisdiction." *Cremi v. Brown*, 955 F. Supp. 499, 522 (D. Md. 1997), *aff'd, Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017 (4th Cir. 1997). In cases like this one, where Defendants' Minnesota-based scheme injured students in multiple jurisdictions, the Court may properly apply the law of the place where the wrongful conduct occurred—here, Minnesota. *Dell v. DeTar*, Civ. No. 16-00887, 2017 WL 3835679 at *4 (D. Md. Aug. 31, 2017). The cases that Defendants cite support this conclusion. *See, e.g.*, *Wells v. Liddy*, 186 F.3d 505, 521–22 (4th Cir. 1999) (applying law of state where defamatory speech was made, not where the victim felt the harm); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510–11 (4th Cir. 1986) (noting that even though harm was felt in Maryland it was possible that Connecticut law applied and permitting amendment to add Connecticut claim). Accordingly, Plaintiffs correctly assert claims under Minnesota law.

Moreover, it is proper to apply Minnesota law extraterritorially here. Defendants wrongly treat a mere presumption against extraterritorial application as a total bar. *See* Defs.' Br. at 28–29. Presumption notwithstanding, courts apply the Minnesota statutes at issue to non-residents when a fraudulent scheme perpetrated in Minnesota affects out-of-state victims, as Plaintiffs

27

allege here. *See, e.g.*, *Mooney v. Allianz Life Ins. Co. of N. Am.*, 244 F.R.D. 531, 537 (D. Minn. 2007) (holding that the MPCFA and Minnesota common law applied to out-of-state class members who alleged they were misled by fraudulent marketing materials prepared by a Minnesota corporation in Minnesota); *Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004, 1009, 1019 (D. Minn. 2012) (applying MCFA and MFSAA to a nationwide class with representatives in California and Florida). Like *Mooney* and *Khoday*, extraterritorial application is appropriate in this case because Minnesota is the locus of Defendants' misconduct, *see* Compl. ¶¶ 60, 74, 117, and because Plaintiffs reasonably expected Minnesota law to apply, *see id.* ¶¶ 48–49, 236.[16]

### 3. Plaintiffs' Fraud Claims are Pled with Specificity

Plaintiffs agree that their state-law claims require them to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also* Defs.' Br. at 24. They have done so. Rule 9(b) does not require that a complaint be "suffused with every minute detail of a misrepresentation" and it "need not state the exact particular of every alleged instance of fraud in order to pass muster." *Carlson v. A.L.S. Enters., Inc.*, Civ. No. 07-3970, 2008 WL 185710 *3 (D. Minn. Jan. 18, 2008) (cleaned up). Rather, the purpose of Rule 9(b) "is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud." *Commercial Prop. Inv., Inc. v. Quality Ins. Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995).

Plaintiffs' allegations far exceed these standards. The misleading contents of Walden's website at different points in time are set forth in precise detail, with screenshots. *See* Compl.

---

[16] The cases on which Defendants rely involved far more attenuated ties to Minnesota and are therefore inapposite. *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 962 (D. Minn. 2020), *aff'd*, 9 F.4th 981 (8th Cir. 2021) (plaintiffs' expectation that Minnesota law would apply was based on the defendant's address and phone number in user manual); *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1232 (D. Kan. 2015) ("Plaintiffs have not specifically alleged that Syngenta Seeds engaged in any specific conduct from Minnesota on which these statutory claims are based.").

¶¶ 78–93. This is easily distinguishable from the circumstances in Defendants' lead case, *Hall v. Capella Univ.*, where the plaintiff could not "specifically identify *any* false representation." Civ. No. 18-27, 2018 WL 3429934 at *2 (D. Minn. Jul. 16, 2018) (emphasis added). Here, each Named Plaintiff alleges sufficient detail about when they investigated the program for Walden to confirm what its website said during the relevant period. *See* Compl. ¶¶ 194–196 (Plaintiff Carroll); *id.* ¶¶ 212, 215–217 (Plaintiff Charles); *id.* ¶¶ 232, 234 (Plaintiff Fair). They are "not required to plead the exact dates on which misrepresentations were made." *McGregor v. Uponer, Inc.*, Civ. No. 09-1136, 2010 WL 55985 at *4 (D. Minn. Jan. 4, 2010); *see also Solvay Pharms., Inc. v. Global Pharms.*, 298 F. Supp. 2d 880, 885–86 (D. Minn. Sept. 24, 2004) (allegation that defendants had been marketing their products on an ongoing basis for the past "several years" was sufficient). Nor do they fall short of 9(b) for not remembering the names of the enrollment advisors they spoke to over the phone. *See Maher v. Sempris*, LLC, Civ. No. 13-2202, 2014 WL 4749186 at *3 (D. Minn. 2014); *see also Odom v. Microsoft Corp.*, 486 F.3d 541, 554-55 (9th Cir. 2007) *(en banc)* (where the full consequences of transaction are realized months later, "it is unrealistic to expect that the retail customer would remember the name" of employee). Rule 9(b) thus provides no basis to dismiss the state-law claims.

### a. Counts III, IV, and V Serve a "Public Benefit" and Are Therefore Actionable Under Minnesota's Private Attorney General Statute

Defendants next attempt to challenge Plaintiffs' satisfaction of the "public benefit" requirement applicable to certain Minnesota statutory claims.[17] While these claims must serve a public benefit, *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000), the statutes are "remedial and

---

[17] Notably, this requirement applies only to claims made actionable under Minnesota's private attorney general statute, Minn. Stat. Ann. § 8.31, subdiv. 3a—here, Plaintiffs' MPCFA and MFSAA claims and their MUDTPA claim for damages, *see infra* 32–33. It provides no basis to dismiss common law fraudulent misrepresentation claims or a MUDTPA claim for injunctive relief.

should be liberally construed in favor of protecting consumers," *id.* at 308.[18] Generally, courts examine four factors: "the degree to which the defendants' alleged misrepresentations affected the public; the form of the alleged misrepresentation; the kind of relief sought; and whether the alleged misrepresentations are ongoing." *Khoday*, 858 F. Supp. 2d at 1017.

The first two factors strongly weigh in favor of finding a public benefit here. In *Ly,* the case establishing the public benefit rule, the court explained that the rule's purpose was to prevent cases where a plaintiff was "defrauded in a single one-on-one transaction in which the fraudulent misrepresentation, while evincing reprehensible conduct, was made only to [plaintiff]." *Ly,* 615 N.W.2d at 314. Fundamentally, "misleading advertising to the general public supports a finding that a claim benefits the public." *Summit Recovery, LLC v. Credit Card Reseller, LLC*, Civ. No. 08-5273, 2010 WL 1427322 at *5 (D. Minn. Apr. 9, 2010); *see also Collins v. Minn. Sch. of Bus., Inc.*, 655 N.W.2d 320, 330 (Minn. 2003) (finding public benefit because defendant made "misrepresentations to the public at large" via deceptive TV ads and sales presentations); *Khoday*, 858 F. Supp. 2d at 1017 (same, due to "size of the audience that Digital River targeted"); *Klinge v. Gem Shopping Network, Inc*., No. 12-CV-2392, 2014 WL 7409580 at *3 (D. Minn. Dec. 31, 2014) (same, where single plaintiff relied on misrepresentations made to "public at large.").

Plaintiffs' claims are nearly identical to those the Minnesota Supreme Court considered in *Collins*: Defendants offered their academic programs to the public, advertised to the public, and enrolled thousands based on their misrepresentations—on an even wider basis and longer duration than in *Collins*. 655 N.W.2d at 330. That Walden's pervasive public misrepresentations

---

[18] MPCFA case law also applies to other claims made actionable under Minn. Stat. Ann. § 8.31, subdiv. 3a. *See Ly,* 615 N.W.2d at 313; *Khoday*, 858 F. Supp. 2d at 1016.

significantly affected the public is further supported by the fact that Walden's scheme relied on the ability of prospective students to borrow the cost of the program from federal student loan funds, thereby putting the public on the hook for its fraud. Compl. ¶ 191.

There is no apparent consensus about the weight to give the final two factors—the type of relief sought and the ongoing nature of the misrepresentations—but injunctive relief and ongoing misrepresentations are not absolute requirements to find a public benefit. The Minnesota Supreme Court in *Collins*, for example, anchored its analysis on the degree and form of the deceptive advertisements, finding a public benefit in the absence of a pending request for injunctive relief. *Collins*, 655 N.W. 2d at 330*; see also In re Nat'l Arb. F. Trade Pracs. Litig.,* 704 F. Supp. 2d 832, 835, 839 (D. Minn. 2010) (claim for damages had a public benefit despite defendant's prior agreement to cease deceptive activity); *Curtis v. Altria Grp*., *Inc*., 792 N.W.2d 836, 851 (Minn. Ct. App. 2010) (public benefit found in action solely for damages because the language of § 8.31 "provides for an action to recover damages" evidencing legislature's intent "that a monetary recovery could support such a benefit"); *Khoday*, 858 F. Supp. 2d at 1017.[19]

Taking the factors as a whole, it is clear that Plaintiffs' claims serve a public benefit. As the court in *Khoday* noted, "damages may benefit consumers through providing compensation

---

[19] Defendants rely predominantly on *Buetow v. A.L.S. Enters., Inc.*, 888 F. Supp. 2d 956 (D. Minn. 2012) and *Overen v. Hasbro, Inc.*, Civ. No. 07-1430, 2007 WL 2695792 (D. Minn. Sept. 12, 2007) and their progeny to assert that injunctive relief is required to find a public benefit. *See* Defs.' Br. at 30–31. But these cases differ from the facts here and in *Collins. See, e.g., Buetow*, 888 F. Supp. 2d at 959 (no public benefit when case had "devolved into a series of small claims for nominal damages that will not vindicate any public interest" (quotation omitted)); *Tuttle v. Lorillard Tobacco Co*., Civ. No. 99-1550, 2003 WL 1571584 at *7 (D. Minn. Mar. 3, 2003) (no public benefit for wrongful death claim because "the Minnesota legislature has determined that wrongful death claims are not for the public benefit"); *see also Zutz v. Case Corp*., Civ. No. 02-1776, 2003 WL 22848943 (D. Minn. Nov. 21, 2003) (no public benefit when allegedly faulty farm equipment was not broadly advertised to the public). Plaintiffs' facts are closer to *Collins* than any of the other cited cases.

and a deterrent effect." 858 F. Supp. 2d at 1017. *See also HomeStar Prop. Sols., LLC v. Safeguard Props., LLC*, No. 14-CV-4531, 2016 WL 526213, at *3 (D. Minn. Feb. 9, 2016) (indirect benefit is sufficient). Such is the case here. For a decade, Defendants engaged in discriminatory and deceptive advertising with impunity, inducing thousands of members of the public to enroll in an academic program that cost tens of thousands of dollars more than represented, structured so that by the time students discovered the fraud they were in too deep to quit. Compl. ¶¶ 9–18, 68, 73, 140–151. Plaintiffs' claims constitute a public benefit by meting out the first consequences to Walden for this exploitive behavior, deterring Walden and others from such actions in the future, and protecting federal student aid dollars.

### b.  Plaintiffs May Seek Damages Under MUDTPA

Walden further argues that Plaintiffs' Unfair Deceptive Trade Practices Act (MUDTPA), Minn. Stat. § 325D.43, *et seq*. claim fails because "the sole statutory remedy under the act is injunctive relief, which cannot issue here." Defs.' Br. at 31 (cleaned up). While only injunctive relief is specified in the MUDTPA, damages are permitted when a claim under MUDTPA is pled along with the private attorney general statute, Minn. Stat. § 8.31, subdiv. 3a. *See Collins*, 636 N.W.2d at 820 (Section 8.31 provides damages for "a violation of any of the laws referred to in subdivision 1, including . . . indirectly, the Deceptive Trade Practices Act," (cleaned up)); *see also Weller v. Accredited Home Lenders, Inc.*, Civ. No. 08-2798, 2009 WL 928522, at *4 (D. Minn. March 31, 2009) (permitting MUDTPA case for damages to proceed pursuant to § 8.31); *Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 242 (W.D.N.Y. 2021) (same).[20]

---

[20] MUDTPA is not specifically listed as one of the statutes that can be enforced through Section 8.31. However, Section 8.31 expressly states that it is not limited "exclusively" to the listed statutes, and courts have interpreted it to extend to other statutes, including MUDTPA. *See Collins*, 636 N.W.2d at 820 (stating that violation of MUDTPA is "indirectly" incorporated into Section 8.31); *see also State v. Juul Labs, Inc.*, No. 27-CV-19-19888, 2021 WL 2692131 at *4

Plaintiffs have pled that statute here. *See* Compl. ¶ 300. In *Gisairo v. Lenovo (United States) Inc.*, Walden's primary case, the court did not consider the private attorney general statute in dismissing the MUDTPA claim. 516 F. Supp. 3d 880, 890–91 (D. Minn. 2021).

### C.  None of Plaintiffs' Claims Are Barred by the "Educational Malpractice" Doctrine

Finally, neither Plaintiffs' federal class claims nor their state-law claims are barred by the "educational malpractice" doctrine. According to Defendants' section title, the educational malpractice doctrine bars "every one of Plaintiffs' claims." Defs.' Br. at 32. Yet Defendants acknowledge this is true only "*to the extent* Plaintiffs complain about the quality of Walden's DBA program or the education they received." (emphasis added). *Id.* In fact, Plaintiffs' allegations focus squarely on Defendants' misrepresentations about the program cost and credit requirements, not education quality.[21] Further, the doctrine does not bar every claim that might have some relationship to the nature of the education provided, particularly where plaintiffs allege a failure to perform on specific promises (as Plaintiffs have here).

Before reaching the content of Plaintiffs' claims, it should be clear that, although Defendants assert that the educational malpractice doctrine prohibits all of Plaintiffs' claims, they cite no cases in which the doctrine bars *federal* causes of action such as Plaintiffs' Title VI and ECOA claims. *See* Defs.' Br. at 32. In fact, Defendants' cited cases suggest the opposite. *See McClean v. Duke Univ.*, 376 F. Supp. 3d 585, 599–604, 609 (M.D.N.C. 2019) (analyzing whether doctrine barred state-law claims, but not applying the same analysis to Title IX discrimination claims); *Sellers v. Sch. Bd. of the City of Manassas*, 960 F. Supp. 1006, 1009–11

---

(Minn. Dist. Ct., June 21, 2021) (summarizing cases where Attorney General enforces through Section 8.31 violations of statutes not expressly listed).

[21] The allegations about the manner in which Walden operates the capstone phase of the DBA program serve to explain how Walden operationalizes its bait-and-switch regarding the cost and requirements of the degree but are not themselves the basis of Plaintiffs' claims.

(E.D. Va. 1997), *aff'd sub nom. Sellers by Sellers v. Sch. Bd. of City of Mannassas, Va*., 141 F.3d

524 (4th Cir. 1998) (evaluating Rehabilitation Act claims without reference to educational

malpractice doctrine). In education cases involving federal discrimination claims, courts across

the country either reject or simply do not apply this doctrine. *See, e.g.*, *Mumid v. Abraham*

*Lincoln High Sch*., Civ. No. 05-2176, 2006 WL 640510, at *3–*4 (D. Minn. Mar. 13, 2006)

(educational malpractice doctrine did not bar Title VI claims); *see also Feminist Majority*

*Found.*, 911 F.3d 674 (evaluating federal discrimination claims against a public university

without applying educational malpractice doctrine); *Doe v. Indep. Sch. Dist. 31,* No. 20-CV-226,

2020 WL 4735503 (D. Minn. Aug. 14, 2020) (same for claims against school district).

      Nor should the doctrine bar Plaintiffs' state-law claims. Minnesota cases, which

Defendants ignore, limit the prohibition on education malpractice claims to allegations involving

an "inquiry into the nuances of educational processes and theories" and expressly permit fraud or

misrepresentation claims alleging "that the institution failed to perform on specific promises it

made to the student." *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 473 (Minn. Ct. App. 1999)

(quotation omitted); *see also Wright v. Capella Univ., Inc.*, 378 F. Supp. 3d 760, 772 (D. Minn.

2019).[22] Without this limitation, "a school could expressly promise anything it wished in terms

of the nature of its instruction . . . [,] never even attempt to provide those things, yet be perfectly

insulated from a suit . . . so long as it actually provided some education to its students." *Ford v.*

*Rensselaer Polytechnic Inst.*, 507 F. Supp. 3d 406, 417 (N.D.N.Y. 2020).

---

[22] Minnesota courts are not alone in distinguishing claims that schools misrepresented specific
facts about their educational programs from those in which students allege that their education
was of *lesser quality* than what they paid for. *See, e.g., Blake v. Career Educ. Corp.*, No. 08-CV-
00821, 2009 WL 2567011 at *3 (E.D. Mo. Aug. 18, 2009); *Harris v. Dutchess Cty. Bd. of Co-op.
Educ. Servs.*, 50 Misc. 3d 750, 760–61 (N.Y. Sup. Ct. 2015), *aff'd but criticized sub nom. Harris
v. Dutchess Cty. Bd. of Coop. Educ. Servs.,* 170 A.D.3d 820, 93 N.Y.S.3d 910 (2019); *Wells v.
One2One Learning Found.*, 39 Cal. 4th 1164, 1210–13 (2006), *as modified* (Oct. 25, 2006).

Defendants' misrepresentations regarding the cost and number of credits of the DBA program are "specific" promises made at the time of enrollment that do not require "inquiry into the nuances of educational processes and theories." *Alsides,* 592 N.W.2d at 473 (quotation omitted). In *Wright*, the court determined that claims exceedingly similar to those made by Plaintiffs' were not based in educational malpractice, because to assess allegations that defendant misrepresented the time and cost of its PhD programs, "the Court need not assess the general quality of [plaintiff's] instructors nor the effectiveness of [defendant's] programs." 378 F. Supp. 3d at 771–72. Similarly, the only inquiries required here are *what* Walden represented about the necessary credits and costs, *how many* credits plaintiffs completed, and *how much* money Plaintiffs paid. There is no need to delve into the education itself. By contrast, the cases from Plaintiffs' home states cited by Defendants focus on allegations of substandard education, not promises made to applicants about program time and cost and are therefore inapposite.[23]

## V.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss should be denied in its entirety.[24]

---

[23] *Arnold v. Univ. of N.C. at Chapel Hill*, 798 S.E.2d 442, 443 (N.C. App. 2017) (unpublished) (alleging that UNC enrolled athletes into "sham" courses); *Mills v. Tarver,* — So.3d —, 2021 WL 6328320, at *17 (La. App. 1 Cir. 2021) ("At their essence, the plaintiffs' claims are academic disputes"); *Miller v. Loyola University of New Orleans*, 829 So. 2d 1057, 1061 (La. App. 4th Cir. 2002) (alleging negligence due to quality of instruction and lack of professors.); *Whayne v. U.S. Dep't of Educ.,* 915 F. Supp. 1143, 1145–46 (D. Kan. 1996) (plaintiff alleged he derived no benefit from his education.); *Sellers,* 960 F. Supp. at 1008, 1013 (claim that school negligently failed to diagnose student's learning disability); *McClean*, 376 F. Supp. 3d at 609 n.12 (claim regarding lack of counseling services was barred because they were "integrally related to the educational process" and there were no allegations of explicit misrepresentations).
[24] Defendants gesture at timeliness arguments in a hail Mary footnote at the end of their brief. Defs.' Br. at n.9. Plaintiffs disagree that their claims are untimely, but because Defendants do not seek dismissal on that basis Plaintiffs do not address that issue here.

Dated: May 11, 2022                              Respectfully Submitted,

                                                 /s/ Alexa T. Milton
                                                 Alexa T. Milton #19990
                                                 Glenn Schlactus
                                                 Tara K. Ramchandani
                                                 Lila R. Miller
                                                 Edward K. Olds
                                                 RELMAN COLFAX, PLLC
                                                 1225 19th St. NW, Suite 600
                                                 Washington, D.C. 20036
                                                 Tel: 202-728-1888
                                                 Fax: 202-728-0848
                                                 amilton@relmanlaw.com
                                                 gschlactus@relmanlaw.com
                                                 tramchandani@relmanlaw.com
                                                 lmiller@relmanlaw.com
                                                 tolds@relmanlaw.com

                                                 Eric Rothschild
                                                 Kirin Jessel
                                                 NATIONAL STUDENT LEGAL DEFENSE
                                                 NETWORK
                                                 1015 15th St. NW, Suite 600
                                                 Washington, D.C. 20005
                                                 eric@defendstudents.org
                                                 kirin@defendstudents.org

                                                 *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of May 2022, copies of Plaintiffs' Memorandum in

Opposition to Defendants' Motion to Dismiss were served to Defendants' counsel of record

electronically via CM/ECF and courtesy copies will be provided to the Court within 48 hours of

filing:

> Andrew D. Prins (D. Md. Bar No. 10597)
> LATHAM & WATKINSLLP
> 555 Eleventh Street, NW, Suite 1000
> Washington, D.C.  20004-1304
> Telephone:  (202) 637-2200
> Facsimile:  (202) 637-220
> 1andrew.prins@lw.com
>
> Sean M. Berkowitz (pro hac vice)
> Eric R. Swibel (pro hac vice)
> Caitlin E. Dahl (pro hac vice)
> LATHAM&WATKINSLLP
> 330 North Wabash Avenue, Suite 2800
> Chicago, Illinois 60611
> Telephone:(312)876-7700
> Facsimile:(312)993-9767
> sean.berkowitz@lw.com
> eric.swibel@lw.com
> caitlin.dahl@lw.com
>
> *Attorneys for Defendants*

/s/ Alexa Milton
Alexa Milton
