## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ALJANAL CARROLL, et al.,** | |
| **Plaintiffs,** | **Civil No.: 1:22-cv-00051-JRR** |
| **v.** | |
| **WALDEN UNIVERSITY, LLC, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendants Walden University, LLC, and Walden e-Learning's Motion to Dismiss. (ECF No. 35; the "Motion.")   The court has reviewed all submissions on the Motion.  No hearing is necessary.  Local Rule 105.6 (D. Md. 2021).

## BACKGROUND[1]

Defendant Walden University, LLC, is a Florida company with its principal place of business in Baltimore, Maryland.  (ECF No. 1 ¶ 38; "the Complaint.")  Defendant Walden e-Learning, LLC, is a Delaware company with its principal place of business in Baltimore, Maryland.  *Id.* ¶ 39.  Walden University and Walden e-Learning jointly own and operate Walden University, a for-profit university with its academic headquarters in Minneapolis, Minnesota.  *Id.* ¶¶ 35, 41

Walden University offers online degrees for various doctoral programs.  *Id.* ¶ 51.  In 2008, Walden University offered its Doctor of Business Administration ("DBA") program as an inaugural professional doctorate program.  (ECF No. 1 ¶ 56.)  Walden University advertised that

---

[1] For purposes of this memorandum opinion, the court accepts as true the well-pled facts set forth in the Complaint.

its DBA program requires sixty credits and costs about $43,000 to $63,000 depending on the year. *Id.* ¶ 58. This case arises from an alleged multi-part discriminatory and fraudulent scheme perpetrated by Walden University. *Id.* ¶ 2.

Plaintiff Aljanal Carroll is a resident of North Carolina and was a student in the DBA program at Walden University from September 2017 until her graduation in October 2020. (Complaint, ECF No. 1, ¶ 35.) Plaintiff Claudia Provost Charles is a resident of Louisiana and was a student in the DBA program from July 2017 until her graduation in May 2021. *Id.* ¶ 36. Plaintiff Tiffany Fair is a resident of Virginia and was a student in the DBA program from June 2016 to January 2021. *Id.* ¶ 37.

The DBA program at Walden University involves two phases: the coursework phase and the capstone phase. *Id.* ¶ 60. Plaintiffs allege that the capstone credit requirement is the primary subject of Defendants' misrepresentations. *Id.* ¶ 68. Plaintiffs allege that Defendants beginning no later than fall semester of 2008, and continuing through at least January 2018, in order to entice students to enroll Defendants fraudulently misrepresented the requirements of the DBA program, including the required credits, the length of time required to complete the program, and the cost of the degree. (ECF No. 1 ¶ 9.) Additionally, Plaintiffs allege that beginning no later than fall semester of 2008 and continuing through the present, Defendants purposefully prolonged the capstone requirement, in order to compel or persuade students to pay for the additional credits to earn a degree. *Id.* ¶ 10. As a result, Plaintiffs allege that Defendants' capstone process was, and is, designed to extract additional tuition revenue from students by prolonging the process without any legitimate academic purpose. *Id.* ¶ 24. Through this predatory scheme, Plaintiffs allege that Defendants overcharged members of the proposed classes more than $28.5 million. *Id.* ¶ 3.

Plaintiffs allege that Defendants lured students into this program by advertising a doctoral degree that could be earned at a reasonable cost and within a reasonable timeframe; however, Defendants knew and intended that the degree would cost much more.  *Id.* ¶ 12.  Plaintiffs assert that Defendants used its websites and enrollment advisors to advertise the DBA program to prospective students and the public at large.  (ECF No. 1 ¶ 15.)  Plaintiffs further allege that Defendants represented the sixty credit program to be about forty coursework credit hours and about twenty capstone credit hours.  *Id.* ¶ 20.  However, between 2008 and 2017, Defendants did not allow students to receive a DBA degree until completing fifty-four capstone credit hours, which is three times the advertised requirement.  *Id.* ¶ 21.  Plaintiffs allege that Defendants specifically targeted the predatory scheme at Black and female students.  *Id.* ¶ 26.

On January 7, 2022, Plaintiffs filed a class action lawsuit.  (ECF No. 1.)  Plaintiffs Carroll, Charles, and Fair bring this action for damages, injunctive relief, and declaratory relief on behalf of themselves and all other similarly situated individuals against Defendants Walden University, LLC and Walden E-Learning, LLC.  *Id.* ¶ 1.  Plaintiffs Carroll and Charles seek redress for violation of Title VI of the Civil Rights Act of 1964 ("Title VI").  Plaintiffs Charles and Fair seek redress for violation of the Equal Credit Opportunity Act ("ECOA").  Plaintiffs Carroll, Charles, and Fair also bring this action individually for violation of the Minnesota Prevention of Consumer Fraud Act, the Minnesota Uniform Deceptive Trade Practices Act, and Minnesota Statute prohibiting false statements in advertising, and for common law fraudulent misrepresentation under Minnesota law.  *Id.*

The Complaint sets forth six counts: (I) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; (II) Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; (III) Minnesota Prevention of Consumer Fraud Act, MINN. STAT. § 325F.68 *et seq.*; (IV) Minnesota Uniform

Deceptive Trade Practices Act, MINN. STAT. § 325D.43 *et seq.*; (V) MINN. STAT. § 325F.67, prohibiting false statements in advertising; and (VI) fraudulent misrepresentation. (ECF No. 1 ¶ 1.)  The prayer for relief seeks (I) declaratory judgment; (II) an injunction directing Defendants and their directors, officers, agents, and employees to take all steps necessary to remedy the effects of the conduct complained of and to prevent additional instances of conduct or similar conduct from occurring in the future; (III) compensatory damages; (IV) punitive damages; (V) an award of Plaintiffs' reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1691e(d), 42 U.S.C. § 1988(b), MINN. STAT. § 325D.45 subdiv. 2, and MINN. STAT. § 8.31, subdiv. 3a; (VI) award prejudgment interest; and (VII) any other relief the court deems just and equitable.  *Id.* at pp. 64-65.

Defendants move to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b).  (ECF No. 35-1, p. 11-12.)  Defendants argue that Plaintiffs federal claims—Counts I and II—fail to state plausible claims and, as a result, the court does not have subject matter jurisdiction over the state law claims—Counts III through VI.  *Id.*  Defendants also argue that Plaintiffs' fraud claims—Counts III through VI—fail to satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  *Id.* at 12-13.

## LEGAL STANDARDS

### Federal Rule of Civil Procedure 12(b)(6)

Defendants assert that Counts I and II of the Complaint fail to state a claim upon which relief can be granted.  (ECF No. 35-1, p. 14.)  A Rule 12(b)(6) motion "tests the legal sufficiency of a complaint.  It does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999)).  Accordingly, a "[r]ule

12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244 (citing *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)).

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "A complaint that provides no more than 'labels and conclusions,' or 'formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "The [c]ourt must be able to deduce 'more than the mere possibility of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. 21-cv-1637, 2021 U.S. Dist. LEXIS 221041, at *4 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

### Federal Rule of Civil Procedure 12(b)(1)

Defendants assert that the Complaint fails to state a plausible federal claim in Counts I and II and, therefore, the court lacks subject matter jurisdiction over Plaintiffs' individual claims—Counts III through VI. (ECF No. 35-1, p. 22.) "Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction." *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016). Subject matter jurisdiction involves a court's power to

hear a case; it may not be forfeited or waived.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (citing *United States v. Cotton*, 535 U.S. 625, 630 (2002)).  "[W]hen a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over pendent state-law claims."  *Id.* Courts look at various factors to decide whether to exercise supplemental jurisdiction after dismissing the claims over which it had original jurisdiction, including the "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy."  *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

### Federal Rule of Civil Procedure 9(b)

Defendants further argue that Plaintiffs' individual claims—Counts III through VI—fail to satisfy the heightened pleading standard of Rule 9(b).  (ECF No. 35, p. 24.)  "Rule 9(b) requires particularity when pleading 'fraud or mistake,' while allowing 'malice, intent, knowledge, and other conditions of a person's mind to be alleged generally.'"  *Ashcroft*, 556 U.S. at 686.  A plaintiff "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Bourgeois*, 3 F. Supp. 3d at 435 (quoting *U.S. ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010)).  "Claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened standard of Rule 9(b)." *Layani v. Ouazana*, No. 20-420, 2021 U.S. Dist. LEXIS 39894, at *61 (D. Md. Mar. 3, 2021); *see Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (quoting Fed. R. Civ. P. 9(b) and holding that "the MCPA claim, which sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires a plaintiff to plead

'with particularity the circumstances constituting fraud'").  Rule 9(b) "ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of." *Layani*, 2021 U.S. Dist. LEXIS 39894, at *62 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

## ANALYSIS

### I. Federal Claims

Plaintiffs Carroll and Charles, individually and on behalf of the putative Title VI Class, bring a claim under Title VI of the Civil Rights Act of 1964.  (ECF No. 1, p. 58.)  Under Title VI of the Civil Rights Act of 1964, Plaintiffs allege that "Defendants' acts, policies, and practices are intentionally discriminatory against Black students, subject Black students to intentional discrimination in Defendants' programs and activities, constitute reverse redlining, and violate 42 U.S.C. § 2000d."  (Complaint, ECF No. 1, ¶ 262.)

Plaintiff Charles, on behalf of herself and the putative ECOA Black Student Class, brings a claim under the Equal Credit Opportunity Act.  (*Id.* p. 59.)  Plaintiffs Charles and Fair each bring a claim on behalf of themselves as individuals and the putative ECOA Female Student Class.  *Id.* Under the ECOA, Plaintiffs allege that "Defendants' acts, policies, and practices are intentionally discriminatory against Black and female students with respect to aspects of credit transactions, constitute reverse redlining, and violate 15 U.S.C. § 1691(a)(1)." (*Id.* ¶ 266.)  In addition, Plaintiffs allege that Defendants' acts, policies, and practices disparately impact Black and female students with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).  *Id.* ¶ 267.

### A. Title VI of the Civil Rights Act of 1964—42 U.S.C. § 2000d (Count I)

Defendants argue that Plaintiffs' claim fails for two reasons: (1) Plaintiffs fail to allege intentional discrimination on the basis of race; and (2) Plaintiffs fail to allege that similarly situated

non-Black students were treated differently.  (ECF No. 35-1, p. 14.)  In addition, Defendants contend that Plaintiffs' reverse redlining theory does not apply because there is no allegation regarding unfavorable loan terms.  *Id.* at 18.

"Title VI provides that no person shall, 'on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'"  *Evans*, 2021 U.S. Dist. LEXIS 221041, at *7 (quoting 42 U.S.C. § 2000d).  Under 42 U.S.C. § 2000d, "[p]rogram or activity" is defined as "a college, university, or other postsecondary institution, or a public system of higher education any part of which is extended Federal financial assistance."  U.S.C. § 2000d-4a (2)(A).

"To survive a motion to dismiss under Title VI, a plaintiff must plead sufficient facts supporting that (1) the defendant is a recipient of federal financial assistance; and (2) the defendant intentionally discriminated against plaintiff on the basis of race, color, or national origin."  *Evans*, 2021 U.S. Dist. LEXIS 221041, at *7.  To satisfy the first element, Plaintiffs must allege facts to demonstrate that the school receives federal financial assistance.  *See Radcliff v. Landau*, 883 F.2d 1481, 1483 (9th Cir. 1989) (holding that "[r]eceipt of federal financial assistance by any student or portion of a school thus subjects the entire school to Title VI coverage").  The parties do not dispute, and Plaintiffs sufficiently allege, the first element under Title VI: Defendants receive federal financial assistance as the recipient of their students' federal financial aid dollars. (Complaint, ECF No. 1, ¶ 260.)

### 1. Intentional Discrimination

Defendants argue that Plaintiffs fail to sufficiently plead intentional discrimination because, even assuming the alleged facts are true, Plaintiffs do not allege facts that could demonstrate a specific intent to discriminate on the basis of race.  (ECF No. 35-1, p. 16.)

Moreover, Defendants argue that Plaintiffs' allegations are insufficient to demonstrate that Defendants operated with discriminatory animus when implementing a facially neutral practice. *Id.* In support, Defendants rely on *Evans v. 7520 Surrats Rd. Operations, LLC*. No. 21-CV-1637, 2021 U.S. Dist. LEXIS 221041 (D. Md. Nov. 16, 2021).

In *Alexander v. Sandoval*, the Supreme Court explained that "Title VI itself directly reaches only instances of intentional discrimination." 532 U.S. 275, 281 (2001). In order to survive a motion to dismiss under Title VI, a plaintiff must allege some facts to support that the defendant's "alleged misconduct was motivated by race." *Evans v. 7520 Surrats Rd. Operations, LLC*. No. 21-CV-1637, 2021 U.S. Dist. LEXIS 221041, at *9 (D. Md. Nov. 16, 2021) (explaining that the defendant "must do more than simply allege his unfavorable treatment was on account of 'discriminatory animus'"). However, "a plaintiff need only 'alleg[e] facts giving rise to a plausible minimal inference of bias' on the basis of race.'" *Wang v. Bethlehem Cent. Sch. Dist.*, No. 21-CV-1023, 2022 U.S. Dist. LEXIS 140153, at *86 (N.D.N.Y. Aug. 8, 2022) (quoting *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 103-104 (2d Cir. 2022)) (explaining that analysis of Title VI claims is similar to Title IX claims).

In analyzing whether a plaintiff alleges discriminatory intent under Title VI, the court takes an "expansive approach . . . as 'plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence.'" *Id.* at *89 (quoting *Minto v. Molloy Coll.*, No. 16-CV-276, 2019 U.S. Dist. LEXIS 165670, at *10 (E.D.N.Y. Sep. 26, 2019)). As established in *Ashcroft v. Iqbal*, courts must be mindful that, at this stage of the pleadings, "[t]he plausibility standard is not akin to a probability requirement, and a plaintiff must only allege enough to nudge[] their claims across the line from conceivable to plausible." *Id.* (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015)).

Plaintiffs allege facts to support their allegation that Defendants' misconduct was motivated by race. Plaintiffs allege that marketing the predatory and fraudulent DBA program, and explicitly targeting Blacks for that program because of their race, violates Title VI. (Complaint, ECF No. 1, ¶¶ 138-154.) Specifically, Plaintiffs allege:

> The Walden doctoral student body includes a significantly higher proportion of Black students than is the case across doctoral programs nationwide. Walden itself touts this fact, noting its "intentional inclusivity. . ."

> This is not an accident. Walden has engaged in intentional and explicit targeting of Black and female prospective students.

> One way Walden accomplishes this is by directing nearly all of its local advertising budget to markets with higher-than-average Black populations.

> For example, Walden's top six markets for local TV advertising between 2010 and 2020 were Washington, D.C., Dallas, Atlanta, Houston, Charlotte, and Baltimore. In 2015, Walden directed 99.8% of its local advertising budget to areas with an above-median percentage of Black residents.

> Starting no later than August 2008 and continuing until early 2018, the Tuition and Fees pages of the website consistently misrepresented the number of credits required to complete a DBA degree and therefore the cost of said degree.

> In addition to its website misrepresentations directed to potential students and the public at large, Walden also consistently misrepresented the true requirements and costs for the DBA degree through its enrollment advisors.

> Walden's intentional and explicit targeting of Black prospective students is demonstrated by a review of Walden's local advertising expenditures in metropolitan areas across the county. Between 2010 and 2020, Walden's local advertising budget was dedicated almost exclusively to metropolitan areas with higher-than-median percentage of Black residents.

> Again, these efforts would be laudable if they resulted in increased access to such educational opportunities on fair, non-predatory terms. Here, however, the result is to subject Black prospective students and communities to a fraudulent, predatory scheme to extract loan proceeds and tuition funds by misleading students and the public about the nature of the program and the resulting costs. As it stands, when Walden markets the DBA, it is marketing a predatory product, and when it intentionally markets the DBA to Black prospective students, it engages in impermissible reverse redlining.

(*Id.* ¶¶ 27, 30, 31-32, 76, 94, 140, 152.)  Therefore, the alleged marketing of the predatory and fraudulent DBA program and alleged race- targeted advertising demonstrates "a plausible minimal inference of bias on the basis of race."  *Wang*, 2022 U.S. Dist. LEXIS 140153, at *86.

Defendants further argue that Plaintiffs' Title VI Claim is not saved by reverse redlining because Plaintiffs do not make any allegation regarding unfavorable loan terms.  (ECF No. 35-1, p. 18.)  Reverse redlining is defined as "the illegal practice of extending credit on unfair terms in a particular community on a discriminatory basis (as because of the race or ethnicity of its residents)."  *Montogomery Cty. v. Bank of Am. Corp.*, 421 F. Supp. 3d 170, 181 n.5 (D. Md. 2019) (quoting Reverse redlining, Merriam-Webster Dictionary, www.merriam-webster.com/legal/reverseredlining).  "In order to state a claim based on reverse redlining, the Plaintiffs must allege that the Defendants' lending practices and loan terms were 'unfair' and 'predatory,' and that the Defendants either intentionally targeted on the basis of race, or that there is a disparate impact on the basis of race."  *U.S. ex rel. Cooper v. Auto Fare, Inc.*, No. 14-cv-0008, 2014 WL 2889993, at *3 (W.D.N.C. June 25, 2014) (citing *Hargraves v. Cap. City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000)).

Reverse redlining has been held to violate various civil rights laws, including the ECOA.  *United States v. Auto Fare, Inc.*, No. 14-CV-00008, 2014 U.S. Dist. LEXIS 86381, at *9 (W.D.N.C. Apr. 16, 2014).  However, whether reverse redlining violates Title VI in the educational context is less well-settled.  There is only one case of which this court is aware that permitted a Title VI claim to proceed on grounds akin to reverse redlining.  In *Brooks v. Sistema Universitario Ana G. Mendez, Inc.*, the plaintiff's complaint "allege[d] that [the university] deliberately targeted the Latino population for a fraudulent scheme."  No. 14-cv-171-T-30AAS, 2017 U.S. Dist. LEXIS 67940, at *8 (M.D. Fla. May 4, 2017).  In *Brooks*, the plaintiff argued that "targeting her for a

11

fraudulent scheme because of her ethnicity or national origin violates Title VI." *Id.* The *Brooks* court allowed the Title VI claim to proceed and reasoned that "[t]he discrimination claim arises from the harmful product being peddled; the targeted advertising simply helps prove that the discrimination was intentional." *Id.* at *10. The *Brooks* court concluded that "the combination of the targeted advertising and the allegedly 'sham' educational program . . . allows the court to infer intentional discrimination." *Id.* Therefore, the court allowed the plaintiff's Title VI claim to proceed "using a theory akin to reverse redlining." *Id.* at *10. The court reasoned that "construing the statute differently would mean that Title VI, part of the Civil Rights Act 'created to be an instrument for the abolition of discrimination, allows [this] injustice so long as it is visited exclusively on [one ethnic group]." *Id.* (quoting *Contract Buyers League v. F & F Inv.*, 300 F. Supp. 210, 216 (N.D. Ill. 1969)). This court agrees.

Plaintiffs allege that Defendants intentionally targeted the Black population for a fraudulent, predatory scheme. (ECF No. 1 ¶ 152.) Specifically, Plaintiffs allege: "when Walden markets the DBA, it is marketing a predatory product, and when it intentionally markets the DBA to Black prospective students, it engages in impermissible redlining." *Id.* Together, the alleged targeted advertising towards Black students and the alleged misrepresented DBA program satisfy the pleading requirements to advance a theory of intentional discrimination "using a theory akin to reverse redlining." *Brooks*, 2017 U.S. Dist. LEXIS 67940, at *10.

### 2. Similarly Situated

Defendants argue that Plaintiffs' Title VI claim separately fails because Plaintiffs fail to allege that similarly situated students outside their protected Title VI class were treated more favorably. (ECF No. 35-1, p. 16.) In support, Defendants rely on numerous cases involving

motions for summary judgment and establishment of prima facie claims of race discrimination in the educational context.  *Id.* at 17.

Defendants correctly assert that in order to survive a motion for summary judgment Plaintiffs must establish a prima facie case of discrimination and generate a genuine dispute of material fact as to whether a jury could conclude that "similarly situated individuals did not suffer the same adverse actions in the same or similar situations."  *Escobar v. Montgomery County Bd. of Educ.*, No. 99-1964, 2001 U.S. Dist. LEXIS 1069, at *18 (D. Md. Feb. 1, 2001).  However, "[a]t the motion to dismiss stage, [] a complaint need not establish a prima facie case of discrimination." *Evans*, 2021 U.S. Dist. LEXIS 221041, at *9; *see Wang*, 2022 U.S. Dist. LEXIS 140153, at *88 (finding that there are several ways in which a plaintiff could raise an inference of discriminatory motivation to survive a motion to dismiss and "disparate treatment is only one avenue among several by which a plaintiff may raise an inference of discriminatory motivation").  Thus, "at this stage of the pleading, a plaintiff need only 'alleg[e] facts giving rise to a plausible minimal inference of bias' on the basis of race." *Wang*, 2022 U.S. Dist. LEXIS 140153, at *88 (quoting *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 103-104 (2d. Cir. 2022)).

At this stage of the litigation, Plaintiffs are not required to establish a prima facie case of discrimination; therefore, Plaintiffs are not required to allege similarly situated individuals did not suffer the same adverse actions.  As stated above, Plaintiffs sufficiently alleges facts giving rise to an inference of intentional discrimination on the basis of race in violation of Title VI.

### B.  Equal Credit Opportunity Act—15 U.S.C. § 1691 (Count II)

Defendants argue that Plaintiffs fail to state a claim under the ECOA because Plaintiffs do not allege discrimination in connection with a credit transaction as required under the statute.  (ECF No. 35-1, p. 19.)

Under 15 U.S.C. § 1691, "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction— (1) on the basis of race, color, religion, national origin, sex or marital status, or age . . ." 15 U.S.C. § 1691. Therefore, "[a] creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction." 12 C.F.R. § 202.4 (a). A creditor is defined as "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit." 12 C.F.R. § 202.2 (l). A creditor may also include "a person, who in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made." *Id.* An applicant under the ECOA is defined as "any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit." 12 C.F.R. § 202.2 (f). "Credit transaction means every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit (including, but not limited to, information requirements; investigation procedures; standards of credit worthiness; terms of credit; furnishing of credit information; revocation, alteration, or termination of credit; and collection procedures)." 12 C.F.R. § 202.2 (l). "The purpose of this regulation is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age." 12 C.F.R. § 202.1 (b); *see Bartlett v. Bank of Am., NA*, No. 13-975, 2014 U.S. Dist. LEXIS 102897, at *11 (D. Md. July 29, 2014) (quoting *Capital Indem. Corp. v. Aulakh*, 313 F.3d 200, 202 (4th Cir. 2002)) ("Congress enacted ECOA 'to prevent discrimination against those applying for credit.'").

The parties do not dispute that Defendants fall within the definition of a "creditor" and Plaintiffs fall within the definition of "applicant." Plaintiffs allege that Defendants refer students

and prospective students to the Free Application for Federal Student Aid to submit their applications. (ECF No. 1 ¶ 184.) Additionally, Plaintiffs allege that Defendants' enrollment advisors provided them with links and school codes to apply for federal student loans. *Id.* ¶¶ 219, 235. Thus, Defendants are creditors and Plaintiffs are applicants for purposes of the ECOA.

Defendants also do not dispute that Plaintiffs adequately allege a credit transaction. Plaintiffs allege that Walden's Office of Financial Aid receives the Free Applications for Federal Student Aid, processes the applications, requests additional information, determines eligibility, and then communicates offers to the students regarding student loans. *Id.* ¶ 184. The credit transaction in this case focuses on the students and prospective students applying for financial aid and, subsequently, Defendants' processing the applications, requesting additional information, determining students' eligibility, and communicating offers to students. *Id.* Therefore, the court finds that Plaintiffs and Defendants are involved in a credit transaction as it relates to the federal student loans.

### *1. Credit Transaction*

Defendants, however, dispute that there is a connection between the above-described credit transaction and the alleged discrimination about which Plaintiffs complain. Defendants argue that Plaintiffs' ECOA claim fails under a theory of disparate impact or reverse redlining because both theories require a direct connection between the alleged discrimination and a credit transaction. (ECF No. 35-1, p. 22.) Specifically, Defendants argue that "an educational institution's dissertation practice is not a credit transaction within the meaning of the ECOA, meaning Plaintiffs' ECOA claim fails as a matter of law." *Id.*

Section 1691 of the ECOA states that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction." The plain language of

the statute makes it unlawful to discriminate with respect to any aspect of a credit transaction.  15 U.S.C. § 1691.  "Congress enacted ECOA 'to prevent discrimination against those applying for credit.'"  *Bartlett*, 2014 U.S. Dist. LEXIS 102897, at *11 (quoting *Capital Indem. Corp.*, 313 F.3d at 202).  Moreover, the purpose of the ECOA "is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age." 12 C.F.R. § 202.1 (b).  Thus, both the plain language of the statute and its purpose satisfy the court that under the ECOA, the alleged discrimination is tied to the credit transaction.

### 2. Reverse Redlining, Disparate Impact, and Disparate Treatment

Defendants argue that Plaintiffs' ECOA claim fails under theories of disparate treatment and disparate impact because Plaintiffs do not adequately allege the requisite a direct connection between the alleged discrimination and an ECOA credit transaction.  (ECF No. 35-1, p. 22.) Plaintiffs plead their ECOA claim under theories of both disparate treatment and disparate impact (by way of reverse redlining).[2]  "ECOA claims may be prosecuted on the basis of (i) disparate treatment, *i.e.*, that plaintiffs were treated differently because of their membership in a protected class, or on the basis of (ii) disparate impact, *i.e.,* that the defendant's practices have a proportionally greater negative impact on minority populations."  *Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 574 (E.D.N.Y. 2010); *see also Powell*, 310 F. Supp. 2d at 487 (explaining that the "ECOA provides for a private cause of action based on disparate impact or disparate treatment.").

Reverse redlining can form the basis of unlawful discrimination in violation of the ECOA. *See Auto Fare, Inc.*, 2014 U.S. Dist. LEXIS 86381, at *9 ("Many plaintiffs bring claims under ECOA based upon the denial of credit to applicants who are members of a protected class under the statue.").  "[R]everse redlining claims are based upon targeting members of a protected class

---

[2] Plaintiffs are entitled to plead both theories of discrimination as potential avenues of recovery.

for the extension and serving of credit under unfair and predatory terms." *Id.* "In order to state a claim based on reverse redlining, the [p]laintiffs must allege that the [d]efendants' lending practices and loan terms were 'unfair' and 'predatory,' and that the [d]efendants either intentionally targeted on the basis of race, or that there is a disparate impact on the basis of race." *U.S. ex rel. Cooper v. Auto Fare, Inc.*, 2014 WL 2889993, at *3 (W.D.N.C. June 25, 2014) (citing *Hargraves*, 140 F. Supp. 2d at 20).

As stated above, Plaintiffs' ECOA claim is plead under theories of both disparate impact and disparate treatment by way of reverse redlining.  Under their theory of reverse redlining, Plaintiffs assert that Defendants' intentionally targeted their protected status group through various forms of marketing and advertising to ensnare them in a credit transaction to enable them to enroll in the DBA program on a false and fraudulent premise (*i.e.*, that the program could be completed within X number of months for approximately X dollars); and once enrolled, Defendants provided a program that took considerably longer and considerably more credits to complete.  Defendants, Plaintiffs allege, got rich on this scheme – as Plaintiffs were compelled to incur mounds of additional and unanticipated loan debt in order to get to the program finish line while Defendants got paid by the course credit.  Plaintiffs also plead that Defendants' status-neutral DBA program and related above-described conduct as an ECOA creditor (including the credit transaction which enabled the ECOA Plaintiffs to enroll) had a disproportionate injurious impact on their protected class.

### A. Unfair and Predatory Actions

Defendants argue that Plaintiffs' ECOA claim fails because regardless of which theory Plaintiffs rely upon, there must be a direct connection between the alleged discrimination and the credit transaction.  (ECF No. 35-1, p. 22.)  It appears that Defendants argue that there is not a direct

connection between the alleged discrimination and credit transaction because Plaintiffs do not allege loan terms that are discriminatory.  (ECF No. 38, p. 11.)  However, neither side's motions papers (specifically, the cited authority) are definitive as to whether an ECOA claim must rest solely on the terms of the loan contract or whether it may be based on conditions or representations external to the four corners of the paper.

Under the ECOA, the court focuses on the loan.  *See M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 574 (E.D.N.Y. 2010) (noting that ECOA and Fair Housing Act claims are similar, but the ECOA "focuses on the loan rather than the rental or purchase of a dwelling").  In considering whether Plaintiffs adequately allege the requisite connection between the alleged discrimination and the credit transaction, the court notes that the ECOA is a "broad anti-discrimination provision[] that 'make[s] it unlawful for any creditor to discriminate against any applicant with respect to any credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age.'"  *Glenn v. Wells Fargo Bank*, N.A., No. 15-3058, 2016 U.S. Dist. LEXIS 85824 *11-12 (D. Md. July 1, 2016) (quoting *Capitol Indem. Corp.*, 313 F.3d at 202, holding that the purpose of the ECOA "is to prevent discrimination against those applying for credit.").

In keeping with the ECOA's broad anti-discrimination purpose, the definition of credit transaction includes every aspect of an applicant's dealings with a creditor, suggesting that the ECOA applies to "more than one aspect of the transaction."  12 C.F.R. § 202.1 (l); *Hargraves v. Capital City Mortg.*, 140 F. Supp. 2d 7, 23 (D.D.C. 2000).  The plain language of the ECOA, its broad purpose, as well as other courts' applications of the statute, satisfy the court at this stage of the litigation that ECOA violations are not necessarily restricted to consideration of the four corners of the paper bearing a student borrower's signature.

18

Plaintiffs allege unfair and predatory actions by Defendants:

Beginning no later than fall semester 2008, and continuing through at least January 2018, Walden engaged in a consistent and longstanding pattern of fraudulent misrepresentations regarding the requirements of the DBA degree—including the required credits, the length of time required for completion, and, most consequentially, the cost of the degree—for the purposes of enticing students to enroll in the DBA degree program.

Starting no later than fall semester 2008 and continuing through the present, Walden has purposefully prolonged the capstone phase of the DBA program, requiring students to pay for additional credits to obtain their degrees.

Through this multi-part fraudulent scheme, Walden lured in potential DBA students by advertising a doctoral degree that could be earned at a reasonable cost, on a reasonable schedule, when in fact the school knew and intended that degree to be much more expensive in order to line its own pockets.

This excess tuition—specifically, tuition paid for capstone credits beyond the advertised requirement—represented a large revenue stream for Walden. An estimated 1,221 students who entered the DBA program between August 2008 and January 2018 have since graduated, representing over $41.9 million in excess tuition for these students alone . . .

Walden's enrollment of large numbers of Black and female students would be laudable if Walden were offering a legitimate, non-predatory educational program. Instead, however, Walden is targeting Black and female students with a predatory program designed to hoodwink students and saddle them with onerous student debt. This is not laudable; instead, it constitutes illegal reverse redlining and racial discrimination.

Across these various platforms, Walden represented that the DBA degree could be earned for a predictable cost. It represented that a DBA degree would require sixty credit hours (forty or forty-one credit hours for coursework credits and nineteen or twenty for their capstone credits, depending on the year), with tuition charged on a per-credit basis. Other than the minimal variation year-by-year in the price of each credit (which ranged from $725 to $980 during the period in question), Walden represented the DBA degree as having a specific cost.

Again, these efforts would be laudable if they resulted in increased access to such educational opportunities on fair, non-predatory terms. Here, however, the result is to subject Black prospective students and communities to a fraudulent, predatory scheme to extract loan proceeds and tuition funds by misleading students and the public about the nature of the program and the resulting costs. As it stands, when Walden markets the DBA, it is marketing a predatory product, and when it intentionally markets the DBA to Black prospective students, it engages in impermissible reverse redlining.

Once again, rather than increasing educational opportunities for women on fair, non-predatory terms, Walden subjects female prospective students to a fraudulent, predatory

scheme to extract loan proceeds and tuition funds by misleading students and the public about the nature of the program and the resulting costs.

Given Walden's extensive receipt of federal funding and facilitation of federal student loans to doctoral students, addressing Walden's predatory practices serves a public benefit, serving to protect the public fisc.

These delays appeared to be intentional features of Walden's dissertation process, designed to extract additional tuition revenue from students beyond the amounts they had been told would be required.

Despite Walden's representations during enrollment that she could complete the degree in 2.5 years for approximately $50,000, Charles ultimately completed her degree in May 2021, after nearly four years of enrollment, sixty-nine credits, and approximately $71,000 in tuition and fees.

As of December 2021, Charles owes almost $88,000 in student loans from her time at Walden.

After relying on representations from Walden's enrollment advisors and Walden's website that she would complete her doctorate degree in two and a half years for $26,215, Fair was charged approximately $54,000 in tuition and fees over four and a half years before she finally graduated in January 2021, roughly $28,000 more than Walden's promised price.

As of December 2021, Fair owes almost $90,000 in student loans from her Walden education.

(Complaint, ECF No. 1, ¶¶ 9-10, 12, 23, 34, 71, 152, 165, 191, 226-28, 248-49.)

As described in detail above, Plaintiffs allege that Defendants intentionally targeted Black and female prospective students for the DBA program by marketing and advertising their predatory program to a protected class; and in reliance on their false representations, Plaintiffs entered into credit transactions and sustained considerable financial harm as a result. Plaintiffs also allege discriminatory disparate impact: that Defendants employed a facially neutral practice – targeting "nontraditional" doctoral students for its DBA program – which disproportionately adversely impacted their protected class. (*Id.* ¶ 166.) In view of the broad, protective reach of ECOA, the Motion as to Count II will be denied at this time.

## II. Subject Matter Jurisdiction Over State Law Claims

Plaintiffs Carroll, Charles, and Fair as individuals bring claims under the Minnesota Prevention of Consumer Fraud Act (Count III), Minnesota False Statement in Advertising (Count IV), and Minnesota Uniform Deceptive Trade Practices Act (Count V).  (ECF No. 1, pp. 59-62.)  In addition, Plaintiffs Carroll, Charles, and Fair on behalf of themselves bring a claim of common law fraudulent misrepresentation (Count VI).  *Id.* at 63.

Defendants argue that the Complaint fails to state a plausible federal claim under Title VI (Count I) and the ECOA (Count II) and therefore, the court lacks subject matter jurisdiction over Plaintiffs' individual claims—Counts III through IV.  (ECF No. 35-1, p. 22.)  "[W]hen a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over pendent state-law claims."  *Arbaugh*, 546 U.S. at 514.  Since Count I is not dismissed, the court may properly exercise supplemental jurisdiction over the state law claims.

## III. Heightened Pleading Standard

Defendants argue that the fraud claims—Counts III through VI—fail to meet the heightened pleading standard of Rule 9(b).  (ECF No. 35-1, p. 24.)  Under Rule 9(b), a plaintiff "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *Bourgeois*, 3 F. Supp. 3d at 435 (quoting *U.S. ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010)).  "Claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened standard of Rule 9(b)."  *Layani*, 2021 U.S. Dist. LEXIS 39894, at *61.  Thus, Rule 9(b) applies to Plaintiffs Minnesota statutory claims (Counts III through V) and the Minnesota common law fraudulent inducement claim (Count VI).

21

Plaintiffs allege that Defendants fraudulently represented the required credits and cost of the DBA program to potential students and the public.  (ECF No. 1, p. 16.)  Plaintiffs' fraud allegations focus on Defendants' website and enrollment advisors.  *Id.* at 16-24.

### A. Time and Place of Misrepresentations

Plaintiffs sufficiently allege the time and place of the false representations—Defendants' website and Defendants' enrollment advisor's emails and phone calls.  *Id.* ¶¶ 195, 196, 212, 215, 232, 234.  Plaintiffs also sufficiently allege the time of the false representations:

> Starting no later than August 2008 and continuing until early 2018, the Tuition and Fees pages of the website consistently misrepresented the number of credits required to complete a DBA degree and therefore the cost of said degree.

> Plaintiff Carroll, who is Black and resides in North Carolina, graduated from Strayer University with a Master of Business Administration (MBA) in June 2017.  At around that time, she learned about Walden through a pop-up ad on the internet.  She wanted to continue her education and explored doing so by pursuing a DBA at Walden.

> After seeing the ad, Carroll visited one of Walden's websites and was impressed with what she saw.  She entered her information into the form on the website and received a phone call from an enrollment advisor shortly thereafter.

> Plaintiff Charles, who is Black and resides in Louisiana, learned of Walden's DBA program in 2017 while researching doctoral programs in business and business administration.

> Fair exchanged emails with Walden enrollment advisor Graham Gwynee.  In an email sent on June 16, 2016, Gwynne explained, using specific numbers, exactly how the fact that Fair qualified for a military spouse discount reduced her tuition: "With your tuition for 48 credits at $950 a credit hour, your tuition with no discounts applied is $45,600, with the 15% discount you would receive a further $6,885 off your tuition [sic] bring it to $38,715."

(ECF No. 1 ¶¶ 76, 194, 195, 212, 232.)

### B. Contents of Misrepresentations

Plaintiffs also sufficiently allege the contents of Defendants' misrepresentations:

Plaintiff Aljanal Carroll enrolled in Walden's DBA program in Fall 2017 based on Walden's representations that, due to transferred credits from her MBA program, she would graduate with her degree in eighteen months.  She was told she would be able to

transfer twelve credits, which would have left her only forty-eight credits to complete the degree.

The enrollment advisor described the DBA program to Carroll as "enhancing" her MBA. He explained to her that she could transfer credits from courses she took for her MBA. He guaranteed to her that she would graduate the DBA program "in no more than eighteen months." The enrollment advisor also told her the total number of credits Walden would allow her transfer. Because she would not have to pay again for those credits, she expected her total cost to be significantly lower than the full program tuition provided on the website, which assumed students were paying for all sixty credits. This understanding was supported by the website, which noted that students could get as much as a $29,325 reduction off of the full cost by transferring credits.

Plaintiff Claudia Provost Charles enrolled in the DBA program in Summer 2017 based on Walden's representations that, after her transferred credits, the program would cost her approximately 50,000 and that she would complete the program in two and a half years.

Instead, Charles graduated in May 2021 after spending four years and almost $71,000 in tuition and fees on the program, about $21,000 more than she expected to spend. She has nearly $88,000 in student loans from her Walden education.

The enrollment advisor told her that she would be able to transfer credits from her MBA program to waive many of the required courses, and that she would not need to pay for these credits. Before accounting for the transferred credits, and consistent with the representations on Walden's website, he advised her that the program would take her approximately 2.5 years to complete and would cost about $62,000.

Plaintiff Tiffany Fair enrolled in Walden's DBA program in June 2016 based on Walden's representation that, after her transferred credits and military discount, the program would cost her $38,715—reduced to $26,215 after a subsequent additional scholarship—and would take her two and a half years to complete.

After relying on the representations from Walden's enrollment advisors and Walden's website that she would complete the doctorate degree in two and a half years for $26,215, Fair was charged approximately $54,000 in tuition and fees over four and a half years before she finally graduated in January 2021, roughly $28,000 more than Walden's promised price.

(ECF No. 1 ¶¶ 192, 196, 209, 210, 216, 229, 248.)

### C. Who

Defendants argue that Plaintiffs fail to meet Rule 9(b) because Plaintiffs do not allege who the enrollment advisor is or identify when the conversation(s) took place that they allege contained

fraudulent misrepresentations.  (ECF No. 35-1, p. 25.)  In support, Defendants cite *Hall v. Capella University*, No. 18-27, 2018 WL 3429934, at *2 (D. Minn. July 6, 2018).  In *Hall*, the court dismissed the plaintiffs' fraud claims for numerous reasons: (1) the plaintiffs did not identify any false representation; (2) the plaintiff did not provide details about the alleged promise; and (3) the plaintiff did not state the contents of any representations or why they were false.  *Id.* at *2.  Further, the court explained that the plaintiffs did not identify the university advisors or allege facts to suggest those advisors made the representations, and the plaintiffs failed to allege that the advisors did not follow through on the promises.  *Id.*

Defendants are correct that Plaintiffs Carroll and Charles do not allege who the specific enrollment advisor was that contacted them.  Contrary to *Hall*, however, Plaintiffs allege: (1) the contents of the false representations; (2) the alleged promises; (3) why the representations were false; and (4) that Defendants did not follow through on the alleged promises.  Although Plaintiffs do not identify the enrollment advisors by name, the court is content that Rule 9(b) is satisfied.  Plaintiffs allege sufficient facts to comply with the purposes of Rule 9(b) such that Defendants are on notice of the conduct about which Plaintiffs complain; and that Plaintiffs may not independently remember the name of the advisors with whom they met is reasonable given the time that has passed.  *Odom v. Microsoft Corp.*, 486 F.3d 541, 554-55 (9th Cir. 2007); *see Maher v. Sempris, LLC*, No. 13-2202, 2014 WL 4749186, at *3 (D. Minn. Sept. 24, 2014) ("Although the pleadings are somewhat skeletal, they sufficiently put [the defendant] on notice as to the time, place, and substance of the alleged fraud allegation.").    The fraud claims in Counts III through VI will not be dismissed for failure to satisfy the heightened pleading standard of Rule 9(b).

**IV. Choice of Law**

Defendants argue that under Maryland's choice of law provisions, Plaintiffs' Minnesota statutory claims fail because, under Maryland choice of law rules, the place of injury is where the loss was felt, not where the wrongful act took place.  (ECF No. 35-1, p. 27-28.)  Defendants argue that under Maryland's choice of law rules, therefore, the court is required to apply Plaintiffs' home state laws and therefore Plaintiffs cannot avail themselves of the Minnesota statutes in Counts III through V.  *Id.* at 28.

"In an action based upon diversity of citizenship, the relevant state law controls.  The district court must apply the law of the forum state, including its choice of law rules." *Bank of La v. Marriott Int'l, Inc.*, 438 F. Supp. 3d 433, 442 (D. Md. 2020) (quoting *Limbach Co., LLC v. Zurich Am. Ins. Co.*, 396 F.3d 358, 361 (4th Cir. 2005)).  Plaintiffs filed this case in Maryland, so Maryland is the forum state.  Thus, the court looks to Maryland law to determine which state's or states' law applies to the state causes of actions.  *Bank of La*, 438 F. Supp. 3d at 442.

"For tort claims, Maryland applies the lex loci delicti rule . . . [which] dictates 'that in a conflict of law situation . . . where the events giving rise to a tort action occur in more than one State, we apply the law of the State where the injury[,] the last event required to constitute the tort[,] occurred.'" *Bank of La*, 438 F. Supp. 3d at 442 (quoting *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 620 (Md. 2007)).  The place of the injury is the place where the injury was suffered, not where the wrongful act took place.  *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986).

Plaintiffs allege that they "have suffered and continue to suffer injuries as a direct, foreseeable, and proximate result" of Defendants' false claims and misrepresentations regarding the DBA program.  (ECF No. 1 ¶¶ 278, 288, 298, 307.)  The named Plaintiffs are citizens of North

Carolina, Virginia, and Louisiana.  Because Walden University's DBA program is an online program, the injury was suffered by Plaintiffs in their home-states.  Plaintiffs do not dispute that the loss or injury occurred in their home states; instead, in opposition to Defendants' arguments, Plaintiffs argue that the choice of law analysis is not appropriate at this stage.  In the alternative, they argue that where the alleged misrepresentations injured students in multiple jurisdictions, the court may apply the law of the place where the wrongful conduct occurred.  (ECF No. 37, p. 27.) In support, Plaintiffs rely on *Cremi v. Brown*, 995 F. Supp. 499 (D. Md. 1997).

The court will first address Plaintiffs' alternative argument that the court should decline to address the choice of law issue at this moment in the litigation.  In opposition to Defendants' arguments, Plaintiffs argue that the choice of law analysis is not appropriate at this stage of the litigation.  There are instances when the court has considered the "fact-intensive[,] context specific . . . [and] complexity" of the choice of law analysis and has properly deferred the determination of choice of law issues to later in the litigation after the parties have engaged in discovery.  *Malinowski v. Lichter Group, LLC*, No. 14-917, 2015 WL 1129522, at *4 (D. Md. Mar. 11, 2015) (quoting *Banner Life Ins. Co. v. Bonney*, No. 11-cv-1982011 WL 5027498, at *8 (E.D. Va. Oct. 21, 2011)).  In *Malinowski*, the plaintiffs filed a class action complaint alleging that their negligent misrepresentation claim was governed by Maryland law; however, the defendant did not address what state's law applies.  *Malinowski*, 2015 WL 1129522, at *3.  The court deferred the choice of law analysis until after the parties engaged in discovery because the plaintiffs alleged "that they and all Plan participants sustained significant economic loss and damages."  *Id.* at *4. The *Malinowski* court reasoned that the choice of law analysis was complex and context specific because the named plaintiffs were citizens of New York and Pennsylvania, thus the law of either

of those states could apply, or the law of any state in which a Plan participant was a citizen could apply. *Id.*

This case is distinguishable from *Malinowski* because the question as to which state's substantive law to apply to this case can be determined by the court at this stage of the proceedings. The parties' do not dispute where Plaintiffs suffered their injuries, such that this court would need to defer its analysis until after discovery.  Instead, this case involves Maryland's choice of law rules in a tort action when the wrongful conduct occurs in a different state than where the loss is felt; the question before the court is whether to apply the law where the alleged wrongful conduct occurred or where the loss was felt.

Maryland courts have not explicitly addressed "the proper application of lex loci delicti in cases where the wrongful conduct in one jurisdiction causes pecuniary loss or injury to the plaintiff in another jurisdiction."  *Dell v. Detar*, No. 16-00887, 2017 U.S. Dist. LEXIS 141366, at *11 (D. Md. Aug. 31, 2017); *see Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 733 (D. Md. 2005) ("Maryland courts have not addressed the issue of where the 'wrong' occurs in cases of fraud, or negligent misrepresentation, when the alleged wrongful act and the alleged loss occur in separate jurisdictions.")  However, in *Cremi v. Brown*, the court examined application of lex loci delicti in other multi-state tort contexts and concluded that the place of the injury is the place where the wrongful acts took place and where the alleged misrepresentations were made. 955 F. Supp. 499, 523-24 (D. Md. 1997).

In *Cremi*, the plaintiffs were institutional customers of a security brokerage who sued the brokerage for loss of investments.  One of the plaintiffs was a credit institution incorporated under the laws of Mexico with its principal place of business in Mexico.  One of the defendants was a securities brokerage firm incorporated under the laws of Maryland with its principal place of

business in Baltimore, Maryland.  The other defendant was a citizen of Texas.  The plaintiffs brought various claims, including common law claims of breach of fiduciary duty, negligence, negligent misrepresentation, and fraud.  The parties disagreed as to what state's substantive law applied to the common law claims.  The court examined "the use of lex loci delecti in other multi-state tort contexts" and relied on the Fourth Circuit's decision in *Farwell v. Un*, 902 F.2d 282 (4th Cir. 1990).  *Id.* at 523.  The *Cremi* court explained that the Fourth Circuit "has determined that it is the law of the place of injury, not that of the place of death (loss) which governs."  *Id.*  (citing *Farwell*, 902 F.2d at 286-87).  Relying on *Farwell* (and Judge Kaufman's self-described "common sense"), the court concluded that the correct state's law to apply under lex loci delicti is the law of the state where defendants were alleged to have made the fraudulent misrepresentations and omissions (as the place where the wrong was committed; not where its effects were felt).  *Id.* at 524.

> Plaintiffs allege that the alleged misrepresentations took place in Minnesota:
>
> Defendants' fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices were made out of Walden University's academic headquarters in Minneapolis, MN.
>
> Defendants made these advertisements out of Walden University's academic headquarters in Minneapolis, MN.
>
> Defendants engaged in these practices out of Walden University's academic headquarters in Minneapolis, MN.
>
> Defendants made these false representations about the cost and number of credits required to complete the DBA program out of Walden University's academic headquarters in Minneapolis, MN.

(ECF No. 1 ¶¶ 275, 285, 296, 305.)  Considering these allegations in the light most favorable to Plaintiffs, the alleged wrongful conduct occurred in Minnesota and the loss or injury to Plaintiffs

allegedly occurred in their respective home states—North Carolina, Virginia, and Louisiana.  The law of the place of the wrong is Minnesota.

Based on guidance from *Cremi*, and the allegations in the Complaint, the court finds that in this case where the alleged wrongful conduct occurred in a different jurisdiction than where the loss was felt, the place of the injury is where the wrong occurred (Minnesota) not where the loss was felt (North Carolina, Louisiana, and Virginia).  In sum, the choice of law issue is appropriately before the court at this stage of the case and Minnesota substantive law applies.

**A. Minnesota Law Extraterritorially**

In the alternative, Defendants argue that even if Minnesota law does apply, the Minnesota statutes in Counts III through V do not apply extraterritorially to Plaintiffs.  (ECF No. 35-1, p. 28.) Defendants assert that Plaintiffs generalized assertions do not overcome the presumption against applying Minnesota statutes extraterritorially to non-residents.  *Id.* at 30.  In support, Defendants rely on *In re Syngenta AG MIR 162 Corn Litigation*,131 F. Supp. 3d 1177 (D. Minn. 2015), and *Johannessohn v. Polaris Industries, Inc.*, 450 F. Supp. 3d 931 (D. Minn. 2020).  *Id.* at 28.

"In general, there is a presumption against the extra-territorial application of a state's statutes." *Johannessohn*, 450 F. Supp. 3d at 949-50 (citations omitted) (quoting *Arnold v. Cargill, Inc.*, No. 012086, 2002 WL 1576141, at *2 (D. Minn. July 15, 2022)).  "While protecting against the potential conflict of law that could arise if one state's statute were to be applied to persons within the borders of another state, such a presumption also serves 'to avoid running afoul of the Commerce Clause of the United States Constitution.'"  *Cruz v. Lawson Software, Inc.*, No. 08-5900, 2009 WL 10711629, at *6 (D. Minn. May 21, 2009) (quoting *Arnold*, 2002 WL 1576141, at *32).

The Minnesota Prevention of Consumer Fraud Act ("MPCFA") and Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA") are silent on extra-territorial application.  In *In re Syngenta AG MIR 162 Corn Litigation*, the court concluded "that these statutes may be applied in this case only to conduct taking place in Minnesota" because the "[p]laintiffs have not pointed to any language in Minnesota's consumer protection statutes allowing for their extra-territorial application."  131 F. Supp. 3d at 1232-33.  The court found that: (1) the plaintiffs did not allege that the defendant company engaged in conduct within Minnesota on which the statutory claims were based; (2) the plaintiffs did not allege that, while residing outside of Minnesota, they had any contact with the defendant or the state; and (3) the plaintiffs did not allege that the defendant's misleading statements were made or distributed in Minnesota, and, to the contrary, the complaint alleged that the statements were made outside of Minnesota.  *Id.*

In the present case, Plaintiffs "have not pointed to any language in Minnesota's consumer protection statutes allowing for their extra-territorial application."  *Id.*  However, Plaintiffs allege that: (1) Defendants engaged in specific conduct in or from Minnesota on which the statutory claims are based; (2) Plaintiffs had contact with Minnesota's  Walden University; and (3) Plaintiffs allege that Defendants' misleading statements occurred in Minnesota.  Specifically, Plaintiffs allege:

> While Walden University, LLC's and Walden e-Learning, LLC's principal place of business is designated as Maryland, Walden University's academic headquarters and its provision of educational services are based in Minnesota and the institution is regulated by and registered with MOHE as a Minnesota institution.

> Like most other Walden doctoral programs, the DBA program has two distinct phases: the coursework phase and the capstone phase.  Upon information and belief, decisions about the design, structure, and requirements of the DBA program are made at Walden's academic headquarters.

> Upon information and belief, Walden's practice of misrepresentation as described herein emanated from decisions made at its academic headquarters in Minneapolis.

> Fair understood when she enrolled in the DBA program that Walden was based and operated out of Minnesota.
>
> Defendants' fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices were made out of Walden University's academic headquarters in Minneapolis, MN.
>
> Defendants made these advertisements out of Walden University's academic headquarters in Minneapolis, MN.
>
> Defendants engaged in these practices out of Walden University's academic headquarters in Minneapolis, MN.
>
> Defendants made these false representations about the cost and number of credits required to complete the DBA program out of Walden University's academic headquarters in Minneapolis, MN.

(Complaint, ECF No. 1, ¶¶ 48, 60, 74, 236, 275, 285, 296, 305.)  The court therefore finds that Minnesota statutes may be applied in this case.

### B. Minnesota Statutory Claims under Minnesota Private Attorney General Statute

Defendants argue that even if Minnesota law applies, and the statutes apply extraterritorially, Plaintiffs' MPCFA and Minnesota False State Advertising Act ("MFSAA") claims (Counts III and IV) fail because Plaintiffs do not allege that this case serves a public benefit. (ECF No. 35-1, p. 30.)

The MPCFA and MFSAA do not "provide a private cause of action . . . .  Thus, a plaintiff suing for violations of those statutes must pursue relief under Minnesota's Private Attorney General Statute." *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1140 (D. Minn. 2016) (citing MINN. STAT. § 8.31, subdiv. 3a).  Minnesota Statute Section 8.31, subdivision 1 provides: "The attorney general shall investigate violations of the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade, and specifically, but not exclusively, . . . section 325.67 and other laws against false or fraudulent advertising, . . . [and]

31

the Prevention of Consumer Fraud Act (sections 325F.68 to 325F.70) . . ."  MINN. STAT. § 8.31, subd. 3a; *see Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004, 1016 (D. Minn. 2012) (citing MINN. STAT. § 8.31, subd. 3a and explaining that the MPCFA does not contain a private cause of action; however, under Minnesota's Private Attorney General Statute "any person injured by a violation of the CFA . . . may file suit and recover damages as well as costs and attorney fees"). The Minnesota Private Attorney General Statute "allows a plaintiff to seek money damages, costs and attorney fees, and injunctive relief." *Johnson*, 175 F. Supp. 3d at 1140; *see* MINN. STAT. § 8.31, subd. 3a (stating that Plaintiffs alleging violations of the MPCFA and MFSAA may bring a civil action under the Minnesota Private Attorney General Statute "and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court").

In order to pursue civil remedies under the Minnesota Private Attorney General Statute, a plaintiff must "demonstrate that the action serves a 'public benefit.'" *Gisairo v. Lenovo (United States) Inc.*, 516 F. Supp. 3d 880, 889 (D. Minn. 2021) (quoting *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000)). "Although 'the public benefit requirement is not onerous, it is a necessary element of a plaintiff's cause of action under the [Private AG Statute].'" *Id.* (quoting *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 11 F. Supp. 3d 933, 937 (D. Minn. 2014)). "In deciding whether there is a public benefit, the following factors are relevant: the degree to which the defendants' alleged misrepresentations affected the public; the form of the alleged misrepresentation; the kind of relief sought; and whether the alleged misrepresentations are ongoing." *Khoday*, 858 F. Supp. 2d at 1017.

### 1) Effect on the Public

"The Minnesota Supreme Court has determined that plaintiffs can establish a public benefit by challenging misrepresentations made to a significant segment of the public." *Khoday*, 858 F. Supp. 2d at 1017.  In *Khoday*, the court found that the plaintiffs "sufficiently alleged a public benefit because of the size of the audience that [defendant] targeted to sell the [product]." *Id.* Additionally, in *Collins v. Minnesota School of Business*, the court found the plaintiff satisfied the public benefit requirement where the defendant "made misrepresentations to the public at large by airing a television advertisement" and "made numerous sales and information presentations" to potential students.  655 N.W.2d 320, 330 (Minn. 2003).

Plaintiffs plead that Defendants' alleged misrepresentations appeared on Defendants' websites and in their advertisements.  (Complaint, ECF No. 1, ¶¶ 75-76, 149.)  Specifically, Plaintiffs allege that Defendants advertised the alleged predatory product through digital banner ads, Facebook ads, video promotions, advertisements on YouTube, and other forms of advertisement.  *Id.* ¶ 149.  Plaintiffs plainly allege that Defendants targeted a large portion of the population for the alleged fraudulent and predatory DBA program through various platforms.  The court therefore finds that alleged misrepresentations were made to, and affected, the public and, therefore, support a finding in favor of a public benefit.

### 2) Form of the Alleged Representation

"Misleading advertising to the general public supports a finding that a claim benefits the public." *Williams v. Total Life Changes, LLC*, No. 20-2463, 2021 WL 2592385, at *3 (D. Minn. June 24, 2021) (quoting *McDougall v. CRC Indus., Inc.*, No. 20-1499, 2021 WL 810635, at *7 (D. Minn. Mar. 3, 2021)).  The alleged misrepresentations regarding the number of credits required to complete the DBA program and the cost of the program appeared under the Tuition and Fees pages

on Defendants' website. (ECF No. 1 ¶ 76.) Additionally, Plaintiffs allege that enrollment advisors used scripted responses to provide prospective students with standardized information consistent with the representations on the website. *Id.* ¶¶ 98-100. Therefore, the alleged misleading advertising through Defendants' websites and enrollment advisors supports a finding that the claim benefits the public.

### 3) *Type of Relief Sought*

Defendants argue that Plaintiffs are not entitled to injunctive relief because Defendants updated their website to include the information Plaintiffs claim was missing. (ECF No. 35-1, p. 30.) As a result, the remaining requested relief is primarily monetary in nature. Defendants rely on *Gisario* for the proposition that when a plaintiff seeks money damages, courts have found that no public benefit exists. 516 F. Supp. 3d at 890.

In *Gisario*, the court found that the action did not benefit the public, reasoning that the plaintiff made "a single conclusory allegation" that the action would benefit the public interest and failed "to address how or why there is any public benefit to the action." *Id.* at 890. "However, 'the fact that a plaintiff requests no injunctive relief does not preclude [him or her] from satisfying the public benefit requirement.'" *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1142 (D. Minn. 2016) (quoting *In re Levaquin*, 752 F. Supp. 2d 1071, 1077 (D. Minn. 2010)).

In *Khoday v. Symantec Corp.*, the court found that the plaintiffs' claim benefitted the public even though the action sought only money damages. 858 F. Supp. 2d 1004, 1017 (D. Minn. 2012). The court reasoned that "[m]oney damages may benefit consumers through providing compensation and a deterrent effect, and the plain language of the Private AG Statute allows for this type of recovery." *Id.*; *see also Johnson*, 175 F. Supp. 3d at 1142 (finding that the plaintiff's claims advanced the public interest and were sufficient to state claims under the Minnesota Private

Attorney General Statute because "the alleged misrepresentations were disseminated to the public at large"), *and Williams*, 2021 WL 2592385, at *4 (explaining that "statutory claims for damages would benefit the public by reimbursing those misled and making [defendant] less likely to make the same misrepresentations to the public in the future").

In the instant case, Plaintiffs seek damages and an injunction to "prevent additional instances of such conduct or similar conduct from occurring in the future, including but not limited to requiring Defendants [to] cease charging tuition for any additional capstone credits they require class members to take beyond the stated requirements as of the time the class member enrolled." (Complaint, ECF No. 1, pp. 64-65.)  Plaintiffs also seek compensatory and punitive damages.  *Id.* Although Defendants may have updated the website to reflect the true cost and duration of the DBA program, Plaintiffs allege that some of the complained-of behavior is ongoing, and that they continue to suffer from substantial financial harm.  *Id.* ¶¶ 256, 278, 288, 299, 307.  Moreover, money damages may also provide for a deterrent effect.[3]

### 4) Whether the Alleged Misrepresentations are Ongoing

Plaintiffs allege that Defendants updated the website to reflect the true cost of the program and disclosed how long and costly the DBA program could be.  (ECF No. 1 ¶ 93.)  However, Plaintiffs also allege, however, that some of Defendants' alleged fraudulent misrepresentations are ongoing, including for example, prolonging the capstone process without any legitimate academic purpose.  *Id.* ¶¶ 24, 256, 278, 288, 299, 307.

In *Gisario*, the court explained that a public benefit is generally not found "when a product no longer is sold[,] or the allegedly false advertisements have ceased."  *Gisario*, 516 F. Supp. 3d

---

[3] Although the court makes no finding as to whether Plaintiffs are entitled to injunctive relief, the court notes that modification to the website (as Defendants describe) does not necessarily resolve the matter or foreclose the availability of injunctive relief.

at 890.  However, the *Gisario* court substantially relied on the type of relief sought (monetary damages) to support its finding that the plaintiff failed to allege sufficient facts to establish a public benefit.  *Id.*  In contrast, in *Khoday*, the court relied heavily on the size of the audience that the defendant targeted to sell the product to find that the action benefitted the public regardless of whether the defendant was still selling the product.  858 F. Supp. 2d at 1017.

The court finds that Plaintiffs have sufficiently alleged a public benefit due to the size of the audience that Defendants targeted for the DBA program.  Plaintiffs allege that Defendants targeted the public and potential students for the DBA program through numerous avenues over the Internet and television.  (ECF No. 1 ¶ 149.)  Although Defendants argue that they have updated the website to reflect the true cost and number of credits for the DBA program and thus there is no injunction remedy, Plaintiffs' action may still benefit the public even where money damages are the only relief requested.  As the Plaintiffs allege, money damages provide compensation, but also provide a deterrent effect to Defendants.  Therefore, taken in the light most favorable to Plaintiffs, the court finds that Plaintiffs have alleged a public benefit.

### III. Minnesota Statutory Claims and State Law Claim

Plaintiffs bring Minnesota statutory claims (Counts III through V) and a claim for common law fraudulent misrepresentation (Count VI).  Defendants do not dispute that Plaintiffs state claims in Counts III through VI.  As discussed in Section II, *supra*, the court may properly exercise subject matter jurisdiction over the remaining state law claims.  Additionally, as detailed in Section IV, the court finds that Minnesota law applies to this case and that the Minnesota statutes at issue may be applied extra-territorially.  Finally, the court finds that Plaintiffs sufficiently allege a public benefit.  Defendants' final argument regarding dismissal of the Minnesota statutory claims is that under the Minnesota Uniform Deceptive Trade Practices Act, MINN. STAT. § 325D.44, the only

remedy is injunctive relief and Plaintiffs do not allege irreparable harm or threat of future harm. (ECF No. 35-1, p. 31.)

### A. Minnesota Uniform Deceptive Trade Practices Act (Count V)

Defendants argue that Plaintiffs' MUDTPA claim fails for two reasons: 1) because "the sole statutory remedy under the act is injunctive relief, which cannot issue here" and 2) Plaintiffs do not allege irreparable harm or threat of future harm.  (ECF No. 35-1, p. 31.)  As to the first arguments, Defendants rely on *Gisario*, where the court stated that the sole remedy under MUDTPA is injunctive relief.  516 F. Supp. 3d at 891.

"A person engages in deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . (5) represents that goods or services have . . . characteristics . . . that they do not have . . . (9) advertises goods or services with intent not to sell them as advertised . . . or (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  MUDTPA § 325D.44.  MUDTPA § 325D.45, subdivision 1, states that "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable."  MUDTPA § 325D.45, subd. 1.  "The relief provided under the act 'is in addition to remedies otherwise available against the same conduct under the common law or other statutes.'"  *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 475 (1999) (quoting MUDTPA § 325D.45, subd. 3)).

A plaintiff may seek damages under MUDTPA pursuant to Minnesota's Private Attorney General Statute provided "the cause of action benefits the public."  *Miami Products & Chemistry Company v. Olin Corporation*, 546 F. Supp. 3d 223, 242 (W.D.N.Y. 2021) (quoting *Tatone v. Suntrust Mortg., Inc.*, 857 F. Supp. 2d 821, 836 (D. Minn. 2012)); MINN. STAT. § 8.31, subdiv. 1.

Under Minnesota's Private Attorney General Statute, MINN. STAT. § 8.31, MUDTPA is not listed as one of the statutes that may be enforced; however, the language of Section 8.31 states "[t]he attorney general shall investigat[e] violations of the law of this state respecting unfair, discriminatory, and other lawful practices in business, commerce, or trade, and specifically, but not exclusively . . ."  MINN. STAT. § 8.31, subd. 1.  Courts have interpreted this section to mean that Minnesota's Private Attorney General Statue extends to MUDTPA.  *Collins v. Minn. Sch. of Bus., Inc.*, 636 N.W.2d 816, 820 (Minn. Ct. App. 2001) ("The private-attorney-general statute provides that 'any person injured by a violation of any of the laws referred to in subdivision 1,' including the Prevention of Consumer Fraud Act . . . and, indirectly, the Deceptive Trade Practices Act.").  In *Maher v. Sempris, LLC*, the defendant argued the plaintiffs could not maintain a claim under MUDTPA because the plaintiffs did not allege potential future harm.  *Maher v. Sempris, LLC*, No. 13-2202, 2014 WL 4749186, at *4 (D. Minn. Sept. 24, 2014).  The court concluded that at a motion to dismiss stage, it would "not dismiss the MUDTPA claim on the basis of a remedy[,]" where the other claims were plausible pled.  *Id.*

At this stage of the proceeding, although Plaintiffs seek money damages, Plaintiffs' MUDTPA claim may proceed because the case benefits the public.  Additionally, although Defendants argue there is nothing to enjoin, Plaintiffs claim that Defendants continue to engage in unlawful conduct:

> Walden continues to prolong the capstone phase well beyond nineteen credits and thus continues to exploit DBA students for profit as part of its discriminatory scheme.
>
> In fact, Walden's capstone process was and is intentionally designed and/or implemented to extract additional tuition revenue from students, beyond the amounts Walden stated were required, by intentionally prolonging the capstone process without any legitimate academic purpose. This conduct remains ongoing.

> Defendants' fraudulent and predatory enrollment scheme led to and continues to cause substantial financial harm to students enrolled in the DBA program, causing them to pay many thousands of dollars in excess tuition at the capstone phase.
>
> The current disclosure is, of course, of no help to students who relied on a much lower figure when they enrolled and who have either completed their degrees at a higher than anticipated cost or who continue to be enrolled at Walden, racking up fees with each passing term.
>
> The content of Walden's advertisements further demonstrates the institution's intentional focus on targeting Black prospective students for its predatory product. The overwhelming majority of Walden's advertisements prominently feature Black people. Through its digital banner ads, Facebook ads, video promotions and other advertisements on YouTube, and other forms of advertisement, Walden targets Black prospective students by designing and publishing marketing materials that, far more often than not, star Black models or Black Walden students.
>
> Walden's advertising reflects its intentional focus on targeting female prospective students for its predatory product. The overwhelming majority of Walden's online advertisements prominently feature women (frequently Black women), as do its websites. By designing and publishing marketing materials that disproportionately feature female models and female Walden students, Walden targets female prospective students for enrollment.

(Complaint, ECF No. 1, ¶¶ 21, 24, 25, 93, 149, 163.)  At this stage, the court declines to "foreclose an equitably remedy that may prove to be appropriate." *Maher*, 2014 WL 4749186, at *4.

As to Defendants' second argument that Plaintiffs do not allege an irreparable injury or threat of future harm, the court finds this lacks merit.  "A plaintiff asserting a claim under the MUDTPA must allege an irreparable injury or threat of future harm in order to withstand a motion to dismiss." *Knotts v. Nissan N. Am.*, 346 F. Supp. 3d 1311, 1328 (D. Minn. 2018).  "An injury to the plaintiff is irreparable if it 'is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Johnson*, 175 F. Supp. 3d at 1140.  In *Johnson*, the court dismissed the plaintiff's MUDTPA claim because all of the claims were "grounded in past damage." *Id.*

Here, Plaintiffs allege a risk of future harm that is sufficient to withstand a motion to dismiss.  Plaintiffs seek injunctive relief requiring that Defendants' "take all affirmative steps

necessary to remedy the effects of the conduct described herein." (Complaint, ECF No. 1, pp. 64-65.) Plaintiffs further allege that they "have suffered and continue to suffer financial injuries as a direct, foreseeable, and proximate result of Defendants' past and ongoing actions set forth above." *Id.* ¶ 256. Additionally, Plaintiffs allege that Defendants' fraudulent and predatory enrollment scheme continues to cause substantial financial harm. *Id.* ¶ 25. Plaintiffs' MUDTPA claim may proceed at this stage of the case.

## VI. Educational Malpractice Doctrine

Finally, Defendants argue that to the extent Plaintiffs complain in Counts I through VI about the quality of Walden's DBA program or the education they received, the educational malpractice doctrine bars these claims because Plaintiffs complain about the way Walden administered the dissertation portion of the DBA doctoral program and their experiences in the capstone phase of the program. (ECF No. 35-1, pp. 32-33.)

"The educational malpractice doctrine applies when a court is 'asked to evaluate the course of instruction . . . [and] is similarly called upon to review the soundness of the method of teaching that has been adopted by an educational institution." *Botts v. Johns Hopkins Univ.*, No. 20-1335, 2021 U.S. Dist. LEXIS 76788, at *17 (D. Md. Apr. 21, 2021) (quoting *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992)). The educational malpractice doctrine "precludes a court from adjudicating claims regarding the quality of education provided by an educational institution." *Id.* (citing *Hunter v. Bd. of Educ. of Montgomery Cty.*, 292 Md. 481, 487 (1982)).

Plaintiffs do not allege an issue with the quality of Walden's DBA program or the education they received. Instead, Plaintiffs allege that Defendants engaged in "a multi-part discriminatory, fraudulent, deceptive, and dishonest scheme" and that Defendants "deliberately hid the true cost of the DBA program by knowingly misrepresenting and understating the number of 'capstone'

credits required to complete the program and obtain a degree." (Complaint, ECF No. 1, ¶¶ 2-3.) The educational malpractice doctrine does not bar any of Plaintiffs' claims.

**CONCLUSION**

For the reasons set forth herein Walden University, LLC, and Walden e-Learning's Motion to Dismiss (ECF No. 35) is **DENIED**.

A separate order follows.

_____/s/_____
Julie R. Rubin
United States District Court Judge

November 28, 2022