# UNITED STATES DISTRICT COURT

# DISTRICT OF MARYLAND

| | |
|---|---|
| Aljanal Carroll, Claudia Provost Charles, Tiffany Fair, and Tareion Fluker<br><br>    Plaintiffs,<br><br>    v.<br><br>Walden University, LLC, and Walden e-Learning, LLC,<br><br>    Defendants. | Civil Action No. 1:22-cv-00051-JRR |

# FIRST AMENDED COMPLAINT AND JURY DEMAND

**INTRODUCTION**

1.      Plaintiffs Aljanal Carroll, Claudia Provost Charles, Tiffany Fair, and Tareion Fluker bring this action for damages, injunctive relief, and declaratory relief on behalf of themselves and all other similarly-situated individuals against Defendants Walden University, LLC and Walden E-Learning, LLC (collectively "Walden"), which jointly own and operate Walden University, a for-profit institution, to seek redress for violation of (for Plaintiffs Carroll and Charles) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI") and (for Plaintiffs Charles and Fair) the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*. ("ECOA"). Additionally, Plaintiffs Carroll, Charles, and Fair bring this action on behalf of themselves for violation of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68 *et seq*., the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43 *et seq*, and Minn. Stat. § 325F.67, prohibiting false statements in advertising; and for common law fraudulent misrepresentation.

2.      Plaintiffs have been and continue to be injured by a multi-part discriminatory, fraudulent, deceptive, and dishonest scheme perpetrated by Defendants in Walden's Doctor of Business Administration ("DBA") program.

3.      Defendants employed, and continue to implement, a concerted constellation of tactics to target, deceive, and exploit Black and female DBA students. As part of this scheme, Walden deliberately hid the true cost of the DBA program by knowingly misrepresenting and understating the number of "capstone" credits required to complete the program and obtain a degree. After luring students to the DBA program with the false promise that they could swiftly earn a graduate degree, Walden kept (and continues to keep) students trapped in the capstone phase by arbitrarily requiring them to complete additional credits at a cost of close to $1,000 each. Through this scheme, which Walden targeted at Black and female prospective students,

2

Walden has overcharged members of the proposed classes more than $28.5 million.

4.     Plaintiffs Carroll, Charles, and Fluker bring their Title VI claims on behalf of **the Title VI Class**, consisting of all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018 and were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled.

5.     Plaintiffs Charles and Fluker bring their Equal Credit Opportunity Act claims on behalf of **the ECOA Black Student Class**, consisting of all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans or payment plans to pay for some or all of their Walden education.

6.     Plaintiffs Charles, Fair, and Fluker bring their Equal Credit Opportunity Act claims on behalf of **the ECOA Female Student Class**, consisting of all female students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans or payment plans to pay for some or all of their Walden education.

7.     Plaintiffs are or have been enrolled as students in Walden's DBA program, a professional terminal-level degree advertised by Walden as equipping its graduates with "practical knowledge that can be directly applied in the workplace."

8.     The DBA program was one of approximately twenty doctoral programs offered by Walden during the relevant time period. Across all programs, Walden's doctoral student

3

population is 41% Black, which is more than seven times the percentage of doctoral recipients nationwide who are Black. Likewise, across all programs, Walden's doctoral student population is 77% female, which is 1.7 times the percentage of doctoral recipients nationwide who are female.

9.      Beginning no later than fall semester 2008, and continuing through at least January 2018, Walden engaged in a consistent and longstanding pattern of fraudulent misrepresentations regarding the requirements of the DBA degree—including the required credits, the length of time required for completion, and, most consequentially, the cost of the degree—for the purposes of enticing students to enroll in the DBA degree program.

10.     Starting no later than fall semester 2008 and continuing through the present, Walden has purposefully prolonged the capstone phase of the DBA program, requiring students to pay for additional credits to obtain their degrees.

11.     This is not an equal opportunity predatory scheme. It is one that Defendants purposefully targeted at and that disparately impacts Black[1] and female DBA students.

12.     Through this multi-part fraudulent scheme, Walden lured in potential DBA students by advertising a doctoral degree that could be earned at a reasonable cost, on a reasonable schedule, when in fact the school knew and intended that degree to be much more expensive in order to line its own pockets.

13.     As part of this scheme, once students had invested considerable time and money in the program, Walden required students to complete—and pay for—significantly more credits than the stated graduation requirement in order to receive a degree.

---

[1] The U.S. Census defines "Black or African American" as a "person having origins in any of the Black racial groups of Africa. It includes people who indicate their race as 'Black or African American,' or report entries such as African American, Kenyan, Nigerian, or Haitian." *Race*, Census.gov, https://www.census.gov/quickfacts/fact/note/US/RHI625219 (last visited Jan. 6, 2022).

14.     Specifically, Walden knowingly and intentionally misrepresented the number of credits and cost required to complete the second of two phases of the degree, called the "capstone" phase. The Walden "capstone" is a research and writing project completed by DBA students after completing their classroom coursework, in place of the dissertation typically required in a traditional academic doctoral program.

15.     Walden, through its website and employees called "enrollment advisors," repeatedly represented to prospective students and the public at large that students needed to earn sixty credit hours to graduate, taking about three and a half years to complete, for a total cost of roughly $43,000 to $60,000,[2] depending on the year—with both reduced costs and time for students transferring credits from a prior degree or program.

16.     Walden knew that these representations were false, and that the average student who completed the DBA degree had, by the time of graduation, been required to complete *far* more than sixty credits and pay tuition significantly exceeding the stated amount—sometimes by as much as a factor of three and on average an additional $34,300 per graduate.

17.     In fact, Walden designed and operated its program so that the vast majority of students would be required to pay far more than the stated price. On average, those who successfully completed a Walden DBA degree between 2008 and 2017 were required to complete more than one and a half times the stated credit requirement—ninety-four credits, instead of the stated sixty credit requirements. *See* Exhibit 1, Minnesota Office of Higher Education, *Walden University Doctoral Program Review*, Figure 14 (Oct. 23, 2019) (hereinafter "MOHE Report").

18.     Walden accomplishes this through its operation of the capstone phase of the

---

[2] The total tuition representation increased each year over the time period based on increases in Walden's per-credit tuition.

5

program. Walden knew that DBA students in the capstone phase were a captive source of tuition revenue, since the students had invested so much time and money in the program by the time they got to the capstone stage that they were unlikely to leave—and squander all the time and money already committed—without completing the program.

19.     Walden also knew that students routinely completed the coursework phase of the program on time and that Walden's duplicity would therefore remain hidden until students reached the capstone phase, at which point they had already invested significant time and money in the program. After the coursework phase, Walden then intentionally trapped (and continues to trap) DBA students in the capstone phase, which Walden purposefully prolonged to ensure ongoing enrollment and make more money.

20.     Walden represented that the sixty required credits were divided between the two phases of the program and the capstone phase, with (depending on the specific year) either forty or forty-one coursework credits and either nineteen or twenty capstone credits required.

21.     Despite representing that the capstone phase of the program required just nineteen or twenty credits to complete, it was in fact exceedingly rare for Walden to permit a student to graduate with just nineteen or twenty capstone credits. On average, Walden did not allow students to receive a DBA degree between 2008 and 2017 until completing fifty-four capstone credit hours, nearly three times Walden's stated requirement. Walden continues to prolong the capstone phase well beyond nineteen credits and thus continues to exploit DBA students for profit as part of its discriminatory scheme.

22.     Because Walden requires students to be continuously and automatically enrolled in its "Doctoral Study Completion" course, subject to the standard per-credit tuition fee, throughout their time in the capstone phase, the true capstone credit requirements result in a

6

sizeable and significant increase in costs for the students—an average of $34,300 in excess tuition for each graduating student.

23.     This excess tuition—specifically, tuition paid for capstone credits beyond the advertised requirement—represented a large revenue stream for Walden. An estimated 1,221 students who entered the DBA program between August 2008 and January 2018 have since graduated, representing over $41.9 million in excess tuition for these students alone. Plaintiffs' proposed class of Black and/or female graduates who enrolled during this time period includes an estimated 830 people, representing over $28.5 million in excess tuition. The total amount of excess tuition received by Walden is far higher, since these figures do not include students who dropped out or have not yet graduated despite exceeding the stated number of credits required and the associated tuition.

24.     In fact, Walden's capstone process was and is intentionally designed and/or implemented to extract additional tuition revenue from students, beyond the amounts Walden stated were required, by intentionally prolonging the capstone process without any legitimate academic purpose. This conduct remains ongoing.

25.     Defendants' fraudulent and predatory enrollment scheme led to and continues to cause substantial financial harm to students enrolled in the DBA program, causing them to pay many thousands of dollars in excess tuition at the capstone phase. Students typically financed this through federal student loans.

26.     To make matters worse, Walden engaged in racial and gender discrimination by targeting this predatory scheme at Black and female students.

27.     The Walden doctoral student body includes a significantly higher proportion of Black students than is the case across doctoral programs nationwide. Walden itself touts this fact,

noting its "intentional inclusivity."[3] According to the National Science Foundation's National Center for Science and Engineering Statistics ("NCSES"), Walden conferred more doctoral degrees to Black candidates than any other institution over the five-year period from 2016–2020. *See* National Center for Science and Engineering Statistics, Survey of Earned Doctorates. Statistical profile of doctorate recipients, by ethnicity, race, and citizenship status: 2020 (Table 9) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables.

28.     Roughly 41% of Walden doctoral students are Black—more than 7 times the proportion of doctoral graduates nationwide (of whom 5.6% are Black) and over 5 times the proportion of MBA graduates nationally (of whom 8% are Black).

29.     Roughly 77% of Walden doctoral students are female—more than 1.7 times the proportion of doctoral graduates nationwide (of whom 45% are female) and nearly twice the proportion of MBA graduates nationally (of whom less than 40% are female).

30.     This is not an accident. Walden has engaged in intentional and explicit targeting of Black and female prospective students.

31.     One way Walden accomplishes this is by directing nearly all of its local advertising budget to markets with higher-than-average Black populations.

32.     For example, Walden's top six markets for local TV advertising between 2010 and 2020 were Washington, D.C., Dallas, Atlanta, Houston, Charlotte, and Baltimore. In 2015, Walden directed 99.8% of its local advertising budget to areas with an above-median percentage of Black residents.

33.     Walden also targets certain groups of nontraditional doctoral students, including students who are employed while pursuing a doctorate, students with children, and students over

---

[3] *See Empowering the greater good for 50 years and counting.*, waldenu.edu, https://www.waldenu.edu/why-walden (last visited Jan. 6, 2022).

30. These groups of students are disproportionately Black and disproportionately female.

34.     Walden's enrollment of large numbers of Black and female students would be laudable if Walden were offering a legitimate, non-predatory educational program. Instead, however, Walden is targeting Black and female students with a predatory program designed to hoodwink students and saddle them with onerous student debt. This is not laudable; instead, it constitutes illegal reverse redlining and racial discrimination.

## PARTIES

35.     Plaintiff Aljanal Carroll was a student in the DBA program at Walden from September 2017 until her graduation in October 2020. Carroll is a resident of North Carolina and has been at all times relevant to the allegations set forth herein. Carroll is Black and is 49 years old.

36.     Plaintiff Claudia Provost Charles was a student in the DBA program at Walden from July 2017 until her graduation in May 2021. Charles is a resident of Louisiana and has been at all times relevant to the allegations set forth herein. Charles is Black and is fifty-one years old.

37.     Plaintiff Tiffany Fair was a student in the DBA program at Walden from June 2016 to January 2021. Fair is a resident of Virginia and has been at all times relevant to the allegations set forth herein. Fair is biracial, is a member of a Black household, and is forty-three years old.

38.     Plaintiff Tareion Fluker was a student in the DBA program at Walden from May 2011 to June 2016. Fluker is a resident of Georgia and has been at all times relevant to the allegations set forth herein. Fluker is Black and is 50 years old.

39.     Defendant Walden University, LLC is a Florida company. Its principal place of business is located at 650 South Exeter Street, Baltimore, Maryland 21202. Walden University,

LLC's estimated annual revenue is $47.67 million.

40.     Defendant Walden e-Learning, LLC is a Delaware company. Its principal place of business is located at 650 South Exeter Street, Baltimore, Maryland 21202. Defendant Walden University, LLC is a wholly-owned subsidiary of Defendant Walden e-Learning, LLC.

41.     Walden e-Learning LLC, in turn, is owned by Adtalem Global Education, Inc., a Delaware corporation.

42.     Defendant Walden University, LLC and Defendant Walden e-Learning, LLC jointly own and operate Walden University.[4] Walden University's academic headquarters are located at 100 Washington Avenue South, Suite 1210, Minneapolis, Minnesota 55401, and it is registered with and regulated by the Minnesota Office of Higher Education ("MOHE") as a Minnesota institution.

43.     In acting or failing to act as alleged herein, Walden acted through its employees and/or agents and is liable for the acts and omissions of its employees and/or agents.

44.      In acting or failing to act as alleged herein, each employee or officer of Walden was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Walden as principal.

## JURISDICTION AND VENUE

45.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

---

[4] In a recent SEC filing, Adtalem described the two companies as together "own[ing] and operat[ing] Walden University, an online for-profit university headquartered in Minneapolis, Minnesota." Adtalem Global Education Inc. Form 8-K, SEC (July 13, 2021), https://www.sec.gov/Archives/edgar/data/0000730464/000115752321000863/a52459329.htm. Additionally, the two most recent Program Participation Agreements between Walden University and the U.S. Department of Education were executed in Walden University's name by principles of both Walden University, LLC and Walden e-Learning, LLC.

46.     Both Defendant Walden University, LLC and Defendant Walden e-Learning, LLC are deemed to reside in Baltimore, MD under 28 U.S.C. § 1391(c)(2), and venue is proper in this district under 28 U.S.C. §§ 1391(b)(1).

47.     This Court has personal jurisdiction over Defendant Walden University, LLC and Defendant Walden e-Learning, LLC because both have their principal place of business in Maryland, and both conduct significant business in the state related to Plaintiffs' claims.

## FACTUAL BACKGROUND

### 1.     WALDEN UNIVERSITY

48.     Walden University is a for-profit university with its academic offices located in Minneapolis, MN. It was founded in 1970 and was accredited in 1990 by the Higher Learning Commission, one of six regional institutional accreditors in the United States. Walden's accredited status was reaffirmed in 2013.

49.     While Walden University, LLC's and Walden e-Learning, LLC's principal place of business is designated as Maryland, Walden University's academic headquarters and its provision of educational services are based in Minnesota and the institution is regulated by and registered with MOHE as a Minnesota institution.

50.     Walden confers the DBA degree "upon the authority vested in the Board of Directors of Walden University by the State of Minnesota."[5]

51.     Walden's website declares that it was created because its founders "were inspired to create opportunities for working professionals where there previously were none."[6] Its stated mission is "to provide a diverse community of career professionals with the opportunity to

---

[5] *See* Walden University, *Summer 2021 College of Management & Technology Commencement Ceremony*, YouTube (July 31, 2021), https://www.youtube.com/watch?v=n80tQNgFNyA at 8:00.
[6] *See supra* note 4.

transform themselves as scholar-practitioners enabling them to create positive social change."[7] MOHE, relying on letters from Walden sent as part of a program review of the school's doctoral programs (described in more detail below), noted that Walden seeks to "serve and provide 'broad access' to underrepresented populations, which may otherwise not have the opportunity to further their education." MOHE Report, at 5.

52.     Walden describes itself as a "pioneer" of distance learning, and it solely offers online degree programs. Walden has offered doctoral programs since its founding in 1970 and offered 20 different doctoral programs as of 2016. Fourteen of these are traditional (Ph.D.) doctorates and six, including the DBA program, are professional doctoral programs. During the years 2009 through 2016, Walden's doctoral programs maintained an average total enrollment of approximately 5,300 students.

53.     According to data from the National Science Foundation, Walden granted 867 doctorates in 2020, more than any other institution in the country. From 2016–2020, Walden awarded 1,383 doctorates to Black students. This is more than five times the number granted by the second-ranking institution (Howard University, a Historically Black College or University ("HBCU"), granted 266 doctorates to Black students during the same period) and 11.4% of *all doctorates* granted to Black students *in the nation. See* National Center for Science and Engineering Statistics, Survey of Earned Doctorates. Doctorate recipients, by ethnicity, race, and citizenship status: 2010–20 (Table 9) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables.

54.     In 2020, Walden produced more female doctorates than any other institution in the country: 591. The institution with the second-largest number produced just 350. A full 68%

---

[7] *The Passion that Drives Us,* waldenu.edu, https://www.waldenu.edu/why-walden/social-change (last visited Jan. 6, 2022).

of Walden's doctoral recipients were women, while the median for the top fifty doctoral-producing institutions was just 44%. There was no other institution among the top fifty with more than 55% female graduates. National Center for Science and Engineering Statistics, Survey of Earned Doctorates. Doctorate recipients, by ethnicity, race, and citizenship status: 2010–20 (Table 3) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables.

55.     As described below, the fact that Walden's student body is composed of such a disproportionate number of Black and female students is not an accident.

56.     Absent needed context, it might be deemed laudable that Walden confers so many doctorates on Black and female students. But context is crucial. The real import of the fact that one out of every nine doctorates received by a Black student in America comes from Walden and that Walden awards more doctorates to females than any other institution in the country is that Walden is harming an extraordinary number of Black and female doctoral candidates with its knowing misrepresentations about the length and cost of its doctoral programs.

## 2.     WALDEN'S DBA PROGRAM

57.     Walden first offered the DBA in 2008 as its inaugural professional doctorate program. Walden describes the DBA as "a terminal[8] business-focused degree that provides practical knowledge that can be directly applied in the workplace," in comparison to the more academically oriented Ph.D. in Business Administration.[9]

58.     Between fall 2008 and fall 2017, 9,015 students began the DBA program. In 2016, 1,032 students were enrolled in the DBA program, or 18.76% of the total number of doctoral candidates across all programs at Walden. The DBA program maintained an average

---

[8] A terminal degree refers to the highest degree available in a particular discipline.
[9] *See DBA Degree 101,* waldenu.edu, https://www.waldenu.edu/online-doctoral-programs/doctor-of-business-administration/resource/what-is-a-dba-degree (last visited Jan. 6, 2022).

enrollment of 1,007 total students during each of the eight academic years between 2008 and 2016.

59.    Walden represented the DBA program as having a total cost of approximately $43,000 to $60,000, depending on the then-current cost per credit hour (or less, for students transferring credits), and requiring a total of sixty post-bachelor's degree credits.

60.    In truth, however, this number does not even approach the actual number of credits completed by DBA recipients: instead, on average, each successful DBA student completed 94 credits before graduating with a DBA degree, representing $34,300 in excess tuition.

61.    Like most other Walden doctoral programs, the DBA program has two distinct phases: the coursework phase and the capstone phase. Upon information and belief, decisions about the design, structure, and requirements of the DBA program are made at Walden's academic headquarters.

62.    During the coursework phase, a student is enrolled in online courses, covering topics such as business strategy, research methods, and courses related to the student's area of specialization. Throughout the 2008-2015 period, the DBA program required students to complete 40 credits during the coursework phase, and it increased the requirement to 41 credits beginning in the 2015–16 academic year.

63.    During the capstone phase, students design and complete a research project, including a prospectus, proposal, and final paper. Throughout the 2008-2015 time period, Walden publicly maintained that the DBA program required completion of a total of 20 credits during the capstone phase, decreasing the requirement to nineteen credits beginning in the 2015–16 academic year.

14

64.     The total number of required credits, including both coursework and capstone credits, remained unchanged at sixty credits throughout the time period at issue.

65.     From 2008 through 2015, the 20 credit DBA capstone phase was made up of four zero-credit "doctoral mentoring" 8000-level courses and five four-credit "doctoral study completion" 9000-level courses.[10]

66.     Students were enrolled in one 9000-level course each eight-week term, for a total of two 9000-level courses per semester.[11] Therefore, Walden's stated requirements informed DBA students that they would complete the capstone phase in two and half semesters over roughly 10 months.

67.     Beginning in the 2015–16 academic year, the doctoral mentoring course was assigned one credit, and the number of credits assigned to each 9000-level doctoral study course was reduced from four credits to three credits. At this point, Walden's stated graduation requirement of nineteen total capstone credits consisted of four credits of doctoral mentoring and five 9000-level courses worth three credits each.

68.     The stated requirements for the number of 9000-level courses and time to completion thus remained the same for the entire time period at issue. Throughout, Walden informed prospective students that the DBA program required sixty total credits and five DBA 9000-level courses and could be completed in roughly three and a half years.

---

[10] In 2008 and 2009, the "doctoral studies sequence" also included a four-credit "Writing the Doctoral Study Prospectus" course. This course, which was apparently discontinued after 2009, was taken alongside other core program requirements during the coursework phase of the program. In these two years, as in the years that followed, the program requirements included 20 capstone credits by way of five iterations of the four-credit, 9000-level "Doctoral Study Completion" course.

[11] The DBA program is a semester-based program. As explained by the MOHE Report, Walden's semester-based programs assume 3 15-week semesters per year. There are two eight-week terms in each semester. *See* MOHE Report at 31.

69.     Walden's representations regarding the required *coursework* credits consistently matched students' experiences; at the point at which students complete their coursework credits, Walden's representations regarding the cost of the DBA program appeared correct because all was proceeding as advertised. It is the capstone credit requirement that is the primary subject of Walden's misrepresentations, the chief mechanism by which Walden imposes additional graduation requirements, and, thus, the cause of financial harm. Walden's duplicity is revealed when students reach the capstone phase and discover that Walden requires them to take many more capstone courses than the stated requirement in order to charge them semester after semester, leading to substantial excess tuition for students and substantial excess revenue for Walden.

70.     Walden advertised and represented to potential students that the capstone phase consisted of just 19-20 capstone credits, which, in 2018, cost $18,620 or $19,600. In fact, successful graduates were required to complete fifty-four capstone credits on average, which cost $52,920—nearly three times the stated amount.

**3.     WALDEN'S MISREPRESENTATIONS AND PREDATORY CAPSTONE SCHEME**

    **A.     WALDEN FRAUDULENTLY REPRESENTED THE REQUIRED CREDITS AND COST OF ITS DBA PROGRAM TO POTENTIAL STUDENTS AND THE PUBLIC**

71.     Through its fraudulent and predatory enrollment practices, Walden has consistently enticed students to enroll in its DBA program by fraudulently misrepresenting the true cost of the program through its websites and online materials, as well as through its enrollment sales associates.

72.     Across these various platforms, Walden represented that the DBA degree could be earned for a predictable cost. It represented that a DBA degree would require sixty credit hours

16

(forty or forty-one credit hours for coursework credits and nineteen or twenty for their capstone credits, depending on the year), with tuition charged on a per-credit basis. Other than the minimal variation year-by-year in the price of each credit (which ranged from $725 to $980 during the period in question), Walden represented the DBA degree as having a specific cost.

73.     In truth, most DBA students are not awarded their degree after completing the advertised graduation requirements—and therefore pay significantly more than the stated cost. MOHE reports that DBA students complete an average of fifty-four capstone credits, *more than two and a half times* the stated requirement, prior to graduation. Capstone credits carry the same tuition cost per credit as coursework credits. MOHE Report at 8. These thirty-five additional average capstone credits therefore cost Walden students approximately $34,300 more than they could have expected from Walden's representations.

74.     Walden's practice of misrepresentation as described herein began in or prior to August 2008 and continued in substantially the same form through at least January 2018. Its misrepresentations were pervasive and consistent across the various ways in which Walden communicated with prospective students and the public, and were intended to induce students to rely on these misrepresentations when enrolling.

75.     Upon information and belief, Walden's practice of misrepresentation as described herein emanated from decisions made at its academic headquarters in Minneapolis.

*i.*     *Website*

76.     Walden's primary public materials describing the cost, credit requirements, and time to completion for its DBA program are on the Tuition and Fees section of its DBA program site or, prior to roughly 2012, on a combined Tuition and Fees page for the School of Management as a whole.

17

77.    Starting no later than August 2008 and continuing until early 2018, the Tuition and Fees pages of the website consistently misrepresented the number of credits required to complete a DBA degree and therefore the cost of said degree.

78.    As described in the MOHE Report, most students were unable to complete the program within the credit requirement published on Walden's website. MOHE Report at 48. Walden would have certainly known that the average DBA student completed almost three times as many capstone credits as Walden's stated requirement. Although there were minor changes to the website during that time period, such as changes to the cost per credit, the page continued throughout that time period to provide the same false representations about the DBA program requirements.

79.    Prior to 2012, Walden's representations were provided on a combined tuition and fees page[12] that included information for each of the degree programs provided by the School of Management, rather than on a stand-alone DBA page. As shown in the screenshot below, which depicts the tuition and fees page as of the 2008-2009 academic year, Walden stated that the costs for the DBA program consisted of three "Curriculum Components": courses, a 4-day residency fee, and a technology fee.

Doctor of Business Administration (D.B.A.)

| Curriculum Component | Requirements | Cost |
|---|---|---|
| Courses | 60 total semester credit hours | $725 per semester credit hour, which includes the cost of all required textbooks |
| 4-Day Residency Fee | 2 during your program | $850 each, plus travel, lodging, and other expenses |
| Technology Fee | per semester | $40 |

---

[12] *See School of Management*, waldenu.edu, http://web.archive.org/web/20090406221512/ [http://www.waldenu.edu/Tuition-and-Financial-Aid/School-of-Management.htm] (last visited Jan. 6, 2022).

80.     By 2012, information related to cost of the DBA program had moved to its own page, but the information provided remained the same, except for the inclusion of an application fee as a fourth "curriculum component" and small adjustments to the cost of each credit. For example, by December 25, 2012, the Tuition and Fees page[13] for the DBA program appeared as follows:

| Curriculum Component | Requirements | Cost |
|---|---|---|
| Courses | 60 total semester credit hours | $845 per semester credit hour, which includes the cost of all required textbooks |
| 4-Day Residency Fee | 2 during your program | $1,090 each, plus travel, lodging, and other expenses |
| Technology Fee | per semester | $150 |
| Application Fee | per program | $50 |

Tuition and fees are subject to change.

Call 1-866-492-5336 for information about a full range of options for:

  • Federal Financial Aid
  • Transfer of Credit

81.     As seen in the screenshots above, Walden clearly states that the program requires a total of sixty total semester credit hours, at a set cost per semester credit hour. No other credit requirements beyond those sixty are listed, and the only other program costs disclosed are the cost of attending two in-person residencies, the application fee, and a small per-semester technology fee.

82.     At $845 per semester credit hour, the cost of the sixty credits required for completion would amount to $50,700, with only relatively small additional costs beyond that for the residencies and a per-semester technology fee.

83.     At no point does the page provide any indication whatsoever that, in fact, the true number of successfully completed credit hours required to graduate can substantially exceed

---

[13] *See Doctor of Business Administration (D.B.A.)*, waldenu.edu, https://web.archive.org/web/20121225015717/ [http://www.waldenu.edu/doctoral/doctor-of-business-administration?tab=tuition-fees] (last visited Jan. 6, 2022).

sixty credits, and in fact does for most students.

84.    Nor does the webpage provide any indication that the tuition cost can—and for most students will—substantially exceed the $50,700 that is commensurate with the supposed credit requirement. Misrepresenting the true number of credits required for most students to graduate had the functional effect of misleading prospective students about the true cost of a DBA degree. The only disclaimer provided is that "tuition and fees are subject to change," but that would only affect the cost per credit and not the number of credits required.

85.    The representations regarding the credit requirements and cost of the DBA program remained largely unchanged on Walden's website through at least January 2018.

86.    For example, as shown in the screenshot below, as of May 4, 2016, the Tuition and Fees page[14] stated that the DBA program consisted of three "Curriculum Components": tuition, a residency fee, and a technology fee.

| Curriculum Component | Requirements | Cost | Total* |
|---|---|---|---|
| Tuition | 60 total semester credit hours | $950 per semester hour | $57,000 |
| Residency Fee | Two residencies | $1,275 each through 12/31/15<br>$1,320 each beginning 1/1/16<br>(travel, lodging, and other expenses are additional) | $2,640 |
| Technology Fee | Per semester | $165 | $1,650 |
| | | Total | $61,290 |
| | | *Transfer up to 30 credits* | $29,325 |
| | | Total With Transfer Credits† | $31,965 |

The tuition reflects the minimum time to completion. Time to completion varies by student, depending on individual progress and credits transferred, if applicable. For a personalized estimate of your time to completion, call an enrollment advisor at 1-866-492-5336.

*Tuition and fees are subject to change.

†Transfer credit total includes reduction in technology fee and books and supplies as related to reduced number of courses over time.

---

[14] *School of Management*, waldenu.edu, http://web.archive.org/web/20090406221512/ [http://www.waldenu.edu/Tuition-and-Financial-Aid/School-of-Management.htm] (last visited Jan. 6, 2022).

87. The required number of credits at this time remained sixty total semester credit hours. The cost per credit hour at that time was $950, resulting in a total of $57,000 in tuition, plus the residency and technology fees.

88. As with earlier versions of the website, at no point does the page provide any disclosure that, in fact, the true number of successfully-completed credit hours (and, accordingly, the true cost in tuition) required to graduate can substantially exceed sixty credits, and in fact does for most students.

89. Instead, Walden represented that students could *reduce* their total cost by transferring in credits from prior advanced-degree coursework. As of the 2012 webpage depicted above, students were instructed to call for additional information about transferring credits. By 2016, however, Walden had begun further emphasizing credit transfer as a cost-saving option, listing the maximum savings from credit transfer of $29,325 directly in the main tuition calculation.

90. The 2016 version of the site adds small-print text noting that the tuition listed "reflects the minimum time to completion" and that the "minimum time to completion varies by student, depending on individual progress and credits transferred, if applicable."

91. As with the prior disclaimer, this language does not disclose that the credit hour "requirements" listed may also vary. This is of particular importance given the nearly $1,000 cost to each credit hour.

92. A particular student's "time to completion" could vary for multiple reasons unrelated to and without changing the stated total credit hours, and therefore tuition, requirement. A student could take fewer credit hours per semester, leading them to take longer to complete the same number of credits. A student could also fail a class or classes, and therefore have to repeat

21

classes in order to reach the required number of successfully completed credits, or could transfer credits in from a prior institution and therefore need to take fewer Walden courses to reach the requirement.

93.    This disclaimer therefore does not put prospective students on notice that the listed credit hour "requirements" for degree completion, which are directly determinative of the cost of the program, also vary by student and often substantially exceed the number listed. In fact, fewer than one-third of students finish within the minimum time to completion.

94.    Only recently did Walden update its website to reflect the true cost of a DBA degree. By 2020, Walden's website describes the capstone phase of the DBA degree as requiring between 19 and 103 credits, costing between $18,810 and $101,970. The total tuition one pays for a DBA degree, Walden finally informed its prospective students, could be as high as $131,670. This was the first time that Walden disclosed how long and costly its DBA program could be. This current disclosure is, of course, of no help to students who relied on a much lower figure when they enrolled and who have either completed their degrees at a higher than anticipated cost or who continue to be enrolled at Walden, racking up fees with each passing term.

ii.     *Enrollment Advisors*

95.    In addition to its website misrepresentations directed to potential students and the public at large, Walden also consistently misrepresented the true requirements and costs for the DBA degree through its enrollment advisors.

96.    Walden maintains two separate websites: its main waldenu.edu site, as well as the sales-oriented info.waldenu.edu site. Only the waldenu.edu site provides information about the credit requirements and cost of the DBA degree. The info.waldenu.edu site instead provides a

form for potential applicants to complete with their contact information to request a contact from a Walden enrollment advisor and is used as the landing page for Walden's digital advertising.

97. Throughout the time period at issue, Walden employed a workforce of enrollment advisors or enrollment specialists, who, upon information and belief, primarily worked out of call-center-type office environments.

98. Enrollment advisors were responsible for communicating with potential students and recruiting them for application and enrollment in Walden's degree programs, including the DBA.

99. Upon information and belief, enrollment advisors' interactions with potential students are heavily scripted and monitored by Walden, and enrollment advisors provide potential students with standardized information consistent with the representations regarding tuition and credit hour requirements on Walden's website.

100. Enrollment advisors functioned as sales agents for the University, operating off of a standard "script" that guided the enrollment advisors on how to anticipate, rebut, and overcome anticipated objections from prospects. Among the anticipated objections advisors were scripted to respond to were both the cost of the degree and the time it would take to complete.

101. Walden provided scripted responses to potential concerns about cost and time to complete the degree because it knew that these were important decision factors for all potential students. Walden intended for potential students to rely on the information about cost and degree requirements provided by the enrollment advisors—and the similar information provided on its website—when deciding whether or not to enroll.

102. Each Plaintiff spoke with an enrollment advisor while evaluating doctoral degree options or during the process of enrolling at Walden.

23

103.     In each case, Walden enrollment advisors provided Plaintiffs with false and misleading representations regarding the cost of the program, based on the number of credit hours and semesters Plaintiffs would be required to complete to earn the DBA degree.

104.     Plaintiff Carroll was told by a Walden enrollment specialist that she would be able to transfer twelve credits, leaving only forty-eight total credits to complete the degree, and would be able to graduate with her degree in eighteen months. Instead, she spent over three years in the program and was compelled to complete sixty-three credits. These extra capstone credits above Walden's stated requirement cost Carroll approximately $15,000 in excess tuition.

105.     Plaintiff Charles was told by a Walden enrollment specialist that the full cost of the program, before accounting for transfer credits, would be roughly $62,000, that she could transfer twelve credits from her MBA, and that she would complete the program within two and a half years. After confirming the cost estimates with the website, Charles subtracted the cost of her transferred credits to reach a total expected cost of approximately $50,000. Instead, she spent approximately $71,000 in tuition and fees on the program over the course of four years, including approximately $21,000 in excess tuition for capstone credits beyond the stated requirement.

106.     Plaintiff Fair was told by a Walden enrollment specialist that, after her transferred credits and military discount, the program would cost her $38,715—reduced to $26,215 after a subsequent additional scholarship—and would take her two and a half years to complete. Instead, Fair graduated after spending four and a half years in the program and being charged approximately $54,000 in tuition and fees, approximately $25,000 of which was attributable to excess tuition for capstone credits beyond the stated requirement.

107.     Plaintiff Fluker was told by a Walden enrollment specialist that the full cost of the

program, after her transferred credits, could be as low as $25,000 and would not exceed $33,000

and that she would complete the program within two and a half years. Instead, she spent

approximately $95,000 in tuition and fees on the program over the course of more than five

years, including approximately $55,000 in excess tuition for capstone credits beyond the stated

requirement.

> **B.    THE EXPERIENCE OF WALDEN'S DBA STUDENTS
> DEMONSTRATES THAT WALDEN'S REPRESENTATIONS
> REGARDING THE COST OF A DBA DEGREE WERE FALSE AND
> MISLEADING**

108.    Walden's representations about the cost of a DBA degree based on sixty total

credit hours, including nineteen or twenty capstone credit hours, were false and misleading.

Plaintiffs' experiences, detailed in Section IV below, are representative of the experience that

thousands of DBA students had, lured into a degree program that Walden knew would take much

longer and be much more expensive than it so confidently represented online, on the phone, and

in print.

109.    Each Plaintiff was required to successfully complete substantially more than

nineteen capstone credits and sixty total credits. In fact, each Plaintiff successfully completed at

least thirty-four and as many as eighty capstone credit hours—from 1.8 to 4.0 times as many as

they were told would be required. In so doing, Plaintiffs paid between approximately $15,000

and $55,000 in excess tuition for capstone credits above the requirement Walden advertised to

them when they enrolled.

110.    The Individual Plaintiffs are not alone. Other DBA students have taken upwards

of twenty or thirty DBA capstone courses, representing as much as eighty to one hundred and

twenty capstone credits.

111.    The Minnesota Office of Higher Education oversees private colleges and

universities operating in Minnesota. As part of its responsibilities, MOHE "investigate[s] complaints from students that question the authenticity and legitimacy of their private institution, its programs, and its adherence to its policies and procedures." MOHE Report at 3. MOHE investigates complaints against Walden from students across the nation. Multiple states, including Virginia and Maryland, refer resident complaints against Walden to MOHE.

112.    As a Minnesota institution regulated by MOHE, Walden is required under Minnesota law to "use[] only publications and advertisements which are truthful and do not give any false, fraudulent, deceptive, inaccurate, or misleading impressions about the school, its personnel, programs, services, or occupational opportunities for its graduates for promotion and student recruitment." Minn. Stat. § 136A.65 subdiv. 4.

113.    In response to almost 1,000 student complaints made between September 2008 and September 2016, MOHE engaged in a review of Walden's doctoral programs. MOHE published a report describing its review and its findings on October 23, 2019. MOHE Report.

114.    As part of its investigation, MOHE reviewed Walden's representations regarding the number of total credit hours and capstone credit hours required for the DBA program and compared that to the actual experiences of enrolled students overall.

115.    MOHE calculated that a student completing the DBA degree with the average number of capstone credit hours for degree completers would pay a total program cost of $97,700—a total of $34,300 more than the program cost as advertised. MOHE Report at 98.

116.    MOHE found that while the DBA program was presented as requiring nineteen capstone credits, MOHE Report at 48, students who had completed their DBA degrees had actually earned, and paid for, an average of 54 capstone credits alone—nearly 3 times the stated requirement. The median number of earned capstone credit hours for students who had

completed their degrees was forty-eight. MOHE Report at 49, Figure 14.[15]

117.  Among those who had withdrawn *without* receiving a degree, the average was thirty-one capstone credits and median twenty-four capstone credits—more than the stated requirement for earning the degree. MOHE Report at 49, Figure 14.

118.  Given that students were charged per credit hour throughout the capstone phase, these discrepancies directly translate into significant excess tuition stemming from Walden's misrepresentations. Plaintiffs' experiences of incurring excess tuition costs are consistent with those of DBA students generally.

### C.      THE CAPSTONE PROCESS

119.  The discrepancies between the stated credit requirements and the actual number of credits earned is due to Walden's policies and practices regarding the capstone process, which are deliberately designed to draw out the process, resulting in additional tuition, and thus profit, for Walden. Acting, upon information and belief, out of its academic headquarters, Walden intentionally set up the capstone process to prolong each student's enrollment, and therefore maximize the tuition they can squeeze out of each new prospect.

120.  The committees' ability to prolong students' dissertations is a feature of the design of the capstone process. It forces students to sit idle for weeks at a time while they wait for overlapping approvals to progress to the next step, all while capstone credits (and cost) continue to accumulate. The structure of the DBA capstone allows Walden to trap and hold students in the DBA program to maximize the tuition that each student is forced to pay.

121.  When they enter the capstone phase of the program, DBA students are assigned a three-member faculty committee intended to provide feedback, guidance, and approval of the

---

[15] MOHE's investigation revealed similar problems in other Walden doctoral programs. *See* MOHE Report at 49-67.

students' progress through the dissertation. The first member (the committee chair) and the second committee member serve as content and methodology experts. The third member of each committee is a University Research Reviewer ("URR"), who purports to ensure that student research meets or exceeds university academic guidelines.

122.    Unanimous committee approval is required to progress through each phase of the dissertation process and is also required for many of the steps within each phase.[16]

123.    When a DBA student submits a piece of work that requires approval, each committee member must submit feedback and approve or reject the submission within 14 days of receipt.

124.    The review process happens sequentially. Upon student submission, the committee chair has two weeks to act on the submission. If the chair approves, the second committee member has another two weeks to provide feedback and approve or reject the submission; the process is repeated a third time for the URR. This means that even if all committee members approve a student submission in adherence to the required timelines, a DBA candidate can still spend almost an entire DBA 9000 term waiting for feedback on their submission. Because DBA students must obtain committee approval before progressing to the next step in the dissertation process, they are forced to sit idle for weeks at a time—while continuing to pay tuition—even in the best-case scenario.

125.    This assumes that the committee members abide by Walden's policy and provide feedback within fourteen days. Some DBA faculty members interpret the policy as requiring

---

[16] Walden describes its dissertation process as comprising five broad phases: (1) Committee Formation and Prospectus Development, (2) Proposal Development and Approval Process, (3) IRB Approval Process and Data Collection, (4) Dissertation Completion and Approval Process, and (5) Final Steps Prior to Graduation. *See* MOHE Report at 120–22. Each of these phases contains numerous steps that must be completed before a student may progress to the next dissertation phase.

response within fourteen *business* days, which causes DBA students to wait for at least eighteen days for each round of feedback. If all three of a student's committee members take eighteen days to provide feedback, that student would spend fifty-four days out of a fifty-six-day term— 96% of a 9000-level class—waiting for approval to move forward.

126.    The wait for feedback is only the beginning of the problem. Plaintiffs describe instances in which they have received glowing feedback from their committee chairs and second members, only to have their submission rejected by the URR for minor, non-substantive suggestions, including misplaced commas or semi-colons. Such a rejection restarts the entire review process, and students are forced to wait for weeks more on resubmission of their work with slightly reworded sentences and without the offending punctuation.

127.    Additionally, committee members are frequently unresponsive to communications from students outside of the formal review process. This exacerbates delay and extends the capstone period for DBA students. Committee members often provide vague or unclear feedback when rejecting a student submission, and students are unable to obtain clarification by reaching out to that member. The only recourse for students is to repeatedly resubmit their work and wait for weeks to discover if they successfully addressed the member's feedback.

128.    While students go through multiple iterations of the review process to resolve these minor issues, they are automatically re-enrolled in the DBA 9000-level course, paying for two DBA 9000-level courses per semester until they are finally able to get signoff on their capstones.

129.    This is no accident; as described above, these are consistent features of Walden's DBA capstone process and are the result of a deliberate policy to prolong the capstone phase for pecuniary gain.

**4.    WALDEN'S PRACTICES ARE INTENTIONALLY DISCRIMINATORY AND HAVE A DISPARATE IMPACT ON BLACK AND FEMALE STUDENTS**

130.    Walden not only engaged in the fraudulent misrepresentations described above, but also engaged in racial and gender discrimination through the practice of targeting these fraudulent and predatory enrollment practices at Black and female students, and at groups of prospective students who are disproportionately likely to be Black or female.

131.    This is known as "reverse redlining"—the practice of targeting communities for predatory products or less favorable treatment based on race or gender, or based on facially-neutral practices that nevertheless have a disproportionate and unjustified impact on the basis of race or gender.

132.    In this case, Walden's DBA program is predatory and abusive, because Walden's misrepresentations regarding the program cost and requirements ensnare prospective students in a bait-and-switch, requiring them to pay substantially more than the stated price—in the case of Plaintiffs, as much as double.

133.    Therefore, Walden's efforts to target this program at Black and female students constitutes illegal reverse redlining and racial discrimination under both ECOA and under Title VI of the Civil Rights Act.

**A.    THE STUDENTS SUBJECTED TO WALDEN'S PREDATORY DBA PRODUCT ARE DISPROPORTIONATELY BLACK**

134.    Walden's DBA student body, and thus the population of people who are subjected to its predatory, fraudulent product, are vastly disproportionately Black compared to doctoral programs at other institutions.

135.    Walden states that its doctoral student population is 41% Black. *Executive Summary (DATA)*, waldenu.edu, https://www.waldenu.edu/about/data/summary (last visited Jan.

6, 2022). In comparison, according to the NCSES Survey of Earned Doctorates, the population

of doctoral graduates across all institutions nationwide in 2020 was just 5.6 % Black. National

Center for Science and Engineering Statistics, Survey of Earned Doctorates. Doctorate

recipients, by ethnicity, race, and citizenship status: 2010–20 (Table 19) (Nov. 30, 2021),

https://ncses.nsf.gov/pubs/nsf22300/data-tables.

136.    The proportion of Walden doctoral students who are Black is therefore more than

seven times the proportion of doctoral students nationwide.

137.    Similarly, nationwide just 8% of MBA students nationwide were Black in 2020.

Jeff Green, *MBA Programs Aren't Enrolling Enough Black and Hispanic Students* (Sept. 15,

2021), https://www.bloomberg.com/news/articles/2021-09-15/business-schools-mba-programs-

need-to-enroll-more-black-hispanic-students. Many Walden DBA students are MBA graduates,

and MBA programs draw from a similar pool of potentially qualified applicants as the DBA

program. The proportion of Walden doctoral students who are Black is over five times the

proportion of MBA graduates nationally.

138.    Recipients of doctoral degrees in Business Administration and Management from

Walden in 2020 were more likely to be Black than recipients of such degrees from other

institutions. At Walden, 44% of all recipients of these degrees were Black, whereas the average

proportion of Black recipients at other institutions was just 10%.  National Center for Education

Statistics, Awards/degrees conferred by program (6-digit CIP code), award level, race/ethnicity,

and gender: July 1, 2019 to June 30, 2020 (Data File C2020_A),

https://nces.ed.gov/ipeds/datacenter/DataFiles.aspx?year=2020 (last visited Jan. 6, 2022).

139.    The disproportionate number of Black students enrolled at Walden is no accident,

whether through intentional targeting or facially neutral policies that have the effect of

disproportionately enrolling Black students.

### B. WALDEN INTENTIONALLY TARGETS ITS PREDATORY PROGRAM TOWARD BLACK PROSPECTIVE STUDENTS

140.    Walden boasts of its staggering percentage of the total number of Black doctorates granted nationwide. As it explained to the U.S. Department of Education, "Walden is most proud to confer the largest number of doctoral degrees on African-Americans and on all minorities in the U.S."[17] This is not happenstance; it is the direct result of Walden intentionally targeting Black prospective students for its predatory product.

141.    The data speak for themselves. Walden would not produce five times more Black doctorates than the next school (HBCU Howard University) and 11.4% of all Black doctorates in the country unless it was intentionally and deliberately targeting Black prospective students for its doctoral programs.

142.    Walden's intentional and explicit targeting of Black prospective students is demonstrated by a review of Walden's local advertising expenditures in metropolitan areas across the county. Between 2010 and 2020, Walden's local advertising budget was dedicated almost exclusively to metropolitan areas with a higher-than-median percentage of Black residents.

143.    This analysis is based on data obtained from Kantar Media's "Ad$pender" database, covering the period between January 2010 and March 2021. Kantar collects data on commercial advertising and develops estimates of advertising spending across nearly all media types.

---

[17] Walden University, Comment of Walden University in Response to Notice of Intent to Establish a Negotiated Rulemaking Committee, Docket ID Ed-2018-OPE-0076 (Sept. 14, 2018), https://www.regulations.gov/comment/ED-2018-OPE-0076-0583 at 2.

144.    Spending on some categories of advertisements, like internet search ads, can only be reported at the national level. Ad spending in many other categories is listed for specific Designated Market Areas ("DMAs") in the United States. DMAs are advertising media markets similar to metropolitan statistical areas. There are 210 DMAs in the United States. Advertising categories listed by DMA include: Spot TV, outdoor, local radio, national spot radio, local internet display, mobile web after April 2014, online video after October 2014, and mobile web video after January 2020.

145.    Combining Walden's advertisement spending in specific DMAs with demographic data from the 2010 Census paints a clear picture of how Walden explicitly targets its ad campaigns toward Black prospective students.

146.    Walden conducts the vast majority of its local advertising in markets with higher-than-average Black populations. For example, Walden's top six markets for local "spot TV" advertising are Washington, D.C., Dallas, Atlanta, Houston, Charlotte, and Baltimore.

147.    In 2010, Walden directed 89.6% of its local advertising budget to areas with an above-median percentage of Black residents.

148.    In 2015, Walden directed 99.8% of its local advertising budget to areas with an above-median percentage of Black residents.

149.    In 2020, Walden directed 90.2% of its local advertising budget to areas with an above-median percentage of Black residents.

150.    Simple univariate regressions show a strong correlation between Black population in a DMA and Walden's ad spending in that area. In 2020 a single percentage point increase in the percentage of Black residents in an area was associated with $1,406 more in ad spending by Walden.

151.    The content of Walden's advertisements further demonstrates the institution's intentional focus on targeting Black prospective students for its predatory product. The overwhelming majority of Walden's advertisements prominently feature Black people. Through its digital banner ads, Facebook ads, video promotions and other advertisements on YouTube, and other forms of advertisement, Walden targets Black prospective students by designing and publishing marketing materials that, far more often than not, star Black models or Black Walden students.

152.    Walden's websites also exemplify its strategy of targeting Black students by highlighting Black people. Both info.waldenu.edu and waldenu.edu prominently feature Black people throughout the websites, and the waldenu.edu homepage proudly announces that Walden is "#1 [in] Awarding Doctorates to Black Students." *Education for Good*, waldenu.edu (last visited Jan. 6, 2022).

153.    The combination of Walden's local advertising statistics—laser focused on metropolitan areas with above-median Black populations—and the prominence of Black people in all forms of Walden's advertising leaves little doubt that Walden intentionally targets Black people for its DBA program.

154.    Again, these efforts would be laudable if they resulted in increased access to such educational opportunities on fair, non-predatory terms. Here, however, the result is to subject Black prospective students and communities to a fraudulent, predatory scheme to extract loan proceeds and tuition funds by misleading students and the public about the nature of the program and the resulting costs. As it stands, when Walden markets the DBA, it is marketing a predatory product, and when it intentionally markets the DBA to Black prospective students, it engages in impermissible reverse redlining.

155.     Walden was responsible for over $800 *million* in federal student loans in the 2019 academic year. U.S. Dep't of Ed., Proprietary School Revenue Percentages Report for Financial Statements with Fiscal Year Ending Dates between 07/01/18 – 06/30/19 (Sept. 3, 2020), https://studentaid.gov/data-center/school/proprietary. Its practice of targeting Black students for predatory products has the function and effect of contributing to and exacerbating the stark racial disparities in student debt loads nationwide. The average total education-related debt for Black doctorate recipients is $88,206, while the average for white doctorate recipients is $31,878. *See* National Center for Science and Engineering Statistics, Education-related debt of doctorate recipients, by sex, citizenship status, ethnicity, and race: 2020 (Table 40) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables.

156.     Upon information and belief, Walden's policy of targeting Black prospective students for its deceptive and unlawful programs directly explains why Walden awards more than five times more doctorates to Black students than the next highest school and a full 11.4% of all doctorates granted to Black students nationwide.

### C.     THE STUDENTS SUBJECTED TO WALDEN'S PREDATORY DBA PROGRAM ARE DISPROPORTIONATELY FEMALE

157.     Walden's DBA student body, and thus the population of people who are subjected to its predatory, fraudulent product, is also disproportionately female compared to doctoral programs at other institutions.

158.     Walden states that its doctoral student population is 76.6% female. Executive Summary (DATA), *supra* n. 133. In comparison, according to the NCSES Survey of Earned Doctorates, the population of doctoral recipients across all institutions nationwide in 2020 was just 45 % female. National Center for Science and Engineering Statistics, Doctorate recipients, by subfield of study and sex: 2020 (Table 16) (Nov. 30, 2021),

https://ncses.nsf.gov/pubs/nsf22300/data-tables. The proportion of Walden doctoral students who are female is therefore more than 1.7 times the proportion of doctoral graduates nationwide.

159.    Similarly, nationwide, just 40% of MBA students were female in 2020. Jeff Green, *Women Fill Fewer MBA Spots Than Men, and Covid Isn't Helping* (Sept. 15, 2021), https://www.bloomberg.com/news/articles/2021-09-15/business-schools-women-fill-fewer-spots-in-mba-programs-than-men. As noted above, many Walden DBA students are MBA graduates, and MBA programs draw from a similar pool of potentially qualified applicants as the DBA program. The proportion of Walden doctoral students who are female is nearly twice the proportion of MBA graduates nationally.

160.    In 2020, Walden produced more female doctorates than any other institution in the country, with 591 total, while the institution with the second-largest number produced just 350. A full 68% of Walden's doctoral recipients were women, while the median for the top fifty doctoral-producing institutions was just 44%. There was no other institution among the top fifty with more than 55% female graduates. National Center for Science and Engineering Statistics, Top 50 doctorate-granting institutions ranked by total number of doctorate recipients, by sex: 2020 (Table 3) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables.

161.    Recipients of doctoral degrees in Business Administration and Management from Walden in 2020 were more likely to be female than recipients of such degrees from other institutions. At Walden, 49% of all recipients of these degrees were female, whereas the average proportion of female recipients at other institutions was just 40%. National Center for Education Statistics, *supra* n. 136.

162.    As is true for Black students, the disproportionate number of female students enrolled at Walden is no accident, but instead has been caused by Walden through its intentional

36

targeting, or facially neutral policies, that have the effect of disproportionately enrolling female students.

### D.   WALDEN INTENTIONALLY TARGETS ITS PREDATORY DBA PROGRAM TOWARD FEMALE PROSPECTIVE STUDENTS

163.   The disproportionate representation of female students in Walden's doctoral programs, including its DBA program, is a result of Walden's efforts to intentionally target women for enrollment.

164.   Walden's website declares that "Women are leading the way," as it touts the fact that "Walden's total student population is more than three-quarters female (76.6%)." *Executive Summary (DATA)*, *supra* n. 133. The same is true for Walden's graduate students; in 2018, 76.5% of graduate students were female. Walden University, *Demonstrating Accountability, Transparency, and Assessment (DATA)*, https://www.waldenu.edu/-/media/walden/files/about-walden/data/data-students-alumni-faculty-employers-sept-2019final.pdf?rev=a96bd39a8d7d4f2f94acddfe0a2aedbe&hash=72C810B209C22B231F587C7C FC85D3F7 (last visited Jan. 6, 2022) at 3.

165.   Walden's advertising reflects its intentional focus on targeting female prospective students for its predatory product. The overwhelming majority of Walden's online advertisements prominently feature women (frequently Black women), as do its websites. By designing and publishing marketing materials that disproportionately feature female models and female Walden students, Walden targets female prospective students for enrollment.

166.   Walden's advertising and marketing materials explicitly target women by, for example, touting its programs' suitability for mothers. In one advertisement, a former student explains that her "inspiration to focus on education was [her] daughter." Walden University, *Jazmin Chi | Shine On | Walden University*, YouTube (July 9, 2021),

37

https://www.youtube.com/watch?v=yUYfNBfMKgI. In another, a student declares that "I am an

avid learner. I am also a wife. I am a mother of two children." Walden University, *Discover*

*Online Learning Your Way at Walden*, YouTube (June 7, 2021),

https://www.youtube.com/watch?v=BtEmnU3eGxI. In countless other advertisements, Walden

shows pictures or videos of parents, particularly women, with children.

167.     Once again, rather than increasing educational opportunities for women on fair,

non-predatory terms, Walden subjects female prospective students to a fraudulent, predatory

scheme to extract loan proceeds and tuition funds by misleading students and the public about

the nature of the program and the resulting costs.

###     E.     WALDEN'S FACIALLY NEUTRAL POLICY OF TARGETING "NONTRADITIONAL" STUDENTS DISPROPORTIONATELY HARMS BLACK AND FEMALE STUDENTS

168.     In addition to intentionally targeting Black and female prospective students as

described above, Walden also targets its programs to certain groups of nontraditional students,

including students who are employed while pursuing a doctorate, students who have children,

and students over thirty. Because these students are both disproportionately Black and

disproportionately female, the facially neutral policy of targeting these groups of nontraditional

students has an impermissible disparate impact on Black and female students.

169.     In academic research, the term "nontraditional students" is used to describe

students with combinations of several characteristics or attributes, including, for example, being

an older student, working full-time while pursuing a degree, being enrolled part-time, having

dependents, and being a single caregiver. According to the National Center for Education

Statistics, nontraditional students overall "are more likely to be women [and] to belong to a

racial-ethnic minority group." *See* National Center for Education Statistics, *Definitions and Data*,

https://nces.ed.gov/pubs/web/97578e.asp (last visited Jan. 6, 2022).

170.    Age is frequently used to describe nontraditional students, both because age is itself an attribute of nontraditional students and because "[a]ge acts as a surrogate variable that captures a large, heterogeneous population of adult students who often have family and work responsibilities as well as other life circumstances that can interfere with successful completion of educational objectives." *See id.*

171.    That Walden targets people who are employed full-time for its programs is made explicit by the company's mission— "to provide [] a diverse community of career professionals with the opportunity to transform themselves as scholar-practitioners enabling them to create positive social change." *The Passion that Drives Us*, waldenu.edu, https://www.waldenu.edu/why-walden/social-change (last visited Jan. 6, 2022). According to Walden's website, the entire purpose of its founding was "to create opportunities for working professionals where there previously were none." *Empowering the greater good for 50 years and counting.*, waldenu.edu, https://www.waldenu.edu/why-walden (last visited Jan. 6, 2022).

172.    Walden's website is replete with additional examples of how it targets its programs toward people who are employed full-time. It describes itself as "A University for Working Professionals" and characterizes its programs as "a Better Way for Adults to Pursue Advanced Degrees Without Leaving the Workforce" and having "flexibility designed for working adults." *A University for Working Professionals*, waldenu.edu, https://www.waldenu.edu/why-walden/flexibility (last visited Jan. 6, 2022).

173.    Walden's ad campaigns tell the same story. Online advertisements declare that Walden allows students to "study online, from where you are, while you work," and provides "online education that fits your life and accelerates your career."

174.    Video advertisements declare that Walden "pioneer[ed] and perfect[ed] online learning for working adults," Walden University, *Learn Online | Succeed Anywhere*, YouTube (Mar. 10, 2021), https://www.youtube.com/watch?v=Cy68OjEKOJc, and that it "understand[s] the nuances of the professional learner." Walden University, *The Future of Education at Walden*, YouTube (Jan. 8, 2020), https://www.youtube.com/watch?app=desktop&v=ig1XE_CR8K8+%28.

175.    Walden's advertisements target students with children. In addition to the above-described advertisements targeting mothers, Walden also brands itself as a school that helps parents "thrive" in their graduate programs while they "care for children."

176.    Walden also specifically targets older students. Walden advertisements ask, "Have you hired an older employee lately?" and declare that "Walden University helps adult learners . . . reach their full potential." Additionally, a large portion of Walden's advertisements appearing on Facebook, YouTube, and in internet searches feature older students.

177.    Publicly available data from the NCSES demonstrate that Black and female doctoral candidates are more likely to work while pursuing their degree. A 2020 NCSES profile of doctorate recipients shows that 40.8% of Black doctorate recipients primarily relied on their own resources to complete their degree compared to only 20.4% of white doctorate recipients. *See* National Center for Science and Engineering Statistics, Doctorate recipients' primary source of financial support, by broad field of study, sex, citizenship status, ethnicity, and race: 2020 (Table 35) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables. Similarly, 19.8% of female doctorate recipients relied on their own resources while only 11.3% of male doctorate recipients did the same. *Id.*

178.    According to a 2016 survey of graduate students by the National Center for

40

Education Statistics, 62.9% of the total number of graduate students with dependents are female. In other words, there are almost twice as many female graduate students with children than male graduate students with children. U.S. Department of Education, National Center for Education Statistics, National Postsecondary Student Aid Study: 2016 Graduate Students (NPSAS:GR).

179.    Older students are disproportionately Black. The median age of Black doctorate recipients is 36.2 while the median age for white doctorate recipients is 31.6. NCES Table 35.

180.    Additionally, data from the American Council on Education show that 64.1% of Black students enrolled in graduate programs are over the age of thirty while only 49.1% of white students enrolled in graduate programs are over the age of thirty. *See* Lorelle L. Espinosa et al., *Race and Ethnicity in Higher Education A Status Report* (2019), https://www.equityinhighered.org/resources/report-downloads/race-and-ethnicity-in-higher-education-a-status-report/ at 79.

181.    The import of the statistics showing that the group of doctoral candidates over the age of 30 is disproportionately Black is twofold. First, Walden specifically targets older students for its predatory product, which has a disparate impact on Black prospective students. Second, age is a surrogate variable for nontraditional students who work full-time while pursuing their doctorate, and statistics showing a racial disparity by age provide additional support that Walden's policy of targeting prospective students who work full-time has a disproportionate effect on Black prospective students.

## F.    WALDEN IS A "CREDITOR" WITHIN THE MEANING OF ECOA AND A RECIPIENT OF FEDERAL FUNDING WITHIN THE MEANING OF TITLE VI

182.    Plaintiffs Carroll, Charles, and Fluker bring their racial discrimination claims against Walden under Title VI, which applies to recipients of federal funding, and Plaintiffs

41

Charles, Fair and Fluker bring their claims under ECOA, which applies to "creditors." Walden is both a creditor within the meaning of ECOA and a recipient of federal funding within the meaning of Title VI.

183.    Most Walden DBA students, including Plaintiffs Claudia Provost Charles, Tiffany Fair, and Tareion Fluker pay for their DBA tuition and fees using federal student loans.

184.    Walden is one of many for-profit post-secondary educational institutions in the country where students who attend are eligible to receive federal financial aid through the United States Department of Education under Title IV of the Higher Education Act of 1965.

185.    Under the federal Title IV loan programs, student loans are made directly by the United States government. The school receives the loan proceeds and typically credits them to the student's account to pay for tuition and other charges. Students must repay these loans, including applicable interest, to the government.

186.    Walden refers students and prospective students applying for financial aid to the Free Application for Federal Student Aid ("FAFSA") to submit their applications, which are then received by Walden's Office of Financial Aid. Walden processes those applications, requests additional information or documentation from applicants as needed, determines applicants' eligibility, and communicates offers to students. Approved loans are funded by the federal government, which transmits the funds to Walden on the students' behalf.

187.    Walden also offers payment plans, through which students can spread the cost of tuition over several months, instead of paying in full at the beginning of the semester.

188.    Walden arranges for and participates in the extension and continuation of federal student loans to its students and prospective students through its participation in the federal financial aid program as described herein, and by referring student applicants to the federal

student loan program.

189.    Walden is therefore considered a "creditor" as defined by ECOA, 15 U.S.C. §
1691a *et seq.*, and subject to its prohibitions on discrimination.

190.    The latest available data show that Walden derives approximately 75.7% of its
revenue from Title IV sources. In its fiscal year ending between July 1, 2018 and June 30, 2019,
Walden received roughly $451.89 million from Title IV sources. U.S. Dep't of Ed., Proprietary
School 90/10 Revenue Percentages Report for Financial Statements with Fiscal Year Ending
Dates between 07/01/18 – 06/30/19 (Sept. 3, 2020), https://studentaid.gov/data-
center/school/proprietary.

191.    Walden was the fourth largest issuer of federal student loans in the country in the
2019–20 academic year, during which it disbursed $806,326,675 in student loans. U.S.
Department of Education, Title IV Program Volume Reports: Award Summaries,
https://studentaid.gov/data-center/student/title-iv#award-year-summaries (last visited Jan. 6,
2022).

192.    In addition to federal student loan funds, Walden receives federal funding from its
enrollment of United States veterans who are eligible to receive tuition assistance and other
educational benefits through the GI Bill. *See* 38 U.S.C. § 3301 *et seq.*

193.    Given Walden's extensive receipt of federal funding and facilitation of federal
student loans to doctoral students, addressing Walden's predatory practices serves a public
benefit, serving to protect the public fisc.

5.      **EXPERIENCES OF THE INDIVIDUAL PLAINTIFFS**

        A.      **ALJANAL CARROLL**

194.    Plaintiff Aljanal Carroll enrolled in Walden's DBA program in Fall 2017 based

43

on Walden's representations that, due to transferred credits from her MBA program, she would graduate with her degree in eighteen months. She was told she would be able to transfer twelve credits, which would have left her only forty-eight total credits to complete the degree.

195.    Instead, Carroll graduated after spending over three years in the program, more than twice the promised time. In the end, she was required to complete sixty-three total Walden credits on top of her twelve transferred credits. She completed ten DBA 9000-level courses, worth thirty credits, and four doctoral mentoring courses, for a total of thirty-four capstone phase credits—fifteen credits more than what Walden had represented as required to complete the program. These additional capstone credits cost Carroll $14,850.

196.    Plaintiff Carroll, who is Black and resides in North Carolina, graduated from Strayer University with a Master of Business Administration (MBA) in June 2017. At around that time, she learned about Walden through a pop-up ad on the internet. She wanted to continue her education and explored doing so by pursuing a DBA at Walden.

197.    After seeing the ad, Carroll visited one of Walden's websites and was impressed with what she saw. She entered her information into the form on the website and received a phone call from an enrollment advisor shortly thereafter.

198.    The enrollment advisor described the DBA program to Carroll as "enhancing" her MBA. He explained to her that she could transfer credits from courses she took for her MBA. He guaranteed to her that she would graduate the DBA program "in no more than eighteen months." The enrollment advisor also told her the total number of credits Walden would allow her to transfer. Because she would not have to pay again for those credits, she expected her total cost to be significantly lower than the full program tuition provided on the website, which assumed students were paying for all sixty credits. This understanding was supported by the website,

44

which noted that students could get as much as a $29,325 reduction off of the full cost by transferring credits.

199.    Carroll enrolled in the DBA program and began her coursework in September 2017. She was able to apply twelve credits from her MBA toward her DBA coursework.

200.    Carroll was employed full-time when she enrolled in the DBA program, and she retained her employment throughout her time in the program.

201.    Carroll completed the coursework phase of the DBA in the first term of the 2019 spring semester, on the timeline Walden had given her. She found the coursework phase of the DBA to be relatively easy and she received mostly A grades in her courses.

202.    After completing the coursework phase, based on Walden's representations Carroll would have had just nineteen capstone credits left to complete. In fact, she was required to complete nearly 60% more capstone credits than that before being permitted to graduate.

203.    In the second term of the 2019 spring semester, Carroll took her first of what would eventually be ten 9000-level courses totaling thirty credits. Due to her success in the coursework phase, Carroll expected to be able to complete her degree by completing Walden's published requirement of fifteen 9000-level credits. However, Walden presented a series of obstacles during the capstone phase, and as a result required her to complete twice the stated requirement for 9000-level credits, for twice the tuition.

204.    Although she was required to complete twice the number of 9000-level credits compared with Walden's stated requirement, Carroll received "Satisfactory" grades in each of her ten 9000-level courses. That Carroll needed twice the 9000-level credits to complete her degree was not due to her performance; rather it was because Walden intentionally misrepresented the actual number of capstone credits needed to graduate.

45

205.    Throughout the capstone process, Carroll observed that her committee members, and Walden generally, were prolonging her capstone process without any academic basis, thus requiring her to continue paying for additional credit hours beyond the stated requirements.

206.    Each reviewer took the entire, or nearly entire, fourteen-day time period to review each of her submissions. Months passed where she spent more time waiting for feedback than working on her dissertation. Throughout this time, she was automatically re-enrolled in a 9000-level class every eight weeks and charged accordingly.

207.    When feedback finally arrived, Carroll reports, it was commonly non-substantive. Members of her committee rejected her submissions based on minor editorial suggestions, including her use of commas or semi-colons. She was then forced to resubmit the assignment and wait, once again, as her committee members each took nearly all their allotted fourteen days to review the corrected version.

208.    Carroll had difficulty reaching and communicating with her assigned committee chair and asked three times to be assigned a new chair. Each time, Walden refused, explaining that a new chair might require Carroll to resubmit assignments already approved by her current committee, setting her back even further.

209.    In fall 2020, Carroll was fed up with Walden's excuses and manufactured delays. She cried to her committee chair, explaining that she had two children in college and she could not afford to continue for an additional semester. She also complained to the director of the DBA program about the unnecessary delays and hold-ups in her dissertation process. After years of false starts and delays, Carroll reports that everything was "pushed through" in September and October of 2020—without any significant additional changes to her capstone—only after she began complaining vociferously.

46

210.    Carroll graduated from the DBA program on October 26, 2020. It took her over three years to complete the program, over twice the eighteen months that was represented to her by her enrollment advisor. She was forced to spend roughly $15,500 in tuition and fees for the additional semesters spent completing capstone credits beyond Walden's representations.

### B.    CLAUDIA PROVOST CHARLES

211.    Plaintiff Claudia Provost Charles enrolled in the DBA program in Summer 2017 based on Walden's representations that, after her transferred credits, the program would cost her approximately 50,000 and that she would complete the program within two and a half years.

212.    Instead, Charles graduated in May 2021 after spending four years and almost $71,000 in tuition and fees on the program, about $21,000 more than she expected to spend. She has nearly $88,000 in student loans from her Walden education.

213.    Charles completed twelve DBA 9000-level courses and forty capstone credits—a total of 2.1 times the nineteen capstone credits that Walden had advertised and represented would be required to complete the DBA program. These twenty-one additional capstone credits cost her $20,790.

214.    Plaintiff Charles, who is Black and resides in Louisiana, learned of Walden's DBA program in 2017 while researching doctoral programs in business and business administration.

215.    At the time, Charles was employed as an administrator at a community college. Charles had previously earned her bachelor's degree in Business, Management, Marketing, and Related Support Services and her Master of Business Administration from the University of Phoenix in 2007 and 2009 respectively, both in person at its Lafayette, LA campus.

216.    She was interested in an online doctoral program because it would be more

47

conducive to her full-time work schedule. The two schools she seriously considered were the University of Phoenix and Walden, because both offered online doctoral programs in business administration.

217.    Charles reviewed Walden's website and submitted her contact information in the form provided to request additional information. She was then contacted by a Walden Senior Enrollment Advisor.

218.    The enrollment advisor told her that she would be able to transfer credits from her MBA program to waive many of the required courses, and that she would not need to pay for these credits. Before accounting for the transferred credits, and consistent with the representations on Walden's website, he advised her that the program would take her approximately 2.5 years to complete and would cost about $62,000.

219.    Charles confirmed these numbers for herself by comparing them with the costs listed on the website, multiplying the number of required credits by the advertised cost per credit and adding in the required fees. Then, because Charles expected to transfer in 12 credits, she calculated that her expected her total cost would be significantly lower, at approximately $50,000.

220.    Charles chose to enroll in Walden over the University of Phoenix because of Walden's representations that Walden would be less expensive than Phoenix and allow her to complete the degree sooner.

221.    The enrollment advisor provided her with a link and school code to apply for federal student loans to finance her Walden education. Charles applied, was approved by Walden's financial aid office, and in July 2017, within approximately two weeks of her initial contact with Walden, she was enrolled in the DBA program and beginning classes.

48

222.    Charles was employed full-time when she enrolled in the DBA program, and she
retained her employment throughout her time in the program.

223.    Charles completed the coursework without issue in spring 2019, maintaining a 4.0
grade point average. Throughout the time she was enrolled in classes, she was simultaneously
gathering and digesting research and sources related to her eventual dissertation topic, so that she
would be prepared to move quickly once she reached the capstone phase. Based on her academic
abilities, preparation, experience in the coursework portion of the program, and Walden's
representations, she fully expected to be able to complete her degree within the two and a half
year period she had been told to expect.

224.    However, once she reached the capstone phase, she found her progress stymied by
Walden's capstone process. She repeatedly received contradictory comments on drafts from her
committee members, who would return drafts to her requesting that she make certain changes,
and then when she made those changes and re-submitted, her committee members would return
the drafts again requesting new—and frequently contradictory—edits.

225.    Although Charles received timely responses from the chair of her committee, she
encountered significant delays from her other committee members. Each time a draft was
submitted, it would take a full fourteen days per reviewer, sometimes more, to receive comments
from her second committee member and URR. If one reviewer requested changes, she would
make those changes and wait for her chair to review. If the chair approved, it would go to the
second committee member, who would take a full fourteen days to review, and then if approved
would go to the URR who would take a further fourteen days to review. If either the second
member or the URR requested changes, the process would begin again. At times, the second
committee member and URR would take even more than fourteen days, and Charles would need

49

to ask her chair to intervene to obtain a response.

226.    The changes requested by reviewers were frequently superficial and unrelated to the substance or academic merit of Charles' work, such as the placement of commas. Making simple corrections of this type and getting the changes approved would routinely take close to a month and a half, two-thirds of the duration of the term. On several occasions, Charles was asked to make extensive changes to sections that had already been approved by all three committee members in a prior submission.

227.    Although Charles faced numerous delays, her committee never questioned her performance in the program. After finishing the coursework phase of the program with a 4.0 GPA, Charles received "Satisfactory" grades on all of her 9000-level courses.

228.    These delays appeared to be intentional features of Walden's dissertation process, designed to extract additional tuition revenue from students beyond the amounts they had been told would be required.

229.    Despite Walden's representations during enrollment that she could complete the degree in 2.5 years for approximately $50,000, Charles ultimately completed her degree in May 2021, after nearly four years of enrollment, sixty-nine credits, and approximately $71,000 in tuition and fees.

230.    As of December 2021, Charles owes almost $88,000 in student loans from her time at Walden.

### C.    TIFFANY FAIR

231.    Plaintiff Tiffany Fair enrolled in Walden's DBA program in June 2016 based on Walden's representations that, after her transferred credits and military discount, the program would cost her $38,715—reduced to $26,215 after a subsequent additional scholarship—and

would take her two and a half years to complete.

232.    Instead, Walden charged Fair over $54,000 in tuition and fees over the four and a half years she spent in the program, more than double her expected total cost. By filing numerous petitions decrying needless delays, Fair was able to convince Walden to return just over $4,000 in tuition waivers (as well as $5,000 she had been improperly charged for courses for which she had already received transfer credit). She completed fifteen DBA 9000-level courses and forty-nine capstone credits, ten more classes and thirty more credits than what Walden told her was required to complete the program. The thirty capstone credits above the requirement cost Fair an additional $25,245.

233.    Fair, who is biracial and resides in Virginia, decided to pursue a doctoral degree to advance her career. She has 21 years of experience in federal acquisitions, and believed a doctorate would make her competitive for the senior executive service in the federal government.

234.    Fair exchanged emails with Walden enrollment advisor Graham Gwynne. In an email sent on June 15, 2016, Gwynne explained, using specific numbers, exactly how the fact that Fair qualified for a military spouse discount reduced her tuition: "With your tuition for 48 credits at $950 a credit hour, your tuition with no discounts applied is $45,600, with the 15% discount you would receive a further $6,885 off your tuition [sic] bring it to $38,715."

235.    Absent from Gwynne's email was any indication that Fair would almost certainly need to complete more than forty-eight credits (after accounting for transfer credits from her master's degree) and pay substantially more than the promised price.

236.    Fair visited Walden's website. Relying on the website's representation that the DBA program required sixty credits (before transferred credits), she calculated that she would finish the program in two and a half years, which was consistent with the representations made

51

by Gwynne. She confirmed the cost of a DBA degree by multiplying the number of required credits by the advertised cost per credit. Fair relied on Walden's representations when deciding to enroll and would not have enrolled had she known the true cost of the program.

237.    Fair applied for federal student loans to fund her Walden education, and was approved by Walden's financial aid office.

238.    Fair understood when she enrolled in the DBA program that Walden was based in and operated out of Minnesota.

239.    Fair enrolled in the DBA program in June 2016. In August 2016 she was awarded a $12,500 scholarship. Through email exchanges between Fair and Gwynne and information on Walden's website, Walden represented to Fair that she would graduate with her doctorate degree in two and a half years for just over $26,000.

240.    Fair was employed full-time when she enrolled in the DBA program, and she retained her employment throughout her time in the program.

241.    Fair breezed through the coursework phase of the program; she completed the required courses by March 2018, less than two years after she had enrolled in the program, with a 4.0 GPA. It was not until the Spring of 2019, months after she had entered the capstone phase, and after she had completed the stated requirement of sixty credits, that she discovered Walden's egregious misrepresentations with regard to cost.

242.    At this point, according to Walden's representations, Fair should have been able to complete her program after taking five 9000-level DBA courses over two and a half semesters. Instead, Fair fought delays for three additional years before graduating in January 2021.

243.    It took Fair a year to obtain approval for her prospectus and another year and a half to obtain approval for her proposal. At times her committee chair took an entire month to

52

review a submission before rejecting it for minor stylistic or formatting suggestions, such as misplaced commas or incorrect line spacing.

244.    Fair received inconsistent and conflicting feedback from her committee members. Substantive feedback was minimal, but Fair's submissions were frequently rejected due to internal committee disagreement about minor issues, including the placement and use of punctuation marks. On several occasions during the final stages of her capstone Fair was asked to make extensive changes to her proposal and prospectus, which had already been approved by all three committee members.

245.    Throughout this time, Fair was continually and automatically enrolled in 9000-level classes. She was continually and automatically charged tuition as she waited for feedback from her committee, and paid thousands of dollars to wait for her committee members to tell her that they disagreed with, for example, the structure of an individual sentence or her punctuation choices.

246.    In December 2020, after Walden had trapped Fair in the capstone phase for more than two years, Fair's concerns about the long delays prompted her to request a change in chair and committee members. Upon receipt of this request, Walden sent her the incorrect form. When Fair again requested re-assignment, Walden refused, explaining that a new chair would result in additional delays, setting her back even further.

247.    Fair's committee members expressed no concerns about her performance; although she was compelled to complete three times the stated number of 9000-level courses, she received "Satisfactory" grades in each and every one.

248.    Walden adopted the 7th Edition of the APA Publication Manual in May of 2020, but allowed current doctoral students to continue using the prior edition as long as they

graduated by December 31, 2020. Fair believed she would complete her capstone and graduate before the end of 2020, but she was stymied, time and again, by delays from her committee members.

249.     Fair was then informed that, rather than simply updating her final paper to adhere to the new version of the publication manual, Walden wanted her to *go back through the entire capstone process again*, re-submitting every step (including the previously approved prospectus and proposal, as well as the capstone paper itself) with citations and references based on the new style guide. This would have required that she, one-by-one, re-submit each of the three documents to each of the three committee members, waiting up to fourteen business days for a response from each member each time, and risking additional delays if any member raised a new stylistic or grammar-based objection. Even if no committee member had raised any concerns, this would have added nearly eight weeks—essentially a whole term—for each of the three documents. All told, it would have delayed her graduation by nearly three full terms, at minimum, and cost her an additional $8,910 at the then-effective rate of $990 per credit hour. Fair vociferously objected to Walden's transparent attempt to squeeze even more tuition money out of her, and was finally permitted to graduate as planned.

250.     After relying on representations from Walden's enrollment advisors and Walden's website that she would complete her doctorate degree in two and a half years for $26,215, Fair was charged approximately $54,000 in tuition and fees over four and a half years before she finally graduated in January 2021, roughly $28,000 more than Walden's promised price.

251.     As of December 2021, Fair owes almost $90,000 in student loans from her Walden education.

54

### D. TAREION FLUKER

252.     Plaintiff Tareion Fluker enrolled in Walden's DBA program in May 2011 based on Walden's representations that she would be able to complete her degree in approximately two and a half years for a total cost of no more than $33,000.

253.     Instead, Fluker graduated in June 2016 after spending approximately five years and $95,000 in tuition and fees on the program, about $62,000 more than the maximum she expected to spend.

254.     As a result of Walden's predatory scheme, Fluker was forced to complete twenty DBA 9000-level courses for a total of eighty capstone credits—more than four times the twenty capstone credits that Walden had advertised and represented would be required to complete the DBA program. Those sixty-one additional capstone credits cost her approximately $55,000.

255.     Fluker, who is Black and resides in Georgia, learned of Walden's DBA program while conducting research into doctoral programs in business after completing her MBA at Kaplan University in 2011. She conducted most of her research online, and then spoke to recruiters or enrollment advisors at the universities she was considering, including Walden, Capella, and Georgia State.

256.     Fluker spoke to a Walden enrollment advisor who told her that the program would cost around $25,000, possibly a little higher, but no more than $33,000.

257.     Fluker also studied Walden's website, which confirmed the information she had been told by the enrollment advisor regarding the total cost and credit requirements of the program.

258.     While considering program options, Fluker received an invitation from Walden, directed to prospective DBA students in the Atlanta area, to attend a round-table event with a Walden DBA faculty member. This event increased her interest in the program, as did the faculty

55

member's statement that Walden graduates had the lowest loan-default rate among for-profit schools. Fluker ultimately selected Walden's DBA program over the other programs she had considered due to its affordable cost.

259.    Fluker enrolled in the DBA program and began her coursework in May 2011. She was able to apply fifteen credits from her MBA toward the DBA coursework requirements and completed the coursework component of the program easily in August 2012, earning an A grade in every course.

260.    Once she entered the capstone phase of the program, it became clear to Fluker that the capstone program was designed not to facilitate learning but rather to needlessly extend the amount of time, and thus the number of credits and cost, needed to complete the degree.

261.    After completing the coursework phase, based on Walden's representations Fluker should have needed just twenty capstone credits to complete the program. In fact, Walden required her to complete over eighty capstone credits before finally permitting her to graduate.

262.    Fluker's initial committee chair frequently failed to review Fluker's submitted drafts and respond to her inquiries about program expectations or rubrics. After a year and a half, Fluker had drafted two separate prospectuses, both of which were based on study designs recommended by her chair. Each time, her other committee members disagreed with the chair's recommendations, declined to approve Fluker's progression to the next phase, and told her to start over with an entirely new methodology.

263.    Exasperated with the lack of progress, she asked to switch to a new chair. Once this request was approved, she was required to start her entire capstone process over to conform to the study design and methodology recommended by the new chair. Although her study design was then approved by her chair, when it was submitted to the methodologist assigned to her

56

committee, he objected to the new methodology and required her to completely revise the study design yet again.

264.     Fluker frequently had to follow up with her chair when committee members failed to complete any review of her submitted work within the required fourteen-day timeframe. On one occasion her second committee member became nonresponsive without explanation, causing the pending review to be delayed for approximately two months before a new committee member was appointed. The same faculty member was subsequently appointed as the methodologist on her committee, where he again became nonresponsive for an extended period without completing pending reviews of Ms. Fluker's submitted work.

265.     Frequently, Fluker received responses focused on non-substantive matters such as comma placement or the number of spaces after a period, although she was a proficient writer and wrote extensively in her day-to-day work as a marketing professional. Plaintiff Fluker's committee chair, who also owned and ran a private for-profit editing and tutoring company, strongly recommended that she hire a professional editor to review her work. Fluker twice hired independent editors to review her work, yet still had her submissions rejected over minor editing concerns. Fluker eventually hired a writing editor through her chair's company, at significant cost, because it appeared to her that she would not be permitted to move forward otherwise.

266.     In many cases, Plaintiff Fluker found that the comments she received after submitting a draft were so superficial that she was able to address them in only an hour or so—but each time this would re-start the review process, requiring her to resubmit and wait another fourteen business days or more for each committee member to review. As a result, there were many terms where she spent a large majority of the term waiting for responses about minor matters from her committee members rather than advancing in her work.

267.     When she did receive substantive feedback from committee members, Plaintiff Fluker was not permitted to reach out to them to discuss the feedback or request clarification. Instead, she was required to direct all questions to the committee chair, who frequently was not familiar with or able to explain the feedback.

268.     After a total of twenty DBA 9000-level courses, Fluker was eventually able to get her capstone approved, and graduated with her degree in June 2016, over five years after enrolling.

269.     Although she was required to complete roughly four times as many capstone credits as required according to Walden's representations, Fluker never received less than a "Satisfactory" grade in any of those courses. The excess credits required were not due to any deficiency in her academic performance, but rather to the fact that Walden's DBA program was not designed to be completed within Walden's false stated credit requirements.

270.     Despite Walden's representations during enrollment that she could complete the degree in 2.5 years for no more than $33,000, Fluker ultimately completed her degree in June 2016 after approximately five years of enrollment, one-hundred and five credits, and $95,000 in tuition and fees.

271.     Fluker paid for nearly all of the required tuition and fees using federal student loans obtained through Walden's financial aid office, ultimately taking out six separate Unsubsidized Direct Stafford loans, two Subsidized Direct Stafford loans, and three Direct Plus Graduate loans. These loans continued to accrue interest throughout the extended period of time it took to complete the program.

272.     As of November 2022, Fluker owes approximately $172,628 in loans from her Walden education.

58

## CLASS ALLEGATIONS

273. Plaintiffs bring this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the Individual Plaintiffs and similarly situated individuals in three putative classes: the Title VI Class, the ECOA Black Student Class, and the ECOA Female Student Class.

274. Plaintiffs Aljanal Carroll, Claudia Provost Charles, and Tareion Fluker request that this Court certify a Title VI Class, consisting of all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018 and were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled. Plaintiffs Carroll, Charles, and Fluker are all members of the class they seek to represent. The Title VI Class asserts claims under Title VI, 42 U.S.C. § 2000d *et seq.*

275. Plaintiffs Charles and Fluker further request that this Court certify pursuant to Fed. R. Civ. P. 23(c)(5) the ECOA Black Student Class, a subclass of all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans to pay for some or all of their Walden education. Plaintiffs Charles and Fluker are members of the subclass they seek to represent. The ECOA Black Student Class asserts claims under ECOA, 15 U.S.C. § 1691 *et seq.*

276. Plaintiffs Charles, Fair, and Fluker request that this Court certify pursuant to Fed. R. Civ. P. 23(c)(5) the ECOA Female Student Class, a class of all Female students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018, were charged for and successfully completed more than the number of capstone-level

credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans to pay for some or all of their Walden education. Plaintiffs Charles, Fair, and Fluker are members of the subclass they seek to represent. The ECOA Female Student Subclass asserts claims under ECOA, 15 U.S.C. § 1691 *et seq*.

277.    This action is properly maintained as a class action because:

a)    Joinder of all class members is impracticable because of the size of the class. Between fall 2008 and fall 2017, 9,015 students enrolled in the DBA program, and upon information and belief, enrollment was similar in subsequent years. Plaintiffs estimate that approximately 68% of those students, or roughly 6,130, are Black and/or female. Plaintiffs are informed and believe that the class includes thousands of students because the class period covers more than five years. Plaintiffs calculate that upwards of 816 Black and/or female students who enrolled during the class period have graduated, with on average thirty five credits above the stated requirement, and that many others who have not graduated have also completed more credits than the stated requirement.

b)    Defendants have acted or refused to act on grounds generally applicable to the class.

c)    The claims alleged on behalf of the putative classes raise questions of law and fact that are common to the classes and predominate over questions affecting only individual members because all class members enrolled in the same school after receiving the same or similar representations, entered into the same or similar written contracts with Walden, and were subjected to the same policies and practices regarding the capstone process and requirements. Common

60

questions of law and fact include, among others: (i) whether Defendants' DBA program, as implemented, was predatory; (ii) whether Defendants intentionally targeted Black and/or female students and prospective students in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. and the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; (iii) whether Defendants' policies and practices have a disparate impact on Black and/or female students in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; (iv) whether any disparate impact is justified by business necessity; and (vii) whether class members who have not yet graduated are entitled to an injunction requiring Walden to cease charging them tuition for any additional capstone credits it requires them to take beyond the stated requirement as of the time they enrolled.

d) The claims of the class representatives are typical of the class because the class representatives enrolled in the same school and program as the other class members after receiving the same or similar representations, entered into the same or similar written contracts with Walden as the other class members, and were subjected to the same policies and practices regarding the capstone process and requirements.

e) A class action is superior to other available methods for fairly and efficiently adjudicating this litigation.

278. The class representatives and class counsel will fairly and adequately represent the interests of the class. The class representatives have no interests that are antagonistic to the interests of other Plaintiffs and class counsel have years of experience in civil rights, consumer, and class action litigation.

**INJURY TO INDIVIDUAL PLAINTIFFS**

279.    Plaintiffs Aljanal Carroll, Claudia Provost Charles, Tiffany Fair, and Tareion Fluker have suffered and continue to suffer financial injuries as a direct, foreseeable, and proximate result of Defendants' past and ongoing actions set forth above. Plaintiffs have each been required to enroll in, pay for, and complete between fifteen and sixty capstone credits in excess of the number of credits Walden represented were required at the time of enrollment. Plaintiffs have each paid large sums of money to enroll in and complete these excess credits, some by taking out large student loans. In the absence of Defendants' actions, Plaintiffs would not have paid this money and taken out these loans and would have been able to complete their degrees without these excess costs.

280.    Walden's practice of misrepresentation as described herein began in or prior to August 2008 and continued in substantially the same form through at least January 2018.

281.    In causing injury to Plaintiffs, Defendants acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for Plaintiffs' rights.

**CAUSES OF ACTION**

**Count I – Violation of Title VI of the Civil Rights Act of 1964,**

**42 U.S.C. § 2000d *et seq.***

*(Plaintiffs Carroll, Charles, and Fluker on behalf of themselves and the Title VI Class)*

282.    Plaintiffs Carroll, Charles, and Fluker reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 281 above.

283.    Defendants receive "Federal financial assistance" within the meaning of 42 U.S.C. § 2000d as the recipient of their students' federal financial aid dollars.

284.    Upon information and belief, Defendants have entered into one or more Program Participation Agreements with the United States Department of Education pursuant to 20 U.S.

Code § 1094(a) and 34 C.F.R. § 668.14, in which they explicitly acknowledge, *inter alia*, that they must comply with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, as amended, and its implementing regulations 34 C.F.R. §§ 100-01.

285.    Defendants' acts, policies, and practices are intentionally discriminatory against Black students, subject Black students to intentional discrimination in Defendants' programs and activities, constitute reverse redlining, and violate 42 U.S.C. § 2000d.

### Count II – Violation of the Equal Credit Opportunity Act,
### 15 U.S.C. § 1691 *et seq.*

*(Plaintiffs Charles and Fluker on behalf of themselves and the ECOA Black Student Class, and Plaintiffs Charles, Fair, and Fluker on behalf of themselves and the ECOA Female Student Class)*

286.    Plaintiffs Charles, Fair, and Fluker reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 281 above.

287.    Defendants are "creditors" within the meaning of 15 U.S.C. § 1691a(e).

288.    Plaintiffs Charles, Fair, and Fluker along with the ECOA Subclass, have been "applicants" within the meaning of 15 U.S.C. § 1691a(b) when they have applied for an extension, renewal, or continuation of student loans.

289.    Defendants' acts, policies, and practices are intentionally discriminatory against Black and female students with respect to aspects of credit transactions, constitute reverse redlining, and violate 15 U.S.C. § 1691(a)(1).

290.    Defendants' acts, policies, and practices disparately impact Black and female students with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

### Count III – Violation of the Minnesota Prevention of Consumer Fraud Act,
### Minn. Stat. § 325F.68 *et seq.*

*(Plaintiffs Carroll, Charles, and Fair on behalf of themselves)*

291.    Plaintiffs Carroll, Charles, and Fair reallege and incorporate by reference all of

the allegations set forth in paragraphs 1 through 281 above.

292.     Defendants are "persons" within the meaning of Minn. Stat. § 325F.68.

293.     The educational services offered by Walden are "services" and "merchandise" within the meaning of Minn. Stat. § 325F.68, subdiv. 2.

294.     Plaintiffs' and class members' enrollment at Walden to receive educational services constitutes a "sale of merchandise" within the meaning of Minn. Stat. § § 325F.68, subdiv. 2 and 325F.69.

295.     Defendants employed fraud, false pretense, false promise, misrepresentation, misleading statements and/or deceptive practices, with the intent to induce reliance thereon, with respect to Plaintiffs' and class members' enrollment at Walden in violation of Minn. Stat. § 325F.69.

296.     Defendants' fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices were made in connection with the "sale of merchandise," i.e. Plaintiffs' and class members' enrollment at Walden to receive educational services.

297.     Defendants made their fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices to Plaintiffs, members of the proposed class, and the public at large.

298.     Defendants' fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices were made out of Walden University's academic headquarters in Minneapolis, MN.

299.     There is a causal nexus between Defendants' fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices and the injuries suffered by Plaintiffs and class members.

300.     Plaintiffs relied on Defendants' fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices when enrolling and re-enrolling in Defendants' DBA program and were induced to enroll in the program by these representations.

301.     Plaintiffs have suffered and continue to suffer injuries as a direct, foreseeable, and proximate result of Defendants' false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices regarding the DBA program.

302.     Plaintiffs' prosecution of this claim serves a public benefit pursuant to Minn. Stat. § 8.31, subdiv. 3a.

### Count IV – False Statement in Advertising,
### Minn. Stat. § 325F.67

*(Plaintiffs Carroll, Charles, and Fair on behalf of themselves)*

303.     Plaintiffs Carroll, Charles, and Fair reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 281 above.

304.     Defendants are "persons," "firms," "corporations," or "associations" within the meaning of Minn. Stat. § 325F.67.

305.     The educational services offered by Walden are "services" and "merchandise" within the meaning of Minn. Stat. § 325F.67.

306.     Defendants made, published, disseminated, circulated, or placed before the public advertisements regarding the educational services offered by Walden with the intent to sell those educational services and with the intent to induce the public to enter into obligations related to those educational services.

307.     These advertisements contained material assertions, representations, or statements of fact about the cost and credit requirements of the DBA program which were untrue, deceptive

or misleading.

308.    Defendants made these advertisements out of Walden University's academic headquarters in Minneapolis, MN.

309.    There is a causal nexus between Defendants' false, deceptive, or misleading advertisements about the cost and credit requirements of the DBA program and the injuries suffered by Plaintiffs and class members.

310.    Plaintiffs relied on Defendants' false, deceptive, or misleading advertisements about the cost and credit requirements of the DBA program when enrolling and re-enrolling in Defendants' DBA program and were induced to enroll in the program by these representations.

311.    Plaintiffs have suffered and continue to suffer injuries as a direct, foreseeable, and proximate result of Defendants' false, deceptive, or misleading advertisements about the cost and credit requirements of the DBA program.

312.    Plaintiffs' prosecution of this claim serves a public benefit pursuant to Minn. Stat. § 8.31, subdiv. 3a.

**Count V – Minnesota Uniform Deceptive Trade Practices Act**

**Minn. Stat. § 325D.43** *et seq.*

*(Plaintiffs Carroll, Charles, and Fair on behalf of themselves)*

313.    Plaintiffs Carroll, Charles, and Fair reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 281 above.

314.    Defendants are "persons" within the meaning of Minn. Stat. § 325D.44.

315.    In making false claims about the cost and credit requirements of its DBA program, Defendants represented to potential students and to the public at large that the services they provided had characteristics that the services did not have in violation of Minn. Stat. § 325D.44.

316.    In making false claims about the cost and credit requirements of its DBA program, Defendants were engaged in advertising services with intent not to sell them as advertised in violation of Minn. Stat. § 325D.44.

317.    In making false claims about the cost and credit requirements of its DBA program, Defendants created a likelihood of confusion and misunderstanding in violation of Minn. Stat. § 325D.44.

318.    Defendants engaged in these practices in the course of business, and while knowing them to be deceptive.

319.    Defendants engaged in these practices out of Walden University's academic headquarters in Minneapolis, MN.

320.    There is a causal nexus between Defendants' false claims about the cost and credit requirements of the DBA program and the injuries suffered by Plaintiffs and class members.

321.    Plaintiffs relied on Defendants' false claims about the cost and credit requirements of the DBA program when enrolling and re-enrolling in Defendants' DBA program and were induced to enroll in the program by these representations.

322.    Plaintiffs have suffered and continue to suffer injuries as a direct, foreseeable, and proximate result of Defendants' false claims about the cost and credit requirements of the DBA program.

323.    Plaintiffs' prosecution of this claim serves a public benefit pursuant to Minn. Stat. § 8.31, subdiv. 3a.

### Count VI – Fraudulent Misrepresentation

*(Plaintiffs Carroll, Charles, and Fair on behalf of themselves)*

324.    Plaintiffs Carroll, Charles, and Fair reallege and incorporate by reference all of

the allegations set forth in paragraphs 1 through 281 above.

325.    Defendants made positive statements of fact regarding the cost and number of credits required to complete the DBA program that were false and material and were relied upon by Plaintiffs in deciding to enroll at Walden.

326.     Defendants knew that their statements regarding the cost and number of credits required to obtain a DBA degree were false at the time they were made and did not intend that Walden would satisfy the statements at the time they were made.

327.    Defendants made these false representations about the cost and number of credits required to complete the DBA program with the intent to induce the Individual Plaintiffs to enroll in the DBA program.

328.    Defendants made these false representations about the cost and number of credits required to complete the DBA program out of Walden University's academic headquarters in Minneapolis, MN.

329.    Plaintiffs Carroll, Charles, and Fair relied on Defendants' representations about the cost and number of credits required to complete the DBA program and were induced to enroll in the program by these representations.

330.    Plaintiffs Carroll, Charles, and Fair have suffered and continue to suffer financial injuries as a direct, foreseeable, and proximate result of Defendants' misrepresentation of the cost and number of credits required to complete the DBA program.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant it the following relief:

(1)    Enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; violate the Minnesota Consumer

Fraud Act, § 325F.68 *et seq,*, the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43 *et seq.*, Minn. Stat. § 325F.67, and Minn. Stat. § 8.31, subdiv. 3a; and constitute fraudulent misrepresentation*;*

(2)     Enter an injunction directing Defendants and their directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future, including but not limited to requiring Defendants cease charging tuition for any additional capstone credits they require class members to take beyond the stated requirement as of the time the class member enrolled;

(3)     Award compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Defendants alleged herein, including but not limited to the compensation for the funds Plaintiffs have paid or owe for tuition at Walden;

(4)     Award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5)     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1691e(d), 42 U.S.C. § 1988(b), Minn. Stat. 325D.45 subdiv. 2, and Minn. Stat. § 8.31, subdiv. 3a;

(6)     Award prejudgment interest to Plaintiffs; and

(7)     Order such other relief as this Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiffs request trial by jury as to all issues in this case.

Dated: December 7, 2022                    Respectfully submitted,

                                           /s/ Alexa T. Milton
                                           Alexa T. Milton #19990
                                           Glenn Schlactus*
                                           Tara K. Ramchandani*
                                           Lila R. Miller*
                                           Edward K. Olds*
                                           RELMAN COLFAX, PLLC
                                           1225 19th St. NW
                                           Suite 600
                                           Washington, D.C. 20036
                                           Tel: 202-728-1888
                                           Fax: 202-728-0848
                                           amilton@relmanlaw.com
                                           gschlactus@relmanlaw.com
                                           tramchandani@relmanlaw.com
                                           lmiller@relmanlaw.com
                                           tolds@relmanlaw.com

                                           Eric Rothschild*
                                           NATIONAL STUDENT LEGAL DEFENSE
                                           NETWORK
                                           1015 15th St. NW
                                           Suite 600
                                           Washington, D.C. 20005
                                           eric@defendstudents.org

                                           *Attorneys for Plaintiffs*

*admitted pro hac vice*