**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **Aljanal Carroll, et al.,** | ) | |
| | ) | **REDACTED VERSION** |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No. 1:22-cv-00051-RR** |
| **v.** | ) | |
| | ) | **Hon. Julie Rebecca Rubin** |
| **Walden University, LLC, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |

**<u>DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO</u>**

**<u>PLAINTIFFS' FIRST AMENDED COMPLAINT</u>**

## ANSWER

Defendants Walden University, LLC and Walden e-Learning, LLC (together, "Walden" or "Defendants"), by their undersigned counsel, respectfully submit their Answer and Affirmative Defenses to the First Amended Complaint ("FAC") of Plaintiffs Aljanal Carroll ("Carroll"), Claudia Provost Charles ("Charles"), Tiffany Fair ("Fair"), and Tareion Fluker ("Fluker," together, "Named Plaintiffs," and collectively with the putative classes, "Plaintiffs").

## PREAMBLE

Walden University is a leading online education institution that offers educational opportunities to students who may not otherwise have the opportunity to earn a doctorate degree. Walden University's mission is "to provide a diverse community of career professionals with the opportunity to transform themselves as scholar-practitioners so that they can effect positive social change."

Plaintiffs cannot claim specific instances of intentional discrimination on the basis of gender or race in Walden University's Doctor of Business Administration ("DBA") program because Walden University does not intentionally discriminate against female students because of their gender or Black students because of their race.  Plaintiffs thus instead allege that Defendants targeted advertisements to the student body it seeks to educate, that Walden University's doctoral student body is predominantly Black and female, and that some students took more than the minimum number of required courses to complete the "capstone" phase of their DBA program, which purportedly increased their expected tuition costs.  But to claim such efforts to educate diverse communities amount to discrimination not only is wrong but is a distortion of Walden University's entire mission.

For this reason, Defendants deny each and every allegation that suggests or implies that Walden University discriminates on the basis of race or gender—intentional or otherwise.  And Defendants specifically deny that they committed any violations of federal, state, or common law.  They further deny that they made any false or misleading statements, that they caused Plaintiffs or any member of the putative class any recoverable damages, or that they acted with the requisite discriminatory or fraudulent intent.  Defendants also deny that evidentiary support will exist for the allegations set forth in the FAC.  Accordingly, Plaintiffs are not entitled to relief for any of the claims they assert.

Moreover, any factual averment admitted herein is admitted to only to the specific fact alleged and not as to any conclusions, characterizations, implications, innuendos, or speculation contained in any averment or in the FAC as a whole.  And any factual averment admitted is done so based upon a Defendant's personal knowledge to the extent the Defendant has such knowledge and otherwise upon information and belief.

Additionally, except to the extent expressly admitted herein, Defendants specifically deny allegations contained in the FAC's headings, footnotes, appendices, table of contents, or images.  Unless otherwise defined, capitalized terms shall refer to the capitalized terms defined in the FAC, but any such use is not an acknowledgment or admission of any characterization Plaintiffs may ascribe to such capitalized terms.

With respect to any purported document cited to or quoted in the FAC, Defendants do not admit that the documents are relevant or admissible in this action, and Defendants reserve all objections as to relevance and admissibility.  Indeed, the FAC contains purported excerpts from, and references to, a number of documents and third-party publications, and Defendants refer to the respective documents and third-party publications for their complete and accurate contents.

Defendants also specifically deny that the National Science Foundation's Survey of Earned Doctorates, cited throughout the FAC, relates to or is supportive of Plaintiffs' claims regarding Walden University's DBA program.  Defendants further deny that the Minnesota Office of Higher Education report dated October 23, 2019, titled *Walden University Doctoral Program Review* (the "MOHE Report") is relevant to Plaintiffs' claims or would be admissible as evidence in this case.

Defendants reserve the right to change, supplement, and amend their answer if and when new information is revealed to them.

The foregoing general denials and responses are incorporated by reference into the following specific responses to Plaintiffs' allegations.

## INTRODUCTION

1.     **Plaintiffs Aljanal Carroll, Claudia Provost Charles, Tiffany Fair, and Tareion Fluker bring this action for damages, injunctive relief, and declaratory relief on behalf of themselves and all other similarly-situated individuals against Defendants Walden University, LLC and Walden E-Learning, LLC (collectively "Walden"), which jointly own and operate Walden University, a for-profit institution, to seek redress for violation of (for Plaintiffs Carroll and Charles) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. ("Title VI") and (for Plaintiffs Charles and Fair) the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*. ("ECOA"). Additionally, Plaintiffs Carroll, Charles, and Fair bring this action on behalf of themselves for violation of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68 *et seq*., the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43 *et seq*, and Minn. Stat. § 325F.67, prohibiting false statements in advertising; and for common law fraudulent misrepresentation.**

1.      Defendants admit that Carroll, Charles, Fair, and Fluker purport to bring this putative class action, but deny Defendants violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. ("Title VI") or the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*. ("ECOA").  Defendants further admit that Carroll, Charles, and Fair, in their individual capacities, purport to bring this action for common law fraudulent misrepresentation and violations of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68 *et seq.*, the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43 *et seq.*, and Minn. Stat. § 325F.67.  Defendants deny they engaged in fraudulent misrepresentation or violated the aforementioned Minnesota statutes.  Defendants further admit they own and operate Walden University.  Defendants deny that Plaintiffs suffered damages or are entitled to injunctive or declaratory relief.

**2.      Plaintiffs have been and continue to be injured by a multi-part discriminatory, fraudulent, deceptive, and dishonest scheme perpetrated by Defendants in Walden's Doctor of Business Administration ("DBA") program.**

2.      Defendants deny the allegations in Paragraph 2.

**3.      Defendants employed, and continue to implement, a concerted constellation of tactics to target, deceive, and exploit Black and female DBA students. As part of this scheme, Walden deliberately hid the true cost of the DBA program by knowingly misrepresenting and understating the number of "capstone" credits required to complete the program and obtain a degree. After luring students to the DBA program with the false promise that they could swiftly earn a graduate degree, Walden kept (and continues to keep) students trapped in the capstone phase by arbitrarily requiring them to complete additional credits at a cost of close to $1,000 each. Through this scheme, which Walden**

**targeted at Black and female prospective students, Walden has overcharged members of the proposed classes more than $28.5 million.**

3. Defendants admit the current cost of a capstone credit at Walden University's DBA program is approximately $1,000 per credit hour. Defendants deny that the cost per credit hour at Walden University was close to $1,000 for the entire period between 2008 and 2018. Defendants deny the remaining allegations in Paragraph 3.

**4. Plaintiffs Carroll, Charles, and Fluker bring their Title VI claims on behalf of the Title VI Class, consisting of all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018 and were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled.**

4. Defendants admit that Carroll, Charles, and Fluker purport to bring Title VI claims on behalf of a purported putative class of all Black students who enrolled in and/or began classes for Walden University's DBA program between August 1, 2008, and January 31, 2018, and were charged for and successfully completed more than the minimum number of capstone-level credits that Walden University stated were required at the time they enrolled, but deny any violations of Title VI. Defendants deny the remaining allegations in Paragraph 4.

**5. Plaintiffs Charles and Fluker bring their Equal Credit Opportunity Act claims on behalf of the ECOA Black Student Class, consisting of all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and**

applied for and/or received student loans or payment plans to pay for some or all of their Walden education.

5.      Defendants admit that Charles and Fluker purport to bring ECOA claims on behalf of a purported putative class of Black students who enrolled in and/or began classes for Walden University's DBA program between August 1, 2008, and January 31, 2018, were charged for and successfully completed more than the minimum number of capstone-level credits that Walden University stated were required at the time they enrolled, and applied for and/or received student loans or payment plans to pay for some or all of their Walden University education, but deny any violations of the ECOA.  Defendants deny the remaining allegations in Paragraph 5.

**6.      Plaintiffs Charles, Fair, and Fluker bring their Equal Credit Opportunity Act claims on behalf of the ECOA Female Student Class, consisting of all female students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans or payment plans to pay for some or all of their Walden education.**

6.      Defendants admit that Charles, Fair, and Fluker purport to bring ECOA claims on behalf of a purported putative class of all female students who enrolled in and/or began classes for Walden University's DBA program between August 1, 2008, and January 31, 2018, were charged for and successfully completed more than the minimum number of capstone-level credits that Walden University stated were required at the time they enrolled, and applied for and/or received student loans or payment plans to pay for some or all of their Walden education,

but deny any violations of the ECOA.  Defendants deny the remaining allegations in Paragraph 6.

**7.     Plaintiffs are or have been enrolled as students in Walden's DBA program, a professional terminal-level degree advertised by Walden as equipping its graduates with "practical knowledge that can be directly applied in the workplace."**

7.     Defendants admit that Carroll, Charles, Fluker, and Fair have been enrolled in Walden University's DBA program.  Defendants further admit that the Walden University website states that a "DBA degree is a terminal business-focused degree that provides practical knowledge that can be directly applied in the workplace."

**8.     The DBA program was one of approximately twenty doctoral programs offered by Walden during the relevant time period. Across all programs, Walden's doctoral student population is 41% Black, which is more than seven times the percentage of doctoral recipients nationwide who are Black. Likewise, across all programs, Walden's doctoral student population is 77% female, which is 1.7 times the percentage of doctoral recipients nationwide who are female.**

8.     Defendants admit that the DBA program was one of approximately twenty doctoral programs offered by Walden University from 2008 to 2018.  Defendants deny that 41% of Walden University's doctoral student population is Black.  Defendants deny that 77% of Walden University's doctoral student population is female.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 8.  Answering further, to the extent Paragraph 8 purports to allege that statistics regarding a doctoral student population and statistics regarding doctoral recipients are comparable, Defendants deny those allegations.

**9.     Beginning no later than fall semester 2008, and continuing through at least January 2018, Walden engaged in a consistent and longstanding pattern of fraudulent misrepresentations regarding the requirements of the DBA degree—including the required credits, the length of time required for completion, and, most consequentially, the cost of the degree—for the purposes of enticing students to enroll in the DBA degree program.**

9.     Defendants deny the allegations in Paragraph 9.

**10.     Starting no later than fall semester 2008 and continuing through the present, Walden has purposefully prolonged the capstone phase of the DBA program, requiring students to pay for additional credits to obtain their degrees.**

10.     Defendants deny the allegations in Paragraph 10.

**11.     This is not an equal opportunity predatory scheme. It is one that Defendants purposefully targeted at and that disparately impacts Black[1] and female DBA students.**

11.     To the extent Paragraph 11 purports to quote U.S. Census data, Defendants refer to that data for their full and accurate contents.  Defendants deny the remaining allegations in Paragraph 11.

**12.     Through this multi-part fraudulent scheme, Walden lured in potential DBA students by advertising a doctoral degree that could be earned at a reasonable cost, on a reasonable schedule, when in fact the school knew and intended that degree to be much more expensive in order to line its own pockets.**

12.     Defendants deny the allegations in Paragraph 12.

---

[1] The U.S. Census defines "Black or African American" as a "person having origins in any of the Black racial groups of Africa. It includes people who indicate their race as 'Black or African American,' or report entries such as African American, Kenyan, Nigerian, or Haitian." Race, Census.gov, https://www.census.gov/quickfacts/fact/note/US/RHI625219 (last visited Jan. 6, 2022).

**13.     As part of this scheme, once students had invested considerable time and money in the program, Walden required students to complete—and pay for—significantly more credits than the stated graduation requirement in order to receive a degree.**

13.     Defendants deny the allegations in Paragraph 13.

**14.     Specifically, Walden knowingly and intentionally misrepresented the number of credits and cost required to complete the second of two phases of the degree, called the "capstone" phase.  The Walden "capstone" is a research and writing project completed by DBA students after completing their classroom coursework, in place of the dissertation typically required in a traditional academic doctoral program.**

14.     Defendants admit the capstone phase of the Walden University DBA program is a research and writing project completed by DBA students after completing their classroom coursework phase.  Defendants deny the remaining allegations in Paragraph 14.

**15.     Walden, through its website and employees called "enrollment advisors," repeatedly represented to prospective students and the public at large that students needed to earn sixty credit hours to graduate, taking about three and a half years to complete, for a total cost of roughly \$43,000 to \$60,000,[2] depending on the year—with both reduced costs and time for students transferring credits from a prior degree or program.**

15.     Defendants admit that information regarding the minimum cost and credit requirements to complete the DBA program was provided on the Walden University website.  Defendants further admit that Walden University enrollment specialists, previously called enrollment advisors, were to provide prospective students with information consistent with that provided on the Walden University website.  Defendants further admit that tuition

---

[2] The total tuition representation increased each year over the time period based on increases in Walden's per-credit tuition.

representations on the Walden University website increased between 2008 and 2018 based on increases in Walden University's per-credit tuition during that period.  Defendants further admit that Walden University offered reduced costs and time to certain prospective DBA students who were eligible to transfer credits from other programs or degrees.  Defendants deny the remaining allegations in Paragraph 15 regarding any purported representations by Walden University as they are vague and unintelligible; Paragraph 15 contains no purported time period.

**16.     Walden knew that these representations were false, and that the average student who completed the DBA degree had, by the time of graduation, been required to complete far more than sixty credits and pay tuition significantly exceeding the stated amount—sometimes by as much as a factor of three and on average an additional $34,300 per graduate.**

16.     Defendants deny the allegations in Paragraph 16 regarding any purported representations by Walden University as they are vague and unintelligible; Paragraph 16 contains no purported time period or source.  Defendants deny the remaining allegations in Paragraph 16.

**17.     In fact, Walden designed and operated its program so that the vast majority of students would be required to pay far more than the stated price. On average, those who successfully completed a Walden DBA degree between 2008 and 2017 were required to complete more than one and a half times the stated credit requirement—ninety-four credits, instead of the stated sixty credit requirements. See Exhibit 1, Minnesota Office of Higher Education, *Walden University Doctoral Program Review*, Figure 14 (Oct. 23, 2019) (hereinafter "MOHE Report").**

17.     To the extent Paragraph 17 purports to cite data from the MOHE Report, Defendants refer to that report for its complete and accurate contents.  Defendants deny that

Plaintiffs have accurately quoted or characterized Figure 14 of the MOHE Report regarding Walden University's stated total credit requirements or total credits completed by DBA students. To the extent Paragraph 17 purports to allege that the MOHE Report is relevant to Plaintiffs' claims or would be admissible as evidence in this case, Defendants deny those allegations. Defendants deny the remaining allegations in Paragraph 17.

**18.     Walden accomplishes this through its operation of the capstone phase of the program. Walden knew that DBA students in the capstone phase were a captive source of tuition revenue, since the students had invested so much time and money in the program by the time they got to the capstone stage that they were unlikely to leave—and squander all the time and money already committed—without completing the program.**

18.     Defendants deny the allegations in Paragraph 18.

**19.     Walden also knew that students routinely completed the coursework phase of the program on time and that Walden's duplicity would therefore remain hidden until students reached the capstone phase, at which point they had already invested significant time and money in the program. After the coursework phase, Walden then intentionally trapped (and continues to trap) DBA students in the capstone phase, which Walden purposefully prolonged to ensure ongoing enrollment and make more money.**

19.     Defendants deny the allegations in Paragraph 19.

**20.     Walden represented that the sixty required credits were divided between the two phases of the program and the capstone phase, with (depending on the specific year) either forty or forty-one coursework credits and either nineteen or twenty capstone credits required.**

20.     Defendants admit that between 2008 and 2018, Walden University represented that the minimum of sixty credits that were required to complete the DBA program were divided between the two phases of the program, with either a minimum of forty or forty-one coursework credits and either a minimum of nineteen or twenty capstone credits, depending on the year.

**21.     Despite representing that the capstone phase of the program required just nineteen or twenty credits to complete, it was in fact exceedingly rare for Walden to permit a student to graduate with just nineteen or twenty capstone credits. On average, Walden did not allow students to receive a DBA degree between 2008 and 2017 until completing fifty-four capstone credit hours, nearly three times Walden's stated requirement. Walden continues to prolong the capstone phase well beyond nineteen credits and thus continues to exploit DBA students for profit as part of its discriminatory scheme.**

21.     Defendants admit that between 2008 and 2018, the minimum required number of capstone credits was nineteen or twenty.  Defendants deny the remaining allegations in Paragraph 21.

**22.     Because Walden requires students to be continuously and automatically enrolled in its "Doctoral Study Completion" course, subject to the standard per-credit tuition fee, throughout their time in the capstone phase, the true capstone credit requirements result in a sizeable and significant increase in costs for the students—an average of $34,300 in excess tuition for each graduating student.**

22.     Defendants admit that DBA students are automatically enrolled in DBA 9000-level courses until they complete the capstone phase.  Defendants deny Walden University students paid "excess tuition" as a result of enrollment in capstone courses.  Defendants deny the remaining allegations in Paragraph 22 as they are vague and unintelligible; Paragraph 22 does

not specify the location, form, or source of the purported misrepresentation.  Answering further, to the extent Paragraph 22 purports to allege that Walden University represented students would complete the DBA program upon completing a certain number of credits, or at a certain cost, Defendants deny those allegations.

**23.     This excess tuition—specifically, tuition paid for capstone credits beyond the advertised requirement—represented a large revenue stream for Walden. An estimated 1,221 students who entered the DBA program between August 2008 and January 2018 have since graduated, representing over $41.9 million in excess tuition for these students alone. Plaintiffs' proposed class of Black and/or female graduates who enrolled during this time period includes an estimated 830 people, representing over $28.5 million in excess tuition. The total amount of excess tuition received by Walden is far higher, since these figures do not include students who dropped out or have not yet graduated despite exceeding the stated number of credits required and the associated tuition.**

23.     Defendants admit approximately 1,221 students who entered the DBA program between the 2008-2009 and 2017-2018 academic years have since graduated.  Defendants deny Walden University students paid "excess tuition" as a result of enrollment in capstone courses. Defendants deny the remaining allegations in Paragraph 23.

**24.     In fact, Walden's capstone process was and is intentionally designed and/or implemented to extract additional tuition revenue from students, beyond the amounts Walden stated were required, by intentionally prolonging the capstone process without any legitimate academic purpose. This conduct remains ongoing.**

24.     Defendants deny the allegations in Paragraph 24.

25.     **Defendants' fraudulent and predatory enrollment scheme led to and continues to cause substantial financial harm to students enrolled in the DBA program, causing them to pay many thousands of dollars in excess tuition at the capstone phase. Students typically financed this through federal student loans.**

25.     Defendants deny the allegations in Paragraph 25.

26.     **To make matters worse, Walden engaged in racial and gender discrimination by targeting this predatory scheme at Black and female students.**

26.     Defendants deny the allegations in Paragraph 26.

27.     **The Walden doctoral student body includes a significantly higher proportion of Black students than is the case across doctoral programs nationwide. Walden itself touts this fact noting its "intentional inclusivity."[3] According to the National Science Foundation's National Center for Science and Engineering Statistics ("NCSES"), Walden conferred more doctoral degrees to Black candidates than any other institution over the five-year period from 2016–2020. *See* National Center for Science and Engineering Statistics, Survey of Earned Doctorates.  Statistical profile of doctorate recipients, by ethnicity, race, and citizenship status: 2020 (Table 9) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables.**

27.     Defendants admit that Walden University's website states that "Walden's emphasis on intentional inclusivity creates an environment where all learners can thrive."  To the extent Paragraph 27 purports to quote or describe data appearing on the website for the National Science Foundation, Defendants refer to that data for their complete and accurate contents and

---

[3] *See Empowering the greater good for 50 years and counting*, waldenu.edu, https://www.waldenu.edu/why-walden (last visited Jan. 6, 2022).

deny any allegations inconsistent with those statements.  To the extent Paragraph 27 purports to allege that data from the National Science Foundation's Survey of Earned Doctorates relates to or is supportive of Plaintiffs' claims regarding Walden University's DBA program, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 27.

**28.     Roughly 41% of Walden doctoral students are Black—more than 7 times the proportion of doctoral graduates nationwide (of whom 5.6% are Black) and over 5 times the proportion of MBA graduates nationally (of whom 8% are Black).**

28.     Defendants deny that 41% of Walden University's doctoral student population is Black.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 28.  Answering further, to the extent Paragraph 28 purports to allege that statistics regarding a doctoral student population and statistics regarding doctoral recipients are comparable, Defendants deny those allegations.

**29.     Roughly 77% of Walden doctoral students are female—more than 1.7 times the proportion of doctoral graduates nationwide (of whom 45% are female) and nearly twice the proportion of MBA graduates nationally (of whom less than 40% are female).**

29.     Defendants deny that 77% of Walden University's doctoral student population is female.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 29.  Answering further, to the extent Paragraph 29 purports to allege that statistics regarding a doctoral student population and statistics regarding doctoral recipients are comparable, Defendants deny those allegations.

**30.     This is not an accident. Walden has engaged in intentional and explicit targeting of Black and female prospective students.**

30.     Defendants deny the allegations in Paragraph 30.

**31.     One way Walden accomplishes this is by directing nearly all of its local advertising budget to markets with higher-than-average Black populations.**

31.     Defendants deny the allegations in Paragraph 31 as they are vague and unintelligible; Paragraph 31 contains no purported time period, and it is not apparent what is meant by the phrase "local advertising budget."  To the extent Paragraph 31 purports to allege that Walden University's advertising targeted Black prospective students for a discriminatory purpose or that Walden University's local advertising budget represents the majority of its overall advertising budget, Defendants deny those allegations.

**32.     For example, Walden's top six markets for local TV advertising between 2010 and 2020 were Washington, D.C., Dallas, Atlanta, Houston, Charlotte, and Baltimore. In 2015, Walden directed 99.8% of its local advertising budget to areas with an above-median percentage of Black residents.**

32.     Defendants admit that at limited times between 2010 and 2020, Walden University had television advertisements in the six cities listed in Paragraph 32.  Defendants deny that Walden University activated brand or local television advertising in those six cities every year between 2010 and 2020.  Defendants deny the remaining allegations in Paragraph 32, as the term "local advertising budget" is vague and unintelligible.  Defendants lack knowledge or information sufficient to form a belief as to which areas have an "above-median percentage of Black residents."  To the extent Paragraph 32 purports to allege that Walden University's advertising targeted Black prospective students for a discriminatory purpose or that Walden University's local advertising budget represents the majority of its overall advertising budget, Defendants deny those allegations.

**33.    Walden also targets certain groups of nontraditional doctoral students, including students who are employed while pursuing a doctorate, students with children, and students over 30. These groups of students are disproportionately Black and disproportionately female.**

33.    Defendants admit that Walden University provides educational opportunities to a diverse community of doctoral students, including students who are employed while pursuing a doctorate, students with children, and students over thirty.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 33.  To the extent Paragraph 33 purports to allege that Defendants implement a policy to target certain groups of students for a discriminatory purpose, Defendants deny those allegations.

**34.    Walden's enrollment of large numbers of Black and female students would be laudable if Walden were offering a legitimate, non-predatory educational program. Instead, however, Walden is targeting Black and female students with a predatory program designed to hoodwink students and saddle them with onerous student debt. This is not laudable; instead, it constitutes illegal reverse redlining and racial discrimination.**

34.    Defendants deny the allegations in Paragraph 34.

PARTIES

**35.    Plaintiff Aljanal Carroll was a student in the DBA program at Walden from September 2017 until her graduation in October 2020. Carroll is a resident of North Carolina and has been at all times relevant to the allegations set forth herein. Carroll is Black and is 49 years old.**

35.    Defendants admit Carroll was a student in the Walden University DBA program starting in September 2017 but deny she graduated in October 2020.  Her degree was conferred

in November 2020.  Defendants admit that in Carroll's application to enroll at Walden University, she stated her race is "Black or African American" and that her birthday is ███████

███████.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 35.

**36.      Plaintiff Claudia Provost Charles was a student in the DBA program at Walden from July 2017 until her graduation in May 2021. Charles is a resident of Louisiana and has been at all times relevant to the allegations set forth herein. Charles is Black and is fifty-one years old.**

36.      Defendants admit Charles was a student in the Walden University DBA program from July 2017 until her graduation in May 2021.  Defendants admit that in Charles' application to enroll at Walden University, she stated her race is "Black or African American" and that her birthday is ███████████.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 36.

**37.      Plaintiff Tiffany Fair was a student in the DBA program at Walden from June 2016 to January 2021. Fair is a resident of Virginia and has been at all times relevant to the allegations set forth herein. Fair is biracial, is a member of a Black household, and is forty-three years old.**

37.      Defendants admit Fair was a student in the Walden University DBA program starting in June 2016 but deny she graduated in January 2021.  Her degree was conferred in March 2021.  On her application to enroll in Walden University, Fair stated her race is "Hispanic; White" and that her birthday is ███████████.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 37.

**38.     Plaintiff Tareion Fluker was a student in the DBA program at Walden from May 2011 to June 2016. Fluker is a resident of Georgia and has been at all times relevant to the allegations set forth herein. Fluker is Black and is 50 years old.**

38.     Defendants admit that Fluker was a student in the Walden University DBA program from May 2011 to June 2016.  Defendants further admit that in Fluker's application to enroll in Walden University, Fluker stated her race is "Black or African American" and that her birthday is ███████.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 38.

**39.     Defendant Walden University, LLC is a Florida company. Its principal place of business is located at 650 South Exeter Street, Baltimore, Maryland 21202. Walden University, LLC's estimated annual revenue is $47.67 million.**

39.     Defendants admit Walden University, LLC is a Florida limited liability company. Defendants admit that at the time the FAC was filed, Walden University, LLC's principal place of business was in Maryland.  Defendants deny the remaining allegations in Paragraph 39 as vague and unintelligible, as the purported annual revenue contains no purported time period.

**40.     Defendant Walden e-Learning, LLC is a Delaware company. Its principal place of business is located at 650 South Exeter Street, Baltimore, Maryland 21202. Defendant Walden University, LLC is a wholly-owned subsidiary of Defendant Walden e-Learning, LLC.**

40.     Defendants admit Walden e-Learning is a Delaware limited liability company and that Walden University, LLC is a wholly-owned subsidiary of Walden e-Learning, LLC. Defendants admit that at the time the FAC was filed, Walden e-Learning LLC's principal place of business was in Maryland.

**41.    Walden e-Learning LLC, in turn, is owned by Adtalem Global Education, Inc., a Delaware corporation.**

41.    Defendants admit the allegations in Paragraph 41.

**42.    Defendant Walden University, LLC and Defendant Walden e-Learning, LLC jointly own and operate Walden University.[4] Walden University's academic headquarters are located at 100 Washington Avenue South, Suite 1210, Minneapolis, Minnesota 55401, and it is registered with and regulated by the Minnesota Office of Higher Education ("MOHE") as a Minnesota institution.**

42.    Defendants admit the allegations in Paragraph 42.

**43.    In acting or failing to act as alleged herein, Walden acted through its employees and/or agents and is liable for the acts and omissions of its employees and/or agents.**

43.    To the extent Paragraph 43 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

**44.    In acting or failing to act as alleged herein, each employee or officer of Walden was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Walden as principal.**

---

[4] In a recent SEC filing, Adtalem described the two companies as together "own[ing] and operat[ing] Walden University, an online for-profit university headquartered in Minneapolis, Minnesota." Adtalem Global Education Inc. Form 8-K, SEC (July 13, 2021), https://www.sec.gov/Archives/edgar/data/0000730464/000115752321000863/a52459329 htm. Additionally, the two most recent Program Participation Agreements between Walden University and the U.S. Department of Education were executed in Walden University's name by principles of both Walden University, LLC and Walden e-Learning, LLC.

44.     To the extent Paragraph 44 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

## JURISDICTION AND VENUE

**45.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.**

45.     Defendants admit that this Court has subject matter jurisdiction over Counts I and II under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1343.  Defendants admit that this Court has subject matter jurisdiction over the Individual Plaintiffs' claims in Counts III-VI under 28 U.S.C. § 1367.  Defendants deny that Plaintiffs' claims against Walden University have any factual or legal basis.

**46.     Both Defendant Walden University, LLC and Defendant Walden e-Learning, LLC are deemed to reside in Baltimore, MD under 28 U.S.C. § 1391(c)(2), and venue is proper in this district under 28 U.S.C. §§ 1391(b)(1).**

46.     Defendants admit that at the time the FAC was filed, Walden University, LLC and Walden e-Learning, LLC had their principal places of business in Maryland, and thus venue is proper in this district, under 28 U.S.C. §§ 1391(b)(1) and 1391(c)(2).  To the extent Paragraph 46 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit those allegations.

**47.     This Court has personal jurisdiction over Defendant Walden University, LLC and Defendant Walden e-Learning, LLC because both have their principal place of business in Maryland, and both conduct significant business in the state related to Plaintiffs' claims.**

47.     Defendants admit that at the time the FAC was filed, Defendants' principal places of business were in Maryland.  Defendants admit they transact business in this judicial district. To the extent the remaining allegations in Paragraph 47 contain conclusions of law as opposed to allegations of fact, no response is required.  To the extent an answer is required as to the remaining allegations in Paragraph 47, Defendants admit those allegations.

## FACTUAL BACKGROUND

1.     **WALDEN UNIVERSITY**

**48.     Walden University is a for-profit university with its academic offices located in Minneapolis, MN. It was founded in 1970 and was accredited in 1990 by the Higher Learning Commission, one of six regional institutional accreditors in the United States. Walden's accredited status was reaffirmed in 2013.**

48.     Defendants admit that Walden University is an accredited for-profit university that has its academic offices in Minneapolis, Minnesota.  Defendants further admit that Walden was founded in 1970 and accredited in 1900 by the Higher Learning Commission, and that Walden University's accredited status was reaffirmed in 2013.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 48.

**49.     While Walden University, LLC's and Walden e-Learning, LLC's principal place of business is designated as Maryland, Walden University's academic headquarters and its provision of educational services are based in Minnesota and the institution is regulated by and registered with MOHE as a Minnesota institution.**

49.     Defendants admit that at the time the FAC was filed, Walden University, LLC and Walden e-Learning, LLC's principal places of business were in Maryland.  Defendants admit that Walden University's academic headquarters are in Minnesota.  Defendants further

admit that Walden University is regulated by and registered with the Minnesota Office of Higher Education.  Defendants deny the remaining allegations in Paragraph 49.

**50.      Walden confers the DBA degree "upon the authority vested in the Board of Directors of Walden University by the State of Minnesota."[5]**

50.      Defendants admit Plaintiffs have accurately quoted the Walden University Summer 2021 College of Management & Technology Commencement Ceremony video.

**51.      Walden's website declares that it was created because its founders "were inspired to create opportunities for working professionals where there previously were none."[6] Its stated mission is "to provide a diverse community of career professionals with the opportunity to transform themselves as scholar-practitioners enabling them to create positive social change."[7] MOHE, relying on letters from Walden sent as part of a program review of the school's doctoral programs (described in more detail below), noted that Walden seeks to "serve and provide 'broad access' to underrepresented populations, which may otherwise not have the opportunity to further their education." MOHE Report, at 5.**

51.      Defendants admit that the Walden University website states that in "1970, two educators were inspired to create opportunities for working professionals where there previously were none."  Defendants deny Plaintiffs have accurately quoted the Walden University mission statement.  Walden University's current stated mission statement is "Walden University provides a diverse community of career professionals with the opportunity to transform themselves as scholar-practitioners so that they can effect positive social change."  Defendants admit Plaintiffs

---

[5] See Walden University, *Summer 2021 College of Management & Technology Commencement Ceremony*, YouTube (July 31, 2021), https://www.youtube.com/watch?v=n80tQNgFNyA at 8:00.

[6] See supra note 4.

[7] *The Passion that Drives Us*, waldenu.edu, https://www.waldenu.edu/why-walden/social-change (last visited Jan. 6, 2022).

have accurately quoted Page 5 of the MOHE Report.  To the extent Paragraph 51 purports to allege that the MOHE Report is relevant to Plaintiffs' claims or would be admissible as evidence in this case, Defendants deny those allegations.  Defendants lack information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph 51.

**52.     Walden describes itself as a "pioneer" of distance learning, and it solely offers online degree programs. Walden has offered doctoral programs since its founding in 1970 and offered 20 different doctoral programs as of 2016. Fourteen of these are traditional (Ph.D.) doctorates and six, including the DBA program, are professional doctoral programs. During the years 2009 through 2016, Walden's doctoral programs maintained an average total enrollment of approximately 5,300 students.**

52.     Defendants admit that Walden University solely offers online degree programs. Defendants further admit that Walden University has offered doctoral programs since its founding in 1970.  Defendants admit that in 2016, Walden University offered twenty different doctoral programs.  Answering further, Defendants admit that Walden University currently offers twenty-five doctoral programs, including the DBA program, which is a professional doctoral program.  Defendants admit that Walden University's doctoral programs had an average annual total enrollment of approximately 5,300 students between 2009 and 2016.  To the extent Paragraph 52 purports to quote or describe documents or statements made by Walden University, Defendants refer to those documents or statements for their complete and accurate contents and deny any allegation inconsistent with those documents or statements.

**53.     According to data from the National Science Foundation, Walden granted 867 doctorates in 2020, more than any other institution in the country. From 2016–2020, Walden awarded 1,383 doctorates to Black students. This is more than five times the**

**number granted by the second-ranking institution (Howard University, a Historically Black College or University ("HBCU"), granted 266 doctorates to Black students during the same period) and 11.4% of *all doctorates* granted to Black students *in the nation*. See National Center for Science and Engineering Statistics, Survey of Earned Doctorates. Doctorate recipients, by ethnicity, race, and citizenship status: 2010–20 (Table 9) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables.**

53.     Defendants admit that the website for the National Science Foundation purports the statistics in Paragraph 53.  To the extent Paragraph 53 purports to allege that data from the National Science Foundation's Survey of Earned Doctorates relates to or is supportive of Plaintiffs' claims regarding Walden University's DBA program, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 53.

**54.     In 2020, Walden produced more female doctorates than any other institution in the country: 591. The institution with the second-largest number produced just 350. A full 68% of Walden's doctoral recipients were women, while the median for the top fifty doctoral-producing institutions was just 44%. There was no other institution among the top fifty with more than 55% female graduates. National Center for Science and Engineering Statistics, Survey of Earned Doctorates. Doctorate recipients, by ethnicity, race, and citizenship status: 2010–20 (Table 3) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables.**

54.     Defendants deny that in 2020, Walden University awarded 591 doctorates to female students.  Defendants further deny that in 2020, 68% of Walden University's doctoral recipients were women.  To the extent Paragraph 54 otherwise purports to quote or describe data

appearing on the website for the National Science Foundation, Defendants refer to that data for their complete and accurate contents.  To the extent Paragraph 54 purports to allege that data from the National Science Foundation's Survey of Earned Doctorates relates to or is supportive of Plaintiffs' claims regarding Walden University's DBA program, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 54.

**55.    As described below, the fact that Walden's student body is composed of such a disproportionate number of Black and female students is not an accident.**

55.    Defendants deny the allegations in Paragraph 55 as they are vague and unintelligible.  To the extent Paragraph 55 purports to allege that the composition of Walden University's student body reflects a discriminatory intent, Defendants deny those allegations.

**56.    Absent needed context, it might be deemed laudable that Walden confers so many doctorates on Black and female students. But context is crucial. The real import of the fact that one out of every nine doctorates received by a Black student in America comes from Walden and that Walden awards more doctorates to females than any other institution in the country is that Walden is harming an extraordinary number of Black and female doctoral candidates with its knowing misrepresentations about the length and cost of its doctoral programs.**

56.    Defendants admit that it is laudable that Walden University confers "so many" doctorates on Black and female students.  Defendants lack knowledge or information sufficient to form a belief as to whether one out of every nine doctorates received by a Black student in America comes from Walden University and that Walden University awards more doctorates to

females than any other institution in the country.  Defendants deny the remaining allegations in Paragraph 56.

2.    **WALDEN'S DBA PROGRAM**

**57.    Walden first offered the DBA in 2008 as its inaugural professional doctorate program. Walden describes the DBA as "a terminal[8] business-focused degree that provides practical knowledge that can be directly applied in the workplace," in comparison to the more academically oriented Ph.D. in Business Administration.[9]**

57.    Defendants admit that Walden University first offered the DBA program in 2008 as its inaugural professional doctorate program.  Defendants further admit that the Walden University website states that a "DBA degree is a terminal business-focused degree that provides practical knowledge that can be directly applied in the workplace."

**58.    Between fall 2008 and fall 2017, 9,015 students began the DBA program. In 2016, 1,032 students were enrolled in the DBA program, or 18.76% of the total number of doctoral candidates across all programs at Walden. The DBA program maintained an average enrollment of 1,007 total students during each of the eight academic years between 2008 and 2016.**

58.    Defendants admit that between fall 2008 and fall 2017, 9,015 students began the DBA program.  Defendants further admit that in 2016, 1,032 students were enrolled in the DBA program, and that the DBA program maintained an average enrollment of 1,007 total students during each of the eight academic years between 2008 and 2016.

---

[8] A terminal degree refers to the highest degree available in a particular discipline.

[9] *See DBA Degree 101*, waldenu.edu, https://www.waldenu.edu/online-doctoral-programs/doctor-of-business-administration/resource/what-is-a-dba-degree (last visited Jan. 6, 2022).

**59.     Walden represented the DBA program as having a total cost of approximately $43,000 to $60,000, depending on the then-current cost per credit hour (or less, for students transferring credits), and requiring a total of sixty post-bachelor's degree credits.**

59.     Defendants deny the allegations in Paragraph 59 as they are vague and unintelligible; Paragraph 59 contains no purported time period and does not specify the location, form, or source of the purported misrepresentation.  To the extent Paragraph 59 purports to allege that Walden University represented students would complete the DBA program upon completing a certain number of credits or at a certain cost, Defendants deny those allegations.

**60.     In truth, however, this number does not even approach the actual number of credits completed by DBA recipients: instead, on average, each successful DBA student completed 94 credits before graduating with a DBA degree, representing $34,300 in excess tuition.**

60.     Defendants deny the allegations in Paragraph 60 as they are vague and unintelligible; Paragraph 60 contains no purported time period and does not identify the source of the information in Paragraph 60.  Defendants further deny Walden University charged students "excess tuition" for DBA credits.  To the extent Paragraph 60 purports to allege that Walden University represented students would complete the DBA program upon completing a certain number of credits or at a certain cost, Defendants deny those allegations.

**61.     Like most other Walden doctoral programs, the DBA program has two distinct phases: the coursework phase and the capstone phase. Upon information and belief, decisions about the design, structure, and requirements of the DBA program are made at Walden's academic headquarters.**

61.     Defendants admit the DBA program has two distinct phases: the coursework phase and the capstone phase.  Defendants deny the remaining allegations in Paragraph 61.

**62.     During the coursework phase, a student is enrolled in online courses, covering topics such as business strategy, research methods, and courses related to the student's area of specialization. Throughout the 2008-2015 period, the DBA program required students to complete 40 credits during the coursework phase, and it increased the requirement to 41 credits beginning in the 2015–16 academic year.**

62.     Defendants admit the that during the coursework phase, a student is enrolled in online courses, covering topics that include business strategy, research methods, and courses related to the student's area of specialization.  Defendants admit that throughout the 2008-2015 period, the DBA program required students to complete forty credits during the coursework phase, and that Walden University increased the requirement to forty-one credits.  Defendants deny the remaining allegations in Paragraph 62.

**63.     During the capstone phase, students design and complete a research project, including a prospectus, proposal, and final paper. Throughout the 2008-2015 time period, Walden publicly maintained that the DBA program required completion of a total of 20 credits during the capstone phase, decreasing the requirement to nineteen credits beginning in the 2015–16 academic year.**

63.     Defendants admit that during the capstone phase, students design and complete a research project, including a prospectus, proposal, and final paper.  Defendants admit that throughout the 2008-2015 time period, the DBA program required completion of a minimum of twenty credits during the capstone phase, and that Walden University decreased the minimum requirement to nineteen credits.  Defendants deny the remaining allegations in Paragraph 63.

**64.     The total number of required credits, including both coursework and capstone credits, remained unchanged at sixty credits throughout the time period at issue.**

64.     Defendants admit that the minimum requirement of credits remained sixty throughout the period at issue. To the extent Paragraph 64 purports to allege that Walden University represented students would complete the DBA program upon completing a certain number of credits, Defendants deny those allegations.

**65.     From 2008 through 2015, the 20 credit DBA capstone phase was made up of four zero-credit "doctoral mentoring" 8000-level courses and five four-credit "doctoral study completion" 9000-level courses.[10]**

65.     Defendants admit that from 2008 through 2015, the twenty credit DBA capstone phase was made up of four zero-credit doctoral mentoring 8000-level courses and at least five four-credit doctoral study completion 9000-level courses.  To the extent Paragraph 65 purports to allege that Walden University represented students would complete the DBA program upon completing a certain number of capstone credits, Defendants deny those allegations.  To the extent Paragraph 65 purports to quote or describe documents or statements made by Walden University, Defendants refer to those documents or statements for their complete and accurate contents and deny any allegation inconsistent with those documents or statements.

**66.     Students were enrolled in one 9000-level course each eight-week term, for a total of two 9000-level courses per semester.[11] Therefore, Walden's stated requirements**

---

[10] In 2008 and 2009, the "doctoral studies sequence" also included a four-credit "Writing the Doctoral Study Prospectus" course. This course, which was apparently discontinued after 2009, was taken alongside other core program requirements during the coursework phase of the program. In these two years, as in the years that followed, the program requirements included 20 capstone credits by way of five iterations of the four-credit, 9000-level "Doctoral Study Completion" course.

[11] The DBA program is a semester-based program. As explained by the MOHE Report, Walden's semester-based programs assume 3 15-week semesters per year. There are two eight-week terms in each semester. *See* MOHE Report at 31.

**informed DBA students that they would complete the capstone phase in two and half semesters over roughly 10 months.**

66.     Defendants deny that each and every Walden University DBA student enrolled in one 9000-level course during each eight-week term for ten consecutive terms.  Defendants admit that the DBA program is semester based and that Walden University's DBA program has three fifteen-week semesters per year.  Defendants deny the remaining allegations in Paragraph 66.  To the extent Paragraph 66 purports to allege that Walden University represented that students would complete the capstone phase of the DBA program within a certain period of time or upon completing a certain number of credits, Defendants deny those allegations.  To the extent Paragraph 66 and its supporting footnote purports to quote or describe statements made in the MOHE Report, Defendants refer to those statements for their complete and accurate contents and deny any allegations inconsistent with those statements.  To the extent Paragraph 66 purports to allege that the MOHE Report is relevant to Plaintiffs' claims or would be admissible as evidence in this case, Defendants deny those allegations.

**67.     Beginning in the 2015–16 academic year, the doctoral mentoring course was assigned one credit, and the number of credits assigned to each 9000-level doctoral study course was reduced from four credits to three credits. At this point, Walden's stated graduation requirement of nineteen total capstone credits consisted of four credits of doctoral mentoring and five 9000-level courses worth three credits each.**

67.     Defendants deny the allegations in Paragraph 67.

**68.     The stated requirements for the number of 9000-level courses and time to completion thus remained the same for the entire time period at issue. Throughout,**

**Walden informed prospective students that the DBA program required sixty total credits and five DBA 9000-level courses and could be completed in roughly three and a half years.**

68.     Defendants admit that the stated requirements for the minimum number of 9000-level courses and the minimum required time to complete those courses remained the same between 2008 and 2018.  Defendants further admit that Walden University informed prospective students that the DBA program required a minimum of sixty total credits and a minimum of five DBA 9000-level courses between 2008 and 2018.  Defendants deny the remaining allegations in Paragraph 68.

**69.     Walden's representations regarding the required coursework credits consistently matched students' experiences; at the point at which students complete their coursework credits, Walden's representations regarding the cost of the DBA program appeared correct because all was proceeding as advertised. It is the capstone credit requirement that is the primary subject of Walden's misrepresentations, the chief mechanism by which Walden imposes additional graduation requirements, and, thus, the cause of financial harm. Walden's duplicity is revealed when students reach the capstone phase and discover that Walden requires them to take many more capstone courses than the stated requirement in order to charge them semester after semester, leading to substantial excess tuition for students and substantial excess revenue for Walden.**

69.     Defendants lack knowledge or information sufficient to form a belief as to all DBA student experiences.  Defendants deny the remaining allegations in Paragraph 69.

**70.     Walden advertised and represented to potential students that the capstone phase consisted of just 19-20 capstone credits, which, in 2018, cost $18,620 or $19,600. In**

**fact, successful graduates were required to complete fifty-four capstone credits on average, which cost $52,920—nearly three times the stated amount.**

70.     Defendants admit that between 2008 and 2018, Walden University disclosed that the minimum number of capstone credits required to graduate consisted of nineteen or twenty credits.  Defendants further admit that, in 2018, completion of the minimum number of nineteen or twenty DBA capstone credits would cost $18,620 or $19,600.  Defendants deny the remaining allegations in Paragraph 70.

**3.     WALDEN'S MISREPRESENTATIONS AND PREDATORY CAPSTONE SCHEME**

    **A.     WALDEN FRAUDULENTLY REPRESENTED THE REQUIRED CREDITS AND COST OF ITS DBA PROGRAM TO POTENTIAL STUDENTS AND THE PUBLIC**

**71.     Through its fraudulent and predatory enrollment practices, Walden has consistently enticed students to enroll in its DBA program by fraudulently misrepresenting the true cost of the program through its websites and online materials, as well as through its enrollment sales associates.**

71.     Defendants deny the allegations in Paragraph 71.

**72.     Across these various platforms, Walden represented that the DBA degree could be earned for a predictable cost. It represented that a DBA degree would require sixty credit hours (forty or forty-one credit hours for coursework credits and nineteen or twenty for their capstone credits, depending on the year), with tuition charged on a per-credit basis. Other than the minimal variation year-by-year in the price of each credit (which ranged from $725 to $980 during the period in question), Walden represented the DBA degree as having a specific cost.**

72.     Defendants admit that Walden University represented that a DBA degree would require a minimum of sixty credit hours (forty or forty-one credit hours for coursework credits and nineteen or twenty for their capstone credits, depending on the year), with tuition charged on a per-credit basis.  Defendants deny the remaining allegations in Paragraph 72.

**73.     In truth, most DBA students are not awarded their degree after completing the advertised graduation requirements—and therefore pay significantly more than the stated cost. MOHE reports that DBA students complete an average of fifty-four capstone credits, *more than two and a half times* the stated requirement, prior to graduation. Capstone credits carry the same tuition cost per credit as coursework credits. MOHE Report at 8. These thirty-five additional average capstone credits therefore cost Walden students approximately $34,300 more than they could have expected from Walden's representations.**

73.     Defendants admit that Walden University capstone credits have the same tuition cost per credit as coursework credits.  Defendants admit that Figure 14 of the MOHE Report, which does not identify the relevant academic years, purports that the average DBA graduate completed an average of fifty-four capstone credits.  Defendants otherwise deny that Plaintiffs' characterization of the MOHE Report is accurate or that it states that students on average complete the capstone program with more than two and a half times the stated requirements.  To the extent Paragraph 73 purports to allege that the MOHE Report is relevant to Plaintiffs' claims or would be admissible as evidence in this case, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to student expectations regarding cost of the DBA program.  Defendants deny the remaining allegations in Paragraph 73.

**74.     Walden's practice of misrepresentation as described herein began in or prior to August 2008 and continued in substantially the same form through at least January 2018. Its misrepresentations were pervasive and consistent across the various ways in which Walden communicated with prospective students and the public, and were intended to induce students to rely on these misrepresentations when enrolling.**

74.     Defendants deny the allegations in Paragraph 74.

**75.     Upon information and belief, Walden's practice of misrepresentation as described herein emanated from decisions made at its academic headquarters in Minneapolis.**

75.     Defendants deny the allegations in Paragraph 75.

*i.     Website*

**76.     Walden's primary public materials describing the cost, credit requirements, and time to completion for its DBA program are on the Tuition and Fees section of its DBA program site or, prior to roughly 2012, on a combined Tuition and Fees page for the School of Management as a whole.**

76.     Defendants admit that Walden University discloses information describing the minimum cost, credit requirements, and estimated time to completion for its DBA program in various locations, including but not limited to on the Walden University websites.  Defendants deny the remaining allegations in Paragraph 76 because the term "primary public materials" is vague and unintelligible.  Answering further, in addition to disclosing information on the Walden University websites, Defendants provide information regarding cost and credit requirements in the Walden University Catalog and the Walden University Student Handbook.

**77.     Starting no later than August 2008 and continuing until early 2018, the Tuition and Fees pages of the website consistently misrepresented the number of credits required to complete a DBA degree and therefore the cost of said degree.**

77.     Defendants deny the allegations in Paragraph 77.

**78.     As described in the MOHE Report, most students were unable to complete the program within the credit requirement published on Walden's website. MOHE Report at 48. Walden would have certainly known that the average DBA student completed almost three times as many capstone credits as Walden's stated requirement. Although there were minor changes to the website during that time period, such as changes to the cost per credit, the page continued throughout that time period to provide the same false representations about the DBA program requirements.**

78.     Defendants deny that Plaintiffs' have fully or accurately quoted Page 48 of the MOHE Report.  Defendants refer to those statements for their complete and accurate contents. To the extent Paragraph 78 purports to allege that the MOHE Report is relevant to Plaintiffs' claims or would be admissible as evidence in this case, Defendants deny those allegations. Defendants admit that the Walden University website changed between 2008 and 2018. Defendants deny the remaining allegations in Paragraph 78.

**79.     Prior to 2012, Walden's representations were provided on a combined tuition and fees page[12] that included information for each of the degree programs provided by the School of Management, rather than on a stand-alone DBA page. As shown in the screenshot below, which depicts the tuition and fees page as of the 2008-2009 academic**

---

[12] *See School of Management*, waldenu.edu, http://web.archive.org/web/20090406221512/
[http://www.waldenu.edu/Tuition-and-Financial-Aid/School-of-Management htm] (last visited Jan. 6, 2022)

year, Walden stated that the costs for the DBA program consisted of three "Curriculum Components": courses, a 4-day residency fee, and a technology fee.

| Doctor of Business Administration (D.B.A.) | | |
|---|---|---|
| Curriculum Component | Requirements | Cost |
| Courses | 60 total semester credit hours | $725 per semester credit hour, which includes the cost of all required textbooks |
| 4-Day Residency Fee | 2 during your program | $850 each, plus travel, lodging, and other expenses |
| Technology Fee | per semester | $40 |

79.    To the extent Paragraph 79 purports to quote or describe Walden University's websites, Defendants refer to those websites for their complete and accurate contents and deny any allegations inconsistent with those websites.  To the extent Paragraph 79 purports that Walden University represented that the cost of, or time to, completion of the DBA program would not exceed a certain amount for each and every DBA student, or that the snapshot of the website provided in Paragraph 79 is the full extent of information about the DBA program provided to prospective students, Defendants deny those allegations.

80.    By 2012, information related to cost of the DBA program had moved to its own page, but the information provided remained the same, except for the inclusion of an application fee as a fourth "curriculum component" and small adjustments to the cost of each credit. For example, by December 25, 2012, the Tuition and Fees page[13] for the DBA program appeared as follows:

---

[13] *See Doctor of Business Administration (D.B.A.)*, waldenu.edu, https://web.archive.org/web/20121225015717/ [http://www.waldenu.edu/doctoral/doctor-of-business-administration?tab=tuition-fees] (last visited Jan. 6, 2022)



80.     To the extent Paragraph 80 purports to quote or describe Walden University's websites, Defendants refer to those websites for their complete and accurate contents and deny any allegations inconsistent with those websites.  To the extent Paragraph 80 purports that Walden University represented that the cost of, or time to, completion of the DBA program would not exceed a certain amount for each and every DBA student, or that the snapshot of the website provided in Paragraph 80 is the full extent of information about the DBA program provided to prospective students, Defendants deny those allegations.

**81.     As seen in the screenshots above, Walden clearly states that the program requires a total of sixty total semester credit hours, at a set cost per semester credit hour. No other credit requirements beyond those sixty are listed, and the only other program costs disclosed are the cost of attending two in-person residencies, the application fee, and a small per-semester technology fee.**

81.     To the extent Paragraph 81 purports to quote or describe Walden University's websites, Defendants refer to those websites for their complete and accurate contents and deny any allegations inconsistent with those websites.  To the extent Paragraph 81 purports that Walden University represented that the cost of, or time to, completion of the DBA program would not exceed a certain amount for each and every DBA student, or that the snapshots of the website provided in Paragraphs 79 and 80 are the full extent of information about the DBA program provided to prospective students, Defendants deny those allegations.

**82.     At $845 per semester credit hour, the cost of the sixty credits required for completion would amount to $50,700, with only relatively small additional costs beyond that for the residencies and a per-semester technology fee.**

82.     Defendants admit that at $845 per semester credit hour, which was the cost per semester credit hour at Walden University as of December 25, 2012, the minimum cost of the minimum of sixty credits required for completion would amount to $50,700.  Defendants deny that the cost per semester credit hour at Walden University was at least $845 for the entire period between 2008 and 2018.  To the extent that Paragraph 82 purports that Walden University represented that the cost of completion of the DBA program would not exceed $50,700 for each and every DBA student, Defendants deny those allegations.

**83.     At no point does the page provide any indication whatsoever that, in fact, the true number of successfully completed credit hours required to graduate can substantially exceed sixty credits, and in fact does for most students.**

83.     To the extent Paragraph 83 purports to quote or describe Walden University's websites, Defendants refer to those websites for their complete and accurate contents and deny any allegations inconsistent with those websites.  To the extent Paragraph 83 purports that Walden University represented that the cost of, or time to, completion of the DBA program would not exceed a certain amount for each and every DBA student, Defendants deny those allegations.

**84.     Nor does the webpage provide any indication that the tuition cost can—and for most students will—substantially exceed the $50,700 that is commensurate with the supposed credit requirement. Misrepresenting the true number of credits required for most students to graduate had the functional effect of misleading prospective students**

about the true cost of a DBA degree. The only disclaimer provided is that "tuition and fees are subject to change," but that would only affect the cost per credit and not the number of credits required.

84.     To the extent Paragraph 84 purports to quote or describe Walden University's websites, Defendants refer to those websites for their complete and accurate contents and deny any allegations inconsistent with those websites.  Defendants deny the remaining allegations in Paragraph 84.

**85.     The representations regarding the credit requirements and cost of the DBA program remained largely unchanged on Walden's website through at least January 2018.**

85.     To the extent Paragraph 85 purports to quote or describe Walden University's website, Defendants refer to that website for its complete and accurate contents and deny any allegations inconsistent with that website.

**86.     For example, as shown in the screenshot below, as of May 4, 2016, the Tuition and Fees page[14] stated that the DBA program consisted of three "Curriculum Components": tuition, a residency fee, and a technology fee.**



86.     To the extent Paragraph 86 purports to quote or describe Walden University's website, Defendants refer to that website for its complete and accurate contents and deny any

---

[14] *School of Management*, waldenu.edu, http://web.archive.org/web/20090406221512/ [http://www.waldenu.edu/Tuition-and-Financial-Aid/School-of-Management.htm] (last visited Jan. 6, 2022)

allegations inconsistent with that website.  To the extent Paragraph 86 purports that Walden University represented that the cost of, or time to, completion of the DBA program would not exceed a certain amount for each and every DBA student, or that the snapshot of the website provided in Paragraph 86 is the full extent of information about the DBA program provided to prospective students, Defendants deny those allegations.

**87.     The required number of credits at this time remained sixty total semester credit hours. The cost per credit hour at that time was $950, resulting in a total of $57,000 in tuition, plus the residency and technology fees.**

87.     Defendants admit that at $950 per semester credit hour, which was the cost per semester credit hour as of May 2016, the minimum cost of the minimum of sixty credits required for completion could amount to $57,000.  Defendants deny that Walden University represented that the cost of completion of the DBA program would not exceed $57,000.

**88.     As with earlier versions of the website, at no point does the page provide any disclosure that, in fact, the true number of successfully-completed credit hours (and, accordingly, the true cost in tuition) required to graduate can substantially exceed sixty credits, and in fact does for most students.**

88.     To the extent Paragraph 88 purports to quote or describe Walden University's website, Defendants refer to that website for its complete and accurate contents and deny any allegations inconsistent with that website.  To the extent that Paragraph 88 purports that Walden University represented that the credits required to successfully complete the DBA program would never exceed sixty credits, Defendants deny those allegations.

**89.     Instead, Walden represented that students could *reduce* their total cost by transferring in credits from prior advanced-degree coursework. As of the 2012 webpage**

42

**depicted above, students were instructed to call for additional information about transferring credits. By 2016, however, Walden had begun further emphasizing credit transfer as a cost-saving option, listing the maximum savings from credit transfer of $29,325 directly in the main tuition calculation.**

89.     Defendants admit that Walden University disclosed that students could transfer credits from prior advanced-degree coursework and apply those credits towards their doctoral degree at Walden University.  To the extent Paragraph 89 purports to quote or describe Walden University's websites, Defendants refer to those websites for their complete and accurate contents and deny any allegations inconsistent with those websites.  To the extent Paragraph 89 purports that Walden University represented that the cost of, or time to, completion of the DBA program would not exceed a certain amount for each and every DBA student, Defendants deny those allegations.

**90.     The 2016 version of the site adds small-print text noting that the tuition listed "reflects the minimum time to completion" and that the "minimum time to completion varies by student, depending on individual progress and credits transferred, if applicable."**

90.     To the extent Paragraph 90 purports to quote or describe Walden University's website, Defendants refer to that website for its complete and accurate contents and deny any allegations inconsistent with that website.  To the extent that Paragraph 90 alleges that Walden University did not disclose before 2016 that the time to completion of the DBA program varies by student, Defendants deny those allegations.

**91.     As with the prior disclaimer, this language does not disclose that the credit hour "requirements" listed may also vary. This is of particular importance given the nearly $1,000 cost to each credit hour.**

91.     To the extent Paragraph 91 purports to quote or describe Walden University's website, Defendants refer to that website for its complete and accurate contents and deny any allegations inconsistent with that website.  To the extent that Paragraph 91 alleges that Walden University represented that the credits required to successfully complete the DBA program would never vary, Defendants deny those allegations.  Defendants deny that the cost per credit hour at Walden University was nearly $1,000 for the entire period between 2008 and 2018.

**92.     A particular student's "time to completion" could vary for multiple reasons unrelated to and without changing the stated total credit hours, and therefore tuition, requirement. A student could take fewer credit hours per semester, leading them to take longer to complete the same number of credits. A student could also fail a class or classes, and therefore have to repeat classes in order to reach the required number of successfully completed credits, or could transfer credits in from a prior institution and therefore need to take fewer Walden courses to reach the requirement.**

92.     Defendants admit that a particular student's time to completion could vary for multiple reasons.  Defendants deny that those reasons may not affect the total number of credit hours, and therefore tuition, necessary for a given student to complete the DBA program.

**93.     This disclaimer therefore does not put prospective students on notice that the listed credit hour "requirements" for degree completion, which are directly determinative of the cost of the program, also vary by student and often substantially exceed the number listed. In fact, fewer than one-third of students finish within the minimum time to completion.**

93.     Defendants deny the allegations in Paragraph 93 as vague and unintelligible, as it is unclear how the "listed credit hour 'requirements'" could vary by student or exceed the

number "listed."  Defendants admit that the actual number of credit hours completed can vary by student and, for some students, exceed the minimum required credits.  Defendants deny the remaining allegations in Paragraph 93.

**94.    Only recently did Walden update its website to reflect the true cost of a DBA degree. By 2020, Walden's website describes the capstone phase of the DBA degree as requiring between 19 and 103 credits, costing between $18,810 and $101,970. The total tuition one pays for a DBA degree, Walden finally informed its prospective students, could be as high as $131,670. This was the first time that Walden disclosed how long and costly its DBA program could be. This current disclosure is, of course, of no help to students who relied on a much lower figure when they enrolled and who have either completed their degrees at a higher than anticipated cost or who continue to be enrolled at Walden, racking up fees with each passing term.**

94.    To the extent Paragraph 94 purports to quote or describe statements made on Walden University's websites, Defendants refer to those websites for their complete and accurate contents and deny any allegations inconsistent with those websites.  Defendants deny the remaining allegations in Paragraph 94.

*ii.    Enrollment Advisors*

**95.    In addition to its website misrepresentations directed to potential students and the public at large, Walden also consistently misrepresented the true requirements and costs for the DBA degree through its enrollment advisors.**

95.    Defendants deny the allegations in Paragraph 95.

**96.    Walden maintains two separate websites: its main waldenu.edu site, as well as the sales-oriented info.waldenu.edu site. Only the waldenu.edu site provides information**

**about the credit requirements and cost of the DBA degree. The info.waldenu.edu site instead provides a form for potential applicants to complete with their contact information to request a contact from a Walden enrollment advisor and is used as the landing page for Walden's digital advertising.**

96.     Defendants admit that Walden University maintains separate waldenu.edu and info.waldenu.edu websites.  To the extent that Paragraph 96 purports to quote or describe those websites, Defendants refer to those websites for their complete and accurate contents and deny any allegations inconsistent with those websites.

**97.     Throughout the time period at issue, Walden employed a workforce of enrollment advisors or enrollment specialists, who, upon information and belief, primarily worked out of call-center-type office environments.**

97.     Defendants admit the allegations in Paragraph 97.

**98.     Enrollment advisors were responsible for communicating with potential students and recruiting them for application and enrollment in Walden's degree programs, including the DBA.**

98.     Defendants admit that enrollment specialists, which were previously called enrollment advisors, communicate with potential students about their potential application and enrollment in Walden University degree programs, including the DBA program.  Defendants deny the remaining allegations in Paragraph 98, as the term "recruiting" is vague and unintelligible.

**99.     Upon information and belief, enrollment advisors' interactions with potential students are heavily scripted and monitored by Walden, and enrollment advisors provide**

**potential students with standardized information consistent with the representations regarding tuition and credit hour requirements on Walden's website.**

99.     Defendants admit that Walden University instructs enrollment specialists, which were previously called enrollment advisors, to provide prospective students with information consistent with the representations regarding tuition and credit hour requirements on Walden University's website.  Defendants further admit that Walden University monitors interactions between enrollment specialists and potential students.  Defendants deny the remaining allegations in Paragraph 99.

**100.     Enrollment advisors functioned as sales agents for the University, operating off of a standard "script" that guided the enrollment advisors on how to anticipate, rebut, and overcome anticipated objections from prospects. Among the anticipated objections advisors were scripted to respond to were both the cost of the degree and the time it would take to complete.**

100.     Defendants admit that Walden University instructs enrollment specialists, previously called enrollment advisors, to provide information to prospective students consistent with the representations regarding tuition and credit hour requirements on Walden University's website.  Defendants admit that enrollment specialists were instructed to provide responses to questions raised by potential students, including questions about the cost of the degree and the time it would take to complete a degree.  Defendants deny the remaining allegations in Paragraph 100.

**101.     Walden provided scripted responses to potential concerns about cost and time to complete the degree because it knew that these were important decision factors for all potential students. Walden intended for potential students to rely on the information**

47

**about cost and degree requirements provided by the enrollment advisors—and the similar information provided on its website—when deciding whether or not to enroll.**

101.    Defendants admit that enrollment specialists, previously called enrollment advisors, were instructed to provide responses to questions raised by potential students. Defendants deny enrollment specialists or advisors were given "scripted responses."  To the extent that Paragraph 101 purports that Walden University's enrollment specialists, advisors, or website provided misleading information about the cost and degree requirements of the DBA program, or that Walden University otherwise misrepresented the cost and time to complete the degree, in order to induce prospective students to enroll, Defendants deny those allegations.

**102.    Each Plaintiff spoke with an enrollment advisor while evaluating doctoral degree options or during the process of enrolling at Walden.**

102.    Defendants admit that Carroll, Charles, and Fair spoke with a Walden University enrollment advisor or specialist.  Defendants lack knowledge or information sufficient at this time to form a belief as to whether Fluker spoke with an enrollment advisor or specialist.

**103.    In each case, Walden enrollment advisors provided Plaintiffs with false and misleading representations regarding the cost of the program, based on the number of credit hours and semesters Plaintiffs would be required to complete to earn the DBA degree.**

103.    Defendants deny the allegations in Paragraph 103.

**104.    Plaintiff Carroll was told by a Walden enrollment specialist that she would be able to transfer twelve credits, leaving only forty-eight total credits to complete the degree, and would be able to graduate with her degree in eighteen months. Instead, she spent over three years in the program and was compelled to complete sixty-three credits.**

**These extra capstone credits above Walden's stated requirement cost Carroll approximately $15,000 in excess tuition.**

104.    At this time, Defendants lack knowledge or information sufficient form a belief as to the substance of Carroll's discussion with a Walden University enrollment specialist or advisor, as alleged in Paragraph 104.  Defendants admit that Carroll was enrolled in the DBA program from September 2017 until November 2020 and completed sixty-three DBA credits. Defendants deny the remaining allegations in Paragraph 104.

**105.    Plaintiff Charles was told by a Walden enrollment specialist that the full cost of the program, before accounting for transfer credits, would be roughly $62,000, that she could transfer twelve credits from her MBA, and that she would complete the program within two and a half years. After confirming the cost estimates with the website, Charles subtracted the cost of her transferred credits to reach a total expected cost of approximately $50,000. Instead, she spent approximately $71,000 in tuition and fees on the program over the course of four years, including approximately $21,000 in excess tuition for capstone credits beyond the stated requirement.**

105.    At this time, Defendants lack knowledge or information sufficient to form a belief as to the substance of Charles's discussion with a Walden University enrollment specialist or advisor, as alleged in Paragraph 105.  Defendants admit that Charles was enrolled in the DBA program from July 2017 until May 2021.  Defendants lack knowledge or information sufficient to form a belief as to how Charles calculated anticipated costs.  Defendants deny the remaining allegations in Paragraph 105.

**106.    Plaintiff Fair was told by a Walden enrollment specialist that, after her transferred credits and military discount, the program would cost her $38,715—reduced to**

**$26,215 after a subsequent additional scholarship—and would take her two and a half years to complete. Instead, Fair graduated after spending four and a half years in the program and being charged approximately $54,000 in tuition and fees, approximately $25,000 of which was attributable to excess tuition for capstone credits beyond the stated requirement.**

106.    At this time, Defendants lack knowledge or information sufficient to form a belief as to the substance of Fair's discussion with a Walden University enrollment specialist or advisor, as alleged in Paragraph 106. Defendants admit that Fair was enrolled in the DBA program from June 2016 until March 2021. Defendants deny the remaining allegations in Paragraph 106.

**107.    Plaintiff Fluker was told by a Walden enrollment specialist that the full cost of the program, after her transferred credits, could be as low as $25,000 and would not exceed $33,000 and that she would complete the program within two and a half years. Instead, she spent approximately $95,000 in tuition and fees on the program over the course of more than five years, including approximately $55,000 in excess tuition for capstone credits beyond the stated requirement.**

107.    Defendants lack knowledge or information sufficient at this time to form a belief as to whether Fluker spoke with a Walden University enrollment specialist or advisor. Defendants admit that Fluker was enrolled in the DBA program from May 2011 until June 2016 and paid approximately $95,000 in tuition. Defendants deny the remaining allegations in Paragraph 107.

B.   **THE EXPERIENCE OF WALDEN'S DBA STUDENTS DEMONSTRATES THAT WALDEN'S REPRESENTATIONS REGARDING THE COST OF A DBA DEGREE WERE FALSE AND MISLEADING**

**108.    Walden's representations about the cost of a DBA degree based on sixty total credit hours, including nineteen or twenty capstone credit hours, were false and misleading. Plaintiffs' experiences, detailed in Section IV below, are representative of the experience that thousands of DBA students had, lured into a degree program that Walden knew would take much longer and be much more expensive than it so confidently represented online, on the phone, and in print.**

108.    Defendants deny the allegations in Paragraph 108.

**109.    Each Plaintiff was required to successfully complete substantially more than nineteen capstone credits and sixty total credits. In fact, each Plaintiff successfully completed at least thirty-four and as many as eighty capstone credit hours—from 1.8 to 4.0 times as many as they were told would be required. In so doing, Plaintiffs paid between approximately $15,000 and $55,000 in excess tuition for capstone credits above the requirement Walden advertised to them when they enrolled.**

109.    To the extent Paragraph 109 purports that Walden University misrepresented the number of credits and cost to completion that may be required to complete the DBA program, Defendants deny those allegations.  Defendants deny any of the Plaintiffs paid "excess" tuition. Defendants admit that each Individual Plaintiff completed more than the nineteen minimum capstone credits required and sixty minimum total credits required.  Defendants deny the remaining allegations in Paragraph 109.

**110.    The Individual Plaintiffs are not alone. Other DBA students have taken upwards of twenty or thirty DBA capstone courses, representing as much as eighty to one hundred and twenty capstone credits.**

110.     Defendants admit that some, but not all, students take more than the minimum number of capstone credits before earning their DBA degree.

**111.     The Minnesota Office of Higher Education oversees private colleges and universities operating in Minnesota. As part of its responsibilities, MOHE "investigate[s] complaints from students that question the authenticity and legitimacy of their private institution, its programs, and its adherence to its policies and procedures." MOHE Report at 3. MOHE investigates complaints against Walden from students across the nation. Multiple states, including Virginia and Maryland, refer resident complaints against Walden to MOHE.**

111.     Defendants admit Plaintiffs have accurately quoted Page 3 of the MOHE Report. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 111.

**112.     As a Minnesota institution regulated by MOHE, Walden is required under Minnesota law to "use[] only publications and advertisements which are truthful and do not give any false, fraudulent, deceptive, inaccurate, or misleading impressions about the school, its personnel, programs, services, or occupational opportunities for its graduates for promotion and student recruitment." Minn. Stat. § 136A.65 subdiv. 4.**

112.     To the extent that Paragraph 112 purports to quote or describe Minnesota statutes, Defendants refer to those statutes for their complete and accurate contents and deny any allegations inconsistent with those statutes.  To the extent Paragraph 112 purports to suggest that Walden University violated the quoted statute, Defendants deny those allegations.

**113.     In response to almost 1,000 student complaints made between September 2008 and September 2016, MOHE engaged in a review of Walden's doctoral programs.**

**MOHE published a report describing its review and its findings on October 23, 2019.**
**MOHE Report.**

113.    Defendants admit that MOHE published the MOHE Report on October 23, 2019.
Defendants refer to that report for its complete and accurate contents.  Defendants lack
knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph
113.  To the extent Paragraph 113 purports to allege that the MOHE Report is relevant to
Plaintiffs' claims or would be admissible as evidence in this case, Defendants deny those
allegations.

**114.    As part of its investigation, MOHE reviewed Walden's representations**
**regarding the number of total credit hours and capstone credit hours required for the DBA**
**program and compared that to the actual experiences of enrolled students overall.**

114.    Defendants lack knowledge or information sufficient to form a belief as to the
allegations in Paragraph 114.  To the extent Paragraph 114 purports to quote or describe the
MOHE Report, Defendants refer to that report for its complete and accurate contents.  To the
extent Paragraph 114 purports to allege that the MOHE Report is relevant to Plaintiffs' claims or
would be admissible as evidence in this case, Defendants deny those allegations.

**115.    MOHE calculated that a student completing the DBA degree with the**
**average number of capstone credit hours for degree completers would pay a total program**
**cost of $97,700—a total of $34,300 more than the program cost as advertised. MOHE**
**Report at 98.**

115.    Defendants admit that Page 98 of the MOHE Report purports that the average
cost of the DBA program for graduates who completed the average number of credits, as
opposed to the minimum required, was $97,700.  Defendants otherwise deny Plaintiffs'

characterization of the MOHE Report is accurate.  To the extent Paragraph 115 purports to allege that the MOHE Report is relevant to Plaintiffs' claims or would be admissible as evidence in this case, Defendants deny those allegations.  To the extent Paragraph 115 purports that Walden misrepresented the potential cost of completion of the DBA program, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 115.

**116.     MOHE found that while the DBA program was presented as requiring nineteen capstone credits, MOHE Report at 48, students who had completed their DBA degrees had actually earned, and paid for, an average of 54 capstone credits alone—nearly 3 times the stated requirement. The median number of earned capstone credit hours for students who had completed their degrees was forty-eight. MOHE Report at 49, Figure 14.[15]**

116.     Defendants admit that Pages 48-49 of the MOHE Report purport that the average DBA graduate completed an average of fifty-four capstone credits and the median was forty-eight credits.  Defendants otherwise deny that Plaintiffs' characterization of the MOHE Report is complete or accurate.  To the extent Paragraph 116 purports to allege that the MOHE Report is relevant to Plaintiffs' claims or would be admissible as evidence in this case, Defendants deny those allegations.  To the extent Paragraph 116 purports that Defendants misrepresented the potential number of credits required to complete the DBA program or Walden University's other doctoral programs, Defendants deny those allegations.

---

[15] MOHE's investigation revealed similar problems in other Walden doctoral programs. See MOHE Report at 49-67.

**117.    Among those who had withdrawn *without* receiving a degree, the average was thirty-one capstone credits and median twenty-four capstone credits—more than the stated requirement for earning the degree. MOHE Report at 49, Figure 14.**

117.    Defendants admit that Figure 14 of the MOHE Report purports that among DBA students who withdrew from the program before graduating, the mean number of capstone credits taken was thirty-one and the median twenty-four.  Defendants otherwise deny that Plaintiffs' characterization of the MOHE Report is complete or accurate.  To the extent Paragraph 117 purports to allege that the MOHE Report is relevant to Plaintiffs' claims or would be admissible as evidence in this case, Defendants deny those allegations. To the extent Paragraph 117 purports that Walden misrepresented the potential number of credits required to complete the DBA program, Defendants deny those allegations.

**118.    Given that students were charged per credit hour throughout the capstone phase, these discrepancies directly translate into significant excess tuition stemming from Walden's misrepresentations. Plaintiffs' experiences of incurring excess tuition costs are consistent with those of DBA students generally.**

118.    Defendants admit that DBA program students are charged per credit hour throughout the capstone phase of the DBA program.  Defendants deny the remaining allegations in Paragraph 118.

**C.    THE CAPSTONE PROCESS**

**119.    The discrepancies between the stated credit requirements and the actual number of credits earned is due to Walden's policies and practices regarding the capstone process, which are deliberately designed to draw out the process, resulting in additional tuition, and thus profit, for Walden. Acting, upon information and belief, out of its academic headquarters, Walden intentionally set up the capstone process to prolong each**

student's enrollment, and therefore maximize the tuition they can squeeze out of each new prospect.

119.    Defendants deny the allegations in Paragraph 119.

**120.    The committees' ability to prolong students' dissertations is a feature of the design of the capstone process. It forces students to sit idle for weeks at a time while they wait for overlapping approvals to progress to the next step, all while capstone credits (and cost) continue to accumulate. The structure of the DBA capstone allows Walden to trap and hold students in the DBA program to maximize the tuition that each student is forced to pay.**

120.    Defendants deny the allegations in Paragraph 120.

**121.    When they enter the capstone phase of the program, DBA students are assigned a three-member faculty committee intended to provide feedback, guidance, and approval of the students' progress through the dissertation. The first member (the committee chair) and the second committee member serve as content and methodology experts. The third member of each committee is a University Research Reviewer ("URR"), who purports to ensure that student research meets or exceeds university academic guidelines.**

121.    Defendants admit the allegations in Paragraph 121 starting with academic year 2009-2010.  Defendants deny the remaining allegations in Paragraph 121.

**122.    Unanimous committee approval is required to progress through each phase of the dissertation process and is also required for many of the steps within each phase.[16]**

_____

[16] Walden describes its dissertation process as comprising five broad phases: (1) Committee Formation and Prospectus Development, (2) Proposal Development and Approval Process, (3) IRB Approval Process and Data Collection, (4) Dissertation Completion and Approval Process, and (5) Final Steps Prior to Graduation. See MOHE Report at 120–22. Each of these phases contains numerous steps that must be completed before a student may progress to the next dissertation phase.

122.     Defendants admit that unanimous committee approval is required to progress through each phase of the capstone process and is also required for many of the steps within each phase.  Defendants further admit that there are five broad phases applicable to the capstone process: (1) Committee Formation and Prospectus Development, (2) Proposal Development and Approval Process, (3) IRB Approval Process and Data Collection, (4) Dissertation Completion and Approval Process, and (5) Final Steps Prior to Graduation.  To the extent Paragraph 122 purports to quote or describe the MOHE Report, Defendants refer to that report for its complete and accurate contents.

**123.     When a DBA student submits a piece of work that requires approval, each committee member must submit feedback and approve or reject the submission within 14 days of receipt.**

123.     Defendants admit that at all times relevant, Walden University faculty were allotted at or around fourteen calendar days to provide feedback on student submissions.

**124.     The review process happens sequentially. Upon student submission, the committee chair has two weeks to act on the submission. If the chair approves, the second committee member has another two weeks to provide feedback and approve or reject the submission; the process is repeated a third time for the URR. This means that even if all committee members approve a student submission in adherence to the required timelines, a DBA candidate can still spend almost an entire DBA 9000 term waiting for feedback on their submission. Because DBA students must obtain committee approval before progressing to the next step in the dissertation process, they are forced to sit idle for weeks at a time—while continuing to pay tuition—even in the best-case scenario.**

124.     Defendants admit that at all times relevant, Walden University faculty were allotted at or around fourteen calendar days to provide feedback on student submissions. Defendants further admit that DBA students must obtain committee approval before progressing to the next step in the capstone process.  Defendants deny Walden University students are "forced to sit idle" during their capstone phases.  To the extent Paragraph 124 purports that Walden University pursues a policy of intentionally delaying students' progress through the capstone phase, Defendants deny those allegations.

**125.     This assumes that the committee members abide by Walden's policy and provide feedback within fourteen days. Some DBA faculty members interpret the policy as requiring response within fourteen *business* days, which causes DBA students to wait for at least eighteen days for each round of feedback. If all three of a student's committee members take eighteen days to provide feedback, that student would spend fifty-four days out of a fifty-six-day term—96% of a 9000-level class—waiting for approval to move forward.**

125.     Defendants admit that if three faculty members took eighteen days each, sequentially, to review a student's submission, that would equal fifty-four days.  To the extent that Paragraph 125 purports that Walden pursues a policy of intentionally delaying students' progress through the capstone phase, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 125.

**126.     The wait for feedback is only the beginning of the problem. Plaintiffs describe instances in which they have received glowing feedback from their committee chairs and second members, only to have their submission rejected by the URR for minor,**

**non-substantive suggestions, including misplaced commas or semi-colons. Such a rejection restarts the entire review process, and students are forced to wait for weeks more on resubmission of their work with slightly reworded sentences and without the offending punctuation.**

126.     Defendants deny the allegations in Paragraph 126 as vague and unintelligible as the review process is described in insufficient detail.  Defendants lack knowledge or information sufficient to form a belief as to every Walden University student's experience and feedback provided by faculty.  To the extent that Paragraph 126 purports that Walden University pursues a policy of intentionally delaying student's progress through the capstone phase, Defendants deny those allegations.  Defendants admit that if a student's submission during the capstone phase is rejected by the URR, then the student is required to revise and resubmit the submission consistent with faculty feedback.  To the extent that Paragraph 126 purports that Walden University permits faculty to provide insubstantial feedback in order to prolong the capstone phase for students, Defendants deny those allegations.

**127.     Additionally, committee members are frequently unresponsive to communications from students outside of the formal review process. This exacerbates delay and extends the capstone period for DBA students. Committee members often provide vague or unclear feedback when rejecting a student submission, and students are unable to obtain clarification by reaching out to that member. The only recourse for students is to repeatedly resubmit their work and wait for weeks to discover if they successfully addressed the member's feedback.**

127.     Defendants deny the allegations in Paragraph 127 as vague and unintelligible; it contains no allegations regarding specific instances of feedback, committee members, or

students.  To the extent that Paragraph 127 purports that Walden University pursues a policy of intentionally delaying student's progress through the capstone phase of the DBA program, including by providing vague or unclear feedback, or delaying responding to student inquiries, Defendants deny those allegations.  Defendants admit that some students are required to resubmit work consistent with faculty feedback.

**128.    While students go through multiple iterations of the review process to resolve these minor issues, they are automatically re-enrolled in the DBA 9000-level course, paying for two DBA 9000-level courses per semester until they are finally able to get signoff on their capstones.**

128.    Defendants admit that DBA students are automatically enrolled in DBA 9000-level courses until they complete the capstone phase.  Defendants further admit that DBA students complete two DBA 9000-level courses per semester during the capstone phase until they successfully complete the capstone phase.  Defendants deny the remaining allegations in Paragraph 128 as vague and unintelligible; it contains no allegations regarding specific instances of feedback, and the term "minor feedback" is vague and susceptible to multiple interpretations. To the extent that Paragraph 128 purports that Walden pursues a policy of intentionally delaying student's progress through the capstone phase, Defendants deny those allegations.

**129.    This is no accident; as described above, these are consistent features of Walden's DBA capstone process and are the result of a deliberate policy to prolong the capstone phase for pecuniary gain.**

129.    Defendants deny the allegations in Paragraph 129.

**4.    WALDEN'S PRACTICES ARE INTENTIONALLY DISCRIMINATORY AND HAVE A DISPARATE IMPACT ON BLACK AND FEMALE STUDENTS**

**130.    Walden not only engaged in the fraudulent misrepresentations described above, but also engaged in racial and gender discrimination through the practice of targeting these fraudulent and predatory enrollment practices at Black and female students, and at groups of prospective students who are disproportionately likely to be Black or female.**

130.    Defendants deny the allegations in Paragraph 130.

**131.    This is known as "reverse redlining"—the practice of targeting communities for predatory products or less favorable treatment based on race or gender, or based on facially-neutral practices that nevertheless have a disproportionate and unjustified impact on the basis of race or gender.**

131.    To the extent Paragraph 131 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

**132.    In this case, Walden's DBA program is predatory and abusive, because Walden's misrepresentations regarding the program cost and requirements ensnare prospective students in a bait-and-switch, requiring them to pay substantially more than the stated price—in the case of Plaintiffs, as much as double.**

132.    Defendants deny the allegations in Paragraph 132.

**133.    Therefore, Walden's efforts to target this program at Black and female students constitutes illegal reverse redlining and racial discrimination under both ECOA and under Title VI of the Civil Rights Act.**

133.     To the extent Paragraph 133 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

**A.     THE STUDENTS SUBJECTED TO WALDEN'S PREDATORY DBA PRODUCT ARE DISPROPORTIONATELY BLACK**

**134.     Walden's DBA student body, and thus the population of people who are subjected to its predatory, fraudulent product, are vastly disproportionately Black compared to doctoral programs at other institutions.**

134.     Defendants deny the allegations in Paragraph 134.

**135.     Walden states that its doctoral student population is 41% Black. *Executive Summary (DATA)*, waldenu.edu, https://www.waldenu.edu/about/data/summary (last visited Jan. 6, 2022). In comparison, according to the NCSES Survey of Earned Doctorates, the population of doctoral graduates across all institutions nationwide in 2020 was just 5.6 % Black. National Center for Science and Engineering Statistics, Survey of Earned Doctorates. Doctorate recipients, by ethnicity, race, and citizenship status: 2010–20 (Table 19) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables.**

135.     Defendants deny that its doctoral student population is 41% Black or that Plaintiffs have accurately described Walden University's Executive Summary webpage. Defendants admit that the National Science Foundation website purports the statistic cited in Paragraph 135.  To the extent Paragraph 135 purports to allege that data from the National Science Foundation's Survey of Earned Doctorates relates to or is supportive of Plaintiffs' claims regarding Walden University's DBA program, Defendants deny those allegations. Answering further, to the extent Paragraph 135 purports to allege that statistics regarding a doctoral student population and statistics regarding doctoral graduates are comparable,

Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 135.

**136.    The proportion of Walden doctoral students who are Black is therefore more than seven times the proportion of doctoral students nationwide.**

136.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 136.

**137.    Similarly, nationwide just 8% of MBA students nationwide were Black in 2020. Jeff Green, *MBA Programs Aren't Enrolling Enough Black and Hispanic Students* (Sept. 15, 2021), https://www.bloomberg.com/news/articles/2021-09-15/business-schools-mba-programs-need-to-enroll-more-black-hispanic-students. Many Walden DBA students are MBA graduates, and MBA programs draw from a similar pool of potentially qualified applicants as the DBA program. The proportion of Walden doctoral students who are Black is over five times the proportion of MBA graduates nationally.**

137.    Defendants admit that some portion of Walden University's DBA students are MBA graduates.  Defendants admit Plaintiffs have accurately described statements from a Bloomberg.com news article.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 137.

**138.    Recipients of doctoral degrees in Business Administration and Management from Walden in 2020 were more likely to be Black than recipients of such degrees from other institutions. At Walden, 44% of all recipients of these degrees were Black, whereas the average proportion of Black recipients at other institutions was just 10%.  National Center for Education Statistics, Awards/degrees conferred by program (6-digit CIP code),**

award level, race/ethnicity, and gender: July 1, 2019 to June 30, 2020 (Data File C2020_A), https://nces.ed.gov/ipeds/datacenter/DataFiles.aspx?year=2020 (last visited Jan. 6, 2022).

138.    Defendants deny 44% of recipients of doctoral degrees in Business Administration and Management in 2020 were Black.  To the extent Paragraph 138 purports to quote or describe statements from the National Center for Education Statistics, Defendants refer to those statements for their complete and accurate contents and deny allegations inconsistent with those statements.  To the extent Paragraph 138 purports to allege that data from the National Center for Education Statistics relates to or is supportive of Plaintiffs' claims regarding Walden University's DBA program, Defendants deny those allegations.  Defendants otherwise lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 138.

**139.    The disproportionate number of Black students enrolled at Walden is no accident, whether through intentional targeting or facially neutral policies that have the effect of disproportionately enrolling Black students.**

139.    Defendants deny the allegations in Paragraph 139.

**B.      WALDEN INTENTIONALLY TARGETS ITS PREDATORY PROGRAM TOWARD BLACK PROSPECTIVE STUDENTS**

**140.    Walden boasts of its staggering percentage of the total number of Black doctorates granted nationwide. As it explained to the U.S. Department of Education, "Walden is most proud to confer the largest number of doctoral degrees on African-Americans and on all minorities in the U.S."[17] This is not happenstance; it is the direct**

---

[17] Walden University, Comment of Walden University in Response to Notice of Intent to Establish a Negotiated Rulemaking Committee, Docket ID Ed-2018-OPE-0076 (Sept. 14, 2018), https://www.regulations.gov/comment/ED-2018-OPE-0076-0583 at 2.

**result of Walden intentionally targeting Black prospective students for its predatory product.**

140.   Defendants admit Plaintiffs accurately quote Walden University's statement to the U.S. Department of Education.  Defendants deny the remaining allegations in Paragraph 140.

**141.   The data speak for themselves. Walden would not produce five times more Black doctorates than the next school (HBCU Howard University) and 11.4% of all Black doctorates in the country unless it was intentionally and deliberately targeting Black prospective students for its doctoral programs.**

141.   Defendants deny the allegations in Paragraph 141.

**142.   Walden's intentional and explicit targeting of Black prospective students is demonstrated by a review of Walden's local advertising expenditures in metropolitan areas across the county. Between 2010 and 2020, Walden's local advertising budget was dedicated almost exclusively to metropolitan areas with a higher-than-median percentage of Black residents.**

142.   Defendants admit that at certain times between 2010 and 2020, Walden University advertised in metropolitan areas, but deny that it only advertised "almost exclusively" in metropolitan areas.  Defendants deny the allegations in Paragraph 142 relating to "local advertising budget," as that term is vague and unintelligible.  Defendants lack knowledge or information sufficient to form a belief as to which areas have an "above-median percentage of Black residents."  To the extent Paragraph 142 purports to allege that Walden University's advertising targeted Black prospective students for a discriminatory purpose, Defendants deny those allegations.  Defendants deny the remaining allegations in Paragraph 142.

**143.    This analysis is based on data obtained from Kantar Media's "Ad$pender"**
**database, covering the period between January 2010 and March 2021. Kantar collects data**
**on commercial advertising and develops estimates of advertising spending across nearly all**
**media types.**

143.    Defendants lack knowledge or information sufficient to form a belief as to the
allegations in Paragraph 143.

**144.    Spending on some categories of advertisements, like internet search ads, can**
**only be reported at the national level. Ad spending in many other categories is listed for**
**specific Designated Market Areas ("DMAs") in the United States. DMAs are advertising**
**media markets similar to metropolitan statistical areas. There are 210 DMAs in the United**
**States. Advertising categories listed by DMA include: Spot TV, outdoor, local radio,**
**national spot radio, local internet display, mobile web after April 2014, online video after**
**October 2014, and mobile web video after January 2020.**

144.    Defendants lack knowledge or information sufficient to form a belief as to the
allegations in Paragraph 144.

**145.    Combining Walden's advertisement spending in specific DMAs with**
**demographic data from the 2010 Census paints a clear picture of how Walden explicitly**
**targets its ad campaigns toward Black prospective students.**

145.    Defendants deny the allegations in Paragraph 145.

**146.    Walden conducts the vast majority of its local advertising in markets with**
**higher-than-average Black populations. For example, Walden's top six markets for local**
**"spot TV" advertising are Washington, D.C., Dallas, Atlanta, Houston, Charlotte, and**
**Baltimore.**

146.    Defendants deny the allegations in Paragraph 146 as they are vague and unintelligible; Paragraph 146 contains no purported time period, and it is not clear what is meant by "local advertising budget."  To the extent Paragraph 146 purports to allege that Walden University's advertising targeted Black prospective students for a discriminatory purpose or that the majority of Walden University's advertising is spent on "spot TV" advertisements, Defendants deny those allegations.

**147.    In 2010, Walden directed 89.6% of its local advertising budget to areas with an above-median percentage of Black residents.**

147.    Defendants deny the allegations in Paragraph 147, as the term "local advertising budget" is vague and unintelligible.  Answering further, Defendants admit that in 2010, Walden University advertised in some metropolitan areas.  Defendants lack knowledge or information sufficient to form a belief as to which areas have an "above-median percentage of Black residents."  To the extent Paragraph 147 purports to allege that Walden University's advertising targeted Black prospective students for a discriminatory purposes, or that Walden University's local advertising budget represents the majority of its overall advertising budget, Defendants deny those allegations.

**148.    In 2015, Walden directed 99.8% of its local advertising budget to areas with an above-median percentage of Black residents.**

148.    Defendants deny the allegations in Paragraph 148, as the term "local advertising budget" is vague and unintelligible.  Answering further, Defendants admit that in 2015, Walden University advertised in some metropolitan areas.  Defendants lack knowledge or information sufficient to form a belief as to which areas have an "above-median percentage of Black residents."  To the extent Paragraph 148 purports to allege that Walden University's advertising

targeted Black prospective students for a discriminatory purpose or that Walden University's local advertising budget represents the majority of its overall advertising budget, Defendants deny those allegations.

**149.    In 2020, Walden directed 90.2% of its local advertising budget to areas with an above-median percentage of Black residents.**

149.    Defendants deny the allegations in Paragraph 149, as the term "local advertising budget" is vague and unintelligible.  Answering further, Defendants admit that in 2020, Walden University advertised in some metropolitan areas.  Defendants lack knowledge or information sufficient to form a belief as to which areas have an "above-median percentage of Black residents."  To the extent Paragraph 149 purports to allege that Walden University's advertising targeted Black prospective students for a discriminatory purpose, or that Walden University's local advertising budget represents the majority of its overall advertising budget, Defendants deny those allegations.

**150.    Simple univariate regressions show a strong correlation between Black population in a DMA and Walden's ad spending in that area. In 2020 a single percentage point increase in the percentage of Black residents in an area was associated with $1,406 more in ad spending by Walden.**

150.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 150.  To the extent Paragraph 150 purports to allege that Walden University's advertising targeted Black prospective students for a discriminatory purpose, Defendants deny those allegations.

**151.    The content of Walden's advertisements further demonstrates the institution's intentional focus on targeting Black prospective students for its predatory**

**product. The overwhelming majority of Walden's advertisements prominently feature Black people. Through its digital banner ads, Facebook ads, video promotions and other advertisements on YouTube, and other forms of advertisement, Walden targets Black prospective students by designing and publishing marketing materials that, far more often than not, star Black models or Black Walden students.**

151.    To the extent Paragraph 151 purports to describe Walden's advertisements, Defendants refer to those advertisements for their complete and accurate contents and deny any allegations inconsistent with those advertisements.  Defendants deny the remaining allegations in Paragraph 151.  Answering further, Defendants admit that Walden University's advertisements reflect its diverse student population.

**152.    Walden's websites also exemplify its strategy of targeting Black students by highlighting Black people. Both info.waldenu.edu and waldenu.edu prominently feature Black people throughout the websites, and the waldenu.edu homepage proudly announces that Walden is "#1 [in] Awarding Doctorates to Black Students." *Education for Good*, waldenu.edu (last visited Jan. 6, 2022).**

152.    To the extent Paragraph 151 purports to quote or describe Walden's websites, Defendants refer to those websites for their complete and accurate contents and deny any allegations inconsistent with those websites.  Defendants deny Plaintiffs have accurately quoted the walden.edu website.  To the extent Paragraph 152 purports to allege that Walden University's advertising targeted Black prospective students for a discriminatory purpose, Defendants deny those allegations.  Answering further, Defendants admit that Walden University's advertisements reflect its diverse student population.

**153.    The combination of Walden's local advertising statistics—laser focused on metropolitan areas with above-median Black populations—and the prominence of Black people in all forms of Walden's advertising leaves little doubt that Walden intentionally targets Black people for its DBA program.**

153.    Defendants deny the allegations in Paragraph 153.

**154.    Again, these efforts would be laudable if they resulted in increased access to such educational opportunities on fair, non-predatory terms. Here, however, the result is to subject Black prospective students and communities to a fraudulent, predatory scheme to extract loan proceeds and tuition funds by misleading students and the public about the nature of the program and the resulting costs. As it stands, when Walden markets the DBA, it is marketing a predatory product, and when it intentionally markets the DBA to Black prospective students, it engages in impermissible reverse redlining.**

154.    Defendants deny the allegations in Paragraph 154.

**155.    Walden was responsible for over $800 *million* in federal student loans in the 2019 academic year. U.S. Dep't of Ed., Proprietary School Revenue Percentages Report for Financial Statements with Fiscal Year Ending Dates between 07/01/18 – 06/30/19 (Sept. 3, 2020), https://studentaid.gov/data-center/school/proprietary. Its practice of targeting Black students for predatory products has the function and effect of contributing to and exacerbating the stark racial disparities in student debt loads nationwide. The average total education-related debt for Black doctorate recipients is $88,206, while the average for white doctorate recipients is $31,878. See National Center for Science and Engineering Statistics, Education-related debt of doctorate recipients, by sex, citizenship status,**

ethnicity, and race: 2020 (Table 40) (Nov. 30, 2021),

https://ncses.nsf.gov/pubs/nsf22300/data-tables.

155.    Defendants admit that the gross disbursement of federal student loans, including origination fees, to Walden University students was over $800 million in the 2019 academic year.  To the extent Paragraph 155 purports to quote or describe statistics from the National Center for Science and Engineering website, Defendants refer to those statistics for their complete and accurate contents and deny any allegations inconsistent with those statistics.  To the extent Paragraph 155 purports to allege that data from the National Science Foundation's Survey of Earned Doctorates relates to or is supportive of Plaintiffs' claims regarding Walden University's DBA program, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the accuracy of the statistics on the National Center for Science and Engineering website.  Defendants deny the remaining allegations in Paragraph 155.

**156.    Upon information and belief, Walden's policy of targeting Black prospective students for its deceptive and unlawful programs directly explains why Walden awards more than five times more doctorates to Black students than the next highest school and a full 11.4% of all doctorates granted to Black students nationwide.**

156.    Defendants deny the allegations in Paragraph 156.

### C.    THE STUDENTS SUBJECTED TO WALDEN'S PREDATORY DBA PROGRAM ARE DISPROPORTIONATELY FEMALE

**157.    Walden's DBA student body, and thus the population of people who are subjected to its predatory, fraudulent product, is also disproportionately female compared to doctoral programs at other institutions.**

157.    Defendants deny the allegations in Paragraph 157.

**158.     Walden states that its doctoral student population is 76.6% female. Executive Summary (DATA),** *supra* **n. 133. In comparison, according to the NCSES Survey of Earned Doctorates, the population of doctoral recipients across all institutions nationwide in 2020 was just 45 % female. National Center for Science and Engineering Statistics, Doctorate recipients, by subfield of study and sex: 2020 (Table 16) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables. The proportion of Walden doctoral students who are female is therefore more than 1.7 times the proportion of doctoral graduates nationwide.**

158.     Defendants deny that Plaintiffs have accurately described or quoted the Walden University Executive Summary website or that its doctoral student population is 76.6% female. Defendants deny that the National Science Foundation's Survey of Earned Doctorates purports that in 2020, the population of doctoral recipients across all institutions nationwide was 45% female.  To the extent Paragraph 158 purports to allege that data from the National Science Foundation's Survey of Earned Doctorates relates to or is supportive of Plaintiffs' claims regarding Walden University's DBA program, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 158.

**159.     Similarly, nationwide, just 40% of MBA students were female in 2020. Jeff Green,** *Women Fill Fewer MBA Spots Than Men, and Covid Isn't Helping* **(Sept. 15, 2021), https://www.bloomberg.com/news/articles/2021-09-15/business-schools-women-fill-fewer-spots-in-mba-programs-than-men. As noted above, many Walden DBA students are MBA graduates, and MBA programs draw from a similar pool of potentially qualified applicants**

**as the DBA program. The proportion of Walden doctoral students who are female is nearly twice the proportion of MBA graduates nationally.**

159.    Defendants admit that some of portion of Walden University's DBA students are MBA graduates.  To the extent Paragraph 159 purports to describe statements from a Bloomberg.com news article, Defendants refer to those statements for their complete and accurate contents and deny any allegations inconsistent with those statements.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 159.

**160.    In 2020, Walden produced more female doctorates than any other institution in the country, with 591 total, while the institution with the second-largest number produced just 350. A full 68% of Walden's doctoral recipients were women, while the median for the top fifty doctoral-producing institutions was just 44%. There was no other institution among the top fifty with more than 55% female graduates. National Center for Science and Engineering Statistics, Top 50 doctorate-granting institutions ranked by total number of doctorate recipients, by sex: 2020 (Table 3) (Nov. 30, 2021), https://ncses.nsf.gov/pubs/nsf22300/data-tables.**

160.    Defendants deny 591 female doctoral candidates graduated from Walden University in 2020.  To the extent Paragraph 160 purports to quote or describe statements from the National Science Foundation website, Defendants refer to those statements for their complete and accurate contents and deny allegations inconsistent with those statements.  To the extent Paragraph 160 purports to allege that data from the National Science Foundation's Survey of Earned Doctorates relates to or is supportive of Plaintiffs' claims regarding Walden University's

DBA program, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 160.

**161.    Recipients of doctoral degrees in Business Administration and Management from Walden in 2020 were more likely to be female than recipients of such degrees from other institutions. At Walden, 49% of all recipients of these degrees were female, whereas the average proportion of female recipients at other institutions was just 40%. National Center for Education Statistics,** *supra* **n. 136.**

161.    Defendants deny 49% of recipients of doctoral degrees in Business Administration and Management from Walden University in 2020 were female.  To the extent Paragraph 161 purports to quote or describe statements from the National Center for Education Statistics, Defendants refer to those statements for their complete and accurate contents and deny allegations inconsistent with those statements.  To the extent Paragraph 161 purports to allege that data from the National Science Foundation's Survey of Earned Doctorates relates to or is supportive of Plaintiffs' claims regarding Walden University's DBA program, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 161.

**162.    As is true for Black students, the disproportionate number of female students enrolled at Walden is no accident, but instead has been caused by Walden through its intentional targeting, or facially neutral policies, that have the effect of disproportionately enrolling female students.**

162.    Defendants deny the allegations in Paragraph 162.

### D.   WALDEN INTENTIONALLY TARGETS ITS PREDATORY DBA PROGRAM TOWARD FEMALE PROSPECTIVE STUDENTS

**163.   The disproportionate representation of female students in Walden's doctoral programs, including its DBA program, is a result of Walden's efforts to intentionally target women for enrollment.**

163.   Defendants deny the allegations in Paragraph 163.

**164.   Walden's website declares that "Women are leading the way," as it touts the fact that "Walden's total student population is more than three-quarters female (76.6%)."** *Executive Summary (DATA)*, **supra n. 133. The same is true for Walden's graduate students; in 2018, 76.5% of graduate students were female. Walden University,** *Demonstrating Accountability, Transparency, and Assessment (DATA)*, **https://www.waldenu.edu/-/media/walden/files/about-walden/data/data-students-alumni-faculty-employers-sept-2019final.pdf?rev=a96bd39a8d7d4f2f94acddfe0a2aedbe&hash=72C810B209C22B231F587 C7C FC85D3F7 (last visited Jan. 6, 2022) at 3.**

164.   Defendants admit the current Walden Executive Summary (DATA) states "Women are leading the way" and "Walden's total student population is more than three-quarters female (76.6%)."  Defendants admit that the *Demonstrating Accountability, Transparency, and Assessment* document cited in Paragraph 164 states that in 2018, 76.5% of Walden University's graduate students were female.  Defendants deny the remaining allegations in Paragraph 164.

**165.   Walden's advertising reflects its intentional focus on targeting female prospective students for its predatory product. The overwhelming majority of Walden's online advertisements prominently feature women (frequently Black women), as do its**

**websites. By designing and publishing marketing materials that disproportionately feature female models and female Walden students, Walden targets female prospective students for enrollment.**

165.    To the extent Paragraph 165 purports to describe Walden University's advertisements, Defendants refer to those advertisements for their complete and accurate contents and deny any allegations inconsistent with those advertisements.  Defendants deny the remaining allegations in Paragraph 165.  Answering further, Defendants admit that Walden University's advertisements reflect its diverse student population.

**166.    Walden's advertising and marketing materials explicitly target women by, for example, touting its programs' suitability for mothers. In one advertisement, a former student explains that her "inspiration to focus on education was [her] daughter." Walden University, *Jazmin Chi | Shine On | Walden University*, YouTube (July 9, 2021), https://www.youtube.com/watch?v=yUYfNBfMKgI. In another, a student declares that "I am an avid learner. I am also a wife. I am a mother of two children." Walden University, *Discover Online Learning Your Way at Walden*, YouTube (June 7, 2021), https://www.youtube.com/watch?v=BtEmnU3eGxI. In countless other advertisements, Walden shows pictures or videos of parents, particularly women, with children.**

166.    Defendants admit Plaintiffs have accurately quoted the Jazmin Chi "Shine On" and the "Discover Online Learning Your Way at Walden" YouTube Videos.  To the extent Paragraph 166 purports to describe other Walden University's advertisements, Defendants refer to those advertisements for their complete and accurate contents and deny any allegations inconsistent with those advertisements.  Defendants deny the remaining allegations in Paragraph

166.  Answering further, Defendants admit that Walden University's advertisements reflect its diverse student population.

**167.    Once again, rather than increasing educational opportunities for women on fair, non-predatory terms, Walden subjects female prospective students to a fraudulent, predatory scheme to extract loan proceeds and tuition funds by misleading students and the public about the nature of the program and the resulting costs.**

167.    Defendants deny the allegations in Paragraph 167.

**E.    WALDEN'S FACIALLY NEUTRAL POLICY OF TARGETING "NONTRADITIONAL" STUDENTS DISPROPORTIONATELY HARMS BLACK AND FEMALE STUDENTS**

**168.    In addition to intentionally targeting Black and female prospective students as described above, Walden also targets its programs to certain groups of nontraditional students, including students who are employed while pursuing a doctorate, students who have children, and students over thirty. Because these students are both disproportionately Black and disproportionately female, the facially neutral policy of targeting these groups of nontraditional students has an impermissible disparate impact on Black and female students.**

168.    Defendants admit that Walden provides educational opportunities to a diverse community of students, including those who are employed while pursuing a doctorate, students who have children, and students over thirty.  Defendants deny the remaining allegations in Paragraph 168.

**169.    In academic research, the term "nontraditional students" is used to describe students with combinations of several characteristics or attributes, including, for example, being an older student, working full-time while pursuing a degree, being enrolled part-time, having dependents, and being a single caregiver. According to the National Center for**

**Education Statistics, nontraditional students overall "are more likely to be women [and] to belong to a racial-ethnic minority group." See National Center for Education Statistics, *Definitions and Data*, https://nces.ed.gov/pubs/web/97578e.asp (last visited Jan. 6, 2022).**

169.    To the extent Paragraph 169 purports to quote or describe statements from the National Center for Education Statistics, Defendants refer to those statements for their complete and accurate contents and deny any allegations inconsistent with those statements.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 169.

**170.    Age is frequently used to describe nontraditional students, both because age is itself an attribute of nontraditional students and because "[a]ge acts as a surrogate variable that captures a large, heterogeneous population of adult students who often have family and work responsibilities as well as other life circumstances that can interfere with successful completion of educational objectives." *See id*.**

170.    To the extent Paragraph 170 purports to quote or describe statements from the National Center for Education Statistics, Defendants refer to those statements for their complete and accurate contents, and deny any allegations inconsistent with those statements.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 170.

**171.    That Walden targets people who are employed full-time for its programs is made explicit by the company's mission—"to provide [] a diverse community of career professionals with the opportunity to transform themselves as scholar-practitioners enabling them to create positive social change." *The Passion that Drives Us*, waldenu.edu, https://www.waldenu.edu/why-walden/social-change (last visited Jan. 6, 2022). According**

to Walden's website, the entire purpose of its founding was "to create opportunities for working professionals where there previously were none." *Empowering the greater good for 50 years and counting*., waldenu.edu, https://www.waldenu.edu/why-walden (last visited Jan. 6, 2022).

171.    Defendants deny Plaintiffs have accurately quoted the Walden University mission statement.  Walden University's current stated mission statement is "Walden University provides a diverse community of career professionals with the opportunity to transform themselves as scholar-practitioners so that they can effect positive social change."  Defendants admit the Walden University website states that in "1970, two educators were inspired to create opportunities for working professionals where there previously were none."  Defendants further admit that Walden University provides educational opportunities to a diverse community of students, including students who are employed full time.  Defendants deny the remaining allegations in Paragraph 171.

172.    **Walden's website is replete with additional examples of how it targets its programs toward people who are employed full-time. It describes itself as "A University for Working Professionals" and characterizes its programs as "a Better Way for Adults to Pursue Advanced Degrees Without Leaving the Workforce" and having "flexibility designed for working adults."** *A University for Working Professionals*, **waldenu.edu, https://www.waldenu.edu/why-walden/flexibility (last visited Jan. 6, 2022).**

172.    Defendants admit Plaintiffs have accurately quoted the Walden University website.  Defendants further admit that Walden University provides educational opportunities to a diverse community of students, including students who are employed full time.  Defendants deny the remaining allegations in Paragraph 172.

**173.   Walden's ad campaigns tell the same story. Online advertisements declare that Walden allows students to "study online, from where you are, while you work," and provides "online education that fits your life and accelerates your career."**

173.   Defendants admit that Walden University provides educational opportunities to a diverse community of students, including students who are employed full time.  To the extent Paragraph 173 purports to quote statements from Walden University's online advertisements, Defendants refer to those statements for their complete and accurate contents and deny any allegations inconsistent with those statements.  Defendants deny the remaining allegations in Paragraph 173.

**174.   Video advertisements declare that Walden "pioneer[ed] and perfect[ed] online learning for working adults," Walden University, *Learn Online | Succeed Anywhere*, YouTube (Mar. 10, 2021), https://www.youtube.com/watch?v=Cy68OjEKOJc, and that it "understand[s] the nuances of the professional learner." Walden University, The Future of Education at Walden, YouTube (Jan. 8, 2020), https://www.youtube.com/watch?app=desktop&v=ig1XE_CR8K8+%28.**

174.   Defendants deny Plaintiffs have accurately quoted the "Lean Online, Succeed Anywhere" YouTube video.  Defendants admit Plaintiffs have accurately quoted "The Future of Education at Walden" YouTube video.  Answering further, Defendants admit that Walden University provides educational opportunities to a diverse community of students, including working adults.

**175.    Walden's advertisements target students with children. In addition to the above-described advertisements targeting mothers, Walden also brands itself as a school that helps parents "thrive" in their graduate programs while they "care for children."**

175.    Defendants admit that Walden University provides educational opportunities to a diverse community of students, including students with children.  To the extent Paragraph 175 purports to quote statements on Walden University's advertisements, Defendants refer to those statements for their complete and accurate contents and deny any allegations inconsistent with those statements.  Defendants deny the remaining allegations in Paragraph 175.

**176.    Walden also specifically targets older students. Walden advertisements ask, "Have you hired an older employee lately?" and declare that "Walden University helps adult learners . . . reach their full potential." Additionally, a large portion of Walden's advertisements appearing on Facebook, YouTube, and in internet searches feature older students.**

176.    Defendants admit that Walden University provides educational opportunities to a diverse community of students, including "older students."  To the extent Paragraph 176 purports to quote statements on Walden University's advertisements, Defendants refer to those statements for their complete and accurate contents and deny any allegations inconsistent with those statements.  Defendants deny the remaining allegations in Paragraph 176.

**177.    Publicly available data from the NCSES demonstrate that Black and female doctoral candidates are more likely to work while pursuing their degree. A 2020 NCSES profile of doctorate recipients shows that 40.8% of Black doctorate recipients primarily relied on their own resources to complete their degree compared to only 20.4% of white doctorate recipients. See National Center for Science and Engineering Statistics, Doctorate**

**recipients' primary source of financial support, by broad field of study, sex, citizenship**

**status, ethnicity, and race: 2020 (Table 35) (Nov. 30, 2021),**

**https://ncses.nsf.gov/pubs/nsf22300/data-tables. Similarly, 19.8% of female doctorate**

**recipients relied on their own resources while only 11.3% of male doctorate recipients did**

**the same.** *Id.*

177.   Defendants admit that National Science Foundation website purports the statistics

cited in Paragraph 177.  To the extent Paragraph 177 purports to allege that data from the

National Science Foundation's Survey of Earned Doctorates relates to or is supportive of

Plaintiffs' claims regarding Walden University's DBA program, Defendants deny those

allegations.  Defendants lack knowledge or information sufficient to form a belief as to the

remaining allegations in Paragraph 177.

**178.   According to a 2016 survey of graduate students by the National Center for**

**Education Statistics, 62.9% of the total number of graduate students with dependents are**

**female. In other words, there are almost twice as many female graduate students with**

**children than male graduate students with children. U.S. Department of Education,**

**National Center for Education Statistics, National Postsecondary Student Aid Study: 2016**

**Graduate Students (NPSAS:GR).**

178.   To the extent Paragraph 178 purports to quote or describe statements from the

National Center for Education Statistics, Defendants refer to those statements for their complete

and accurate contents, and deny any allegations inconsistent with those statements.  Defendants

lack knowledge or information sufficient to form a belief as to the remaining allegations in

Paragraph 178.

**179.     Older students are disproportionately Black. The median age of Black doctorate recipients is 36.2 while the median age for white doctorate recipients is 31.6. NCES Table 35.**

179.     To the extent Paragraph 179 purports to quote or describe statements from the National Center for Education Statistics, Defendants refer to those statements for their complete and accurate contents and deny any allegations inconsistent with those statements.  To the extent Paragraph 179 purports to allege that data from the National Science Foundation's Survey of Earned Doctorates relates to or is supportive of Plaintiffs' claims regarding Walden University's DBA program, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 179.

**180.     Additionally, data from the American Council on Education show that 64.1% of Black students enrolled in graduate programs are over the age of thirty while only 49.1% of white students enrolled in graduate programs are over the age of thirty. See Lorelle L. Espinosa et al., *Race and Ethnicity in Higher Education A Status Report* (2019), https://www.equityinhighered.org/resources/report-downloads/race-and-ethnicity-in-higher-education-a-status-report/ at 79.**

180.     Defendants admit *Race and Ethnicity in Higher Education A Status Report* purports the statistics in Paragraph 180.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 180.

**181.     The import of the statistics showing that the group of doctoral candidates over the age of 30 is disproportionately Black is twofold. First, Walden specifically targets older students for its predatory product, which has a disparate impact on Black prospective students. Second, age is a surrogate variable for nontraditional students who**

work full-time while pursuing their doctorate, and statistics showing a racial disparity by age provide additional support that Walden's policy of targeting prospective students who work full-time has a disproportionate effect on Black prospective students.

181.    Defendants deny the allegations in Paragraph 181.

F.    **WALDEN IS A "CREDITOR" WITHIN THE MEANING OF ECOA AND A RECIPIENT OF FEDERAL FUNDING WITHIN THE MEANING OF TITLE VI**

**182.    Plaintiffs Carroll, Charles, and Fluker bring their racial discrimination claims against Walden under Title VI, which applies to recipients of federal funding, and Plaintiffs Charles, Fair and Fluker bring their claims under ECOA, which applies to "creditors." Walden is both a creditor within the meaning of ECOA and a recipient of federal funding within the meaning of Title VI.**

182.    Defendants admit Plaintiffs purport to bring claims under Title VI and the ECOA but deny violations of either.  To the extent the remaining allegations in Paragraph 182 contain conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit that Walden University receives federal funding within the meaning of Title VI and is a creditor within the meaning of the ECOA.

**183.    Most Walden DBA students, including Plaintiffs Claudia Provost Charles, Tiffany Fair, and Tareion Fluker pay for their DBA tuition and fees using federal student loans.**

183.    Defendants admit that Charles, Fair, and Fluker paid for their Walden University DBA tuition, at least in part, using federal student loans.  Defendants further admit that some DBA students pay for their tuition, at least in part, using federal student loans.  Defendants otherwise deny the remaining allegations in Paragraph 183, as the term "most" is vague and unintelligible.

**184.     Walden is one of many for-profit post-secondary educational institutions in the country where students who attend are eligible to receive federal financial aid through the United States Department of Education under Title IV of the Higher Education Act of 1965.**

184.     Defendants admit that certain Walden University students are eligible to receive federal financial aid through the United States Department of Education under Title IV. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 184.

**185.     Under the federal Title IV loan programs, student loans are made directly by the United States government. The school receives the loan proceeds and typically credits them to the student's account to pay for tuition and other charges. Students must repay these loans, including applicable interest, to the government.**

185.     Defendants admit the allegations in Paragraph 185 to the extent they apply to Walden University and Walden University students who participate in federal Title VI loan programs.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 185.

**186.     Walden refers students and prospective students applying for financial aid to the Free Application for Federal Student Aid ("FAFSA") to submit their applications, which are then received by Walden's Office of Financial Aid. Walden processes those applications, requests additional information or documentation from applicants as needed, determines applicants' eligibility, and communicates offers to students. Approved loans are funded by the federal government, which transmits the funds to Walden on the students' behalf.**

186.     Defendants admit that Walden University refers students and prospective students applying for financial aid to the FAFSA to submit their applications.  Defendants deny that those applications are then received by Walden University or that Walden University then "processes" those applications.  Answering further, Walden University's Office of Financial Aid receives loan applications after they have been processed by the Department of Education.  Defendants admit that after receiving loan applications processed by the Department of Education, Walden University's Office of Financial Aid may request additional information or documentation from applicants as needed, determine applicants' eligibility for certain loans, and communicate offers to students.  Answering further, Defendants deny that Walden University offers or determines an applicants' eligibility for all types of federal loans, some of which require approval by the Department of Education.  Defendants admit that approved loans are funded by the federal government, which transmits the funds to Walden University on the students' behalf.

**187.     Walden also offers payment plans, through which students can spread the cost of tuition over several months, instead of paying in full at the beginning of the semester.**

187.     Defendants admit the allegations in Paragraph 187.

**188.     Walden arranges for and participates in the extension and continuation of federal student loans to its students and prospective students through its participation in the federal financial aid program as described herein, and by referring student applicants to the federal student loan program.**

188.     Defendants admit that Walden University's website references the U.S. Department of Education's FAFSA and that certain eligible Walden University students apply

for and receive federal student loans.  Defendants deny the remaining allegations in Paragraph 188.

**189.    Walden is therefore considered a "creditor" as defined by ECOA, 15 U.S.C. § 1691a *et seq*., and subject to its prohibitions on discrimination.**

189.    To the extent Paragraph 189 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit the allegations in Paragraph 189 but deny Defendants violated the ECOA.

**190.    The latest available data show that Walden derives approximately 75.7% of its revenue from Title IV sources. In its fiscal year ending between July 1, 2018 and June 30, 2019, Walden received roughly $451.89 million from Title IV sources. U.S. Dep't of Ed., Proprietary School 90/10 Revenue Percentages Report for Financial Statements with Fiscal Year Ending Dates between 07/01/18 – 06/30/19 (Sept. 3, 2020), https://studentaid.gov/data-center/school/proprietary.**

190.    To the extent Paragraph 190 purports to quote or describe statements from the Federal Student Aid website, Defendants refer to that website for their complete and accurate statements and deny any allegations inconsistent with those statements.  Defendants admit that between July 1, 2018, and June 30, 2019, Walden University received roughly $451.89 million from Title IV sources, which accounted for approximately 75.7% of its total revenue that year.

**191.    Walden was the fourth largest issuer of federal student loans in the country in the 2019–20 academic year, during which it disbursed $806,326,675 in student loans. U.S. Department of Education, Title IV Program Volume Reports: Award Summaries, https://studentaid.gov/data-center/student/title-iv#award-year-summaries (last visited Jan. 6, 2022).**

191.    To the extent Paragraph 191 purports to quote or describe statements from the Federal Student Aid website, Defendants refer to that website for their complete and accurate statements and deny any allegations inconsistent with those statements.  Defendants admit that in gross and including origination fees, Walden University disbursed over $800 million in federal student loans in the 2019-2020 academic year.  Defendants lack information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph 191.

**192.    In addition to federal student loan funds, Walden receives federal funding from its enrollment of United States veterans who are eligible to receive tuition assistance and other educational benefits through the GI Bill. *See* 38 U.S.C. § 3301 *et seq*.**

192.    Defendants admit the allegations in Paragraph 192.

**193.    Given Walden's extensive receipt of federal funding and facilitation of federal student loans to doctoral students, addressing Walden's predatory practices serves a public benefit, serving to protect the public.**

193.    To the extent Paragraph 193 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

5.    **EXPERIENCES OF THE INDIVIDUAL PLAINTIFFS**

A.    **ALJANAL CARROLL**

**194.    Plaintiff Aljanal Carroll enrolled in Walden's DBA program in Fall 2017 based on Walden's representations that, due to transferred credits from her MBA program, she would graduate with her degree in eighteen months. She was told she would be able to transfer twelve credits, which would have left her only forty-eight total credits to complete the degree.**

194.     Defendants admit that Carroll enrolled in Walden University's DBA program in September 2017.  Defendants lack knowledge or information sufficient to form a belief as to why Carroll enrolled in the program.  At this time, Defendants lack knowledge or information sufficient to form a belief as to the substance of Carroll's discussions with a Walden University enrollment specialist or advisor, as alleged in Paragraph 194.

**195.     Instead, Carroll graduated after spending over three years in the program, more than twice the promised time. In the end, she was required to complete sixty-three total Walden credits on top of her twelve transferred credits. She completed ten DBA 9000-level courses, worth thirty credits, and four doctoral mentoring courses, for a total of thirty-four capstone phase credits—fifteen credits more than what Walden had represented as required to complete the program. These additional capstone credits cost Carroll $14,850.**

195.     Defendants admit that Carroll was enrolled in the DBA program from September 2017 to November 2020 and completed sixty-three DBA credits.  Defendants further admit that Carroll completed ten DBA 9000-level courses and four doctoral mentoring courses, totaling thirty-four capstone credits.  Defendants further admit that the cost to complete fifteen capstone credits between January 2019 and November 2020 was $14,850.  Defendants deny the remaining allegations in Paragraph 195.

**196.     Plaintiff Carroll, who is Black and resides in North Carolina, graduated from Strayer University with a Master of Business Administration (MBA) in June 2017. At around that time, she learned about Walden through a pop-up ad on the internet. She wanted to continue her education and explored doing so by pursuing a DBA at Walden.**

196.    Defendants admit that in Carroll's application to enroll at Walden University, she stated her race is "Black or African American," and she stated her highest level of education earned was a Master's Degree.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 196.

**197.    After seeing the ad, Carroll visited one of Walden's websites and was impressed with what she saw. She entered her information into the form on the website and received a phone call from an enrollment advisor shortly thereafter.**

197.    Defendants admit that a Walden University enrollment advisor contacted Carroll after she completed a form on Walden's website.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 197.

**198.    The enrollment advisor described the DBA program to Carroll as "enhancing" her MBA. He explained to her that she could transfer credits from courses she took for her MBA. He guaranteed to her that she would graduate the DBA program "in no more than eighteen months." The enrollment advisor also told her the total number of credits Walden would allow her to transfer. Because she would not have to pay again for those credits, she expected her total cost to be significantly lower than the full program tuition provided on the website, which assumed students were paying for all sixty credits. This understanding was supported by the website, which noted that students could get as much as a $29,325 reduction off of the full cost by transferring credits.**

198.    Defendants admit that Carroll transferred twelve credits towards her DBA degree at Walden University upon enrollment.  At this time, Defendants lack knowledge or information sufficient to form a belief as to the substance of Carroll's discussions with a Walden University enrollment specialist or advisor, as alleged in Paragraph 198. To the extent Paragraph 198

purports to quote or describe statements on Walden University's websites, Defendants refer to those statements for their complete and accurate contents and deny any allegations inconsistent with those statements.  Defendants lack knowledge or information sufficient to form a belief as Carroll's expectations or assumptions.

**199.    Carroll enrolled in the DBA program and began her coursework in September 2017. She was able to apply twelve credits from her MBA toward her DBA coursework.**

199.    Defendants admit the allegations in Paragraph 199.

**200.    Carroll was employed full-time when she enrolled in the DBA program, and she retained her employment throughout her time in the program.**

200.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 200.

**201.    Carroll completed the coursework phase of the DBA in the first term of the 2019 spring semester, on the timeline Walden had given her. She found the coursework phase of the DBA to be relatively easy and she received mostly A grades in her courses.**

201.    Defendants admit that Carroll completed the coursework phase of the DBA program in the first term of the 2019 spring semester and received mostly A grades in her courses.  Defendants lack knowledge or information sufficient to form a belief as to Carroll's perception of the difficulty of the DBA coursework.  To the extent Paragraph 201 purports to allege that Defendants represented that Carroll would complete the DBA program within a certain period of time, Defendants deny those allegations.

**202.    After completing the coursework phase, based on Walden's representations Carroll would have had just nineteen capstone credits left to complete. In fact, she was**

**required to complete nearly 60% more capstone credits than that before being permitted to graduate.**

202.    Defendants admit that the minimum number of capstone credits required to complete the DBA program in 2019 was nineteen credits.  Defendants admit that Carroll took thirty-four capstone credits.  To the extent Paragraph 202 purports to summarize Carroll's expectations as to the capstone phase of the DBA program, Defendants lack knowledge or information sufficient to form a belief as to those allegations.  Defendants deny the remaining allegations in Paragraph 202.

**203.    In the second term of the 2019 spring semester, Carroll took her first of what would eventually be ten 9000-level courses totaling thirty credits. Due to her success in the coursework phase, Carroll expected to be able to complete her degree by completing Walden's published requirement of fifteen 9000-level credits. However, Walden presented a series of obstacles during the capstone phase, and as a result required her to complete twice the stated requirement for 9000-level credits, for twice the tuition.**

203.    Defendants admit that Carroll took her first 9000-level course in the second term of the 2019 spring semester.  Defendants further admit that Carroll completed ten 9000-level courses totaling thirty credits before graduating.  Defendants lack knowledge or information sufficient to form a belief as to Carroll's expectations as to the capstone phase of the DBA program.  Defendants deny the remaining allegations in Paragraph 203.

**204.    Although she was required to complete twice the number of 9000-level credits compared with Walden's stated requirement, Carroll received "Satisfactory" grades in each of her ten 9000-level courses. That Carroll needed twice the 9000-level credits to complete her degree was not due to her performance; rather it was because**

**Walden intentionally misrepresented the actual number of capstone credits needed to graduate.**

204.     Defendants admit that Carroll received "Satisfactory" grades in each of her 9000-level courses.  Defendants deny the remaining allegations in Paragraph 204.

**205.     Throughout the capstone process, Carroll observed that her committee members, and Walden generally, were prolonging her capstone process without any academic basis, thus requiring her to continue paying for additional credit hours beyond the stated requirements.**

205.     Defendants deny the allegations in Paragraph 205.

**206.     Each reviewer took the entire, or nearly entire, fourteen-day time period to review each of her submissions. Months passed where she spent more time waiting for feedback than working on her dissertation. Throughout this time, she was automatically re-enrolled in a 9000-level class every eight weeks and charged accordingly.**

206.     Defendants admit that Carroll was automatically enrolled in DBA 9000-level courses until she completed the capstone phase.  Defendants deny that each reviewer took the entire, or nearly entire, fourteen-day time period to review each of her submissions.  Defendants admit that at all times relevant, Walden University faculty were allotted at or around fourteen calendar days to provide feedback on student submissions.  Defendants lack knowledge or information sufficient to form a belief as to what Carroll did with respect to her capstone project while faculty reviewed her submissions.  To the extent that Paragraph 206 alleges that Defendants intentionally delayed Carroll's progress through the capstone phase of the DBA program, Defendants deny those allegations.

**207.    When feedback finally arrived, Carroll reports, it was commonly non-substantive. Members of her committee rejected her submissions based on minor editorial suggestions, including her use of commas or semi-colons. She was then forced to resubmit the assignment and wait, once again, as her committee members each took nearly all their allotted fourteen days to review the corrected version.**

207.    Defendants lack knowledge or information sufficient at this time to form a belief as to the feedback provided to Carroll, and on that basis, deny the allegations in Paragraph 207. To the extent that Paragraph 207 alleges that Defendants intentionally delayed Carroll's progress through the capstone phase of the DBA program, including by providing insubstantial feedback on submissions related to her capstone project, Defendants deny those allegations.  Defendants admit that students are required to resubmit work consistent with faculty feedback.  Defendants admit that at all times relevant, Walden University faculty were allotted at or around fourteen calendar days to provide feedback on student submissions.

**208.    Carroll had difficulty reaching and communicating with her assigned committee chair and asked three times to be assigned a new chair. Each time, Walden refused, explaining that a new chair might require Carroll to resubmit assignments already approved by her current committee, setting her back even further.**

208.    Defendants admit that Carroll asked three times for a new committee chair. Defendants further admit that Walden University denied all three requests.  Answering further, Defendants admit that a new committee chair may require DBA students to resubmit assignments already approved by a current committee, which could delay a student's progress in the capstone phase of the DBA program.  Defendants lack knowledge or information sufficient at this time to form a belief as to Carroll's communications with her committee chair.  To the extent

that Paragraph 208 purports that Defendants intentionally delayed Carroll's progress through the capstone phase of the DBA program, Defendants deny those allegations.

**209.    In fall 2020, Carroll was fed up with Walden's excuses and manufactured delays. She cried to her committee chair, explaining that she had two children in college and she could not afford to continue for an additional semester. She also complained to the director of the DBA program about the unnecessary delays and hold-ups in her dissertation process. After years of false starts and delays, Carroll reports that everything was "pushed through" in September and October of 2020—without any significant additional changes to her capstone—only after she began complaining vociferously.**

209.    Defendants admit that Carroll completed her capstone work in September and October of 2020.  At this time, Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 209.  To the extent that Paragraph 209 alleges that Defendants intentionally delayed Carroll's progress through the capstone phase of the DBA program, Defendants deny those allegations.

**210.    Carroll graduated from the DBA program on October 26, 2020. It took her over three years to complete the program, over twice the eighteen months that was represented to her by her enrollment advisor. She was forced to spend roughly $15,500 in tuition and fees for the additional semesters spent completing capstone credits beyond Walden's representations.**

210.    Defendants admit Carroll was a student in the Walden University DBA program starting in September 2017 but deny she graduated from the DBA program in October 2020.  Her degree was conferred in November 2020.  Defendants admit Carroll paid $53,845.10 in tuition over the course of her DBA degree.  At this time, Defendants lack knowledge or information

sufficient to form a belief as to the substance of Carroll's discussion with a Walden University enrollment specialist or advisor, as alleged in Paragraph 210.  To the extent that Paragraph 210 purports that Walden University intentionally delayed Carroll's progress through the capstone phase of the DBA program, Defendants deny those allegations.

### B.    CLAUDIA PROVOST CHARLES

**211.    Plaintiff Claudia Provost Charles enrolled in the DBA program in Summer 2017 based on Walden's representations that, after her transferred credits, the program would cost her approximately 50,000 and that she would complete the program within two and a half years.**

211.    Defendants admit that Charles enrolled in Walden University's DBA program in July 2017.  Defendants lack knowledge or information sufficient to form a belief as to why Charles enrolled in the program.  At this time, Defendants lack knowledge or information sufficient to form a belief as to the substance of Charles's discussions with a Walden University enrollment specialist or advisor, as alleged in Paragraph 211.

**212.    Instead, Charles graduated in May 2021 after spending four years and almost $71,000 in tuition and fees on the program, about $21,000 more than she expected to spend. She has nearly $88,000 in student loans from her Walden education.**

212.    Defendants admit that Charles was enrolled in the DBA program from July 2017 to May 2021 and paid nearly $71,000 in tuition and fees.  Defendants lack knowledge or information sufficient to form a belief as to what Charles expected to spend to earn her DBA degree or regarding Charles's total student loans.  To the extent Paragraph 212 purports that Defendants represented that the cost to Charles of completing the DBA program would not exceed a certain amount, Defendants deny those allegations.

**213.    Charles completed twelve DBA 9000-level courses and forty capstone credits—a total of 2.1 times the nineteen capstone credits that Walden had advertised and represented would be required to complete the DBA program. These twenty-one additional capstone credits cost her $20,790.**

213.    Defendants admit that Charles completed twelve DBA 9000-level courses and forty capstone credits.  Defendants further admit that the cost to complete twenty-one capstone credits between January 2019 and May 2021 was $20,790.  Defendants deny the remaining allegations in Paragraph 213.

**214.    Plaintiff Charles, who is Black and resides in Louisiana, learned of Walden's DBA program in 2017 while researching doctoral programs in business and business administration.**

214.    Defendants admit that in Charles's application to enroll at Walden University, she stated her race is "Black or African American."  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 214.

**215.    At the time, Charles was employed as an administrator at a community college. Charles had previously earned her bachelor's degree in Business, Management, Marketing, and Related Support Services and her Master of Business Administration from the University of Phoenix in 2007 and 2009 respectively, both in person at its Lafayette, LA campus.**

215.    Defendants admit that in Charles's application to enroll at Walden University, she stated her highest level of education earned was a Master's Degree.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 215.

**216.    She was interested in an online doctoral program because it would be more conducive to her full-time work schedule. The two schools she seriously considered were the University of Phoenix and Walden, because both offered online doctoral programs in business administration.**

216.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 216.

**217.    Charles reviewed Walden's website and submitted her contact information in the form provided to request additional information. She was then contacted by a Walden Senior Enrollment Advisor.**

217.    Defendants admit that a Walden University enrollment advisor contacted Charles after she completed a form on Walden University's website.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 217.

**218.    The enrollment advisor told her that she would be able to transfer credits from her MBA program to waive many of the required courses, and that she would not need to pay for these credits. Before accounting for the transferred credits, and consistent with the representations on Walden's website, he advised her that the program would take her approximately 2.5 years to complete and would cost about $62,000.**

218.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 218.

**219.    Charles confirmed these numbers for herself by comparing them with the costs listed on the website, multiplying the number of required credits by the advertised cost per credit and adding in the required fees. Then, because Charles expected to transfer**

**in 12 credits, she calculated that her expected her total cost would be significantly lower, at**
**approximately $50,000.**

219.    Defendants lack knowledge or information sufficient to form a belief as to the
allegations in Paragraph 219.

**220.    Charles chose to enroll in Walden over the University of Phoenix because of**
**Walden's representations that Walden would be less expensive than Phoenix and allow her**
**to complete the degree sooner.**

220.    Defendants lack knowledge or information sufficient to form a belief as to the
allegations in Paragraph 220.

**221.    The enrollment advisor provided her with a link and school code to apply for**
**federal student loans to finance her Walden education. Charles applied, was approved by**
**Walden's financial aid office, and in July 2017, within approximately two weeks of her**
**initial contact with Walden, she was enrolled in the DBA program and beginning classes.**

221.    Defendants admit the allegations in Paragraph 221.

**222.    Charles was employed full-time when she enrolled in the DBA program, and**
**she retained her employment throughout her time in the program.**

222.    Defendants lack knowledge or information sufficient to form a belief as to the
allegations in Paragraph 222.

**223.    Charles completed the coursework without issue in spring 2019, maintaining**
**a 4.0 grade point average. Throughout the time she was enrolled in classes, she was**
**simultaneously gathering and digesting research and sources related to her eventual**
**dissertation topic, so that she would be prepared to move quickly once she reached the**
**capstone phase. Based on her academic abilities, preparation, experience in the coursework**

**portion of the program, and Walden's representations, she fully expected to be able to complete her degree within the two and a half year period she had been told to expect.**

223.    Defendants admit that Charles completed her DBA coursework in spring 2019 with a 4.0 grade point average.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 223.

**224.    However, once she reached the capstone phase, she found her progress stymied by Walden's capstone process. She repeatedly received contradictory comments on drafts from her committee members, who would return drafts to her requesting that she make certain changes, and then when she made those changes and re-submitted, her committee members would return the drafts again requesting new—and frequently contradictory—edits.**

224.    Defendants lack knowledge or information sufficient at this time to form a belief as to the feedback provided to Charles, and on that basis, deny the allegations in Paragraph 224. To the extent that Paragraph 224 purports that Defendants intentionally delayed Charles' progress through the capstone phase of the DBA program, including by providing insubstantial feedback on submissions related to her capstone project, Defendants deny those allegations. Defendants admit that students are required to resubmit work consistent with faculty feedback.

**225.    Although Charles received timely responses from the chair of her committee, she encountered significant delays from her other committee members. Each time a draft was submitted, it would take a full fourteen days per reviewer, sometimes more, to receive comments from her second committee member and URR. If one reviewer requested changes, she would make those changes and wait for her chair to review. If the chair approved, it would go to the second committee member, who would take a full fourteen**

**days to review, and then if approved would go to the URR who would take a further**

**fourteen days to review. If either the second member or the URR requested changes, the**

**process would begin again. At times, the second committee member and URR would take**

**even more than fourteen days, and Charles would need to ask her chair to intervene to**

**obtain a response.**

225.    Defendants admit that students are required to resubmit work consistent with

faculty feedback.  Defendants admit that there were instances when a faculty member took

fourteen days or more to review Charles's capstone submissions.  Defendants admit that at all

times relevant, Walden University faculty were allotted at or around fourteen days to provide

feedback on student submissions.  To the extent that Paragraph 225 purports that Defendants

intentionally delayed Charles's progress through the capstone phase of the DBA program,

Defendants deny those allegations.  At this time, Defendants lack knowledge or information

sufficient to form a belief as to the substance of Charles's discussions with her committee chair,

as alleged in Paragraph 225.

**226.    The changes requested by reviewers were frequently superficial and**

**unrelated to the substance or academic merit of Charles' work, such as the placement of**

**commas. Making simple corrections of this type and getting the changes approved would**

**routinely take close to a month and a half, two-thirds of the duration of the term. On**

**several occasions, Charles was asked to make extensive changes to sections that had**

**already been approved by all three committee members in a prior submission.**

226.    Defendants lack knowledge or information sufficient at this time to form a belief

as to the changes requested by Charles's reviewers, and on that basis, deny the allegations in

Paragraph 226.  Defendants admit that students are required to resubmit work consistent with

faculty feedback.  To the extent that Paragraph 226 purports that Defendants intentionally delayed Charles's progress through the capstone phase of the DBA program, including by providing insubstantial feedback on submissions related to her capstone project, Defendants deny those allegations.

**227.    Although Charles faced numerous delays, her committee never questioned her performance in the program. After finishing the coursework phase of the program with a 4.0 GPA, Charles received "Satisfactory" grades on all of her 9000-level courses.**

227.    Defendants admit that Charles finished the coursework phase of the DBA program with a 4.0 GPA and received "Satisfactory" grades in each of her 9000-level courses. Defendants lack knowledge or information sufficient at this time to form a belief as to how Charles's committee members evaluated her performance, and on that basis, deny the allegations in Paragraph 227.

**228.    These delays appeared to be intentional features of Walden's dissertation process, designed to extract additional tuition revenue from students beyond the amounts they had been told would be required.**

228.    Defendants deny the allegations in Paragraph 228.

**229.    Despite Walden's representations during enrollment that she could complete the degree in 2.5 years for approximately $50,000, Charles ultimately completed her degree in May 2021, after nearly four years of enrollment, sixty-nine credits, and approximately $71,000 in tuition and fees.**

229.    Defendants admit that Charles was enrolled in the DBA program from July 2017 to May 2021, completed sixty-nine DBA credits, and paid approximately $71,000 in tuition and fees.  At this time, Defendants lack knowledge or information sufficient to form a belief as to the

102

full substance of Charles's discussion with a Walden University enrollment specialist or advisor, as alleged in Paragraph 229.  Answering further, to the extent Paragraph 229 purports that Defendants intentionally delayed Charles's progress through the capstone phase of the DBA program, Defendants deny those allegations.

**230.  As of December 2021, Charles owes almost $88,000 in student loans from her time at Walden.**

230.  Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 230.

**C.    TIFFANY FAIR**

**231.  Plaintiff Tiffany Fair enrolled in Walden's DBA program in June 2016 based on Walden's representations that, after her transferred credits and military discount, the program would cost her $38,715—reduced to $26,215 after a subsequent additional scholarship—and would take her two and a half years to complete.**

231.  Defendants admit Fair enrolled in Walden University's DBA program in June 2016.  At this time, Defendants lack knowledge or information sufficient to form a belief as to the purported representations made before Fair's enrollment, as alleged in Paragraph 231.

**232.  Instead, Walden charged Fair over $54,000 in tuition and fees over the four and a half years she spent in the program, more than double her expected total cost. By filing numerous petitions decrying needless delays, Fair was able to convince Walden to return just over $4,000 in tuition waivers (as well as $5,000 she had been improperly charged for courses for which she had already received transfer credit). She completed fifteen DBA 9000-level courses and forty-nine capstone credits, ten more classes and thirty more credits than what Walden told her was required to complete the program. The thirty capstone credits above the requirement cost Fair an additional $25,245.**

232.     Defendants admit Fair owed over $54,000 in tuition and fees over approximately

four and a half years.  Defendants further admit that Fair received tuition waivers after filing

certain petitions; Fair received approximately $4,920 in tuition waivers in 2017 and over $4,000

in tuition waivers in 2020.  Defendants further admit that Fair completed fifteen DBA 9000-level

courses and forty-nine capstone credits.  Defendants lack knowledge or information sufficient to

form a belief as Fair's expectations as to the length and cost of the DBA program.  Defendants

deny the remaining allegations in Paragraph 232.

**233.     Fair, who is biracial and resides in Virginia, decided to pursue a doctoral**

**degree to advance her career. She has 21 years of experience in federal acquisitions, and**

**believed a doctorate would make her competitive for the senior executive service in the**

**federal government.**

233.     Defendants lack knowledge or information sufficient to forma a belief as to the

allegations in Paragraph 233.

**234.     Fair exchanged emails with Walden enrollment advisor Graham Gwynne. In**

**an email sent on June 15, 2016, Gwynne explained, using specific numbers, exactly how the**

**fact that Fair qualified for a military spouse discount reduced her tuition: "With your**

**tuition for 48 credits at $950 a credit hour, your tuition with no discounts applied is**

**$45,600, with the 15% discount you would receive a further $6,885 off your tuition [sic]**

**bring it to $38,715."**

234.     At this time, Defendants lack knowledge or information sufficient to form a belief

as to the substance of Fair's communications with a Walden University enrollment specialist or

advisor.  To the extent Plaintiffs purport to quote or describe a June 15, 2016 email from Graham

Gwynne to Fair, Defendants refer to that email for its complete and accurate contents, and deny any allegations inconsistent with that email.

**235.    Absent from Gwynne's email was any indication that Fair would almost certainly need to complete more than forty-eight credits (after accounting for transfer credits from her master's degree) and pay substantially more than the promised price.**

235.    At this time, Defendants lack knowledge or information sufficient to form a belief as to the substance of Fair's communications with a Walden University enrollment specialist or advisor.  To the extent Plaintiffs purport to quote or describe a June 15, 2016 email from Graham Gwynne to Fair, Defendants refer to that email for its complete and accurate contents, and deny any allegations inconsistent with that email.

**236.    Fair visited Walden's website. Relying on the website's representation that the DBA program required sixty credits (before transferred credits), she calculated that she would finish the program in two and a half years, which was consistent with the representations made by Gwynne. She confirmed the cost of a DBA degree by multiplying the number of required credits by the advertised cost per credit. Fair relied on Walden's representations when deciding to enroll and would not have enrolled had she known the true cost of the program.**

236.    Defendants admit that the DBA program requires a minimum of sixty credits to graduate.  To the extent Paragraph 236 purports to allege that the Walden University website represented that Fair would complete the DBA program within a certain time, upon completing a certain number of credits, or that the cost to Fair of completing the DBA program would not exceed a certain amount, Defendants deny those allegations.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 236.

**237.    Fair applied for federal student loans to fund her Walden education, and was approved by Walden's financial aid office.**

237.    Defendants admit Fair applied for federal student loans to fund, at least in part, her Walden University education and that Walden University approved Fair's loans.

**238.    Fair understood when she enrolled in the DBA program that Walden was based in and operated out of Minnesota.**

238.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 238.

**239.    Fair enrolled in the DBA program in June 2016. In August 2016 she was awarded a $12,500 scholarship. Through email exchanges between Fair and Gwynne and information on Walden's website, Walden represented to Fair that she would graduate with her doctorate degree in two and a half years for just over $26,000.**

239.    Defendants admit Fair enrolled in Walden University's DBA program in June 2016 and was awarded a $12,500 scholarship in August 2016.  Defendants deny the remaining allegations in Paragraph 239.

**240.    Fair was employed full-time when she enrolled in the DBA program, and she retained her employment throughout her time in the program.**

240.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 240.

**241.    Fair breezed through the coursework phase of the program; she completed the required courses by March 2018, less than two years after she had enrolled in the program, with a 4.0 GPA. It was not until the Spring of 2019, months after she had entered**

**the capstone phase, and after she had completed the stated requirement of sixty credits,**
**that she discovered Walden's egregious misrepresentations with regard to cost.**

241.    Defendants admit that Fair completed the coursework phase of the DBA program
by March 2018 with a 4.0 GPA.  Defendants deny the remaining allegations in Paragraph 241.

**242.    At this point, according to Walden's representations, Fair should have been**
**able to complete her program after taking five 9000-level DBA courses over two and a half**
**semesters. Instead, Fair fought delays for three additional years before graduating in**
**January 2021.**

242.    Defendants deny the allegations in Paragraph 242.

**243.    It took Fair a year to obtain approval for her prospectus and another year**
**and a half to obtain approval for her proposal. At times her committee chair took an entire**
**month to review a submission before rejecting it for minor stylistic or formatting**
**suggestions, such as misplaced commas or incorrect line spacing.**

243.    Defendants deny that it took one year for Fair to receive approval for her
prospectus or a year and a half for Fair to receive approval for her proposal.  Defendants lack
knowledge or information sufficient at this time to form a belief as to the changes requested by
Fair's committee chair, as alleged in Paragraph 243. To the extent that Paragraph 243 purports
that Walden intentionally delayed Fair's progress through the capstone phase of the DBA
program, including by providing insubstantial feedback on submissions related to her capstone
project, Defendants deny those allegations.

**244.    Fair received inconsistent and conflicting feedback from her committee**
**members. Substantive feedback was minimal, but Fair's submissions were frequently**
**rejected due to internal committee disagreement about minor issues, including the**

**placement and use of punctuation marks. On several occasions during the final stages of her capstone Fair was asked to make extensive changes to her proposal and prospectus, which had already been approved by all three committee members.**

244.    Defendants deny committee members only provided feedback that Fair purports was insubstantial or relating to minor issues.  To the extent that Paragraph 244 purports that Defendants intentionally delayed Fair's progress through the capstone phase of the DBA program, including by providing insubstantial feedback on submissions related to her capstone project, Defendants deny those allegations.  Defendants admit that students are required to resubmit work consistent with faculty feedback.  Defendants deny the remaining allegations in Paragraph 244.

**245.    Throughout this time, Fair was continually and automatically enrolled in 9000-level classes. She was continually and automatically charged tuition as she waited for feedback from her committee, and paid thousands of dollars to wait for her committee members to tell her that they disagreed with, for example, the structure of an individual sentence or her punctuation choices.**

245.    Defendants admit that DBA students are automatically enrolled in DBA 9000-level courses until they complete the capstone phase.  Defendants admit that students are required to resubmit work consistent with faculty feedback.  At this time, Defendants lack knowledge or information sufficient to form a belief as to the specific faculty feedback alleged in Paragraph 245.  To the extent that Paragraph 245 purports that Defendants intentionally delayed Fair's progress through the capstone phase of the DBA program, including by providing insubstantial feedback on submissions related to her capstone project, Defendants deny those allegations.

**246.    In December 2020, after Walden had trapped Fair in the capstone phase for more than two years, Fair's concerns about the long delays prompted her to request a change in chair and committee members. Upon receipt of this request, Walden sent her the incorrect form. When Fair again requested re-assignment, Walden refused, explaining that a new chair would result in additional delays, setting her back even further.**

246.    Defendants lack knowledge or information sufficient at this time to form a belief as to Fair's request for a change in chair and committee members, as alleged in Paragraph 246. To the extent that Paragraph 246 purports that Defendants intentionally delayed Fair's progress through the capstone phase, Defendants deny those allegations.

**247.    Fair's committee members expressed no concerns about her performance; although she was compelled to complete three times the stated number of 9000-level courses, she received "Satisfactory" grades in each and every one.**

247.    Defendants admit Fair received "Satisfactory" grades in her 9000-level courses. Defendants deny the remaining allegations in Paragraph 247.

**248.    Walden adopted the 7th Edition of the APA Publication Manual in May of 2020, but allowed current doctoral students to continue using the prior edition as long as they graduated by December 31, 2020. Fair believed she would complete her capstone and graduate before the end of 2020, but she was stymied, time and again, by delays from her committee members.**

248.    Defendants admit Walden University adopted the 7th Edition of the APA Publication Manual in May 2020 but allowed current students to continue to using the prior edition if they graduated by December 31, 2020.  Defendants lack knowledge or information

sufficient to form a belief as Fair's beliefs or expectations about her graduation.  Defendants

deny the remaining allegations in Paragraph 248.

**249.     Fair was then informed that, rather than simply updating her final paper to**

**adhere to the new version of the publication manual, Walden wanted her to *go back***

***through the entire capstone process again*, re-submitting every step (including the**

**previously approved prospectus and proposal, as well as the capstone paper itself) with**

**citations and references based on the new style guide. This would have required that she,**

**one-by-one, re-submit each of the three documents to each of the three committee**

**members, waiting up to fourteen business days for a response from each member each**

**time, and risking additional delays if any member raised a new stylistic or grammar-based**

**objection. Even if no committee member had raised any concerns, this would have added**

**nearly eight weeks—essentially a whole term—for each of the three documents. All told, it**

**would have delayed her graduation by nearly three full terms, at minimum, and cost her an**

**additional $8,910 at the then-effective rate of $990 per credit hour. Fair vociferously**

**objected to Walden's transparent attempt to squeeze even more tuition money out of her,**

**and was finally permitted to graduate as planned.**

249.     At this time, Defendants lack knowledge or information sufficient to form a belief

as to the substance of any discussion Fair had with Walden University regarding the APA

Manual and its impact on her capstone submission, as alleged in Paragraph 249.  Defendants

deny Fair graduated in January 2021.  Her degree was conferred in March 2021.  To the extent

that Paragraph 249 purports that Defendants intentionally delayed Fair's progress through the

capstone phase, Defendants deny those allegations.

**250.     After relying on representations from Walden's enrollment advisors and Walden's website that she would complete her doctorate degree in two and a half years for $26,215, Fair was charged approximately $54,000 in tuition and fees over four and a half years before she finally graduated in January 2021, roughly $28,000 more than Walden's promised price.**

250.     Defendants admit that Fair was enrolled in the DBA Program beginning in June 2016 until March 2021 and paid approximately $54,000 in tuition and fees.  Defendants deny the remaining allegations in Paragraph 250.

**251.     As of December 2021, Fair owes almost $90,000 in student loans from her Walden education.**

251.     Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 251.

**D.     TAREION FLUKER**

**252.     Plaintiff Tareion Fluker enrolled in Walden's DBA program in May 2011 based on Walden's representations that she would be able to complete her degree in approximately two and a half years for a total cost of no more than $33,000.**

252.     Defendants admit that Fluker enrolled in Walden University's DBA program in May 2011.  At this time, Defendants lack knowledge or information sufficient to form a belief as to any purported representations made before Fluker's enrollment, as alleged in Paragraph 252.

**253.   Instead, Fluker graduated in June 2016 after spending approximately five years and $95,000 in tuition and fees on the program, about $62,000 more than the maximum she expected to spend.**

253.   Defendants admit that Fluker graduated in June 2016 and paid approximately $95,000 in tuition.  Defendants lack knowledge or information sufficient to form a belief as to Fluker's expectations.

**254.   As a result of Walden's predatory scheme, Fluker was forced to complete twenty DBA 9000-level courses for a total of eighty capstone credits—more than four times the twenty capstone credits that Walden had advertised and represented would be required to complete the DBA program. Those sixty-one additional capstone credits cost her approximately $55,000.**

254.   Defendants admit that Fluker completed twenty DBA 9000-level courses for a total of eighty capstone credits.  Defendants admit that at the time Fluker enrolled at Walden University, Walden University disclosed that the minimum number of capstone credits required to complete the DBA program was 20 credits, but that the precise number of credits each student would complete was subject to change.  Defendants deny the remaining allegations in Paragraph 254.

**255.   Fluker, who is Black and resides in Georgia, learned of Walden's DBA program while conducting research into doctoral programs in business after completing her MBA at Kaplan University in 2011. She conducted most of her research online, and**

**then spoke to recruiters or enrollment advisors at the universities she was considering, including Walden, Capella, and Georgia State.**

255.    Defendants admit that in her application to enroll at Walden University, Fluker stated she previously attended Kaplan University.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 255.

**256.    Fluker spoke to a Walden enrollment advisor who told her that the program would cost around $25,000, possibly a little higher, but no more than $33,000.**

256.    At this time, Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 256.

**257.    Fluker also studied Walden's website, which confirmed the information she had been told by the enrollment advisor regarding the total cost and credit requirements of the program.**

257.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 257.

**258.    While considering program options, Fluker received an invitation from Walden, directed to prospective DBA students in the Atlanta area, to attend a round-table event with a Walden DBA faculty member. This event increased her interest in the program, as did the faculty member's statement that Walden graduates had the lowest loan-default rate among for-profit schools. Fluker ultimately selected Walden's DBA program over the other programs she had considered due to its affordable cost.**

258.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 258.

**259.    Fluker enrolled in the DBA program and began her coursework in May 2011. She was able to apply fifteen credits from her MBA toward the DBA coursework requirements and completed the coursework component of the program easily in August 2012, earning an A grade in every course.**

259.    Defendants admit that Fluker began her DBA coursework in May 2011 and that Walden University applied fifteen transfer credits towards her DBA program.  Defendants further admit that Fluker completed the DBA coursework in the summer of 2012 and earned an A or Satisfactory grade in each course.  Defendants lack knowledge or information sufficient to form a belief as to Fluker's opinion of the difficulty of the coursework.

**260.    Once she entered the capstone phase of the program, it became clear to Fluker that the capstone program was designed not to facilitate learning but rather to needlessly extend the amount of time, and thus the number of credits and cost, needed to complete the degree.**

260.    Defendants deny the allegations in Paragraph 260.

**261.    After completing the coursework phase, based on Walden's representations Fluker should have needed just twenty capstone credits to complete the program. In fact, Walden required her to complete over eighty capstone credits before finally permitting her to graduate.**

261.    Defendants admit that at the time Fluker enrolled at Walden University, Walden University disclosed that the minimum number of capstone credits required to complete the DBA program was 20 credits, but that the precise number of credits each student would complete was subject to change.  Defendants admit Fluker completed over eighty capstone credits.  Defendants deny the remaining allegations in Paragraph 261.

**262.    Fluker's initial committee chair frequently failed to review Fluker's submitted drafts and respond to her inquiries about program expectations or rubrics. After a year and a half, Fluker had drafted two separate prospectuses, both of which were based on study designs recommended by her chair. Each time, her other committee members disagreed with the chair's recommendations, declined to approve Fluker's progression to the next phase, and told her to start over with an entirely new methodology.**

262.    Defendants lack knowledge or information sufficient at this time to form a belief as to the representations of Fluker's individual committee members, and on that basis, deny the allegations in Paragraph 262.  To the extent that Paragraph 262 purports that Defendants intentionally delayed Fluker's progress through the capstone phase of the DBA program, including by delaying responding to her inquiries, Defendants deny those allegations. Defendants admit that students are required to resubmit work consistent with faculty feedback.

**263.    Exasperated with the lack of progress, she asked to switch to a new chair. Once this request was approved, she was required to start her entire capstone process over to conform to the study design and methodology recommended by the new chair. Although her study design was then approved by her chair, when it was submitted to the methodologist assigned to her committee, he objected to the new methodology and required her to completely revise the study design yet again.**

263.    Defendants admit Fluker requested a new chair, which Walden University approved.  Answering further, Defendants admit that a new committee chair may require DBA students to resubmit assignments already approved by a current committee, which could delay a student's progress in the capstone phase of the DBA program.  At this time, Defendants lack knowledge or information sufficient to form a belief as to the changes or feedback provided by

Fluker's methodologist or new chair.  To the extent that Paragraph 263 purports that Defendants intentionally delayed Fluker's progress through the capstone phase of the DBA program, Defendants deny those allegations.

**264.    Fluker frequently had to follow up with her chair when committee members failed to complete any review of her submitted work within the required fourteen-day timeframe. On one occasion her second committee member became nonresponsive without explanation, causing the pending review to be delayed for approximately two months before a new committee member was appointed. The same faculty member was subsequently appointed as the methodologist on her committee, where he again became nonresponsive for an extended period without completing pending reviews of Ms. Fluker's submitted work.**

264.    Defendants lack knowledge or information sufficient at this time to form a belief as to the allegations in Paragraph 264.  To the extent that Paragraph 264 purports that Defendants intentionally delayed Fluker's progress through the capstone phase of the DBA program, including by delaying responding to her inquiries, Defendants deny those allegations.

**265.    Frequently, Fluker received responses focused on non-substantive matters such as comma placement or the number of spaces after a period, although she was a proficient writer and wrote extensively in her day-to-day work as a marketing professional. Plaintiff Fluker's committee chair, who also owned and ran a private for-profit editing and tutoring company, strongly recommended that she hire a professional editor to review her work. Fluker twice hired independent editors to review her work, yet still had her submissions rejected over minor editing concerns. Fluker eventually hired a writing editor**

**through her chair's company, at significant cost, because it appeared to her that she would not be permitted to move forward otherwise.**

265.    Defendants lack knowledge or information sufficient at this time to form a belief as to the feedback provided to Fluker, and on that basis, deny the allegations in Paragraph 265. To the extent that Paragraph 265 purports that Defendants intentionally delayed Fluker's progress through the capstone phase of the DBA program, including by providing insubstantial feedback on submissions related to her capstone project, Defendants deny those allegations.

**266.    In many cases, Plaintiff Fluker found that the comments she received after submitting a draft were so superficial that she was able to address them in only an hour or so—but each time this would re-start the review process, requiring her to resubmit and wait another fourteen business days or more for each committee member to review. As a result, there were many terms where she spent a large majority of the term waiting for responses about minor matters from her committee members rather than advancing in her work.**

266.    Defendants lack knowledge or information sufficient at this time to form a belief as to the feedback provided to Fluker or Fluker's responses to said feedback, and on that basis, deny the allegations in Paragraph 266.  To the extent that Paragraph 266 purports that Defendants intentionally delayed Fluker's progress through the capstone phase of the DBA program, including by providing insubstantial feedback on submissions related to her capstone project, Defendants deny those allegations.  Defendants admit that students are required to resubmit work consistent with faculty feedback.  Defendants admit that at all times relevant, Walden University faculty were allotted at or around fourteen calendar days to provide feedback on student submissions.

**267.    When she did receive substantive feedback from committee members, Plaintiff Fluker was not permitted to reach out to them to discuss the feedback or request clarification. Instead, she was required to direct all questions to the committee chair, who frequently was not familiar with or able to explain the feedback.**

267.    Defendants lack knowledge or information sufficient at this time to form a belief as to Fluker's outreach to committee members, and on that basis, deny the allegations in Paragraph 267.  Answering further, Defendants admit that Walden University's approach was for committee chairs to facilitate student responses to committee member feedback.  To the extent that Paragraph 267 purports that Defendants intentionally delayed Fluker's progress through the capstone phase of the DBA program, Defendants deny those allegations.

**268.    After a total of twenty DBA 9000-level courses, Fluker was eventually able to get her capstone approved, and graduated with her degree in June 2016, over five years after enrolling.**

268.    Defendants admit the allegations in Paragraph 268.

**269.    Although she was required to complete roughly four times as many capstone credits as required according to Walden's representations, Fluker never received less than a "Satisfactory" grade in any of those courses. The excess credits required were not due to any deficiency in her academic performance, but rather to the fact that Walden's DBA program was not designed to be completed within Walden's false stated credit requirements.**

269.    Defendants admit that Fluker's final transcript reflects that she received "Satisfactory" grades in her capstone credits.  Defendants deny the remaining allegations in Paragraph 269.

**270.    Despite Walden's representations during enrollment that she could complete the degree in 2.5 years for no more than $33,000, Fluker ultimately completed her degree in June 2016 after approximately five years of enrollment, one-hundred and five credits, and $95,000 in tuition and fees.**

270.    Defendants admit that Fluker completed her degree in June 2016 after completing one-hundred and five credits and paying approximately $95,000 in tuition and fees.  Defendants lack knowledge or information sufficient to form a belief at this time as to any purported representations made during Fluker's enrollment, as alleged in Paragraph 270.  **Fluker paid for nearly all of the required tuition and fees using federal student loans obtained through Walden's financial aid office, ultimately taking out six separate Unsubsidized Direct Stafford loans, two Subsidized Direct Stafford loans, and three Direct Plus Graduate loans. These loans continued to accrue interest throughout the extended period of time it took to complete the program.**

271.    Defendants admit Fluker paid for over $90,000 of tuition with federal student loans.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 271.

**271.    As of November 2022, Fluker owes approximately $172,628 in loans from her Walden education.**

272.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 272.

## CLASS ALLEGATIONS

**272.    Plaintiffs bring this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the Individual Plaintiffs and similarly situated**

**individuals in three putative classes: the Title VI Class, the ECOA Black Student Class, and the ECOA Female Student Class.**

273.    Defendants admit that Plaintiffs purport to bring their FAC as a class action on behalf of the Individual Plaintiffs and three putative classes under Title VI and the ECOA. Defendants deny any violations of Title VI or the ECOA, or that the putative classes satisfy the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3).

**273.    Plaintiffs Aljanal Carroll, Claudia Provost Charles, and Tareion Fluker request that this Court certify a Title VI Class, consisting of all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018 and were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled. Plaintiffs Carroll, Charles, and Fluker are all members of the class they seek to represent. The Title VI Class asserts claims under Title VI, 42 U.S.C. § 2000d** *et seq***.**

274.    Defendants admit that Carroll, Charles, and Fluker request that this Court certify a class consisting of all Black students who enrolled in and/or began classes in Walden University's DBA program between August 1, 2008, and January 31, 2018, and who completed certain capstone-level credits.  Defendants further admit that this class purports to bring claims under Title VI, 42 U.S.C. § 2000d *et seq.*, but deny any violations of same, or that the purported class satisfies the requirements under Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3).

**274.    Plaintiffs Charles and Fluker further request that this Court certify pursuant to Fed. R. Civ. P. 23(c)(5) the ECOA Black Student Class, a subclass of all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008**

**and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans to pay for some or all of their Walden education. Plaintiffs Charles and Fluker are members of the subclass they seek to represent. The ECOA Black Student Class asserts claims under ECOA, 15 U.S.C. § 1691 *et seq*.**

275.    Defendants admit that Charles and Fluker request that this Court certify a sub-class of all Black students who enrolled in and/or began classes in Walden University's DBA program between August 1, 2008, and January 31, 2018, who completed certain capstone-level credits, and who applied for and/or received student loans to pay for their Walden University education.  Defendants further admit that this class purports to bring claims under ECOA, 15 U.S.C. § 1691 *et seq*., but deny any violations of same, or that the putative subclass satisfies the requirements under Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3).

**275.    Plaintiffs Charles, Fair, and Fluker request that this Court certify pursuant to Fed. R. Civ. P. 23(c)(5) the ECOA Female Student Class, a class of all Female students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008 and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans to pay for some or all of their Walden education. Plaintiffs Charles, Fair, and Fluker are members of the subclass they seek to represent. The ECOA Female Student Subclass asserts claims under ECOA, 15 U.S.C. § 1691 *et seq*.**

276.    Defendants admit that Charles, Fair, and Fluker request that this Court certify a class of all female students who enrolled in and/or began classes in Walden University's DBA program between August 1, 2008, and January 31, 2018, who completed certain capstone-level

credits, and who applied for and/or received student loans to pay for their Walden University education.  Defendants further admit that this class purports to bring claims under ECOA, 15 U.S.C. § 1691 *et seq*., but deny any violations of same, or that the purported class satisfies the requirements under Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3).

**276.     This action is properly maintained as a class action because:**

**(a)        Joinder of all class members is impracticable because of the size of the class. Between fall 2008 and fall 2017, 9,015 students enrolled in the DBA program, and upon information and belief, enrollment was similar in subsequent years. Plaintiffs estimate that approximately 68% of those students, or roughly 6,130, are Black and/or female. Plaintiffs are informed and believe that the class includes thousands of students because the class period covers more than five years. Plaintiffs calculate that upwards of 816 Black and/or female students who enrolled during the class period have graduated, with on average thirty five credits above the stated requirement, and that many others who have not graduated have also completed more credits than the stated requirement.**

(a)        To the extent Paragraph 277(a) contains conclusions of law as opposed to allegations of fact regarding whether this action is properly maintained as a class action or joinder of class members is practicable, no answer is required.  To the extent an answer is required, Defendants deny those allegations.  Defendants admit that between fall 2008 and fall 2017, 9,015 students enrolled in Walden University's DBA program.

Defendants deny that 9,015 students enrolled in each subsequent academic

122

year; to the extent Paragraph 277(a) purports to allege that "enrollment was similar" to 9,015 students in "subsequent years," Defendants deny those allegations as vague and unintelligible.  Defendants deny approximately 68% of Walden University DBA students between fall 2008 and fall 2017 were Black and/or female.  Defendants deny the remaining allegations in Paragraph 277(a).

**(b)      Defendants have acted or refused to act on grounds generally applicable to the class.**

(b)      To the extent Paragraph 277(b) contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

**(c)      The claims alleged on behalf of the putative classes raise questions of law and fact that are common to the classes and predominate over questions affecting only individual members because all class members enrolled in the same school after receiving the same or similar representations, entered into the same or similar written contracts with Walden, and were subjected to the same policies and practices regarding the capstone process and requirements. Common questions of law and fact include, among others: (i) whether Defendants' DBA program, as implemented, was predatory; (ii) whether Defendants intentionally targeted Black and/or female students and prospective students in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. and the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*.; (iii) whether Defendants' policies**

**and practices have a disparate impact on Black and/or female students in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*.; (iv) whether any disparate impact is justified by business necessity; and (vii) whether class members who have not yet graduated are entitled to an injunction requiring Walden to cease charging them tuition for any additional capstone credits it requires them to take beyond the stated requirement as of the time they enrolled.**

> (c)     To the extent Paragraph 277(c) contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

**(d)     The claims of the class representatives are typical of the class because the class representatives enrolled in the same school and program as the other class members after receiving the same or similar representations, entered into the same or similar written contracts with Walden as the other class members, and were subjected to the same policies and practices regarding the capstone process and requirements.**

> (d)     To the extent Paragraph 277(d) contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

**(e)     A class action is superior to other available methods for fairly and efficiently adjudicating this litigation.**

(e)     To the extent Paragraph 277(e) contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

**277.     The class representatives and class counsel will fairly and adequately represent the interests of the class. The class representatives have no interests that are antagonistic to the interests of other Plaintiffs and class counsel have years of experience in civil rights, consumer, and class action litigation.**

278.     Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 278.

### INJURY TO INDIVIDUAL PLAINTIFFS

**278.     Plaintiffs Aljanal Carroll, Claudia Provost Charles, Tiffany Fair, and Tareion Fluker have suffered and continue to suffer financial injuries as a direct, foreseeable, and proximate result of Defendants' past and ongoing actions set forth above. Plaintiffs have each been required to enroll in, pay for, and complete between fifteen and sixty capstone credits in excess of the number of credits Walden represented were required at the time of enrollment. Plaintiffs have each paid large sums of money to enroll in and complete these excess credits, some by taking out large student loans. In the absence of Defendants' actions, Plaintiffs would not have paid this money and taken out these loans and would have been able to complete their degrees without these excess costs.**

279.     Defendants deny the allegations in Paragraph 279.

**279.     Walden's practice of misrepresentation as described herein began in or prior to August 2008 and continued in substantially the same form through at least January 2018.**

280.     Defendants deny the allegations in Paragraph 280.

**280.    In causing injury to Plaintiffs, Defendants acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for Plaintiffs' rights.**

281.    Defendants deny the allegations in Paragraph 281.

## CAUSES OF ACTION

### Count I – Violation of Title VI of the Civil Rights Act of 1964,

### 42 U.S.C. § 2000d *et seq*.

*(Plaintiffs Carroll, Charles, and Fluker on behalf of themselves and the Title VI Class)*

**281.    Plaintiffs Carroll, Charles, and Fluker reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 281 above.**

282.    In response to Paragraph 282, Defendants repeat and incorporate by reference their responses to Plaintiffs' allegations set forth in Paragraphs 1 through 281 above as though set forth fully herein.

**282.    Defendants receive "Federal financial assistance" within the meaning of 42 U.S.C. § 2000d as the recipient of their students' federal financial aid dollars.**

283.    To the extent the allegations in Paragraph 283 contain conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit that Walden University receives federal financial assistance within the meaning of Title VI, but deny Defendants violated Title VI.

**283.    Upon information and belief, Defendants have entered into one or more Program Participation Agreements with the United States Department of Education pursuant to 20 U.S. Code § 1094(a) and 34 C.F.R. § 668.14, in which they explicitly acknowledge, *inter alia*, that they must comply with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, as amended, and its implementing regulations 34 C.F.R. §§ 100-01.**

284.    Defendants admit the allegations in Paragraph 284.

284.    **Defendants' acts, policies, and practices are intentionally discriminatory against Black students, subject Black students to intentional discrimination in Defendants' programs and activities, constitute reverse redlining, and violate 42 U.S.C. § 2000d.**

285. To the extent Paragraph 285 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

### Count II – Violation of the Equal Credit Opportunity Act,

### 15 U.S.C. § 1691 *et seq*.

*(Plaintiffs Charles and Fluker on behalf of themselves and the ECOA Black Student Class, and Plaintiffs Charles, Fair, and Fluker on behalf of themselves and the ECOA Female Student Class)*

285.    **Plaintiffs Charles, Fair, and Fluker reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 281 above.**

286.    In response to Paragraph 286, Defendants repeat and incorporate by reference their responses to Plaintiffs' allegations set forth in Paragraphs 1 through 281 above as though set forth fully herein.

286.    **Defendants are "creditors" within the meaning of 15 U.S.C. § 1691a(e).**

287.    To the extent the allegations in Paragraph 287 contain conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit Walden University is a "creditor" within the meaning of the ECOA but deny any violations of the ECOA.

287.    **Plaintiffs Charles, Fair, and Fluker along with the ECOA Subclass, have been "applicants" within the meaning of 15 U.S.C. § 1691a(b) when they have applied for an extension, renewal, or continuation of student loans.**

288.     To the extent Paragraph 288 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit those allegations.

**288.     Defendants' acts, policies, and practices are intentionally discriminatory against Black and female students with respect to aspects of credit transactions, constitute reverse redlining, and violate 15 U.S.C. § 1691(a)(1).**

289.     To the extent Paragraph 289 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

**289.     Defendants' acts, policies, and practices disparately impact Black and female students with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).**

290.     To the extent Paragraph 290 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny those allegations.

<strong>Count III – Violation of the Minnesota Prevention of Consumer Fraud Act,</strong>

<strong>Minn. Stat. § 325F.68</strong> <em>et seq.</em>

<em>(Plaintiffs Carroll, Charles, and Fair on behalf of themselves)</em>

**290.     Plaintiffs Carroll, Charles, and Fair reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 281 above.**

291.     In response to Paragraph 291, Defendants repeat and incorporate by reference their responses to Plaintiffs' allegations set forth in Paragraphs 1 through 281 above as though set forth fully herein.

**291.    Defendants are "persons" within the meaning of Minn. Stat. § 325F.68.**

292.    To the extent Paragraph 292 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit they are "persons" within the meaning of Minnesota Statute § 325F.68 but deny that Defendants violated Minnesota law.

**292.    The educational services offered by Walden are "services" and "merchandise" within the meaning of Minn. Stat. § 325F.68, subdiv. 2.**

293.    To the extent Paragraph 293 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit the educational services offered by Walden University are "services" and "merchandise" within the meaning of Minnesota Statute § 325F.68, subdiv. 2, but deny that Defendants violated Minnesota law.

**293.    Plaintiffs' and class members' enrollment at Walden to receive educational services constitutes a "sale of merchandise" within the meaning of Minn. Stat. § § 325F.68, subdiv. 2 and 325F.69.**

294.    To the extent Paragraph 294 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit that Plaintiffs' and class members' enrollment at Walden University to receive educational services constitutes a "sale of merchandise" within the meaning of Minnesota Statute §§ 325F.68, subdiv. 2 and 325F.69 but deny that Defendants violated Minnesota law.

**294.    Defendants employed fraud, false pretense, false promise, misrepresentation, misleading statements and/or deceptive practices, with the intent to induce reliance**

thereon, with respect to Plaintiffs' and class members' enrollment at Walden in violation of Minn. Stat. § 325F.69.

295.    To the extent Paragraph 295 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 295.

**295.    Defendants' fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices were made in connection with the "sale of merchandise," i.e. Plaintiffs' and class members' enrollment at Walden to receive educational services.**

296.    To the extent Paragraph 296 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 296.

**296.    Defendants made their fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices to Plaintiffs, members of the proposed class, and the public at large.**

297.    To the extent Paragraph 297 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 297.

**297.    Defendants' fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices were made out of Walden University's academic headquarters in Minneapolis, MN.**

298.    Defendants deny the allegations in Paragraph 298.

**298.    There is a causal nexus between Defendants' fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices and the injuries suffered by Plaintiffs and class members.**

299.    To the extent Paragraph 299 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 299.

**299.    Plaintiffs relied on Defendants' fraud, false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices when enrolling and re-enrolling in Defendants' DBA program and were induced to enroll in the program by these representations.**

300.    To the extent Paragraph 300 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 300.

**300.    Plaintiffs have suffered and continue to suffer injuries as a direct, foreseeable, and proximate result of Defendants' false pretense, false promise, misrepresentation, misleading statements, and/or deceptive practices regarding the DBA program.**

301.    To the extent Paragraph 301 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 301.

**301.    Plaintiffs' prosecution of this claim serves a public benefit pursuant to Minn. Stat. § 8.31, subdiv. 3a.**

302.    To the extent Paragraph 302 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 302.

**Count IV – False Statement in Advertising,**

**Minn. Stat. § 325F.67**

*(Plaintiffs Carroll, Charles, and Fair on behalf of themselves)*

**302.    Plaintiffs Carroll, Charles, and Fair reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 281 above.**

303.    In response to Paragraph 303, Defendants repeat and incorporate by reference their responses to Plaintiffs' allegations set forth in Paragraphs 1 through 281 above as though set forth fully herein.

**303.    Defendants are "persons," "firms," "corporations," or "associations" within the meaning of Minn. Stat. § 325F.67.**

304.    To the extent Paragraph 304 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit they are "persons," "firms," "corporations," or "associations" within the meaning of Minnesota Statute § 325F.67 but deny that Defendants violated Minnesota law.

**304.    The educational services offered by Walden are "services" and "merchandise" within the meaning of Minn. Stat. § 325F.67.**

305.    To the extent Paragraph 305 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit the

educational services offered by Walden University are "services" and "merchandise" within the meaning of Minnesota Statute § 325F.67 but deny that Defendants violated Minnesota law.

**305.     Defendants made, published, disseminated, circulated, or placed before the public advertisements regarding the educational services offered by Walden with the intent to sell those educational services and with the intent to induce the public to enter into obligations related to those educational services.**

306.     To the extent Paragraph 306 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 306.

**306.     These advertisements contained material assertions, representations, or statements of fact about the cost and credit requirements of the DBA program which were untrue, deceptive or misleading.**

307.     To the extent Paragraph 307 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 307.

**307.     Defendants made these advertisements out of Walden University's academic headquarters in Minneapolis, MN.**

308.     Defendants admit that Walden University's academic headquarters are in Minneapolis, Minnesota.  Defendants deny the remaining allegations in Paragraph 308.

**308.    There is a causal nexus between Defendants' false, deceptive, or misleading advertisements about the cost and credit requirements of the DBA program and the injuries suffered by Plaintiffs and class members.**

309.    To the extent Paragraph 309 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 309.

**309.    Plaintiffs relied on Defendants' false, deceptive, or misleading advertisements about the cost and credit requirements of the DBA program when enrolling and re-enrolling in Defendants' DBA program and were induced to enroll in the program by these representations.**

310.    To the extent Paragraph 310 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 310.

**310.    Plaintiffs have suffered and continue to suffer injuries as a direct, foreseeable, and proximate result of Defendants' false, deceptive, or misleading advertisements about the cost and credit requirements of the DBA program.**

311.    To the extent Paragraph 311 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 311.

**311.     Plaintiffs' prosecution of this claim serves a public benefit pursuant to Minn. Stat. § 8.31, subdiv. 3a.**

312.     To the extent Paragraph 312 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 312.

## Count V – Minnesota Uniform Deceptive Trade Practices Act

## Minn. Stat. § 325D.43 *et seq*.

*(Plaintiffs Carroll, Charles, and Fair on behalf of themselves)*

**312.     Plaintiffs Carroll, Charles, and Fair reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 281 above.**

313.     In response to Paragraph 313, Defendants repeat and incorporate by reference their responses to Plaintiffs' allegations set forth in Paragraphs 1 through 281 above as though set forth fully herein.

**313.     Defendants are "persons" within the meaning of Minn. Stat. § 325D.44.**

314.     To the extent Paragraph 314 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants admit they are "persons" within the meaning of Minnesota Statute § 325D.44 but deny that Defendants violated Minnesota law.

**314.     In making false claims about the cost and credit requirements of its DBA program, Defendants represented to potential students and to the public at large that the**

**services they provided had characteristics that the services did not have in violation of Minn. Stat. § 325D.44.**

315.     To the extent Paragraph 315 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 315.

**315.     In making false claims about the cost and credit requirements of its DBA program, Defendants were engaged in advertising services with intent not to sell them as advertised in violation of Minn. Stat. § 325D.44.**

316.     To the extent Paragraph 316 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 316.

**316.     In making false claims about the cost and credit requirements of its DBA program, Defendants created a likelihood of confusion and misunderstanding in violation of Minn. Stat. § 325D.44.**

317.     To the extent Paragraph 317 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 317.

**317.     Defendants engaged in these practices in the course of business, and while knowing them to be deceptive.**

318.     To the extent Paragraph 318 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 318.

**318.     Defendants engaged in these practices out of Walden University's academic headquarters in Minneapolis, MN.**

319.     Defendants deny the allegations in Paragraph 319.

**319.     There is a causal nexus between Defendants' false claims about the cost and credit requirements of the DBA program and the injuries suffered by Plaintiffs and class members.**

320.     To the extent Paragraph 320 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 320.

**320.     Plaintiffs relied on Defendants' false claims about the cost and credit requirements of the DBA program when enrolling and re-enrolling in Defendants' DBA program and were induced to enroll in the program by these representations.**

321.     To the extent Paragraph 321 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 321.

**321.     Plaintiffs have suffered and continue to suffer injuries as a direct, foreseeable, and proximate result of Defendants' false claims about the cost and credit requirements of the DBA program.**

322.     To the extent Paragraph 322 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 322.

**322.    Plaintiffs' prosecution of this claim serves a public benefit pursuant to Minn. Stat. § 8.31, subdiv. 3a.**

323.    To the extent Paragraph 323 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 323.

### Count VI – Fraudulent Misrepresentation

*(Plaintiffs Carroll, Charles, and Fair on behalf of themselves)*

**323.    Plaintiffs Carroll, Charles, and Fair reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 281 above.**

324.    In response to Paragraph 324, Defendants repeat and incorporate by reference their responses to Plaintiffs' allegations set forth in Paragraphs 1 through 281 above as though set forth fully herein.

**324.    Defendants made positive statements of fact regarding the cost and number of credits required to complete the DBA program that were false and material and were relied upon by Plaintiffs in deciding to enroll at Walden.**

325.    To the extent Paragraph 325 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 325.

**325.    Defendants knew that their statements regarding the cost and number of credits required to obtain a DBA degree were false at the time they were made and did not intend that Walden would satisfy the statements at the time they were made.**

326.    To the extent Paragraph 326 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 326.

**326.    Defendants made these false representations about the cost and number of credits required to complete the DBA program with the intent to induce the Individual Plaintiffs to enroll in the DBA program.**

327.    To the extent Paragraph 327 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 327.

**327.    Defendants made these false representations about the cost and number of credits required to complete the DBA program out of Walden University's academic headquarters in Minneapolis, MN.**

328.    Defendants deny the allegations in Paragraph 328.

**328.    Plaintiffs Carroll, Charles, and Fair relied on Defendants' representations about the cost and number of credits required to complete the DBA program and were induced to enroll in the program by these representations.**

329.    To the extent Paragraph 329 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 329.

**329.    Plaintiffs Carroll, Charles, and Fair have suffered and continue to suffer financial injuries as a direct, foreseeable, and proximate result of Defendants' misrepresentation of the cost and number of credits required to complete the DBA program.**

330.    To the extent Paragraph 330 contains conclusions of law as opposed to allegations of fact, no answer is required.  To the extent an answer is required, Defendants deny the allegations in Paragraph 330.

## PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to any of the relief sought in the prayer for relief or any relief whatsoever.

## JURY DEMAND

Defendants acknowledge that Plaintiffs demand a trial by jury on all issues so triable.

## AFFIRMATIVE DEFENSES

Defendants plead the following affirmative defenses.  By asserting these defenses, Defendants do not concede that they bear the burden of proof on any defense.  Nothing stated herein is intended, or shall be construed, as an acknowledgment that any particular issue or subject matter is relevant to the allegations.  Defendants further reserve the right to assert any additional affirmative defenses, cross-claims, or third-party claims that may become apparent through discovery or other investigation.

## FIRST AFFIRMATIVE DEFENSE

This action cannot be maintained as a class action because none of the putative classes or subclasses satisfy the prerequisites of Federal Rule of Civil Procedure 23(a) and 23(b).

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' state law claims under Counts III – VI are barred, in whole or in part, due to the absence of subject matter jurisdiction in the event the Court dismisses Plaintiffs' federal law claims, as the Court will not have supplemental jurisdiction over Counts III – VI under 28 U.S.C. § 1367(c)(3).

## THIRD AFFIRMATIVE DEFENSE

Count I of the FAC (entitled "Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*") fails to state an actionable claim against Defendants and fails to state sufficient facts upon which the relief demanded can be granted.  The pleading deficiencies with respect to Count I include, but are not limited to, that Plaintiffs have failed to sufficiently allege intentional discrimination on the basis of race and have failed to allege less favorable treatment compared to "similarly situated" students.  Further, Plaintiffs have failed to allege a claim for "reverse redlining" under Title IV because Plaintiffs do not make any allegations regarding grossly unfavorable loan terms.  Count I is also barred by the educational malpractice doctrine.

## FOURTH AFFIRMATIVE DEFENSE

Count II of the FAC (entitled "Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*") fails to state an actionable claim against Defendants and fails to state sufficient facts upon which the relief demanded can be granted.  The pleading deficiencies with respect to Count II include, but are not limited to, that Plaintiffs have failed to allege a credit transaction within the meaning of ECOA, or discrimination in connection with a credit practice.  Count II is also barred by the educational malpractice doctrine.

## FIFTH AFFIRMATIVE DEFENSE

Count III of the FAC (entitled "Violation of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68 *et seq.*") fails to state an actionable claim against Defendants and fails to state sufficient facts upon which the relief demanded can be granted.  The pleading deficiencies with respect to Count III include, but are not limited to, that Count III fails to satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b) because Plaintiffs do not allege the circumstances of the purported fraud with the requisite particularity; Plaintiffs cannot avail themselves of the Minnesota status that forms the basis of Count III; even if Minnesota law did apply, it does not apply extraterritorially to Plaintiffs; and even if Minnesota law did apply, and even if the applicable Minnesota statute applied extraterritorially, Count III does not serve a "public benefit."  Count III is also barred by the educational malpractice doctrine.

## SIXTH AFFIRMATIVE DEFENSE

Count IV of the FAC (entitled "False Statement in Advertising, Minn. Stat. § 325F.67") fails to state an actionable claim against Defendants and fails to state sufficient facts upon which the relief demanded can be granted.  The pleading deficiencies with respect to Count IV include, but are not limited to, that Count IV fails to satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b) because Plaintiffs do not allege the circumstances of the purported fraud with the requisite particularity; Plaintiffs cannot avail themselves of the Minnesota status that forms the basis of Count IV; even if Minnesota law did apply, it does not apply extraterritorially to Plaintiffs; and even if Minnesota law did apply, and even if the applicable Minnesota statute applied extraterritorially, Count IV does not serve a "public benefit."  Count IV is also barred by the educational malpractice doctrine.

142

## SEVENTH AFFIRMATIVE DEFENSE

Count V of the FAC (entitled "Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43 *et seq.*") fails to state an actionable claim against Defendants and fails to state sufficient facts upon which the relief demanded can be granted.  The pleading deficiencies with respect to Count V include, but are not limited to, that Count V fails to satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b) because Plaintiffs do not allege the circumstances of the purported fraud with the requisite particularity; Plaintiffs cannot avail themselves of the Minnesota status that forms the basis of Count V; and even if Minnesota law did apply, it does not apply extraterritorially to Plaintiffs; and even if Minnesota law did apply, and even if the applicable Minnesota statute applied extraterritorially, Count V fails because the sole statutory remedy under the applicable statute is injunctive relief, which is unavailable to Plaintiffs.  Count V is also barred by the educational malpractice doctrine.

## EIGHTH AFFIRMATIVE DEFENSE

Count VI of the FAC (entitled "Fraudulent Misrepresentation") fails to state an actionable claim against Defendants, and fails to state sufficient facts upon which the relief demanded can be granted.  The pleading deficiencies with respect to Count VI include, but are not limited to, that Count VI fails to satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b) because Plaintiffs do not allege the circumstances of the purported fraud with the requisite particularity.  Count VI is also barred by the educational malpractice doctrine.

## NINTH AFFIRMATIVE DEFENSE

The FAC fails to state a claim against Defendants warranting declaratory relief and fails to state sufficient facts upon which the declaratory relief demanded can be granted.

### TENTH AFFIRMATIVE DEFENSE

The FAC fails to state a claim against Defendants warranting injunctive relief; the FAC admits that Defendants currently disclose the information that Plaintiffs allege Defendants previously omitted, and the FAC otherwise fails to state sufficient facts upon which the injunctive relief demanded can be granted.

### ELEVENTH AFFIRMATIVE DEFENSE

The FAC fails to state a claim against Defendants warranting an award of compensatory damages, punitive damages, or attorney's fees, and fails to state sufficient facts upon which an award of compensatory damages, punitive damages, or attorney's fees can be granted.

### TWELFTH AFFIRMATIVE DEFENSE

Certain matters alleged to be the subject of misrepresentations and omissions were publicly disclosed or were in the public domain, and as such were known by or available to Plaintiffs, other members of the putative class, including but not limited to the fact that Defendants disclosed that the published credit and cost requirements were the "minimum" requirements, and that the number of credits and cost to completion was subject to change and varied by student.

### THIRTEENTH AFFIRMATIVE DEFENSE

Defendants are not liable for any alleged damages suffered by Plaintiffs and other members of the putative class to the extent that their putative damages, if any, were caused or contributed, in whole or in part, by the acts or omissions of independent persons or entities other than Defendants over which Defendants had no control.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' and other members of the putative class's claims are barred, in whole or in part, because superseding or intervening events caused some or all of the alleged damages.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' and other members of the putative class's claims are time-barred, in whole or in part, due to laches and/or the applicable statute(s) of limitations, including but not limited to one or more of the following:

- To the extent that purported Title VI claims (Count I) accrued for any Plaintiff or putative class member more than three (3) years before this action was initiated, such claims are barred by the three (3) year limitation period applicable to such claims, Md. Code Ann., Cts. & Jud. Proc. § 5-101;

- To the extent that purported ECOA claims (Count II) for any Plaintiff or putative class member accrued more than five (5) years before this action was initiated, such claims are barred by the five (5) year limitation period applicable to such claims, 15 U.S.C. § 1691e(f);

- To the extent that Carroll, Charles, or Fair's purported Minnesota Prevention of Consumer Fraud Act claims (Count III) accrued more than three (3) years before this action was initiated, such claims are barred by the three (3) year limitation period applicable to such claims, Md. Code Ann., Cts. & Jud. Proc. § 5-101;

- To the extent that Carroll, Charles, or Fair's purported Minnesota False Statement in Advertising claims (Count IV) accrued more than three (3) years before this action was initiated, such claims are barred by the three (3) year limitation period applicable to such claims, Md. Code Ann., Cts. & Jud. Proc. § 5-101;

- To the extent that Carroll, Charles, or Fair's purported Minnesota Uniform Deceptive Trade Practices Act claims (Count V) accrued more than three (3) years before this action was initiated, such claims are barred by the three (3) year limitation period applicable to such claims, Md. Code Ann., Cts. & Jud. Proc. § 5-101; and

- To the extent that Carroll, Charles, or Fair's purported Fraudulent Misrepresentation claims (Count VI) accrued more than three (3) years before this action was initiated, such claims are barred by the three (3) year limitation period applicable to such claims.  Md. Code Ann., Cts. & Jud. Proc. § 5-101.

**SIXTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs and other members of the putative class are barred from recovery for damages, in whole or part, because they failed to make reasonable efforts to mitigate any such damages, including but not limited to failing to undertake their own diligence regarding the potential time and cost of the DBA program, take reasonable steps to expedite their progress through the capstone phase of the DBA program, or seek faculty feedback on submissions related to their capstone project.

Dated:  February 2, 2023                          Respectfully submitted,

_/s/ Andrew D. Prins_
Andrew D. Prins (D. Md. Bar No. 10597)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
andrew.prins@lw.com

Sean M. Berkowitz (pro hac vice)
Eric R. Swibel (pro hac vice)
Caitlin E. Dahl (pro hac vice)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
sean.berkowitz@lw.com
eric.swibel@lw.com
caitlin.dahl@lw.com

_Counsel for Defendants Walden University,_
_LLC and Walden e-Learning, LLC_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of February, 2023, copies of Defendants' Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint were served to Plaintiffs' counsel of record electronically via CM/ECF and courtesy copies will be provided to the Court within 48 hours of filing.

*/s/ Andrew D. Prins*
Andrew D. Prins (D. Md. Bar No. 10597)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
andrew.prins@lw.com