## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| Aljanal Carroll, Claudia Provost Charles, Tiffany Fair, and Tareion Fluker,<br><br>    Plaintiffs,<br><br>    v.<br><br>Walden University, LLC, and Walden e-Learning, LLC,<br><br>    Defendants. | Civil Action No. 1:22-cv-00051-JRR |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT, PROVISIONAL
CERTIFICATION OF SETTLEMENT CLASS, AND APPROVAL OF NOTICE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................ii
PRELMINARY STATEMENT ..................................................................................................... 1
BACKGROUND ........................................................................................................................... 1
I.   THE LITIGATION BETWEEN PLAINTIFFS AND WALDEN ........................................ 1
II.  THE MEDIATION AND RESULTING SETTLEMENT AGREEMENT ........................... 3
    A.   Monetary Terms of Settlement .................................................................................. 6
    B.   Non-Monetary Terms of Settlement .......................................................................... 6
    C.   Administration of Settlement ..................................................................................... 7

ARGUMENT .................................................................................................................................. 8
I.   PRELIMINARY APPROVAL SHOULD BE GRANTED BECAUSE THE
SETTLEMENT AGREEMENT IS IN THE RANGE OF POSSIBLE APPROVAL ............... 8
    A.   The Fairness Factors ................................................................................................. 9
        1.   Posture of the Case ........................................................................................ 9
        2.   Extent of Discovery ..................................................................................... 10
        3.   Circumstances Surrounding Negotiations ................................................... 12
        4.   Experience of Counsel ................................................................................. 12
    B.   The Adequacy Factors ............................................................................................. 15
        1.   Relative Strength of Plaintiffs' Case on the Merits and Difficulties of Proof or
Strong Defenses Likely at Trial .......................................................................... 15
        2.   Duration and Expense of Additional Litigation .......................................... 17
        3.   Solvency of Defendant and Likelihood of Recovery on a Litigated Judgment 18
        4.   Degree of Opposition ................................................................................... 18
    C.   Reasonableness ........................................................................................................ 18
        1.   The Size of the Recovery is Reasonable ..................................................... 19
        2.   The Incentive Awards for the Named Plaintiffs are Reasonable ................. 19
        3.   The Attorneys' Fees and Costs are Reasonable ........................................... 21
II.  A SETTLEMENT CLASS SHOULD BE PROVISIONALLY CERTIFIED UNDER
RULES 23(a), 23(b)(2), and 23(b)(3) ...................................................................................... 24
    A.   Rule 23(a) is Satisfied ............................................................................................. 25
        1.   Rule 23(a)(1) – Numerosity ......................................................................... 25
        2.   Rule 23(a)(2) – Commonality ...................................................................... 25
        3.   Rule 23(a)(3) – Typicality ........................................................................... 30
        4.   Rule 23(a)(4) – Adequacy of Representation .............................................. 31
    B.   Rule 23(b)(2) is Satisfied ........................................................................................ 32
    C.   Rule 23(b)(3) is Satisfied ........................................................................................ 32
    D.   Plaintiffs' Counsel Satisfy Rule 23(g) Requirements ............................................. 34

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................................17

*Archbold v. Wells Fargo Bank, N.A.*,
  No. 3:13-CV-24599, 2015 WL 4276295 (S.D.W. Va. July 14, 2015) ....................12

*Barber v. Kimbrell's, Inc.*,
  577 F.2d 216 (4th Cir. 1978) .................................................................................21

*Beaulieu v. EQ Indus. Servs., Inc.*,
  No. 5:06-cv-00400, 2009 WL 2208131 (E.D.N.C. July 22, 2009)...........................9

*Berry v. Schulman*,
  807 F.3d 600 (4th Cir. 2015) .................................................................................22

*Binotti v. Duke Univ.*,
  No. 1:20-CV-470, 2021 WL 5366877 (M.D.N.C. Aug. 30, 2021) .........................21

*Brown v. Transurban USA, Inc.*,
  318 F.R.D. 560 (E.D. Va. 2016) ............................................................................30

*Butela v. Midland Credit Mgmt. Inc.*,
  341 F.R.D. 581 (W.D. Pa. 2022) ...........................................................................28

*Carroll v. Walden Univ., LLC*,
  650 F. Supp. 3d 342 (D. Md. 2022).............................................................2, 15, 16

*In re Celebrex (Celecoxib) Antitrust Litig.*,
  No. 2:14-CV-00361, 2018 WL 2382091 (E.D. Va. Apr. 18, 2018) .......................23

*Chisolm v. TranSouth Fin. Corp.*,
  194 F.R.D. 538 (E.D. Va. 2000) ............................................................................32

*City of Memphis v. Wells Fargo Bank, N.A.*,
  No. 09-2857, 2011 WL 1706756 (W.D. Tenn. May 4, 2011) ................................13

*Comm'rs of Pub. Works of City of Charleston v. Costco Wholesale Corp.*,
  340 F.R.D. 242 (D.S.C. 2021) .................................................................8, 9, 10, 14

*Comm'rs of Pub. Works of City of Charleston v. Costco Wholesale Corp.*,
  No. 2:21-CV-42, 2022 WL 214531 (D.S.C. Jan. 24, 2022) .....................................8

*In re Cook Med., Inc., Pelvic Repair Sys. Prods. Liability Litig.*,
  365 F. Supp. 3d 685 (S.D. W. Va. 2019)................................................................24

*Cullen v. Whitman Med. Corp.*,
   197 F.R.D. 136 (E.D. Pa. 2000)........................................................................19

*Decohen v. Abbasi, LLC*,
   299 F.R.D. 469 (D. Md. 2014).....................................................................17, 20

*Deem v. Ames True Temper, Inc.*,
   No. 6:10-CV-01339, 2013 WL 2285972 (S.D.W. Va. May 23, 2013)...................23

*Detmer, et al. v. La'James Coll. of Hairstyling, Inc. of Fort Dodge, et al.*,
   05771 LACL 147597 (Ia. District Ct. for Polk Cty. Compl. Filed March 30,
   2020) ...............................................................................................................14

*DeWitt v. Darlington Cnty.*,
   No. 4:11-CV-00740, 2013 WL 6408371 (D.S.C. Dec. 6, 2013) ..........................23

*Dickey v. R.R. Donnelley & Sons Co.*,
   No. 1:18CV920, 2021 WL 1169245 (M.D.N.C. Mar. 26, 2021) ..........................11

*Doe v. Chao*,
   435 F.3d 492 (4th Cir. 2006) ..........................................................................22

*Dunagan et al. v. Illinois Inst. of Art, et al.*,
   No. 19-cv-809 (N.D. Ill., Am. Compl. filed Apr. 19, 2019)...............................14

*Eubanks v. Billington*,
   110 F.3d 87 (D.C. Cir. 1997) ..........................................................................25

*Fair Hous. Ctr. Of Cent. Indiana, Inc. v. Rainbow Realty Grp., Inc.*,
   No. 1:17-CV-1782, 2020 WL 1493021 (S.D. Ind. Mar. 27, 2020) ......................13

*Fernandez v. RentGrow, Inc.*,
   341 F.R.D. 174 (D. Md. 2022)..........................................................................26

*Fisher v. Virginia Elec. & Power Co.*,
   217 F.R.D. 201 (E.D. Va. 2003) .......................................................................25

*Flack v. Wisconsin Dep't of Health Servs.*,
   18-cv-209 (W.D. Wis. 2019) ...........................................................................13

*Fuller, et al. v. Bloom Inst. of Tech.*,
   *formerly d/b/a Lambda School, et al.*, 23-605179 (Sup. Ct. Cal., filed Mar. 16,
   2023) ...............................................................................................................14

*Galloway v. Williams*,
   No. 3:19-CV-470, 2020 WL 7482191 (E.D. Va. Dec. 18, 2020) ..........................23

*Good v. Am. Water Works Co., Inc.*,
310 F.R.D. 274 (S.D.W. Va. 2015)......................................................................25

*Good v. Am. Water Works Co., Inc.*,
No. CV 2:14-01374, 2016 WL 5746347 (S.D.W. Va. Sept. 30, 2016) ...................35

*Graham v. Famous Dave's of Am., Inc.*,
No. CV 19-0486, 2022 WL 17584274 (D. Md. Dec. 12, 2022) ............................33

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003) ............................................................................33

*Haney v. Genworth Life Ins. Co.*,
No. 3:22CV55, 2023 WL 174956 (E.D. Va. Jan. 11, 2023)..................................15

*Helmick v. Columbia Gas Transmission*,
No. 2:07-cv-00743, 2010 WL 2671506 (S.D.W.V. July 1, 2010).........................21

*Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
855 F. Supp. 825 (E.D.N.C. 1994)....................................................................10

*J.O.P. v. U.S. Dep't of Homeland Sec.*,
338 F.R.D. 33 (D. Md. 2020)............................................................................26

*Jacob v. Duane Reade, Inc.*,
289 F.R.D. 408 (S.D.N.Y.) ...............................................................................30

*In re Jiffy Lube Secs. Litig.*,
927 F.2d 155 (4th Cir. 1991) .................................................................. *passim*

*Jonathan R. v. Just.*,
344 F.R.D. 294 (S.D.W. Va. 2023).....................................................................24

*Kay Co. v. Equitable Prod. Co.*,
749 F. Supp. 2d 455 (S.D.W. Va. 2010)..............................................................21

*Kirven v. Cent. States Health & Life Co. of Omaha*,
No. CA 3:11-2149, 2015 WL 1314086 (D.S.C. Mar. 23, 2015) ...........................12

*Lopez v. California Inst. of Tech.*,
No. 23-607810 (Sup. Ct. Cal., filed July 20, 2023) ..............................................14

*Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A.*,
NO. 08-62, 2011 WL 1557759 (D. Md. Apr. 22, 2011)........................................13

*McAdams v. Robinson*,
26 F.4th 149 (4th Cir. 2022) ............................................................................35

iv

*In re MicroStrategy, Inc. Sec. Litig.*,
148 F. Supp. 2d 654 (E.D. Va. 2001) ............................................................18, 19

*Minter v. Wells Fargo Bank, N.A.*,
283 F.R.D. 268 (D. Md. 2012) ..............................................................................35

*Mitchell-Tracey v. United Gen. Title Ins. Co.*,
237 F.R.D. 551 (D. Md. 2006) ..............................................................................31

*Moore v. Duke*,
Civ. No. 00-953 (D.D.C. 2000) .............................................................................13

*Moore v. Napolitano*,
926 F. Supp. 2d. 8, 35 (D.D.C. Feb. 25, 2013) ....................................................13

*Morgan v. Richmond Sch. of Health and Tech., Inc.*,
No. 3:12-cv-373 (E.D. Va. Apr. 9, 2013), ECF No. 81-1......................................13

*Morgan v. Richmond Sch. of Health and Tech., Inc.*,
No. 3:12-cv-373 (E.D. Va. July 25, 2013), ECF No. 100 ................................13, 19

*Nelson v. Warner*,
336 F.R.D. 118 (S.D.W.Va. 2020).........................................................................31

*In re Outer Banks Power Outage Litig.*,
No. 4:17-CV-141, 2018 WL 2050141 (E.D.N.C. May 2, 2018) ...................8, 9, 12

*Pitt v. City of Portsmouth*,
221 F.R.D. 438 (E.D. Va. 2004) ......................................................................33, 34

*In re Red Hat, Inc. Sec. Litig.*,
No. 5:04-CV-473, 2010 WL 2710517 (E.D.N.C. June 11, 2010) ..........................11

*Reed v. Alecto Healthcare Servs., LLC*,
2022 WL 4115858 (N.D. W. Va. 2022) ................................................................33

*Saint-Jean v. Emigrant Mort. Co.*,
No. 11CV2122, 337 F. Supp. 3d 186 (E.D.N.Y. 2018).........................................14

*Santos v. E&R Servs., Inc.*,
No. 20-2737, 2021 WL 6073039 (D. Md. Dec. 23, 2021)......................................25

*Sharp Farms v. Speaks*,
917 F.3d 276 (4th Cir. 2019) ................................................................................31

*Sims v. BB&T Corp.*,
No. 1:15-CV-732, 2019 WL 1993519 (M.D.N.C. May 6, 2019) ............................23

*Soutter v. Equifax Info. Servs., LLC*,
   307 F.R.D. 183 (E.D. Va. 2015) ...........................................................................26

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
   325 F.R.D. 136 (D.S.C. 2018) .............................................................................34

*In re The Mills Corp. Secs. Litig.*,
   265 F.R.D. 246 (E.D. Va. 2009) ........................................................9, 10, 12, 15

*Thornhill v. Walden Univ.*,
   No. 2:16-cv-00962 (S.D. Ohio) .............................................................................6

*Thorpe v. Virginia Dep't of Corr.*,
   No. 2:20CV00007, 2023 WL 5038692 (W.D. Va. Aug. 8, 2023)..........................35

*In re Titanium Dioxide Antitrust Litig.*,
   No. 10-CV-00318, 2013 WL 6577029 (D. Md. Dec. 13, 2013)....................21, 24

*Wal-mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011).............................................................25, 26, 27, 32

*Williams v. Big Picture Loans, LLC*,
   339 F.R.D. 46 (E.D. Va. 2021) ......................................................................26, 30

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   7 F.4th 227 (4th Cir. 2021) ..................................................................................25

**Statutes and Regulations**

Civil Rights Act of 1964 Title VI, 42 U.S.C. § 2000d, *et seq.* .............................................. *passim*

Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*...................................................... *passim*

Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ................................................7, 8

Minnesota False Statement in Advertising Act § 325F.67, *et seq.* .................................................20

Minnesota Prevention of Consumer Fraud Act § 325F.68, *et seq.* .................................................20

Minnesota Uniform Deceptive Trade Practices Act § 325D.43, *et seq.* ........................................21

34 C.F.R. § 99.31(a)(9)(i) ...............................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 12(b) .......................................................................................................................2

Fed. R. Civ. P. 23........................................................................................................... *passim*

Fed. R. Civ. P. 54(d)(2)......................................................................................................24

*Manual for Complex Litig.* (Fourth) § 21.632 (Federal Judicial Center 2004)...........................8, 9

*Michael K. Lewis*, JAMS (2023), https://www.jamsadr.com/lewis/................................................4

*Michelle Yoshida*, Phillips ADR Enterprises (2023),
   https://phillipsadr.com/bios/michelle-yoshida/ ...............................................................3

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class
   Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 272 tbl.14
   (2010)................................................................................................................24

U.S. Dep't of Education, Borrower Defense Loan Discharge,
   https://studentaid.gov/manage-loans/forgiveness-cancellation/borrower-
   defense ............................................................................................................4

William B. Rubenstein, 5 Newberg and Rubenstein on Class Actions § 17:13 (6th
   ed.) ...........................................................................................................20, 21, 22

**PRELMINARY STATEMENT**

Plaintiffs Aljanal Carroll, Claudia Provost Charles, Tiffany Fair, and Tareion Fluker ("Plaintiffs") respectfully submit this memorandum of law in support of their unopposed motion for an order, pursuant to Federal Rule of Civil Procedure 23, (1) preliminarily approving the proposed Settlement Agreement, a copy of which is attached hereto as Exhibit 1; (2) conditionally certifying a settlement class; and (3) approving the form and manner of giving notice of the settlement to members of the proposed settlement class.

After vigorous advocacy and negotiation, Plaintiffs and Defendants Walden University, LLC and Walden e-Learning, LLC (collectively "Walden") agreed on a settlement of the claims in this case. The proposed Settlement Agreement provides $28.5 million in monetary relief and important injunctive relief. The parties negotiated the Settlement Agreement at arm's length under the auspices of mediators Michael K. Lewis of JAMS and Michelle Yoshida of Phillips ADR, believe it achieves a fair and adequate resolution of Plaintiffs' claims, and agree that it merits preliminary approval by this Court. The class is composed of approximately 2,291 former and current Walden students.

**BACKGROUND**

**I.     THE LITIGATION BETWEEN PLAINTIFFS AND WALDEN**

Walden University is an online for-profit university headquartered in Minneapolis, Minnesota. This litigation was brought by four former students in Walden's Doctor of Business Administration ("DBA") program on behalf of themselves and all others similarly situated. Plaintiffs asserted putative class claims for violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, and violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*; and four claims on behalf of themselves for violation of Minnesota state and common

law. To prevail on their class claims, Plaintiffs are required to prove that (1) Defendants' practices were unfair and predatory, and (2) Defendants either intentionally targeted prospective students on the basis of a protected class, or that there is a disparate impact on the basis of a protected class. *See Carroll v. Walden Univ., LLC*, 650 F. Supp. 3d 342, 357, 360 (D. Md. 2022).

Plaintiffs alleged that Walden engaged in "reverse redlining" by (1) inducing enrollment through material misrepresentations about the cost and time required to complete its DBA program, and (2) intentionally targeting Black and female prospective students to enroll in the program. Specifically, Plaintiffs alleged that Walden deliberately hid the true cost of the DBA program by knowingly misrepresenting and understating the number of "capstone credits" required to complete the program and obtain a degree, both on its website and through "enrollment advisors" it employed to communicate false information to prospective students. The capstone phase of the program comes last and typically begins approximately two years after initial enrollment. Plaintiffs alleged that Walden, as a result of this scheme, kept students trapped in the capstone phase by requiring them to complete additional credits at a cost of close to $1,000 per credit, totaling tens of millions of dollars in excess fees charged to putative class members. Plaintiffs further alleged that Walden intentionally targeted its marketing to Black populations and women and that Walden targeted nontraditional doctoral students, who are disproportionately Black and disproportionately female. Defendants have at all times denied these allegations.

This case was filed in the United States District Court for the District of Maryland on January 7, 2022. Dkt. No. 1. On March 23, 2022, Defendants filed a Motion to Dismiss Plaintiffs' Complaint under Fed. R. Civ. P. 12(b). Dkt. No. 35. On November 28, 2022, the Court denied the Motion to Dismiss. Dkt. Nos. 43 (Mem. Op.), 44 (Order). On December 7, 2022,

Plaintiffs filed a motion (with Defendants' consent) to amend their complaint, adding Plaintiff Tareion Fluker to the lawsuit, which the Court granted. Dkt. Nos. 45, 46. On February 2, 2023, Defendants filed an Answer denying all material allegations in the First Amended Complaint Action and interposing affirmative defenses. Dkt. No. 58.

On February 6, 2023, the Court issued its Scheduling Order, Dkt. No. 53, and on February 21, 2023, the Parties filed an Initial Joint Status Report. On February 28, 2023, Plaintiff Tiffany Fair issued Interrogatories and Requests for Production to Defendants. On March 13, 2023, the Parties held a telephonic status conference with the Court and resolved certain disputes regarding the scope of discovery, after which the Court ordered the Parties to file a joint status report within 30 days regarding interest in a settlement conference. Dkt. No. 60. On April 13, 2023, the Parties filed their Joint Status Report, which reported that the Parties had engaged in constructive conversations regarding the possibility of settlement and a process for exchanging the information necessary to facilitate a productive negotiation. Dkt. No. 65. Shortly thereafter, the Parties scheduled a private mediation session, and on April 27, 2023, the Parties filed a Joint Motion to Temporarily Stay Discovery Deadlines in light of the mediation, Dkt. No. 66, which the Court granted, Dkt. No. 67. The stay was subsequently extended to permit continued negotiations and then, on January 12, 2024, finalization of the settlement including the drafting of associated documents. Dkt. No. 88.

## II.    THE MEDIATION AND RESULTING SETTLEMENT AGREEMENT

On May 4, 2023, the Parties had a private full-day mediation session in New York to explore resolution with mediator Michelle Yoshida[1] of Phillips ADR. Decl. of Alexa T. Milton

---

[1] *Michelle Yoshida*, Phillips ADR Enterprises (2023), https://phillipsadr.com/bios/michelle-yoshida/.

(Ex. 2) at ¶ 10.  Prior to the mediation, the Parties submitted confidential mediation statements and exchanged term sheets, and Defendants furnished Plaintiffs with data regarding the tuition and fees paid to Walden and the total number of capstone credits taken for all 2,291 prospective class members. *Id.* ¶¶ 4, 7.  At the mediation, the Parties made preliminary progress on narrowing the monetary gap between the parties' offers and affirmed all Parties' interest in exploring a negotiated resolution. The Parties also agreed to exchange more information to facilitate settlement.

Following the mediation, the Parties engaged in frequent communication, and they exchanged legal authority on key legal issues. For example, Plaintiffs provided Defendants with significant authority addressing Defendants' concern that class members who filed a borrower defense application[2] would recoup a windfall if they also received a monetary settlement. On other issues—including on the statute of limitations and class certification—the exchange of legal authority helped to clarify the Parties' respective positions and enabled the Parties to better assess their litigation risk should the case move forward. *Id.* ¶¶ 6-8, 12-13.

On September 21, 2023, the Parties held a second full-day mediation session in Washington, DC, this time with Michael K. Lewis[3] of JAMS. At that mediation, after extensive discussions and exchange of multiple proposals, Mr. Lewis made a mediator's proposal of $28,500,000 to resolve the monetary component of the case. The Parties agreed to this number. The Parties further agreed to keep working together on the non-monetary terms of the settlement. *Id.* ¶¶ 10-11.

---

[2] *See* U.S. Dep't of Education, Borrower Defense Loan Discharge, https://studentaid.gov/manage-loans/forgiveness-cancellation/borrower-defense.

[3] *Michael K. Lewis*, JAMS (2023), https://www.jamsadr.com/lewis/.

The Parties have since engaged in additional negotiations regarding the details of the agreement, particularly with respect to the non-monetary terms, and to reduce their agreement to writing. The Settlement Agreement, including the several documents attached to it, is the result of these negotiations.

The parties have agreed, through the Settlement Agreement, to seek certification of a Settlement Class consisting of people in one or more of the following three categories: (1) all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008, and January 31, 2018 and were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled ("Title VI Group"); (2) all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008, and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans or payment plans to pay for some or all of their Walden education ("ECOA Black Student Group"); and (3) all female students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008, and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans or payment plans to pay for some or all of their Walden education ("ECOA Female Student Group").[4] Settlement Agreement § 1(g).  The parties estimate that there are approximately 2,291 members of these three partially overlapping groups:

---

[4] Everyone in the ECOA Black Student Group is also in the Title VI Group, but this manner of defining the Settlement Class matches the complaint and therefore may be easier to follow by class members who review the key documents in the case.

approximately 1,805 members of the Title VI Group, 1,505 members of the ECOA Black

Student Group, and 1,348 members of the ECOA Female Student Group. Ex. 2 at ¶ 7.

### A.  Monetary Terms of Settlement

The Settlement Agreement provides for different amounts of monetary compensation to

class members based upon the amount of excess tuition paid to Walden. After deduction of

$7,125,000 for attorneys' fees and expenses (25% of $28.5 million) and $100,000 for anticipated

third-party administration costs—subject to Court approval—the total amount of compensation

for the class members is approximately $21,275,000. The precise amount will depend on the

exact cost of third-party administration and the amount of interest earned (which will increase

the amount distributed). Settlement Agreement §§ 1(y), 4-8, 12, 59.

These funds will be distributed pro rata to class members based on how many DBA

capstone credits each took above the number that Walden stated was the minimum at the time

they enrolled. Settlement Agreement ¶¶ 1(n), 6(b). That is, if a particular class member took 44

excess capstone credits and submits a valid claim form, and all class members who submit valid

claim forms collectively took 90,000 excess capstone credits, then that class member will receive

44/90,000 of the compensation pool, or approximately $10,000.[5]

The Settlement Agreement also provides for the four named Plaintiffs to each receive

$25,000 as an incentive award. This totals $100,000. *Id.* § 6(a).

### B.  Non-Monetary Terms of Settlement

The Settlement Agreement also provides non-monetary relief in the form of disclosures

---

[5] A small number of class members (approximately 55) received cash payments from the
settlement in *Thornhill v. Walden University*, No. 2:16-cv-00962 (S.D. Ohio). *Thornhill*
concerned allegedly excessive time and costs to complete doctoral programs at Walden
generally. Payments here will be reduced by the amount of any cash payment pursuant to
*Thornhill*. Settlement Agreement §§ 1(aa), 6(b).

and programmatic changes for a period of at least four years from the date of implementation. First, on the "Tuition and Fees" section of its DBA Program website, and in students' enrollment agreements, Walden will disclose the median time to complete the DBA program and median cost to complete the DBA program based on historic data from the preceding 3 years of graduates. The enrollment agreements will include additional disclosures about the potential length of the DBA Program. Second, Walden has eliminated a layer of review during the capstone phase of the DBA Program and is making certain other changes intended to help students reduce the time and cost for completion of the DBA program. *See* Settlement Agreement § 15.

### C. Administration of Settlement

The Settlement Agreement further provides that Settlement Services, Inc. ("SSI") will be retained as Claims Administrator to distribute the notice, distribute the claim forms, process claims, prepare tax documents, and otherwise administer the settlement.  *See* Settlement Agreement ¶ 1(c).  SSI is an experienced class action claims administrator.  Information regarding the firm is attached as Exhibit 3.  Based on consultation with the proposed claims administrator, the parties have agreed to set aside $100,000 from the settlement fund for these costs, but have also included a provision in the Settlement Agreement for excess administrative funds to be included in the funds distributed to class members.[6]  *See* Settlement Agreement ¶¶ 4(c), 10.

Because some of the information needed to implement the settlement is covered by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, the Settlement

---

[6] Paragraph 18 of the proposed order submitted with this motion, and Paragraph 20 of the proposed final approval order (Exhibit 4 to the Settlement Agreement), both provide for a grant of immunity to the Claims Administrator for work performed in connection with the Settlement.

Agreement provides that Class Members will be given notice regarding such information and an opportunity to decline its disclosure in accordance with FERPA implementing regulation 34 C.F.R. § 99.31(a)(9)(i).  Settlement Agreement §§ 1(o), 22.

## ARGUMENT

The Settlement Agreement is a fair, reasonable and adequate resolution of the matter that provides substantial and meaningful relief to members of the Class, results from extensive litigation and arm's-length negotiations by experienced counsel, and takes account of the complexity and risks at issue in this litigation.

## I.  PRELIMINARY APPROVAL SHOULD BE GRANTED BECAUSE THE SETTLEMENT AGREEMENT IS IN THE RANGE OF POSSIBLE APPROVAL

Approval of a proposed class action settlement typically proceeds in two steps. *See In re Jiffy Lube Secs. Litig.*, 927 F.2d 155, 158–59 (4th Cir. 1991). First, the Court grants preliminary approval if it determines that the settlement "is within the range of possible approval." *Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, 340 F.R.D. 242, 249 (D.S.C. 2021) ("*Commissioners of Pub. Works*") (cleaned up); *see also, e.g.*, *In re Outer Banks Power Outage Litig.*, No. 4:17-CV-141, 2018 WL 2050141, at *3 (E.D.N.C. May 2, 2018); *Manual for Complex Litigation* (Fourth) § 21.632 (Federal Judicial Center 2004) ("*Manual*"). Second, after notice of the settlement is provided to the class and the Court conducts a fairness hearing, the Court determines whether the settlement is "fair, reasonable and adequate," as required under Fed. R. Civ. P. 23(e)(2), such that final approval should be granted. *See Comm'rs of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, No. 2:21-CV-42,

2022 WL 214531, at *2-4 (D.S.C. Jan. 24, 2022); *In re Outer Banks Power Outage Litig.*, 2018 WL 2050141, at *2; *Manual* §§ 21.634-35.

The Fourth Circuit applies a four-factor fairness inquiry and a five-factor adequacy inquiry in determining whether a class action settlement should be approved. *See, e.g.*, *In re Jiffy Lube Secs. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991) ("*Jiffy Lube*"); *Comm'rs of Pub. Works*, 340 F.R.D. at 249-50; *In re The Mills Corp. Secs. Litig.*, 265 F.R.D. 246, 254 (E.D. Va. 2009) ("*Mills*"). No specific factors must be considered in assessing reasonableness. *See, e.g.*, *Comm'rs of Pub. Works*, 340 F.R.D. at 249-50; *Mills*, 265 F.R.D. at 258; *Beaulieu v. EQ Indus. Servs., Inc.*, No. 5:06-cv-00400-BR, 2009 WL 2208131, at *23-27 (E.D.N.C. July 22, 2009). The fairness factors are:

> (1) the posture of the case at the time the proposed settlement was reached, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the settlement negotiations, and (4) counsel's experience in the type of case at issue.

*Comm'rs of Pub. Works*, 340 F.R.D. at 249 (citing *Jiffy Lube*, 927 F.2d at 158-59). The adequacy factors are:

> (1) the relative strength of the case on the merits, (2) any difficulties of proof or strong defenses the plaintiff and class would likely encounter if the case were to go to trial, (3) the expected duration and expense of additional litigation, (4) the solvency of the defendants and the probability of recovery on a litigated judgment, [and] (5) the degree of opposition to the proposed settlement[.]

*Id.* (citing *Jiffy Lube*, 927 F.2d at 159). Consideration of these factors demonstrates that the proposed settlement is in the range of possible approval.

### A.  The Fairness Factors

All of the fairness factors indicate that the Settlement Agreement should be preliminarily approved.

#### 1.  <u>Posture of the Case</u>

This factor addresses principally "how far the case has come from its inception." *Mills*,

265 F.R.D. at 254. Settlement at a very early stage may suggest "collusion among the settling parties" and that the proposed settlement is not legitimate. *Jiffy Lube*, 927 F.2d at 159; *see also Mills*, 265 F.R.D. at 254. Here, the parties contested a hard-fought motion to dismiss all six causes of action. The vigorous litigation of this motion and the legal issues therein demonstrates a clear lack of collusion. And the serving of extensive written discovery requests by Plaintiff Fair demonstrates Plaintiffs' intent to litigate this case fully and aggressively absent a reasonable settlement.

The posture of the case also favors approval for the additional reason articulated in *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*:

> By reaching an agreement in principle prior to notification of the potential class members, the members could choose to be included or excluded based on the terms of the proposed settlement. If such agreement had been reached after notification, potential class members would have had to decide whether to opt-in or opt-out of the class without knowledge of the proposed settlement. Thus, the posture of the case at the time of the settlement favors final approval.

855 F. Supp. 825, 829 (E.D.N.C. 1994).

### 2. <u>Extent of Discovery</u>

While the Proposed Settlement was negotiated before formal discovery was produced, Plaintiff Fair's written discovery requests and the Parties' exchange of substantial information during negotiations weighs in favor of approval of the settlement. *See Comm'rs of Pub. Works*, 340 F.R.D. at 249 (finding fairness factors favored approval where "the proposed settlement was the result of extensive prior communication between the Parties" even though it "was negotiated before formal discovery was conducted"). In particular, Defendants provided Plaintiffs with a dataset containing information on all putative class members, including their gender, race, enrollment start and end dates, tuition and fees paid to Walden, the total number of capstone credits taken, and whether they had taken out loans (*i.e.*, whether they fell within the ECOA

Black Student Group or the ECOA Female Student Group). Ex. 2 at ¶ 4. Defendants also

provided information about the minimum credit requirement and minimum per semester credit

cost for Defendants' DBA program. *Id.* ¶ 5.  In *Jiffy Lube*, the Fourth Circuit held that even

though no formal discovery had taken place, informal discovery was an adequate substitute. *See*

927 F.2d at 159; *see also Dickey v. R.R. Donnelley & Sons Co.*, No. 1:18CV920, 2021 WL

1169245, at *3 (M.D.N.C. Mar. 26, 2021) (finding "all factors support a finding that the

settlement is fair" because "while the parties did not engage in formal discovery prior to

settlement, they exchanged material information"). So too here: the key information furnished by

Defendants enabled Plaintiffs to determine the size of each Class and to assess the scope of

Defendants' potential liability, providing a foundation for informed settlement negotiations. *See*

*In re Red Hat, Inc. Sec. Litig.*, No. 5:04-CV-473, 2010 WL 2710517, at *2 (E.D.N.C. June 11,

2010) (recommending approval prior to merits-based discovery where "the parties have been

able to make informed decisions regarding settlement"), *report and recommendation adopted*,

No. 5:04-CV-473, 2010 WL 2710446 (E.D.N.C. July 8, 2010).

Beyond formal discovery, extensive communications between counsel prior to and

following the Parties' mediation sessions likewise favor approval. The Parties' exchange of

information on key legal disputes—for example, on the appropriate statute of limitations period

and on Defendants' argument that class members who filed a borrower defense application

would recoup a windfall—resolved certain disputes and otherwise clarified the Parties' stances,

enabling the Parties to assess their litigation risk more accurately. Ex. 2 at ¶ 6-8, 12-13.  Just as

disputes around the proper scope of discovery facilitate better understanding of parties'

respective positions on legal issues, the Parties' communications narrowed points of

disagreement and allowed for more informed settlement negotiations.

11

### 3.  **Circumstances Surrounding Negotiations**

This factor serves to assure that the settlement is the result of arm's-length negotiations based on counsel's informed understanding of the case. *See Mills*, 265 F.R.D. at 255. "Absent evidence to the contrary, the Court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Archbold v. Wells Fargo Bank, N.A.*, No. 3:13-CV-24599, 2015 WL 4276295, at *2 (S.D.W. Va. July 14, 2015); *Kirven v. Cent. States Health & Life Co. of Omaha*, No. CA 3:11-2149, 2015 WL 1314086, at *5 (D.S.C. Mar. 23, 2015) (same). The circumstances here include a vigorously contested motion to dismiss; an initial mediation that, while productive, did not yield a settlement and concluded with the parties remaining far apart in monetary terms; over four months of continued discussion and exchange of authority on contested legal issues; a second mediation that finally produced agreement on total monetary terms; and four more months of extensive back and forth on the non-monetary terms of the settlement, even after the Parties had come to an agreement on monetary terms. The success in finally reaching an agreement has been based on a well-developed understanding of the factual and legal issues in this case and has been achieved only through the involvement of Michelle Yoshida and Michael K. Lewis as mediators. *See In re Outer Banks Power Outage Litig.*, 2018 WL 2050141, at *3 ("mediation with a highly experienced mediator" supported finding that settlement was the result of "arms-length negotiations"). All of these circumstances favor approval of the proposed settlement.

### 4.  **Experience of Counsel**

Plaintiffs' lead counsel Relman Colfax PLLC ("Relman Colfax") is a civil rights law firm based in Washington, DC, with a national practice. Relman Colfax routinely litigates a wide

range of discrimination cases in federal court including many cases, like this one, that involve

lending and other consumer issues under both state and federal law. *See* Ex. 4.

Relman Colfax previously litigated what is, to their knowledge, the first and only

discrimination class action certified against a for-profit college. *See* Order Granting Preliminary

Approval of Proposed Class Action Settlement, *Morgan v. Richmond School of Health and

Technology, Inc.* ("*RSHT*") No. 3:12-cv-373 (E.D. Va. July 25, 2013), ECF No. 100 at ¶ 11.

There, counsel brought reverse redlining claims under Title VI and ECOA and secured a

$5,000,000 settlement for a class of students enrolled at a for-profit university. *See* Settlement

Agreement, *RSHT*, No. 3:12-cv-373 (E.D. Va. Apr. 9, 2013), ECF No. 81-1. Counsel have

further experience serving as class counsel for multiple certified class actions, including: *Fair

Hous. Ctr. Of Cent. Indiana, Inc. v. Rainbow Realty Grp., Inc.*, No. 1:17-CV-1782, 2020 WL

1493021 (S.D. Ind. Mar. 27, 2020) (predatory rent to buy program targeted on the basis of race

and ethnicity); *Flack v. Wisconsin Dep't of Health Servs.*, 18-cv-209 (W.D. Wis. 2019) (denial of

Medicaid coverage for treatments related to gender transition); and *Moore v. Duke*, Civ. No. 00-

953 (D.D.C. 2000) (discrimination by U.S. Secret Service). In each of the class cases, the court

found Relman Colfax to be qualified to serve as class counsel. For example, in *Moore*, the court

stated that "[t]here is no dispute as to whether the plaintiffs' class counsel are appropriate, and

there is no indication that class counsel lack the experience and knowledge required to represent

the class." *Moore v. Napolitano*, 926 F. Supp. 2d. 8, 35 (D.D.C. Feb. 25, 2013). And counsel

have deep experience and knowledge in prosecuting "reverse redlining" cases such as this one,

which allege the discriminatory targeting of a predatory practice or product. In addition to

*Rainbow Realty Group*, noted above, these include, *e.g.*, *Mayor & City Council of Baltimore v.

Wells Fargo Bank, N.A.*, NO. 08-62, 2011 WL 1557759 (D. Md. Apr. 22, 2011); *City of

13

*Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857, 2011 WL 1706756 (W.D. Tenn. May 4, 2011); and *Saint-Jean v. Emigrant Mortgage Co.*, No. 11CV2122, 337 F. Supp. 3d 186 (E.D.N.Y. 2018).

Plaintiffs' co-counsel, National Student Legal Defense Network ("Student Defense"), possesses additional, specialized experience that weighs in favor of approval. Student Defense is a non-profit organization that works to advance students' rights to educational opportunity, including by addressing civil rights disparities in higher education and in the student lending system. *See* Ex. 5.  Student Defense is co-counsel on several active litigation matters brought against educational institutions for fraud and other claims similar to those at issue here, including: *Lopez v. California Institute of Technology*, No. 23-607810 (Sup. Ct. Cal., filed July 20, 2023) (class suit against Caltech and online learning provider for false advertising, fraud, and other state law violations); *Fuller, et al. v. Bloom Institute of Technology, formerly d/b/a Lambda School, et al.*, 23-605179 (Sup. Ct. Cal., filed Mar. 16, 2023) (class suit against coding bootcamp for violating consumer protection laws); *Dunagan et al. v. Illinois Institute of Art, et al.*, No. 19-cv-809 (N.D. Ill., Am. Compl. filed Apr. 19, 2019) (class suit against school that lost accreditation for defrauding students); *Detmer, et al. v. La'James College of Hairstyling, Inc. of Fort Dodge, et al.*, 05771 LACL 147597 (Ia. District Ct. for Polk Cnty. Compl. Filed March 30, 2020) (class suit against cosmetology school for delayed disbursement of financial aid).

Counsel's experience litigating class actions and reverse redlining and other discrimination claims, including in the context of for-profit education, gives substantial credence to their representation to the Court herein that the settlement is fair. *See, e.g.*, *Comm'rs of Pub. Works*, 340 F.R.D. at 248.

### B. The Adequacy Factors

The adequacy factors also indicate that the Court should preliminarily approve the

Settlement Agreement.

### 1. Relative Strength of Plaintiffs' Case on the Merits and Difficulties of Proof or Strong Defenses Likely at Trial

The first two adequacy factors are often addressed in tandem. *See, e.g.*, *Haney v.*

*Genworth Life Ins. Co.*, No. 3:22CV55, 2023 WL 174956, at *6 (E.D. Va. Jan. 11, 2023); Fed.

R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment (grouping these two factors

together). These factors consider "how much the class sacrifices in settling a potentially strong

case in light of how much the class gains in avoiding the uncertainty of a potentially difficult

case." *Haney*, 2023 WL 174956, at *6 (quoting *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560,

573 (E.D. Va. 2016)). Undersigned counsel are very confident in the strength of Plaintiffs' case,

yet are cognizant that "no matter how confident one may be of the outcome of litigation, such

confidence is often misplaced." *Mills*, 265 F.R.D. at 256 (quoting *W. Va. v. Chas. Pfizer & Co.*,

314 F. Supp. 710, 743–744 (S.D.N.Y. 1970)).

This case includes issues that are typically difficult to prove, an obstacle that is regularly

noted when applying the first two adequacy factors. *See, e.g.*, *Jiffy Lube*, 927 F.2d at 159.

Plaintiffs must prove both that (1) Defendants' practices were unfair and predatory, and (2) that

Defendants either intentionally targeted on the basis of a protected class, or that there is a

disparate impact on the basis of a protected class. *See Carroll v. Walden Univ.*, LLC, 650 F.

Supp. 3d 342, 357, 360 (D. Md. 2022). To the first requirement, Plaintiffs would need jurors to

find that Walden's practices were indeed unfair and predatory, and reject Walden's likely

argument that they were instead legitimate business practices that provided benefits to students.

To the second requirement, Plaintiffs would need jurors to find the witnesses supporting the

discriminatory intent claim more persuasive than those who would sharply dispute it, and on jurors' willingness to infer discrimination from other evidence such as the over-representation of Black and female students in the study body. Walden would likely raise as a defense that the school's education is geared toward low-income students, and that focusing on recruiting low-income students is a legitimate and even commendable business practice despite any resulting over-representation of Blacks. This defense might appeal to a jury.

Walden's motion to dismiss also demonstrates that there are considerable legal hurdles that Plaintiffs must overcome to prevail. For example, as this Court recognized, "to survive a motion for summary judgment [on their Title VI claim] Plaintiffs must establish a prima facie case of discrimination" and generate a genuine dispute of material fact as to whether a jury could conclude that Walden discriminated on the basis of race and sex. *Carroll*, 650 F. Supp. 3d at 358. With respect to their ECOA claim, Plaintiffs would need to establish that ECOA applies to the conduct at issue based on a sufficiently direct connection between Walden's discriminatory conduct and the loans they obtained—an obstacle that is surmountable but not without legal difficulty. *See id.* at 359-60.

Plaintiffs face further risks in persuading the Court that a sizable portion of Class members' claims are not time barred. Based on months of negotiations, Plaintiffs expect that—absent settlement—Defendants would contend that the three-year statute of limitations applicable to Title VI claims bars those claims for students who enrolled prior to July 7, 2015, and that the five-year statute of limitations applicable to ECOA claims bars those claims for students who enrolled prior to July 7, 2013. If Defendants prevailed on this issue, the damages available to Plaintiffs could be reduced by over 60% and the number of Class members could fall by over 55%. Ex. 2 at ¶¶ 8, 13. Plaintiffs believe that, pursuant to the continuing violations doctrine, the

16

statutes of limitations do not apply as Defendants contend, but again it is not a certainty that the Court will agree.

Plaintiffs must also overcome the hurdle of class certification. Defendants are likely to litigate vigorously against a class certification motion made outside the context of settlement and to seek immediate appeal of an order granting class certification. *See* Fed. R. Civ. P. 23(f). And although Plaintiffs must demonstrate that the Settlement Class satisfies the requirements of Rule 23, this obstacle is easier to overcome in the settlement context because "a district court need not inquire whether the case, if tried, would present intractable management problems." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (citing Fed. R. Civ. P. 23(b)(3)(D)); *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 476-77 (D. Md. 2014) (same).

In short, there would be genuine factual and legal challenges to prevailing in this case, which favors approval of the proposed settlement.

### 2. Duration and Expense of Additional Litigation

There is no doubt that litigation of this case through discovery, summary judgment, trial, and appeal would require substantial additional time and expense. Fact and expert discovery on class certification issues and litigation of the class certification motion alone would take a considerable amount of time (more than a year under the schedule jointly proposed by the Parties and adopted by the Court) and expense. Assuming the Court granted Plaintiffs' class certification motion, merits discovery would likely include a very large number of fact deponents given the many students, teachers, and administrators who have been enrolled at or employed by Walden, and relevant outside consultants and vendors (*e.g.*, with respect to marketing). Trial would be lengthy because there could be a very large number of fact witnesses; three to four weeks is not unlikely. There would also be dueling expert witnesses regarding business administration

17

doctoral programs, demographics, marketing, and possibly other subjects. Throughout all of this, there would be hard-fought motions practice, as indicated by the history of the litigation to date. And, as in *In re MicroStrategy, Inc. Sec. Litig.*:

> Nor is it likely that this litigation would have ended with a jury verdict; there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs.

148 F. Supp. 2d 654, 667 (E.D. Va. 2001) ("*MicroStrategy*").

Full litigation, in short, would require several years and millions of dollars in fees and expenses, in addition to the risk of an unfavorable outcome.

### 3.  <u>Solvency of Defendant and Likelihood of Recovery on a Litigated Judgment</u>

At this time, Plaintiffs do not anticipate difficulty collecting a potential judgment from Defendants. Nevertheless, the settlement provides substantial relief to Class members, obviating any solvency-related concerns that may arise were their claims to be litigated over the course of the next several years.

### 4.  <u>Degree of Opposition</u>

All of the Plaintiffs support the proposed settlement, *see* Decl. of A. Carroll (Ex. 6) at ¶ 12; Decl. of C. Charles (Ex. 7) at ¶ 12; Decl. of T. Fair (Ex. 8) at ¶ 12; Decl. of T. Fluker (Ex. 9) at ¶ 11, and no opposition has been identified, *see* Ex. 2 at ¶ 24. If the instant motion is granted, Plaintiffs will address at the final approval hearing any opposition articulated after notice is provided to members of the class.

### C.  **Reasonableness**

As noted above, there are no specific factors used to assess reasonableness in the Fourth Circuit. Factors that Plaintiffs believe are relevant, however, all favor approval of the proposed settlement.

18

### 1.   **The Size of the Recovery is Reasonable**

The settlement achieves an excellent result for the class, especially in light of the legal and factual obstacles that Plaintiffs would otherwise need to overcome and the costs of proceeding through trial and appeal. The $28.5 million settlement fund represents approximately 31% of the costs that Class members who enrolled between 2008 and 2018 were charged for what Plaintiffs allege were excess capstone credits. It is 79% of the costs that Class members who enrolled between 2013 and 2018 were charged for excess capstone credits, which Defendants contend is the correct time period based on their statute of limitations argument discussed *supra*.  Ex. 2 at ¶ 12-13.  In *RSHT*—a class action involving ECOA and Title VI civil rights claims against a for-profit college that is the most analogous case anywhere in the country to this one—the court approved a settlement amounting to 19% of the tuition at issue paid by Class members.[7] In *Cullen v. Whitman Med. Corp.*, another class action similar to this one, the court approved a settlement for only 17% of the tuition at issue paid by the students.[8] 197 F.R.D. 136, 144, 148 (E.D. Pa. 2000). And in other cases, courts have approved class action settlements reflecting much lower percentage recoveries. *See, e.g.*, *MicroStrategy,* 148 F. Supp. 2d at 666 n.22 (collecting cases approving settlements with recoveries of 5% to 16%). The recovery here is well within the bounds of reasonableness.

### 2.   **The Incentive Awards for the Named Plaintiffs are Reasonable**

Fed. R. Civ. P. 23(e)(2)(D) authorizes the payment of incentive awards to named

---

[7] *See* Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement, No. 3:12-cv-373, ECF No. 93 at 19 (July 16, 2023) ("settlement fund represents approximately 19% of the tuition that the Class Members paid to [Defendant]"); Order Granting Final Approval of Proposed Class Action Settlement, No. 3:12-cv-373, ECF No. 100 (July 25, 2013) (approving settlement).
[8] Just as the 31% here, the 19% and 17% figures both reflect the full recovery, *i.e.*, before any allocation for fees and costs.

Plaintiffs to ensure that the settlement "treats class members equitably relative to each other." *See* William B. Rubenstein, 5 Newberg and Rubenstein on Class Actions § 17:13 (6th ed.) ("To the extent that the class representatives . . . took risks, or protected the class's interests through their work, it is surely equitable to provide them a modest extra payment from the class's recovery."). "To determine whether an incentive payment is warranted, the court should consider 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 483 (D. Md. 2014) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)). Here, the class members have benefitted tremendously from the named Plaintiffs' steadfast work on their behalf, and Plaintiffs should be compensated accordingly.

The four named Plaintiffs have all devoted substantial time and effort to the development and prosecution of the lawsuit. They have met with counsel in-person, by video, and telephonically on many occasions, searched for and provided documents, and subjected themselves to public attention as this case has attracted significant media interest, which resulted in unwelcome calls and outreach to some of the Plaintiffs. All four Plaintiffs traveled to New York to attend the May 4 mediation in-person, and all met with mediator Lewis prior to the second mediation. After the Parties reached a tentative agreement on monetary terms, Plaintiffs provided their approval and offered invaluable input during the lengthy negotiation of on the non-monetary terms of the settlement agreement—advocating not only for their own interests, but those of the whole class. Ex. 6 at ¶¶ 9-11; Ex. 7 at ¶¶ 9-11; Ex. 8 at ¶¶ 9-11; Ex. 9 at ¶¶ 8-10. Further, in agreeing to the settlement, Plaintiffs Carroll, Charles, and Fair are forfeiting their individual state law claims under the Minnesota Prevention of Consumer Fraud Act, the

Minnesota False Statement in Advertising Act, Minnesota Uniform Deceptive Trade Practices Act, and the common law for fraudulent misrepresentation. *See* First Am. Compl. at 63-68. These Plaintiffs are thus foregoing sums they could have obtained had they pursued their cases individually.

The $25,000 incentive awards for each of the four named Plaintiffs are reasonable. *See, e.g.*, *Binotti v. Duke Univ.*, No. 1:20-CV-470, 2021 WL 5366877, at *5-*6 (M.D.N.C. Aug. 30, 2021) (approving $65,000 incentive award and collecting cases with incentive awards from $85,000 to $300,000 per plaintiff)); *In re Titanium Dioxide Antitrust Litig.*, No. 10-CV-00318, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (approving $125,000 incentive award); *Helmick v. Columbia Gas Transmission*, No. 2:07-cv-00743, 2010 WL 2671506, at *3 (S.D.W.V. July 1, 2010) (approving $50,000 incentive award in addition to regular distribution from settlement proceeds); William B. Rubenstein, 5 Newberg and Rubenstein on Class Actions § 17:8 tbl.1 (6th ed.) (summarizing study showing mean incentive award of $24,517 per plaintiff in 2021 inflation-adjusted USD).

### 3.   <u>The Attorneys' Fees and Costs are Reasonable</u>

Plaintiffs anticipate seeking an award of up to $7,125,000 for attorneys' fees and expenses, out of the $28.5 million settlement fund. Courts in the Fourth Circuit typically use the percentage-of-the-fund method in calculating attorneys' fees in common fund cases. *See, e.g.*, *Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 462 (S.D.W. Va. 2010) ("Courts have increasingly favored the percentage method for calculating attorneys' fees in common fund cases."). In determining the appropriate percentage to award, courts in the Fourth Circuit look at several factors, as outlined in *Barber v. Kimbrell's, Inc.*: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the

legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases." 577 F.2d 216, 226 n.28 (4th Cir. 1978); *see also Berry v. Schulman*, 807 F.3d 600, 618 (4th Cir. 2015) (affirming use of the *Barber* factors).

The *Barber* factors favor award of one-fourth of the common fund. "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Doe v. Chao*, 435 F.3d 492, 506 (4th Cir. 2006) (quoting *Farrar v. Hobby,* 506 U.S. 103, 114 (1992)). Plaintiffs' counsel have achieved an extremely successful result here, especially given the infrequency of comparable legal claims, the high-powered defense mounted by Walden, and Walden's total exposure. "Although Congress explicitly authorized class action litigation in enacting the ECOA, such litigation is extraordinarily rare." William B. Rubenstein, Newberg and Rubenstein on Class Actions § 21:5 (6th ed.). That is because "the rewards of most ECOA cases likely do not exceed the costs of pursuing them" given difficulties in proving discrimination claims, especially on a class-wide basis. *Id.* Class litigation under Title VI is likewise both rare and difficult to pursue for the same reasons. In this case, Plaintiffs' counsel faced great risk pursuing a legal theory that is not common and devoting millions of dollars' worth of attorney time to a risky lawsuit. Ex. 2 at ¶ 16. Moreover, Plaintiffs' counsel achieved this result against one of the nation's leading law firms which, according to public filings, charges between $655 and $1,690 per hour for attorneys. *Id.* at ¶ 15. In light of these challenges, the result here is

22

remarkable: the settlement fund represents approximately 31% of the excess costs for capstone credits paid by Class members who enrolled between 2008 and 2018 (Walden's maximum exposure), and 79% of the excess costs paid by those who enrolled between 2013 and 2018 (Walden's maximum exposure if they prevailed on their statute of limitations argument). As detailed *supra*, this recovery would be a triumph in a run-of-the-mill class action. Here, it is exceptional.

The remaining *Barber* factors likewise support the fee award. Plaintiffs' counsel conducted a thorough investigation of Defendants' practices that spanned multiple years, briefed (and prevailed on) a contentious and complex motion to dismiss, and engaged in hard-fought settlement negotiations for more than half a year. Moreover, the experience, reputation and ability of the attorneys and the undesirability of the case within the legal community weigh in favor of a high fee award. In this case and in *RSHT*, Plaintiffs' counsel have demonstrated they are able and willing to bring claims under ECOA and Title VI against for-profit educational institutions like Walden, while few others have been willing to do so or capable of achieving similar results.

Fee awards in similar cases in this Circuit support an award of one-fourth of the settlement fund. Courts in the Fourth Circuit routinely award a larger portion of the settlement fund in attorneys' fees. *See, e.g.*, *Galloway v. Williams*, No. 3:19-CV-470, 2020 WL 7482191, at *11 (E.D. Va. Dec. 18, 2020) (final approval of 33% of common fund); *Sims v. BB&T Corp.*, No. 1:15-CV-732, 2019 WL 1993519, at *3 (M.D.N.C. May 6, 2019) (same); *Deem v. Ames True Temper, Inc.*, No. 6:10-CV-01339, 2013 WL 2285972, at *6 (S.D.W. Va. May 23, 2013) (same); *DeWitt v. Darlington Cnty.*, No. 4:11-CV-00740, 2013 WL 6408371, at *7 (D.S.C. Dec. 6, 2013) (preliminary approval of 33.33% of common fund). This holds true in cases with

common funds significantly larger than the $28.5 million dollar fund here. *In re Celebrex (Celecoxib) Antitrust Litig.*, No. 2:14-CV-00361, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018) (final approval of one-third of the $94 million settlement); *In re Titanium Dioxide,* 2013 WL 6577029, at *1 (final approval of 33.33% of $163.5 million common fund).

Courts using the percentage method often perform a lodestar cross-check to confirm the reasonableness of the percentage award. *See, e.g.*, *In re Cook Med., Inc., Pelvic Repair Syts. Prods. Liability Litig.*, 365 F. Supp. 3d 685, 701 (S.D. W. Va. 2019). The lodestar for Plaintiffs' counsel as of the end of February 2024 is over $3,500,000, Ex. 2 at ¶ 16, meaning that Plaintiffs' requested fee award of $7,125,000 yields a multiplier of approximately two and class action approval and settlement administration are not yet complete. According to one study, the average lodestar multiplier in this Circuit is 2.43. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Stud. 248, 272 tbl.14 (2010). In light of the *Barber* factors discussed above, the lodestar multiplier here is reasonable.

In accordance with Fed. R. Civ. P. 23(h) and Fed. R. Civ. P. 54(d)(2), Plaintiffs will move for an award of fees in an amount no greater than $7,125,000 as part of their motion for final approval of the settlement.

## II.   A SETTLEMENT CLASS SHOULD BE PROVISIONALLY CERTIFIED UNDER RULES 23(a), 23(b)(2), and 23(b)(3)

The Settlement Agreement provides that the settlement will be effectuated through class action treatment, and the parties will support certification for this purpose. *See* Settlement Agreement at §§ 2-3, 16-17. For a class to be certified, it must meet the requirements of Fed. R. Civ. P. 23. *Jonathan R. v. Just.*, 344 F.R.D. 294, 302 (S.D.W. Va. 2023). This requires that Plaintiffs satisfy each of the four criteria provided in Rule 23(a)(1)-(4), but only one of three

24

subcategories of Rule 23(b). *Id.* Rule 23 should be given "a liberal, rather than a restrictive, construction" along with "a standard of flexibility that will 'best serve the ends of justice for the affected parties and . . . promote judicial efficiency.'" *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 285 (S.D.W. Va. 2015) (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003)).

The proposed Settlement Class satisfies the criteria of Rule 23(a). The proposed Settlement Class also satisfies Rule 23(b)(2) with respect to injunctive relief, and Rule 23(b)(3) with respect to monetary relief. Certification under multiple subsections of Rule 23(b) is proper. *See, e.g.*, *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997); *Fisher v. Virginia Elec. & Power Co.*, 217 F.R.D. 201, 214 (E.D. Va. 2003). Because the requirements of Rule 23 are met, the Court should provisionally certify the Settlement Class.

### A. Rule 23(a) is Satisfied

#### 1. Rule 23(a)(1) – Numerosity

The Parties' exchange of information during settlement negotiations confirmed that the proposed class is composed of thousands of students. Ex. 2 at ¶ 7. This easily satisfies the Rule 23(a)(1) requirement that "the class is so numerous that joinder of all members is impracticable." *See, e.g., In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (noting that "a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone"); *see also Santos v. E&R Servs., Inc.*, No. DLB-20-2737, 2021 WL 6073039, at *8 (D. Md. Dec. 23, 2021) (same).

#### 2. Rule 23(a)(2) – Commonality

To satisfy commonality, "a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Commonality is present when the claims of class members

"depend upon a common contention . . . . [that is] capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Only one such common issue of law or fact is needed to satisfy commonality. *See, e.g.*, *id.* at 359; *Fernandez v. RentGrow, Inc.*, 341 F.R.D. 174, 201 (D. Md. 2022). "This does *not* mean, of course, that the entire *case* must be decided by a single issue." *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 200 (E.D. Va. 2015) (emphases in original). Moreover, as recognized in the Fourth Circuit, "[m]inor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 53 (D. Md. 2020) (quoting *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997)).

Though one only is needed, here there are several common factual and legal questions that are central to resolving this dispute and capable of classwide resolution, satisfying Rule 23(a)(2). These include whether Walden systematically targeted Black, female, and nontraditional students through advertising and marketing; whether it systematically misrepresented the number of credits required to complete the capstone component of the DBA program, including through its website and standardized representations by enrollment advisors; whether doing so was predatory or, to the contrary, a justifiable business choice; whether ECOA applies to the conduct at issue; whether the targeting of nontraditional students disproportionately harmed Black and female students; and whether such targeting is a justifiable business choice. Cases like this, where Plaintiffs' allegations are based on Defendants' "standardized conduct," are especially appropriate for class treatment. *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 61 (E.D. Va. 2021), *aff'd sub nom. Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023). That is because such conduct allows key questions—e.g., did Walden

systematically target based on race and gender— to be answered "in one stroke," *Dukes*, 564 U.S. at 350, for the whole class.

**Intentional Targeting of Black and Female Students.** Plaintiffs allege that as a result of Walden's deliberate targeting of Black and female students, the university's recipients of doctoral degrees in Business are significantly more likely to be Black than recipients of such degrees at other universities. First Am. Compl., ¶ 138; Ex. 2 at ¶ 19. Similarly, sixty-eight percent of its doctoral recipients in 2020 were women, significantly higher than the percentage of female doctoral recipients across universities nationally. First Am. Compl. at ¶ 160; Ex. 2 at ¶ 20 & Attachs. H, I. Plaintiffs allege that this resulted from Walden engaging in a uniform practice of directing an overwhelming portion of its local advertising in markets with higher-than-average Black populations, First Am. Compl. at ¶ 146, in which the university used approximately ninety to one hundred percent of its local advertising budget in areas with an above-median percentage of Black residents. *id.*, ¶¶ at 142, 147-49. The content of Walden's social media, website, and other media advertising also reflected its uniform targeting of Black and female students by prominently featuring Black people, explicitly announcing its top ranking in awarding doctorates to Black students, and promoting the suitability of its academic programs for mothers, wives, and working women. *Id.* at 151-52, ¶¶ 165-67; Ex. 2 at ¶ 21 & Attachs. J, K.

Whether Walden intentionally targeted Black and female students to enroll them into its DBA program raises common questions of racial and gender discrimination.

**Intentional Targeting of Nontraditional Students.** Plaintiffs also allege that Walden uniformly targets nontraditional students. The university consistently advertised and marketed to nontraditional students through video and social media advertisements, as well as advertisements displayed on its websites. Many of its advertisements that appear on social media platforms and

internet searches feature older students, students who are full-time employees, and students with children. First Am. Compl. at ¶¶ 170-76. These advertisements coincided with Walden's messaging, in which the university describes itself as a university that is suitable for working professionals, parents, and older individuals. *Id.*; Ex. 2 at ¶ 21.

Whether Walden knowingly targeted nontraditional prospective students through systematic marketing, and whether doing so disparately impacted Black and female students, raise common questions of gender and racial discrimination.

**Walden's False Representations Through Its Website.** Plaintiffs allege that Walden, through its website, knowingly understated the number of credits students were required to take for completion of the capstone portion of the DBA program. First Am. Compl. at ¶ 109; *see also* Ex. 2 at ¶ 22 & Attach. L (Minnesota Office of Higher Education's Walden University Doctoral Program Review, Oct. 23, 2019) at 101 ("Given the average capstone credits students t[ook], it is likely that many students complete[d] their program with more than the minimum credits and therefore end[ed] up paying more than the minimum tuition costs."). The website indicated that nineteen or twenty capstone credits were required. Ex. 2 at ¶ 18 & Attachs. B-G. But, Plaintiffs allege, Walden actually required students to complete many more capstone credits, resulting in, on average, over $30,000 in extra costs per student. First Am. Compl. at ¶ 16.

The consistent information on Walden's webpage about required credits served as standardized information that Walden intended prospective and enrolled students to rely on. *Id.*, at ¶¶ 64, 85-86. *See, e.g.*, *Butela v. Midland Credit Mgmt. Inc.*, 341 F.R.D. 581 (W.D. Pa. 2022) (certifying class based on "common questions" concerning the "uniform conduct by [the defendant] with respect to every class member"). Information shared between the Parties during mediation confirms Plaintiffs' allegations that Walden's own data made clear that students would

28

likely have to enroll in more capstone credits than what was stated on Walden's website. *See* Ex. 2 at ¶ 9.

Whether Walden knowingly engaged in predatory misrepresentation of the number of capstone credits and thus the cost to complete the DBA program on its website raises a common question.

**Walden's False Representation Through Its Enrollment Advisors.** Along with standardized misrepresentations on its website, Plaintiffs allege Walden's enrollment advisors, or enrollment specialists, consistently communicated false information to prospective students to attract and ultimately enroll them for profit. First Am. Compl. at ¶¶ 95, 97; Ex. 6 at ¶¶ 4, 6; Ex. 7 at ¶¶ 4, 6; Ex. 8 at ¶¶ 4, 6; Ex. 9 at ¶¶ 3, 5. Even without discovery, documentary evidence shows that enrollment advisors served as sales agents for Walden to sell "our product" by establishing standardized, scripted ways to interact with prospective students. First Am. Compl. at ¶¶ 97-100; Ex. 2 at ¶ 17 & Attach. A (internal Walden document titled "Overcoming Objections").

The process begins with a prospective student filling out an interest form on Walden's website. First Am. Compl. at ¶¶ 96, 197, 217. An enrollment advisor would then communicate with prospective students using standard talking points that offered enrollment advisors guidance on how to overcome anticipated objections from prospective students about credit requirements, time of completing the program, and costs. *Id.*, at ¶¶ 99-101. Each named Plaintiff in this suit communicated with an enrollment advisor during their process of assessing doctoral degree options or enrolling at Walden and was also provided the same or similar misleading information from enrollment advisors regarding the amount of credit hours per semester to complete the DBA program and thus the cost of their education. Ex. 6 at ¶¶ 3-4, 6; Ex. 7 at ¶¶ 3-4, 6; Ex. 8 at ¶¶ 3-4, 6; Ex. 9 at ¶¶ 2-3, 5.

Whether enrollment advisors used uniform instructions from Walden to misrepresent the credit requirements and costs of the DBA program when speaking with prospective students to enroll them into Walden's DBA program, and whether this amounts to a predatory practice, are common questions that are at the center of Plaintiffs' claims. *See Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408 (S.D.N.Y.), *on reconsideration in part*, 293 F.R.D. 578 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) (finding that the defendant's uniform conduct weighed in favor of commonality).

Accordingly, the issues discussed in this section are common ones of fact and law that would drive the resolution of this suit absent settlement, satisfying the commonality requirement.

### 3.  <u>Rule 23(a)(3) – Typicality</u>

"The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 58 (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)). The "class representative must generally be part of the class and have 'the same interest and suffer the same injury as the class members,' but typicality "does not require that the class representative's claims be identical to those of the class." *Id.* Instead, class representatives' claims must only "fairly encompass those of the entire class." *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560 (E.D. Va. 2016) (internal quotation marks omitted).

The evidence shows that the named Plaintiffs' claims are typical of the class. They were enrolled in Walden's DBA program during the class period; are female; are Black or biracial; were exposed to the standardized misrepresentations regarding the credit requirements and costs of the DBA program on Walden's websites; and interacted with Walden's enrollment advisors. As alleged for the class, the named Plaintiffs assert that they relied on the false representations

on Walden's websites and the misrepresentations of the university's enrollment advisors to enroll

in the DBA program. All the named Plaintiffs, after completing the coursework phase of the

DBA program, entered the capstone phase and had to take more capstone phase credits—and

thus to pay significantly more money—than had been represented by Walden. Ex. 6 at ¶¶ 5-8;

Ex. 7 at ¶¶ 5-8; Ex. 8 at ¶¶ 5-8; Ex. 9 at ¶¶ 4-7. This is precisely what is alleged as to the class,

and demonstrates satisfaction of the typicality requirement.

### 4.  <u>Rule 23(a)(4) – Adequacy of Representation</u>

"The adequacy inquiry . . . serves to uncover conflicts of interest between named parties

and the class they seek to represent." *Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019)

(quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "For a conflict of interest

to defeat the adequacy requirement, 'that conflict must be fundamental.'" *Id.* (quoting *Ward v.*

*Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010)); *see also, Nelson v. Warner*, 336

F.R.D. 118, 124 (S.D.W.Va. 2020) (noting that "[o]nly conflicts that are fundamental . . . and

that go to the heart of the litigation prevent a plaintiff from meeting . . . the adequacy

requirement"). Class counsel's competence and experience is also a second factor in determining

adequacy of representation. *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 558

(D. Md. 2006).

Adequacy is satisfied in both respects. First, no conflict exists between class

representatives and other unnamed members of the class proposed, and the interests of the named

Plaintiffs and the other students of the DBA program are aligned. There is a shared interest

among class members in being properly compensated for the additional money they borrowed

and spent due to Walden's discriminatory targeting and in effecting changes to Walden's

practices and policies regarding its DBA program.

31

Second, undersigned counsel have extensive experience in consumer, discrimination, and class action litigation. Furthermore, by their litigation of this case, counsel have demonstrated that they are able to zealously pursue the class members' interests and are firmly committed to doing so. *See Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 556 n.16 (E.D. Va. 2000) (observing that through the "voluminous pleadings [and] filings" plaintiffs' counsel met "their duties under this analysis," and that counsel "represent[ed] the class with the fervor due under Rule 23 to the absent class members.").

### B.  Rule 23(b)(2) is Satisfied

Rule 23(b)(2) concerns certification with respect to injunctive or declaratory relief. *See Dukes*, 564 U.S. at 360. The Settlement Agreement includes several forms of significant injunctive relief. *See* Settlement Agreement at § 15. Thus, certification of a (b)(2) class is appropriate regarding these aspects of the settlement.

### C.  Rule 23(b)(3) is Satisfied

Rule 23(b)(3) certification generally applies to cases seeking significant monetary relief for a class. *Dukes*, 564 U.S. at 362 ("[W]e think it clear that individualized monetary claims belong in Rule 23(b)(3)."). It is appropriate here because the case satisfies the two relevant criteria: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rules 23 identifies four (non-exhaustive) factors that are pertinent to this inquiry:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of a litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.* The factor in subsection (D) is not relevant regarding a settlement-only class. *Graham v. Famous Dave's of Am., Inc.*, No. CV DKC 19-0486, 2022 WL 17584274, at *6 (D. Md. Dec. 12, 2022) ("[D]istrict courts need not consider the fourth factor . . . when deciding whether to certify a class for settlement purposes only.").

"Courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations." *Reed v. Alecto Healthcare Servs., LLC*, 2022 WL 4115858, at *7 (N.D. W. Va. 2022). "Indeed, in actions for money damages under Rule 23(b)(3), courts usually require individual proof of the amount of damages each member incurred." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 428, 31 Employee Benefits Cas. (BNA) 1833, 57 Fed. R. Serv. 3d 132 (4th Cir. 2003). The common questions detailed above regarding commonality, such as whether Walden systematically targeted on the basis of race and gender, are the predominant issues pertaining to liability, and the resolution of those questions will serve as the basis for liability determinations as to each of the causes of action at issue. In any event, damages determinations will be simple and straightforward under the Settlement Agreement because they will be based on a pro rata calculation using objective data that Walden will provide from its business records.

The Settlement Class also satisfies subsection factors (A), (B), and (C), demonstrating that the class action device is superior. The "dominant[]" purpose of factor (A) is to provide for the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Pitt v. City of Portsmouth*, 221 F.R.D. 438 (E.D. Va. 2004) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 616-17 (1997)); *see*

33

*also In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 162 (D.S.C. 2018)

(finding that "the vast majority of class members have a *de minimis* interest in individually

controlling the prosecution of their . . . claims because the monetary value of their damages

would be dramatically outweighed by the cost of litigation an individual case"). The lack of

economic resources and incentives for individual class members to bring their own suits are key

considerations, *see Pitt*, 221 F.R.D. at 445-46, both of which are present in this case. Many of the

same challenging factual and legal issues identified above would be present in individual, non-

class litigation, in which claims and recovery would likely be under $100,000 for more 90% of

the individuals and under $50,000 for more than two-thirds. This would not justify the

substantial cost required to demonstrate Walden's liability for damages. Given the costliness of

individual litigation, this factor supports class certification.

For the factor in subsection (B), Plaintiffs are unaware of any other litigation concerning

the controversy detailed in their complaint, apart from the only slightly overlapping and

completed case addressed in footnote five. The factor in subsection (C) has been addressed and

satisfied because Walden University, LLC and Walden e-Learning, LLC reside in Baltimore,

MD, and both entities have their principal place of business in Baltimore, which is in this

District. Defs.' Answer, ¶¶ 39-40.

### D.  Plaintiffs' Counsel Satisfy Rule 23(g) Requirements

Rule 23(g) requires the Court to appoint class counsel when it certifies a class. Plaintiffs'

counsel have meticulously and diligently investigated the potential class claims in this action;

have substantial experience in discrimination, consumer, class action, and other complex

litigation; are knowledgeable about the law relevant to this action; and have committed

significant resources to representing the class. *See supra* at 13-15, 22-25. Accordingly, Class

counsel fairly and adequately represents the interest of the class. *See* Fed. R. Civ. P. 23(g)(1) &
(4).

## III.   THE PROPOSED CLASS NOTICE SHOULD BE DISSEMINATED TO THE CLASS

Prior to finally approving the proposed settlement, the Court "must direct notice in a
reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P.
23(e)(1). Because Plaintiffs request certification (in part) under Rule 23(b)(3), the notice must be
"the best notice that is practicable under the circumstances, including individual notice to all
members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).
Similarly, due process requires reasonable notice and the opportunity to be heard or withdraw
from the class. *See McAdams v. Robinson*, 26 F.4th 149, 157–58 (4th Cir. 2022); *see also Good
v. Am. Water Works Co., Inc.*, No. CV 2:14-01374, 2016 WL 5746347, at *9 (S.D.W. Va. Sept.
30, 2016) (explaining that the notice should not be "a long brief of the parties' positions"
(citation omitted)).

The Settlement Agreement provides that notice of the settlement will be sent by the
Claims Administrator to the individual class members in the form attached as Exhibit 2 to the
Settlement Agreement via first-class United States mail, email, and text. Walden will provide the
records necessary to ascertain the identity and last known contact information of the class
members, and the claims administrator will conduct "tracing" to determine whether more up-to-
date contact information is available. *See* Settlement Agreement § VI.  First-class mailing in
conjunction with tracing satisfies Rule 23 and due process where, as here, the parties have
addresses, social security numbers, and phone numbers of the class members.  *See Thorpe v.
Virginia Dep't of Corr.*, No. 2:20CV00007, 2023 WL 5038692, at *5 (W.D. Va. Aug. 8, 2023);
*Minter v. Wells Fargo Bank, N.A.*, 283 F.R.D. 268, 275 (D. Md. 2012). Emails and texts will

35

make the notice process even more effective than the type of notice needed. The notice will be provided to class members with adequate time for them to decide if they want to object or opt out. *See* Settlement Agreement §§ 27-28 (opt-outs due nine weeks after deadline for mailing of notice; objections and rescissions of opt-outs due eleven weeks after deadline for mailing of notice).

The content of the proposed notice is also sufficient. As required under Rule 23(c)(2)(B) and Rule 23(e)(5), it describes the case and terms of settlement, provides the class definition, tells class member that they may appear through an attorney, tells them that they may be excluded from the class or object to the settlement and how to do so, and explains the binding effect of a class judgment on class members. The notice also describes the claims process that will be utilized if the settlement receives final approval.

Because the proposed notice satisfies the requirements of due process and Rule 23, its distribution to the class should be approved.

## IV.    PROPOSED SCHEDULE RELATED TO FINAL APPROVAL

If the Court grants preliminary approval of the proposed settlement, Plaintiffs respectfully propose the following schedule for the remaining procedural steps leading to the Court's final review:

| | |
|---|---|
| Deadline for sending notice to Class Members identified on the basis of Defendants' records | 3 weeks after entry of the Court's order preliminarily approving the settlement |
| Deadline for opting out | 9 weeks after entry of the Court's order preliminarily approving the settlement |
| Deadline for rescinding opt-out or filing objection | 11 weeks days after entry of the Court's order preliminarily approving the settlement |

36

| Deadline for Plaintiffs to file motion for final approval of settlement and to respond to any objections | 12 weeks after entry of the Court's order preliminarily approving the settlement |
|---|---|
| Fairness Hearing | 13 weeks after entry of the Court's order preliminarily approving the settlement |

This schedule is reflected in the Settlement Agreement and its attachments. If this schedule is not convenient for the Court, Plaintiffs request that the Court use the same or greater intervals between each event listed to provide all Parties sufficient time to comply and to provide Class Members sufficient time to review the terms of the proposed settlement, consider their options, and act accordingly.

DATE: March 28, 2024

Respectfully Submitted,

/s/ Tara K. Ramchandani
Alexa T. Milton #19990
Glenn Schlactus*
Tara K. Ramchandani*
Lila R. Miller*
Edward K. Olds*
RELMAN COLFAX PLLC
1225 19th St. NW Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
amilton@relmanlaw.com
gschlactus@relmanlaw.com
tramchandani@relmanlaw.com
lmiller@relmanlaw.com
tolds@relmanlaw.com

Eric Rothschild*
NATIONAL STUDENT LEGAL
DEFENSE NETWORK
1701 Rhode Island Ave., NW
Washington, D.C. 20036
eric@defendstudents.org

37

*Attorneys for Plaintiffs*

*\*admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2024, a true and correct copy of the foregoing Plaintiffs' Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement, Provisional Certification of Settlement Class, and Approval of Notice was served via CM-ECF on all attorneys of record.

Date: March 28, 2024                    /s/ Tara K. Ramchandani
                                        Tara K. Ramchandani

                                        *Attorney for Plaintiffs*