# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| Aljanal Carroll, Claudia Provost Charles, Tiffany Fair, and Tareion Fluker, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:22-cv-00051-JRR |
| Walden University, LLC, and Walden e-Learning, LLC, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND CERTIFICATION OF CLASS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND................................................................................................................ 2

   I.   THE LITIGATION BETWEEN PLAINTIFFS AND WALDEN ...................... 2

   II.  THE MEDIATION AND RESULTING SETTLEMENT AGREEMENT ........................ 4

        A.   Monetary Terms of Settlement ................................................................. 7

        B.   Non-Monetary Terms of Settlement .......................................................... 7

        C.   Administration of Settlement ...................................................................... 8

   III. PRELIMINARY APPROVAL AND NOTICE ...................................................... 9

ARGUMENT .................................................................................................................. 12

   I.   FINAL APPROVAL SHOULD BE GRANTED BECAUSE THE SETTLEMENT

        AGREEMENT IS FAIR, REASONABLE, AND ADEQUATE...................................... 12

        A.   The Fairness Factors ................................................................................. 14

              1.   Posture of the Case ......................................................................... 14

              2.   Extent of Discovery ....................................................................... 14

              3.   Circumstances Surrounding Negotiations....................................... 16

              4.   Experience of Counsel .................................................................... 17

        B.   The Adequacy Factors ............................................................................. 19

              1.   Relative Strength of Plaintiffs' Case on the Merits and Difficulties
                   of Proof or Strong Defenses Likely at Trial............................... 19

              2.   Duration and Expense of Additional Litigation ......................... 22

              3.   Solvency of Defendant and Likelihood of Recovery on a Litigated
                   Judgment ...................................................................................... 23

              4.   Degree of Opposition .................................................................. 23

        C.   Reasonableness ........................................................................................ 24

              1.   The Size of the Recovery is Reasonable .................................... 24

              2.   The Incentive Awards for the Named Plaintiffs are Reasonable ............. 25

              3.   The Attorneys' Fees and Costs are Reasonable ......................... 26

   II.  A SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED UNDER RULES 23(a),

        23(b)(2), AND 23(b)(3) ................................................................................... 27

        A.   Rule 23(a) is Satisfied............................................................................. 28

              1.   Rule 23(a)(1) – Numerosity .......................................................... 28

i

|   |   | 2. | Rule 23(a)(2) – Commonality ................................................. | 28 |
|   |   | 3. | Rule 23(a)(3) – Typicality.................................................... | 33 |
|   |   | 4. | Rule 23(a)(4) – Adequacy of Representation .............................. | 34 |
|   | B. | | Rule 23(b)(2) is Satisfied .................................................... | 35 |
|   | C. | | Rule 23(b)(3) is Satisfied .................................................... | 35 |
|   | D. | | Plaintiffs' Counsel Satisfy Rule 23(g) Requirements ......................... | 38 |
| III. | | | ADEQUATE NOTICE HAS BEEN DISSEMINATED TO THE CLASS ....................... | 38 |
| IV. | | | THE ATTORNEYS' FEES AND COSTS REQUESTED ARE REASONABLE AND SHOULD BE AWARDED ON THE BASIS OF THE PERCENTAGE OF RECOVERY METHOD................................................................... | 40 |
|   | A. | | Fees Should Be Awarded Using the Percentage Method ..................... | 40 |
|   | B. | | An Award of 25% of the Common Fund is Reasonable and Appropriate .......... | 42 |
|   |   | 1. | Time and Labor Expended ................................................... | 42 |
|   |   | 2. | Novelty and Difficulty of the Questions Raised .......................... | 43 |
|   |   | 3. | Skill Required to Properly Perform the Legal Services Rendered .............. | 44 |
|   |   | 4. | Attorneys' Opportunity Costs in Pressing the Instant Litigation ............... | 45 |
|   |   | 5. | Customary Fee for Like Work ................................................ | 45 |
|   |   | 6. | Attorneys' Expectations at the Outset of the Litigation ............................ | 46 |
|   |   | 7. | The Time Limitations Imposed by the Clients or Circumstances .............. | 47 |
|   |   | 8. | The Amount in Controversy and the Results Obtained ............................ | 47 |
|   |   | 9. | The Experience, Reputation and Ability of the Attorneys......................... | 48 |
|   |   | 10. | The Undesirability of the Case Within the Legal Community in which the Suit Arose ................................................................... | 48 |
|   |   | 11. | The Nature and Length of the Professional Relationship Between Attorneys and Clients ................................................................... | 49 |
|   |   | 12. | Attorney's Fees Awards in Similar Cases.................................... | 49 |
|   | C. | | Lodestar Cross-Check Confirms the Reasonableness of the Requested Award. | 50 |
| CONCLUSION | | | ................................................................... | 53 |

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alliance Ophthalmology, PLLC v. ECL Grp., LLC*,
    No. 1:22-CV-296, 2024 WL 3203226 (M.D.N.C. June 27, 2024) ........................................49

*In re Allura Fiber Cement Siding Litig.*,
    No. 2:19-MN-02886-DCN, 2021 WL 2043531 (D.S.C. May 21, 2021) ..........................46, 52

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997) ..........................................................................................................21

*Archbold v. Wells Fargo Bank, N.A.*,
    No. 3:13-CV-24599, 2015 WL 4276295 (S.D.W. Va. July 14, 2015) ............................16, 41

*Barber v. Kimbrell's, Inc.*,
    577 F.2d 216 (4th Cir. 1978) ........................................................................................42, 49

*Beaulieu v. EQ Indus. Servs., Inc.*,
    No. 5:06-cv-00400-BR, 2009 WL 2208131 (E.D.N.C. July 22, 2009) ..................................13

*Berry v. Schulman*,
    807 F.3d 600 (4th Cir. 2015).................................................................................23, 42, 49

*Binotti v. Duke Univ.*,
    No. 1:20-CV-470, 2021 WL 5366877 (M.D.N.C. Aug. 30, 2021).........................................26

*In re Black Farmers Discrimination Litig.*,
    953 F. Supp. 2d 82 (D.D.C. 2013) ....................................................................................42

*Blum v. Stenson*,
    465 U.S. 886 (1984) ..........................................................................................................41

*Boger v. Citrix Sys., Inc.*, No. 19-CV-01234-LKG,
    2023 WL 3763974 (D. Md. June 1, 2023) ............................................................................49

*United States ex. rel. Boyd v. Corinthian Colleges, Inc.*,
    No. 1:14-cv-06620 (N.D. Ill. complaint filed Aug. 27, 2014) ................................................18

*Brown v. Transurban USA, Inc.*,
    318 F.R.D. 560 (E.D. Va. 2016) ...................................................................................33, 46

*Butela v. Midland Credit Mgmt. Inc.*,
    341 F.R.D. 581 (W.D. Pa. 2022).........................................................................................31

*Carlson v. Xerox Corp.*,
    355 Fed. App'x. 523 (2d Cir. 2009).....................................................................................41

*Carroll v. Walden Univ., LLC*,
   650 F. Supp. 3d 342 (D. Md. 2022) ............................................................... *passim*

*CASA de Md., Inc. v. Arbor Realty Tr., Inc.*,
   No. CV DKC 21-1778, 2024 WL 1051120 (D. Md. Mar. 11, 2024).....................51

*In re Celebrex (Celecoxib) Antitrust Litig.*,
   No. 2:14-CV-00361, 2018 WL 2382091 (E.D. Va. Apr. 18, 2018) ......................50

*Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.*,
   888 F.3d 455 (10th Cir. 2017)............................................................................41

*Chisolm v. TranSouth Fin. Corp.*,
   194 F.R.D. 538 (E.D. Va. 2000) ........................................................................35

*Choice Hotels Int'l, Inc. v. Fisher*,
   No. 2:13-CV-23, 2015 WL 12748030 (N.D.W. Va. June 15, 2015) ...................44

*Chrismon v. Pizza*,
   No. 5:10-CV-155-BO, 2020 WL 3790866 (E.D.N.C. July 7, 2020) ...................49

*City of Memphis v. Wells Fargo Bank, N.A.*,
   No. 09-2857, 2011 WL 1706756 (W.D. Tenn. May 4, 2011) .............................18

*Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp.*,
   340 F.R.D. 242 (D.S.C. 2021)...........................................................12, 13, 14, 19

*In re Cook Med., Inc., Pelvic Repair Syts. Prods. Liability Litig.*,
   365 F. Supp. 3d 685 (S.D.W. Va. 2019) ...........................................................50

*Cullen v. Whitman Med. Corp.*,
   197 F.R.D. 136 (E.D. Pa. 2000) ........................................................................24

*Decohen v. Abbasi, LLC*,
   299 F.R.D. 469 (D. Md. 2014) ......................................................................21, 25

*Deem v. Ames True Temper, Inc.*,
   No. 6:10-CV-01339, 2013 WL 2285972 (S.D.W. Va. May 23, 2013)............41, 49

*Detmer v. La'James College of Hairstyling, Inc. of Fort Dodge*, No. 05771 LACL
   147597 (Ia. District Ct. for Polk Cnty. complaint filed Mar. 30, 2020)...................19

*DeWitt v. Darlington Cnty.*,
   No. 4:11-CV-00740, 2013 WL 6408371 (D.S.C. Dec. 6, 2013).............................49

*Dickey v. R.R. Donnelley & Sons Co.*,
   No. 1:18CV920, 2021 WL 1169245 (M.D.N.C. Mar. 26, 2021)....................15, 40

*Doe v. Chao*,
    435 F.3d 492 (4th Cir. 2006)..................................................................................47

*Dunagan v. Illinois Institute of Art*,
    No. 19-cv-809 (N.D. Ill. notice of removal filed Feb. 7, 2019) ..............................19

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    586 F. Supp. 2d 732 (S.D. Tex. 2008) ...................................................................45

*In re Equifax Inc. Customer Data Security Breach Litig.*,
    999 F.3d 1247 (11th Cir. 2021)...............................................................................42

*Eubanks v. Billington*,
    110 F.3d 87 (D.C. Cir. 1997) ..................................................................................27

*Fair Hous. Ctr. of Cent. Indiana, Inc. v. Rainbow Realty Grp., Inc.*,
    No. 1:17-CV-1782, 2020 WL 1493021 (S.D. Ind. Mar. 27, 2020)........................17

*Fangman v. Genuine Title, LLC*,
    No. CV RDB-14-0081, 2017 WL 2591525 (D. Md. June 15, 2017)......................51

*Feinberg v. T. Rowe Price Grp., Inc.*,
    610 F. Supp. 3d 758 (D. Md. 2022) ........................................................................50

*Fernandez v. RentGrow, Inc.*,
    341 F.R.D. 174 (D. Md. 2022).................................................................................29

*Fisher v. Virginia Elec. & Power Co.*,
    217 F.R.D. 201 (E.D. Va. 2003) ..............................................................................27

*Flack v. Wisconsin Dep't of Health Servs.*,
    331 F.R.D. 361 (W.D. Wis. Apr 23, 2019) .............................................................17

*Fuller v. Bloom Institute of Technology, formerly d/b/a Lambda School*,
    No. 23-605179 (Sup. Ct. Cal. complaint filed Mar. 16, 2023) ...............................18

*Galloway v. Williams*,
    No. 3:19-CV-470, 2020 WL 7482191 (E.D. Va. Dec. 18, 2020) ...........................49

*Galvez v. Am. Servs. Corp.*,
    No. 1:11cv1351, 2012 WL 2522814 (E.D. Va. June 29, 2012)...............................46

*In re Genworth Fin. Sec. Litig.*,
    210 F. Supp. 3d 837 (E.D. Va. 2016)......................................................................52

*Good v. Am. Water Works Co., Inc.*,
    310 F.R.D. 274 (S.D.W. Va. 2015).........................................................................27

*Good v. Am. Water Works Co., Inc.*,
  No. CV 2:14-01374, 2016 WL 5746347 (S.D.W. Va. Sept. 30, 2016) .................................38

*Graham v. Famous Dave's of Am., Inc.*,
  No. CV DKC 19-0486, 2022 WL 17584274 (D. Md. Dec. 12, 2022)....................................36

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003)................................................................................................36

*Haney v. Genworth Life Ins. Co.*,
  No. 3:22CV55, 2023 WL 174956 (E.D. Va. Jan. 11, 2023) ...................................................19

*Helmick v. Columbia Gas Transmission*,
  No. 2:07-cv-00743, 2010 WL 2671506 (S.D.W. Va. July 1, 2010) .......................................26

*Hess v. Sprint Commc'ns Co. L.P.*,
  No. 3:11-CV-00035-JPB, 2012 WL 5921149 (N.D.W. Va. Nov. 26, 2012).........................41

*Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
  855 F. Supp. 825 (E.D.N.C. 1994)........................................................................................14

*J.O.P. v. U.S. Dep't of Homeland Sec.*,
  338 F.R.D. 33 (D. Md. 2020).................................................................................................29

*Jacob v. Duane Reade, Inc.*,
  289 F.R.D. 408 (S.D.N.Y.)....................................................................................................33

*In re Jiffy Lube Secs. Litig.*,
  927 F.2d 155 (4th Cir. 1991).......................................................................................... *passim*

*Jonathan R. v. Just.*,
  344 F.R.D. 294 (S.D.W. Va. 2023)........................................................................................27

*Jones v. Dominion Res. Servs., Inc.*,
  601 F. Supp. 2d 756 (S.D.W. Va. 2009) ...............................................................................23

*Kay Co. v. Equitable Prod. Co.*,
  749 F. Supp. 2d 455 (S.D.W. Va. 2010) ...............................................................................26

*Kirven v. Cent. States Health & Life Co. of Omaha*,
  No. CA 3:11-2149, 2015 WL 1314086 (D.S.C. Mar. 23, 2015)............................................16

*Krakauer v. Dish Network, L.L.C.*,
  No. 1:14-cv-333, 2018 WL 6305785 (M.D.N.C. Dec. 3, 2018) ............................................41

*Krakauer v. Dish Network, LLC*,
  No. 1:14-CV-333, 2019 WL 7066834 (M.D.N.C. Dec. 23, 2019) .........................................50

*Kruger v. Novant Health,*
    No. 1:14-CV-208, 2016 WL 676066 (M.D.N.C. Sept. 29, 2016)............................50

*Lamie v. LendingTree, LLC,*
    No. 3:22-CV-00307-FDW-DCK, 2024 WL 811519 (W.D.N.C. Feb. 27, 2024)....................49

*Lopez v. California Institute of Technology,*
    No. 23-607810 (Sup. Ct. Cal. complaint filed July 20, 2023) .................................18

*Manuel v. Wells Fargo Bank, Nat'l Ass'n,*
    No. 3:14CV238 (DJN), 2016 WL 1070819 (E.D. Va. Mar. 15, 2016)....................................41

*Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A.,*
    No. 08-62, 2011 WL 1557759 (D. Md. Apr. 22, 2011) ........................................18

*McAdams v. Robinson,*
    26 F.4th 149 (4th Cir. 2022).........................................................................38, 49

*In re Microstrategy, Inc.,*
    172 F. Supp. 2d 778 (E.D. Va. 2001) ...........................................................52

*In re MicroStrategy, Inc. Sec. Litig.*
    148 F. Supp. 2d 654 (E.D. Va. 2001)............................................................22

*Miller v. HSBC Fin. Corp.,*
    No. 3:08-CV-01942-MJP, 2010 WL 2722689 (D.S.C. July 9, 2010)....................................49

*Minter v. Wells Fargo Bank, N.A.,*
    283 F.R.D. 268 (D. Md. 2012) .....................................................................39

*Missouri v. Jenkins by Agyei,*
    491 U.S. 274 (1989) ...................................................................................52

*Mitchell-Tracey v. United Gen. Title Ins. Co.,*
    237 F.R.D. 551 (D. Md. 2006) .....................................................................34

*Moler et al. v. Univ. of Maryland Med. Sys.,* No. 1:21-CV-01824-JRR
    (D. Md. Final Approval Order and Final J. July 22, 2021)....................................50

*Moore v. Duke,*
    Civ. No. 00-953 (D.D.C. complaint filed May 3, 2000) .................................17, 18

*Moore v. Napolitano,*
    926 F. Supp. 2d 8 (D.D.C. 2013) .................................................................18

*Morgan v. Richmond Sch. of Health and Tech., Inc.* ("*RSHT*"),
    No. 3:12-cv-373 (E.D. Va. Order Granting Preliminary Approval of Proposed
    Class Action Settlement July 25, 2013) .......................................................17, 18, 24

*Nelson v. Warner*,
336 F.R.D. 118 (S.D.W. Va. 2020) ........................................................................34

*In re Novant Health, Inc.*,
No. 1:22-CV-697, 2024 WL 3028443 (M.D.N.C. June 17, 2024) ..........................49

*Oregon Laborers Emps. Pension Tr. Fund v. Maxar Techs. Inc.*,
No. 19-CV-0124-WJM-SKC, 2024 WL 98387 (D. Colo. Jan. 1, 2024)..................45

*In re Outer Banks Power Outage Litig.*,
No. 4:17-CV-141, 2018 WL 2050141 (E.D.N.C. May 2, 2018)................12, 13, 17

*In re Peanut Farmers Antitrust Litig.*,
No. 2:19-CV-00463, 2021 WL 9494033 (E.D. Va. Aug. 10, 2021)..................41, 52

*Phillips v. Triad Guar. Inc.*,
No. 1:09CV71, 2016 WL 2636289 (M.D.N.C. May 9, 2016) ................................44

*Pitt v. City of Portsmouth*,
221 F.R.D. 438 (E.D. Va. 2004) ............................................................................37

*In re Red Hat, Inc. Sec. Litig.*,
No. 5:04-CV-473, 2010 WL 2710517 (E.D.N.C. June 11, 2010)...........................15

*Reed v. Alecto Healthcare Servs., LLC*,
No. 5:19-CV-263, 2022 WL 4115858 (N.D.W. Va. July 7, 2022).........................36

*Rodriguez et al. v. Riverstone Cmtys., LLC et al.*,
No. 5:21-CV-00486 (E.D.N.C. Order Granting Pls.' Unopposed Mot. for
Att'ys' Fees Nov. 23, 2021) ...................................................................................50

*Saint-Jean v. Emigrant Mortgage Co.*,
337 F. Supp. 3d 186 (E.D.N.Y. 2018).....................................................................18

*Santos v. E&R Servs., Inc.*,
No. DLB-20-2737, 2021 WL 6073039 (D. Md. Dec. 23, 2021) ............................28

*Savani v. URS Pro. Sols. LLC*,
121 F. Supp. 3d 564 (D.S.C. 2015) ............................................................... *passim*

*Sharp Farms v. Speaks*,
917 F.3d 276 (4th Cir. 2019)..................................................................................34

*Sims v. BB&T Corp.*,
No. 1:15-CV-732, 2019 WL 1993519 (M.D.N.C. May 6, 2019) ..........................49

*Soutter v. Equifax Info. Servs., LLC*,
307 F.R.D. 183 (E.D. Va. 2015) ............................................................................29

*Taubenfeld v. AON Corp.*,
415 F.3d 597 (7th Cir. 2005) ....................................................................................42

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
325 F.R.D. 136 (D.S.C. 2018) ...................................................................................37

*Temp. Servs., Inc. v. Am. Int'l Group, Inc.*,
No. 3:08-cv-00271-JFA, 2012 WL 4061537 (D.S.C. Sept. 14, 2012) ...........................41, 46

*In re The Mills Corp. Secs. Litig.*,
265 F.R.D. 246 (E.D. Va. 2009) ..................................................................... *passim*

*In re Thirteen Appeals Arising out of San Juan DuPont Plaza Hotel Fire Litig.*,
56 F.3d 295 (1st Cir. 1995) .......................................................................................42

*Thomas v. FTS USA, LLC*,
No. 3:13-cv-825 (REP), 2017 WL 1148283 (E.D. Va. Jan. 9, 2017) .............................41

*Thorpe v. Va. Dep't of Corr.*,
No. 2:20CV00007, 2023 WL 5038692 (W.D. Va. Aug. 8, 2023) ..................................39

*In re Titanium Dioxide Antitrust Litig.*,
No. 10-CV-00318, 2013 WL 6577029 (D. Md. Dec. 13, 2013) ...............................26, 50

*Troncelliti v. Minolta Corp.*,
666 F. Supp. 750 (D. Md. 1987) .................................................................................23

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
669 F.3d 632 (5th Cir. 2012) .....................................................................................41

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ...................................................................................42

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........................................................................................28, 29, 35

*Williams v. Big Picture Loans, LLC*,
339 F.R.D. 46 (E.D. Va. 2021) ............................................................................29, 33

*In re Zetia (Ezetimibe) Antitrust Litig.*,
7 F.4th 227 (4th Cir. 2021) ........................................................................................28

*Zilhaver v. UnitedHealth Grp., Inc.*,
646 F. Supp. 2d 1075 (D. Minn. 2009) .......................................................................45

**Statutes**

Class Action Fairness Act, 28 U.S.C. § 1715 ...................................................................9

Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq* ........................................................ *passim*

Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ................................................8, 9

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*..................................... *passim*

**Regulations**

34 C.F.R. § 99.31(a)(9)(i)...............................................................................................................9

**Rules**

Federal Rules of Civil Procedure 23 ......................................................................... *passim*

Federal Rules of Civil Procedure 52 ....................................................................................40

Federal Rules of Civil Procedure 54(d)........................................................................1, 27, 40

**Other Authorities**

Federal Judicial Center Integrated Database, *available at*
    https://www.fjc.gov/research/idb/interactive/24/IDB-civil-since-1988....................................43

Fee Application, *NPE Winddown Holdings, Inc.*, No. 1:21-bk-10570 (Bankr. D.
    Del. Oct. 18, 2021)..............................................................................................................45

*Manual for Complex Litigation* (Fourth) § 21.632 (Federal Judicial Center 2004)................13, 41

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class
    Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010) ................................52

U.S. Dep't of Educ., Borrower Defense Loan Discharge, https://studentaid.gov/
    manage-loans/forgiveness-cancellation/borrower-defense...........................................................5

William B. Rubenstein, 5 Newberg and Rubenstein on Class Actions § 17:13 (6th
    ed.) (June 2024 Update) ...........................................................................................25, 26, 48

## PRELIMINARY STATEMENT

Plaintiffs Aljanal Carroll, Claudia Provost Charles, Tiffany Fair, and Tareion Fluker ("Plaintiffs") respectfully submit this memorandum of law in support of their unopposed motion for an order, pursuant to Federal Rules of Civil Procedure 23 and 54(d), granting: (1) final approval of the proposed Settlement Agreement, a copy of which is attached hereto as Exhibit 1; (2) final certification of the settlement class; and (3) an award of fees and costs to Plaintiffs' Counsel.

After vigorous advocacy and negotiation, Plaintiffs and Defendants Walden University, LLC and Walden e-Learning, LLC (collectively "Walden") agreed on a settlement of the claims in this case. The proposed Settlement Agreement provides $28.5 million in monetary relief and important injunctive relief. The Parties negotiated the Settlement Agreement at arm's length under the auspices of mediators Michael K. Lewis of JAMS and Michelle Yoshida of Phillips ADR, believe it achieves a fair and adequate resolution of Plaintiffs' claims, and agree that it merits final approval by this Court. The class includes approximately 2,155 former and current Walden students identified through Walden's records. An additional 214 individuals may be class members, but Walden does not have sufficient information to confirm class status; the proposed Final Approval Order provides that these 214 people will have an opportunity to demonstrate their inclusion in the class by submitting appropriate documentation.

On April 17, 2024, the Court granted preliminary approval of the Settlement, provisionally certified the settlement class, appointed undersigned counsel to represent the settlement class, and directed that notice be given to class members. Dkt. No. 95 ("Preliminary Approval Order"). The April 17 Order was modified on July 16, 2024, upon Plaintiffs' unopposed request, to improve the individualized notice plan upon the identification of a modest

number of additional people who are or might be class members. Dkt. No. 98 ("Order Modifying Preliminary Approval"). Tracking by the Claims Administrator of bounced emails, bounced texts, and returned mail indicates that the individualized notice program was highly effective. *See* Decl. of A. Lange ("Lange Decl."), Dkt. No. 99, at ¶ 11, 20. Only one person has opted out of the class, *see id.* at ¶ 14, 23, and only one objection was filed, *see* Dkt. No. 96. Plaintiffs now respectfully submit, and all Parties agree, that the Settlement merits final approval by this Court.

**BACKGROUND**

**I.    THE LITIGATION BETWEEN PLAINTIFFS AND WALDEN**

Walden University is an online for-profit university headquartered in Minneapolis, Minnesota. This litigation was brought by four former students in Walden's Doctor of Business Administration ("DBA") program on behalf of themselves and all others similarly situated. Plaintiffs asserted putative class claims for violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, and violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*; and four claims on behalf of themselves for violation of Minnesota state and common law. To prevail on their class claims under Title VI, Plaintiffs must prove that Defendants intentionally discriminated on the basis of a protected class, and for their Equal Credit Opportunity Act claims, Plaintiffs must prove that Defendants are creditors under the statute and discriminated against credit applicants on the basis of a protected class with respect to any aspect of a credit transaction. *See Carroll v. Walden Univ., LLC*, 650 F. Supp. 3d 342, 355, 359 (D. Md. 2022). Plaintiffs sought to prove intentional discrimination using the "reverse redlining" theory, which required them to prove that (1) Defendants' practices were unfair and predatory, and (2) Defendants either intentionally targeted prospective students on the basis of a protected class, or that there is a disparate impact on the basis of a protected class. *See Id.* at 357, 360.

2

Plaintiffs alleged that Walden engaged in reverse redlining by (1) inducing enrollment through material misrepresentations about the cost and time required to complete its DBA program, and (2) intentionally targeting Black and female prospective students to enroll in the program. Specifically, Plaintiffs alleged that Walden deliberately hid the true cost of the DBA program by knowingly misrepresenting and understating the number of "capstone credits" required to complete the program and obtain a degree, both on its website and through "enrollment advisors" it employed to communicate false information to prospective students. The capstone phase of the program comes last and typically begins approximately two years after initial enrollment. Plaintiffs alleged that Walden, as a result of this scheme, kept students trapped in the capstone phase by requiring them to complete additional credits at a cost of close to $1,000 per credit, totaling tens of millions of dollars in excess fees charged to putative class members. Plaintiffs further alleged that Walden intentionally targeted its marketing to Black populations and women and that Walden targeted nontraditional doctoral students, who are disproportionately Black and disproportionately female. Defendants have at all times denied these allegations.

This case was filed in the United States District Court for the District of Maryland on January 7, 2022. Dkt. No. 1. On March 23, 2022, Defendants filed a Motion to Dismiss Plaintiffs' Complaint under Fed. R. Civ. P. 12(b). Dkt. No. 35. On November 28, 2022, the Court denied the Motion to Dismiss. *Carroll v. Walden Univ., LLC*, 650 F. Supp. 3d 342 (D. Md. 2022). On December 7, 2022, Plaintiffs filed a consent motion to amend their complaint, adding Plaintiff Tareion Fluker to the lawsuit, which the Court granted. Dkt. Nos. 45, 46. On February 2, 2023, Defendants filed an Answer denying all material allegations in the First Amended Complaint and asserting affirmative defenses. Dkt. No. 52.

On February 6, 2023, the Court issued a Scheduling Order, Dkt. No. 53, and on February 21, 2023, the Parties filed an Initial Joint Status Report, Dkt. No. 59. On February 28, 2023, Plaintiff Tiffany Fair issued Interrogatories and Requests for Production to Defendants. On March 13, 2023, the Parties held a telephonic status conference with the Court and resolved certain disputes regarding the scope of discovery, after which the Court ordered the Parties to file a joint status report within 30 days regarding interest in a settlement conference. Dkt. No. 60. On April 13, 2023, the Parties filed their Joint Status Report, which reported that the Parties had engaged in constructive conversations regarding the possibility of settlement and a process for exchanging the information necessary to facilitate a productive negotiation. Dkt. No. 65. Shortly thereafter, the Parties scheduled a private mediation session, and on April 27, 2023, the Parties filed a Joint Motion to Temporarily Stay Discovery Deadlines in light of the mediation, Dkt. No. 66, which the Court granted, Dkt. No. 67. The stay was subsequently extended to permit continued negotiations and then, on January 12, 2024, finalization of the settlement including the drafting of associated documents. Dkt. No. 88.

## II.     THE MEDIATION AND RESULTING SETTLEMENT AGREEMENT

On May 4, 2023, the Parties had a private full-day mediation session in New York to explore resolution with mediator Michelle Yoshida[1] of Phillips ADR. Decl. of A. Milton dated March 28, 2024 ("Milton March Decl."), Dkt. No. 92-3, at ¶ 10. Prior to the mediation, the Parties submitted fulsome mediation statements and exchanged term sheets, and Defendants furnished Plaintiffs with data regarding the tuition and fees paid to Walden and the total number of capstone credits taken for 2,291 people identified at that time as class members based on Walden's records, including capstone credit data and race and gender information submitted

---

[1] *Michelle Yoshida*, Phillips ADR Enterprises (2024), https://phillipsadr.com/bios/michelle-yoshida/.

upon enrollment. *Id.* ¶¶ 4, 7. At the mediation, the Parties made preliminary progress on narrowing the monetary gap between the Parties' offers, discussed possible non-monetary terms, and affirmed all Parties' interest in exploring a negotiated resolution. The Parties also agreed to exchange more information to facilitate settlement.

Following the mediation, the Parties engaged in frequent communication, and they exchanged legal authority on key legal issues. For example, Plaintiffs provided Defendants with significant authority addressing Defendants' concern that class members who filed a borrower defense application[2] would recoup a windfall if they also received a monetary settlement. On other issues—including on the statute of limitations and class certification—the exchange of legal authority helped to clarify the Parties' respective positions and enabled the Parties to better assess their litigation risk should the case move forward. *Id.* ¶¶ 6-8, 12-13.

On September 21, 2023, the Parties held a second full-day mediation session in Washington, D.C., this time with Michael K. Lewis[3] of JAMS. At that mediation, after extensive discussions and exchange of multiple proposals, Mr. Lewis made a mediator's proposal of $28,500,000 to resolve the monetary component of the case. The Parties agreed to this number. The Parties further agreed to keep working together on the non-monetary terms of the settlement. *Id.* ¶¶ 10-11.

The Parties then engaged in additional negotiations regarding the details of the agreement, particularly with respect to the non-monetary terms, and to reduce their agreement to writing. The Settlement Agreement, including the several documents attached to it, is the result of these negotiations. It was executed on March 22, 2024.

---

[2] *See* U.S. Dep't of Educ., Borrower Defense Loan Discharge, https://studentaid.gov/
manage-loans/forgiveness-cancellation/borrower-defense.
[3] *Michael K. Lewis*, JAMS (2024), https://www.jamsadr.com/lewis/.

The Parties agreed, through the Settlement Agreement, to seek certification of a Settlement Class consisting of people in one or more of the following three categories: (1) all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008, and January 31, 2018 and were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled ("Title VI Group"); (2) all Black students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008, and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans or payment plans to pay for some or all of their Walden education ("ECOA Black Student Group"); and (3) all female students who enrolled in and/or began classes for Walden's DBA program between August 1, 2008, and January 31, 2018, were charged for and successfully completed more than the number of capstone-level credits that Walden stated were required at the time they enrolled, and applied for and/or received student loans or payment plans to pay for some or all of their Walden education ("ECOA Female Student Group").[4] Settlement Agreement § 1(g). The Parties estimate that there are approximately 2,155 individual members of these three partially overlapping groups who can be identified from Walden's records. Decl. of A. Milton dated October 8, 2024 ("Milton Oct. Decl.") (Ex. 2) at ¶ 28. The Parties also estimate that there are

---

[4] Everyone in the ECOA Black Student Group is also in the Title VI Group, but this manner of defining the Settlement Class matches the complaint and therefore may be easier to follow by class members who review the key documents in the case. The following are excluded from the Settlement Class definition: the presiding judge and her family; the defendants including their employees; the single person who opted out; the legal representatives, successors, and assigns of the foregoing; and individuals who received a settlement payment in *Thornhill v. Walden University*, No. 2:16-cv-00962 (S.D. Ohio) but did not provide a waiver of confidentiality to Walden. *See* Settlement Agreement ¶¶ 1(f), 30.

approximately 214 additional individuals who *might* be class members, but for whom Walden does not have sufficient race and/or gender information to confirm.[5] *Id.*

### A. Monetary Terms of Settlement

The Settlement Agreement provides for different amounts of monetary compensation to class members based upon the amount of excess tuition paid to Walden. After deduction of $7,125,000 for attorneys' fees and expenses (25% of $28.5 million)—subject to Court approval—and up to $100,000 for third-party administration costs (which the Court approved in the Preliminary Approval Order), the total amount of compensation for the class members is approximately $21,275,000. The precise amount will depend on the exact cost of third-party administration and the amount of interest earned (which will increase the amount distributed). Settlement Agreement ¶¶ 1(y), 4-8, 12, 59. The Settlement Agreement also provides, subject to Court approval, for the four named Plaintiffs to each receive $25,000 as an incentive award. This totals $100,000. *Id.* ¶ 6(a).

The remaining funds will be distributed pro rata to class members based on how many DBA capstone credits each took above the number that Walden stated was the minimum at the time they enrolled. Settlement Agreement ¶¶ 1(n), 6(b). That is, if a particular class member took 44 excess capstone credits and submits a valid claim form, and all class members who submit valid claim forms collectively took 90,000 excess capstone credits, then that class member will receive 44/90,000 of the compensation pool, or approximately $10,000.[6]

### B. Non-Monetary Terms of Settlement

The Settlement Agreement also provides non-monetary relief in the form of disclosures

---

[5] Walden requests race and gender information at the time of enrollment, but the questions are optional and some students decline to provide demographic information.
[6] A small number (19) of the approximately 2,155 class members received payments from the settlement in *Thornhill v. Walden University*, No. 2:16-cv-00962 (S.D. Ohio) and submitted waivers of confidentiality with

and programmatic changes for a period of at least four years from the date of implementation.

First, on the "Tuition and Fees" section of its DBA Program website, and in students' enrollment

agreements, Walden will disclose the median time to complete the DBA program and median

cost to complete the DBA program based on historic data from the preceding three years of

graduates. The enrollment agreements will include additional disclosures about the potential

length of the DBA Program. Second, Walden has eliminated a layer of review during the

capstone phase of the DBA Program and is making certain other changes intended to help

students reduce the time and cost for completion of the DBA program. *See* Settlement

Agreement ¶ 15.

### C. Administration of Settlement

The Settlement Agreement further provides for the retention of Settlement Services, Inc.

("SSI") as Claims Administrator to distribute the notice, distribute the claim forms, process

claims, prepare tax documents, and otherwise administer the settlement. *See* Settlement

Agreement ¶ 1(c). Based on consultation with the Claims Administrator, the Parties agreed to set

aside $100,000 from the settlement fund for these costs, but also included a provision in the

Settlement Agreement for excess administrative funds to be included in the funds distributed to

class members.[7] *See* Settlement Agreement ¶¶ 4(c), 10.

Because some of the information needed to implement the settlement is covered by the

Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, the Settlement

Agreement provides for class members to receive notice regarding such information and an

---

respect to the settlement of *Thornhill* so they could participate in this settlement. *Thornhill* concerned allegedly excessive time and costs to complete doctoral programs at Walden generally. Payments here will be reduced by the amount of any cash payment pursuant to *Thornhill*. Settlement Agreement ¶¶ 1(aa), 6(b).

[7] Paragraph 20 of the Preliminary Approval Order and Paragraph 18 of the proposed final approval order submitted with this motion both provide for a grant of immunity to the Claims Administrator for work performed in connection with the Settlement.

opportunity to decline its disclosure in accordance with FERPA implementing regulation 34 C.F.R. § 99.31(a)(9)(i). Settlement Agreement ¶¶ 1(o), 22.

## III.    PRELIMINARY APPROVAL AND NOTICE

On April 8, 2024, Defendants sent the required notice of the proposed settlement pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, to the requisite officials. Decl. of C. Dahl dated October 7, 2024 (Ex. 5).

On April 17, 2024, the Court granted preliminary approval of the settlement. The Preliminary Approval Order also provisionally certified the Settlement Class, appointed undersigned counsel to represent the Settlement Class, directed that notice be given to class members, and appointed Settlement Services, Inc. as Claims Administrator.

In accordance with the Court's Preliminary Approval Order, notice was directed by the Claims Administrator to a total of 2,259 people, consisting of (1) all of those in the original class estimate of 2,291 other than the 37 *Thornhill* settlement participants who did not agree to waive the confidentiality provisions of that settlement as required to be a class member here,[8] and (2) five of an additional six individuals[9] who were not included on the initial Class Intake List but contacted the Claims Administrator or were otherwise identified by the Parties and, upon investigation, were added to the Class Intake List. Milton Oct. Decl. at ¶ 22; Lange Decl. at ¶7-9.

On July 10, 2024, Plaintiffs filed an Unopposed Motion to Modify Preliminary Approval Order with Respect to the Provision of Notice and to Make Other Conforming Modifications ("Motion to Modify Preliminary Approval"). Dkt. No. 97. As outlined in that Motion, in the course of administering the class notice process in accordance with the Preliminary Approval

---

[8] To be a member of the *Walden* class, participants in the *Thornhill* settlement, discussed in footnotes 4 and 6, were required to waive the confidentiality provisions of the *Thornhill* settlement. Settlement Agreement at ¶ 30.

[9] The sixth additional individual was sent a notice after the Court's Order Modifying Preliminary Approval, pursuant to the notice process set forth in that Order, on August 16, 2024. *See* Milton Oct. Decl. at ¶ 26.

Order and investigating the class status of the six individuals described above, the Parties learned of a relatively small group of additional members or potential members of the class who had not been included in the provision of notice. Milton Oct. Decl. at ¶ 24. This group included 12 individuals who were actively enrolled and had not surpassed the excess credit threshold at the time the initial class list was pulled, but had done so as of the date of the Court's Preliminary Approval Order and otherwise met the class requirements. *Id.* It also included approximately 179 individuals who *might* be class members, but whose membership could not be determined because they did not provide race and/or gender information to Walden at enrollment. *Id.* The Court granted Plaintiffs' Motion on July 16, 2024, approving a second notice period so that these groups would receive individualized notice in the same manner as all class members. Dkt. No. 98. The Court's Order also approved a variation of the claim form for the group of 179 *possible* class members, providing for them to certify their race and gender information as necessary to demonstrate class membership. *Id.*

In the course of doing additional due diligence to ensure that all potential class members were included in the provision of notice, the Parties learned shortly before the second group of notices were disseminated that there were 35 additional individuals in the category of people who might be class members, but whose membership could not be determined because they did not provide race and/or gender information to Walden. Milton Oct. Decl. at ¶ 25. *See also* Lange Decl. at ¶ 3(c) (describing receipt of Updated Second Class Intake List). These 35 additional individuals were identically situated to the group of 179 and were included in the dissemination of notice along with the other members of the second notice group. Milton Oct. Decl. at ¶ 26; Lange Decl. at ¶ 16-18 (describing provision of notice to individuals on the Updated Second Class Intake List). Separately, one additional individual submitted a waiver of the confidentiality

provisions of the *Thornhill* settlement after initial notices were transmitted, so the Claims

Administrator disseminated notice to that individual in the second notice round[10]. A total of 228

individuals were sent notice during the second notice round. *Id.*

Overall, 2,369 people are now identified as members or potential members of the class

and included on the Class Intake Lists provided by Walden to the Claims Administrator—2,155

individuals confirmed to be class members based on Walden's records, and an additional 214 for

whom Walden has insufficient information to confirm class status.[11] Milton Decl. at ¶ 28.

The Parties have taken all steps required by the Preliminary Approval Order and the

Order Modifying Preliminary Approval. Most importantly, individualized notice was directed to

all 2,369 people who are or may be class Members. *See* Milton Oct. Decl. at ¶ 27, 28. First,

notice was sent to each by the Claims Administrator via first-class United States mail, email, and

text. Lange Decl. at ¶¶ 7-9, 16-18. Walden provided the records necessary to ascertain the

identity and last known contact information of each, and the Claims Administrator conducted

tracing to determine whether more up-to-date contact information is available. Lange Decl. at ¶¶

3, 6, 10, 19. No class member in the original group who were sent notice in May—and just one

class member or potential class member in the subsequent group sent notice in August—had all

forms of notice returned undeliverable. Lange Decl. at ¶¶ 11, 20. These facts demonstrate that

the forms of notice approved by the Court have been effective.

---

[10] Notice was also disseminated to the individual discussed in footnote 9 at this time.

[11] Notices were disseminated to a total of 2,488 people. A relatively small number of notices were disseminated during the first notice round to individuals who, upon further investigation, were found not to meet the class criteria. This consisted of 94 individuals who enrolled in, but did not successfully complete, excess capstone credits, 21 Walden employees or former employees, and two individuals who were in both categories. There were also two individuals who were sent notice either at their request or in error, but who Walden's records indicate do not meet the credit requirements for class membership. Milton Oct. Decl. at ¶ 27. *See also* Motion to Modify Preliminary Approval, Dkt. No. 97 at 6-7 (discussing individuals included in the initial class estimate who were determined not to be class members).

For class members who received notice pursuant to the Preliminary Approval Order, the deadline for opting out of the class was June 19, 2024. For the much smaller group of people who received notice pursuant to the Order Modifying Preliminary Approval, the deadline for opting out of the class was September 17, 2024. Only two opt-outs were submitted, and one was timely rescinded. *See* Milton Oct. Decl. at ¶ 29, Exhibit A; Lange Decl. at ¶¶ 14, 23.

For class members who received notice pursuant to the Preliminary Approval Order, the deadline for filing an objection to the Settlement was July 3, 2024. For the smaller group who received notice pursuant to the Order Modifying Preliminary Approval, the deadline for filing an objection was October 1, 2024. Only one objection was filed, as the Court's docket reflects. *See also* Lange Decl. at ¶¶ 15, 24.

Nobody declined disclosure of information covered by FERPA. Milton Oct. Decl. at ¶ 30.

## ARGUMENT

The Settlement Agreement is a fair, reasonable and adequate resolution of the matter that provides substantial and meaningful relief to members of the Class, results from extensive litigation and arm's-length negotiations by experienced counsel, and takes account of the complexity and risks at issue in this litigation.

## I.    FINAL APPROVAL SHOULD BE GRANTED BECAUSE THE SETTLEMENT AGREEMENT IS FAIR, REASONABLE, AND ADEQUATE

Approval of a proposed class action settlement typically proceeds in two steps. *See In re Jiffy Lube Secs. Litig.*, 927 F.2d 155, 158–59 (4th Cir. 1991). First, the Court grants preliminary approval if it determines that the settlement "is within the range of possible approval." *Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, 340 F.R.D. 242, 249 (D.S.C. 2021) ("*Comm'rs of Pub. Works*") (cleaned up); *see also, e.g.*, *In re Outer Banks Power Outage Litig.*, No. 4:17-CV-141, 2018 WL 2050141, at *3 (E.D.N.C. May 2, 2018);

*Manual for Complex Litigation* (Fourth) § 21.632 (Federal Judicial Center 2004) ("*Manual*").

Second, after notice of the settlement is provided to the class and the Court conducts a fairness

hearing, the Court determines whether the settlement is "fair, reasonable and adequate," as

required under Fed. R. Civ. P. 23(e)(2), such that final approval should be granted. *See Comm'rs*

*of Pub. Works*, No. 2:21-CV-42-RMG, 2024 WL 1004697 (D.S.C. Mar. 8, 2024), at *3-5; *In re*

*Outer Banks Power Outage Litig.*, 2018 WL 2050141, at *2; *Manual* §§ 21.634-35.

The Fourth Circuit applies a four-factor fairness inquiry and a five-factor adequacy

inquiry in determining whether a class action settlement should be approved. *See, e.g.*, *In re Jiffy*

*Lube Secs. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991) ("*Jiffy Lube*"); *Comm'rs of Pub. Works*,

340 F.R.D. at 249-50; *In re The Mills Corp. Secs. Litig.*, 265 F.R.D. 246, 254 (E.D. Va. 2009)

("*Mills*"). No specific factors must be considered in assessing reasonableness. *See, e.g.*, *Comm'rs*

*of Pub. Works*, 340 F.R.D. at 249-50; *Mills*, 265 F.R.D. at 258; *Beaulieu v. EQ Indus. Servs.*,

*Inc.*, No. 5:06-cv-00400-BR, 2009 WL 2208131, at *23-27 (E.D.N.C. July 22, 2009). The

fairness factors are:

> (1) the posture of the case at the time the proposed settlement was reached, (2) the
> extent of discovery that had been conducted, (3) the circumstances surrounding
> the settlement negotiations, and (4) counsel's experience in the type of case at
> issue.

*Comm'rs of Pub. Works*, 340 F.R.D. at 249 (citing *Jiffy Lube*, 927 F.2d at 158-59). The adequacy

factors are:

> (1) the relative strength of the case on the merits, (2) any difficulties of proof or
> strong defenses the plaintiff and class would likely encounter if the case were to
> go to trial, (3) the expected duration and expense of additional litigation, (4) the
> solvency of the defendants and the probability of recovery on a litigated
> judgment, [and] (5) the degree of opposition to the proposed settlement[.]

*Id.* (citing *Jiffy Lube*, 927 F.2d at 159). Consideration of these factors and those that are relevant to reasonableness demonstrates that the proposed settlement should receive final approval from the Court.

### A. The Fairness Factors

All of the fairness factors indicate that the Settlement Agreement should be finally approved.

### 1. Posture of the Case

This factor addresses principally "how far the case has come from its inception." *Mills*, 265 F.R.D. at 254. Settlement at a very early stage may suggest "collusion among the settling parties" and that the proposed settlement is not legitimate. *Jiffy Lube*, 927 F.2d at 159; *see also Mills*, 265 F.R.D. at 254. Here, the Parties contested a hard-fought motion to dismiss all six causes of action. The vigorous litigation of this motion and the legal issues therein demonstrates a clear lack of collusion.

The posture of the case also favors approval for the additional reason articulated in *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*:

> By reaching an agreement in principle prior to notification of the potential class members, the members could choose to be included or excluded based on the terms of the proposed settlement. If such agreement had been reached after notification, potential class members would have had to decide whether to opt-in or opt-out of the class without knowledge of the proposed settlement. Thus, the posture of the case at the time of the settlement favors final approval.

855 F. Supp. 825, 829 (E.D.N.C. 1994).

### 2. Extent of Discovery

While the Proposed Settlement was negotiated before formal discovery was produced, Plaintiff Fair's written discovery requests and the Parties' exchange of substantial information during negotiations weigh in favor of approval of the settlement. *See Comm'rs of Pub. Works*,

340 F.R.D. at 249 (finding fairness factors favored approval where "the proposed settlement was the result of extensive prior communication between the Parties" even though it "was negotiated before formal discovery was conducted"). In particular, Defendants provided Plaintiffs with a dataset containing information on all then-known putative class members, including their gender, race, enrollment start and end dates, tuition and fees paid to Walden, the total number of capstone credits taken, and whether they had taken out loans (*i.e.*, whether they fell within the ECOA Black Student Group or the ECOA Female Student Group). Milton Oct. Decl. at ¶ 20. Defendants also provided information about the minimum credit requirement and minimum per semester credit cost for Defendants' DBA program. *Id*. In *Jiffy Lube*, the Fourth Circuit held that even though no formal discovery had taken place, informal discovery was an adequate substitute. *See* 927 F.2d at 159; *see also Dickey v. R.R. Donnelley & Sons Co.*, No. 1:18CV920, 2021 WL 1169245, at *3 (M.D.N.C. Mar. 26, 2021) (finding "all factors support a finding that the settlement is fair" because "while the parties did not engage in formal discovery prior to settlement, they exchanged material information"). So too here: the key information furnished by Defendants enabled Plaintiffs to determine the size of the class and to assess the scope of Defendants' potential liability, providing a foundation for informed settlement negotiations. *See In re Red Hat, Inc. Sec. Litig.*, No. 5:04-CV-473, 2010 WL 2710517, at *2 (E.D.N.C. June 11, 2010) (recommending approval prior to merits-based discovery where "the parties have been able to make informed decisions regarding settlement"), *report and recommendation adopted*, No. 5:04-CV-473, 2010 WL 2710446 (E.D.N.C. July 8, 2010). While additional class members and possible class members were identified more recently, the size of this additional group is relatively small, and its earlier identification would not have meaningfully impacted settlement negotiations.

Beyond formal discovery, extensive communications between counsel prior to and following the Parties' mediation sessions likewise favor final approval. The Parties' exchange of information on key legal disputes—for example, on the appropriate statute of limitations period (and the potential effect of that limitations period on the size, scope, and potential damages of the case), and on Defendants' argument that class members who filed a borrower defense application would recoup a windfall—resolved certain disputes and otherwise clarified the Parties' stances, enabling the Parties to assess their litigation risk more accurately. Milton March Decl. at ¶ 6-8, 12-13. Just as disputes around the proper scope of discovery facilitate better understanding of parties' respective positions on legal issues, the Parties' communications narrowed points of disagreement and allowed for more informed settlement negotiations.

### 3. Circumstances Surrounding Negotiations

This factor serves to assure that the settlement is the result of arm's-length negotiations based on counsel's informed understanding of the case. *See Mills*, 265 F.R.D. at 255. "Absent evidence to the contrary, the Court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Archbold v. Wells Fargo Bank, N.A.*, No. 3:13-CV-24599, 2015 WL 4276295, at *2 (S.D.W. Va. July 14, 2015); *Kirven v. Cent. States Health & Life Co. of Omaha*, No. CA 3:11-2149, 2015 WL 1314086, at *5 (D.S.C. Mar. 23, 2015) (same). The circumstances here include a vigorously contested motion to dismiss; an initial mediation that, though productive, did not yield a settlement and concluded with the Parties remaining far apart in monetary terms; over four months of continued discussion and exchange of authority on contested legal issues; a second mediation that finally produced agreement on total monetary terms; and four more months of extensive back and forth on the non-monetary terms of the settlement, even after the Parties had come to an agreement on monetary terms. The success in finally reaching an agreement has been based on a well-

16

developed understanding of the factual and legal issues in this case and has been achieved only through the involvement of Michelle Yoshida and Michael K. Lewis as mediators. *See In re Outer Banks Power Outage Litig.*, 2018 WL 2050141, at *3 ("mediation with a highly experienced mediator" supported finding that settlement was the result of "arms-length negotiations"). All of these circumstances favor approval of the proposed settlement.

### 4. <u>Experience of Counsel</u>

Plaintiffs' lead counsel Relman Colfax PLLC ("Relman Colfax") is a civil rights law firm based in Washington, D.C., with a national practice. *See* Milton Oct. Decl. ¶ 4. Relman Colfax routinely litigates a wide range of discrimination cases in federal court including many cases, like this one, that involve lending and other consumer issues under both state and federal law. *See id.* ¶ 4.

Relman Colfax previously litigated what is, to their knowledge, the first discrimination class action certified against a for-profit college. *See* Order Granting Preliminary Approval of Proposed Class Action Settlement, *Morgan v. Richmond Sch. of Health and Tech., Inc.* ("*RSHT*") No. 3:12-cv-373 (E.D. Va. July 25, 2013), ECF No. 100 at ¶ 11. There, counsel brought reverse redlining claims under Title VI and the Equal Credit Opportunity Act ("ECOA") and secured a $5,000,000 settlement for a class of students enrolled at a for-profit university. *See* Settlement Agreement, *RSHT*, No. 3:12-cv-373 (E.D. Va. Apr. 9, 2013), ECF No. 81-1. Counsel have further experience serving as class counsel for multiple certified class actions, including: *Fair Hous. Ctr. of Cent. Indiana, Inc. v. Rainbow Realty Grp., Inc.*, No. 1:17-CV-1782, 2020 WL 1493021 (S.D. Ind. Mar. 27, 2020) (predatory rent to buy program targeted on the basis of race and ethnicity); *Flack v. Wisconsin Dep't of Health Servs.*, 331 F.R.D. 361 (W.D. Wis. Apr. 23, 2019) (denial of Medicaid coverage for treatments related to gender transition); and *Moore v. Duke*, Civ. No. 00-953 (D.D.C. complaint filed May 3, 2000) (discrimination by U.S. Secret

Service). Milton Oct. Decl. at ¶ 5. In each of the class cases, the court found Relman Colfax

qualified to serve as class counsel. For example, in *Moore*, the court stated that "[t]here is no

dispute as to whether the plaintiffs' class counsel are appropriate, and there is no indication that

class counsel lack the experience and knowledge required to represent the class." *Moore v.

Napolitano*, 926 F. Supp. 2d. 8, 35 (D.D.C. 2013). And counsel have deep experience and

knowledge in prosecuting "reverse redlining" cases such as this one, which allege the

discriminatory targeting of a predatory practice or product. In addition to *Rainbow Realty Group*

and *RSHT*, noted above, these include *United States ex. rel. Boyd v. Corinthian Colleges, Inc.*,

No. 1:14-cv-06620 (N.D. Ill. complaint filed Aug. 27, 2014); *Mayor & City Council of Baltimore

v. Wells Fargo Bank, N.A.*, No. 08-62, 2011 WL 1557759 (D. Md. Apr. 22, 2011); *City of

Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857, 2011 WL 1706756 (W.D. Tenn. May 4,

2011); and *Saint-Jean v. Emigrant Mortgage Co.*, 337 F. Supp. 3d 186 (E.D.N.Y. 2018). Milton

Oct. Decl. at ¶ 6.

Plaintiffs' co-counsel, National Student Legal Defense Network ("Student Defense"),

possesses additional, specialized experience that weighs in favor of approval. Student Defense is

a non-profit organization that works to advance students' rights to educational opportunity,

including by addressing civil rights disparities in higher education and in the student lending

system. *See* Decl. of E. Rothschild ("Rothschild Decl.") (Ex. 3) at ¶ 4. Student Defense regularly

litigates cases on behalf of students in both federal and state courts and is co-counsel on several

active litigation matters brought against educational institutions for fraud and other claims

similar to those at issue here, including: *Lopez v. California Institute of Technology*, No. 23-

607810 (Sup. Ct. Cal. complaint filed July 20, 2023) (class suit against Caltech and online

learning provider for false advertising, fraud, and other state law violations); *Fuller v. Bloom*

*Institute of Technology, formerly d/b/a Lambda School,* 23-605179 (Sup. Ct. Cal. complaint filed

Mar. 16, 2023) (class suit against coding bootcamp for violating consumer protection laws);

*Dunagan v. Illinois Institute of Art*, No. 19-cv-809 (N.D. Ill. notice of removal filed Feb. 7,

2019) (class suit against school that lost accreditation for defrauding students; originally filed in

state court on Dec. 8, 2018); *Detmer v. La'James College of Hairstyling, Inc. of Fort Dodge*, No.

05771 LACL 147597 (Ia. District Ct. for Polk Cnty. complaint filed Mar. 30, 2020) (class suit

against cosmetology school for delayed disbursement of financial aid). Rothschild Decl. at ¶ 6-7.

Counsel's experience litigating class actions and reverse redlining and other

discrimination claims, including in the context of for-profit education, gives substantial credence

to their representation to the Court that the settlement is fair. *See, e.g.*, *Comm'rs of Pub. Works*,

340 F.R.D. at 248.

### B.  The Adequacy Factors

All the adequacy factors indicate that the Settlement Agreement should be finally

approved.

#### 1.  <u>Relative Strength of Plaintiffs' Case on the Merits and Difficulties of Proof or Strong Defenses Likely at Trial</u>

The first two adequacy factors are often addressed in tandem. *See, e.g.*, *Haney v.*

*Genworth Life Ins. Co.*, No. 3:22CV55, 2023 WL 174956, at *6 (E.D. Va. Jan. 11, 2023); Fed.

R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment (grouping these two factors

together). These factors consider "how much the class sacrifices in settling a potentially strong

case in light of how much the class gains in avoiding the uncertainty of a potentially difficult

case." *Haney*, 2023 WL 174956, at *6 (quoting *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560,

573 (E.D. Va. 2016)). Undersigned counsel are very confident in the strength of Plaintiffs' case,

yet are cognizant that "no matter how confident one may be of the outcome of litigation, such

confidence is often misplaced." *Mills*, 265 F.R.D. at 256 (quoting *W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743–744 (S.D.N.Y. 1970)).

This case includes issues that are typically difficult to prove, an obstacle that is regularly noted when applying the first two adequacy factors. *See, e.g.*, *Jiffy Lube*, 927 F.2d at 159. To prevail on Plaintiffs' reverse redlining theory of liability, Plaintiffs must prove both that (1) Defendants' practices were unfair and predatory, and (2) that Defendants either intentionally targeted on the basis of a protected class, or that there is a disparate impact on the basis of a protected class. *See Carroll v. Walden Univ.*, LLC, 650 F. Supp. 3d 342, 357, 360 (D. Md. 2022). To prove the first requirement, Plaintiffs would need jurors to find that Walden's practices were indeed unfair and predatory, and reject Walden's likely argument that they were instead legitimate business practices that provided benefits to students. To prove the second requirement, Plaintiffs would need jurors to find the witnesses supporting the discriminatory intent claim more persuasive than those who would sharply dispute it, and would rely on jurors' willingness to infer discrimination from other evidence, such as the over-representation of Black and female students in the student body. Walden would likely raise as a defense that the school's education is geared toward low-income students, and that focusing on recruiting low-income students is a legitimate and even commendable business practice despite any resulting over-representation of Black students. This defense might appeal to a jury.

Walden's Motion to Dismiss also demonstrates that there are considerable legal hurdles that Plaintiffs must overcome to prevail. As the Court recognized, at the pleading stage Plaintiffs "must only allege enough to nudge[ ] their claims across the line from conceivable to plausible." *Carroll*, 650 F. Supp. 3d at 356. But of course, that burden is higher at the summary judgment stage, requiring Plaintiffs to generate a genuine dispute of material fact as to whether a jury

could conclude that Walden discriminated on the basis of race and sex. *Id.* at 358. With respect

to their ECOA claim, Plaintiffs would need to establish that ECOA applies to the conduct at

issue based on a sufficiently direct connection between Walden's discriminatory conduct and the

loans they obtained—an obstacle that Plaintiffs' Counsel believes is surmountable but not

without legal difficulty. *See id.* at 359-60.

Plaintiffs face further risks in persuading the Court that a sizable portion of class

members' claims are not time barred. Based on months of negotiations, Plaintiffs expect that—

absent settlement—Defendants would contend that the three-year statute of limitations applicable

to Title VI claims bars those claims for students who enrolled prior to July 7, 2015, and that the

five-year statute of limitations applicable to ECOA claims bars those claims for students who

enrolled prior to July 7, 2013. If Defendants prevailed on this issue, the damages available to

Plaintiffs could be reduced by over 60% and the number of class members could fall by over

55%. Milton March Decl. at ¶¶ 8, 13. Plaintiffs believe that, pursuant to the continuing violations

doctrine, the statutes of limitations do not apply as Defendants contend, but again it is not a

certainty that the Court will agree.

Plaintiffs must also overcome the hurdle of class certification. Defendants are likely to

litigate vigorously against a class certification motion made outside the context of settlement and

to seek immediate appeal of an order granting class certification. *See* Fed. R. Civ. P. 23(f). And

although Plaintiffs must demonstrate that the Settlement Class satisfies the requirements of Rule

23, this obstacle is easier to overcome in the settlement context because "a district court need not

inquire whether the case, if tried, would present intractable management problems." *Amchem

Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (citing Fed. R. Civ. P. 23(b)(3)(D)); *Decohen v.

Abbasi, LLC*, 299 F.R.D. 469, 476-77 (D. Md. 2014) (same).

In short, there would be genuine factual and legal challenges to prevailing in this case, which favors approval of the proposed settlement.

### 2. Duration and Expense of Additional Litigation

There is no doubt that litigation of this case through discovery, summary judgment, trial, and appeal would require substantial additional time and expense. Fact and expert discovery on class certification issues and litigation of the class certification motion alone would take a considerable amount of time (more than a year under the schedule jointly proposed by the Parties and adopted by the Court) and expense. Assuming the Court granted Plaintiffs' class certification motion, merits discovery would likely include a very large number of fact deponents given the many students, teachers, and administrators who have been enrolled at or employed by Walden, and relevant outside consultants and vendors (*e.g.*, with respect to marketing). Trial would be lengthy because there could be a very large number of fact witnesses; three to four weeks is not unlikely. There would also be dueling expert witnesses regarding business administration doctoral programs, demographics, marketing, and possibly other subjects. Throughout all of this, there would be hard-fought motions practice, as indicated by the history of the litigation to date. And, as in *In re MicroStrategy, Inc. Sec. Litig.*:

> Nor is it likely that this litigation would have ended with a jury verdict; there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs.

148 F. Supp. 2d 654, 667 (E.D. Va. 2001) ("*MicroStrategy*").

Full litigation, in short, would require several years and millions of dollars in fees and expenses, in addition to the risk of an unfavorable outcome.

### 3. <u>Solvency of Defendant and Likelihood of Recovery on a Litigated Judgment</u>

At this time, Plaintiffs do not anticipate difficulty collecting a potential judgment from Defendants. Nevertheless, the settlement provides substantial relief to class members, obviating any solvency-related concerns that may arise were their claims to be litigated over the course of the next several years.

### 4. <u>Degree of Opposition</u>

All of the Plaintiffs support the proposed settlement, *see* Decl. of A. Carroll ("Carroll Decl."), Dkt. No. 92-7, at ¶ 12; Decl. of C. Charles ("Charles Decl."), Dkt. No. 92-8, at ¶ 12; Decl. of T. Fair ("Fair Decl."), Dkt. No. 92-9, at ¶ 12; Decl. of T. Fluker ("Fluker Decl."), Dkt. No. 94-1, at ¶ 11, and only one class member filed an objection. *See* Dr. Joni Hoxsey Opposition, Dkt. 96. As an initial matter, this "almost complete lack of objection" to the settlement agreement favors approval. *Berry v. Schulman*, 807 F.3d 600, 619 (4th Cir. 2015) (holding, where only one member of a sizeable class objected to a fee request, that the absence of broader objection "provides additional support for the district court's decision to approve" the agreement); *see also Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 763 (S.D.W. Va. 2009) (finding that a single outstanding objection to the class settlement agreement "not only demonstrates the Class Members' satisfaction with the settlement result, but also shows their implicit approval of its terms"); *Troncelliti v. Minolta Corp.*, 666 F. Supp. 750, 754–55 (D. Md. 1987) (holding that the "almost complete absence of opposition to the settlement" supported final approval). Turning to the single objection filed, Dr. Hoxsey objects to the amount of the settlement, asserting that Defendants should be made to pay a larger portion of the excess tuition they received from class members. But, as explained in Section C.1 below, the settlement amount represents an above average recovery for a case of this type.

### C. Reasonableness

As noted above, there are no specific factors used to assess reasonableness in the Fourth Circuit. Factors that Plaintiffs believe are relevant, however, all favor approval of the proposed settlement.

### 1. **The Size of the Recovery is Reasonable**

The settlement achieves an excellent result for the class, especially in light of the legal and factual obstacles that Plaintiffs would otherwise need to overcome and the costs—in terms of both resources and time—of proceeding through trial and appeal. The $28.5 million settlement fund represents approximately 31% of the costs that class members who enrolled between 2008 and 2018 were charged for what Plaintiffs allege were excess capstone credits. It is approximately 79% of the costs that class members who enrolled between 2013 and 2018 were charged for excess capstone credits, which Defendants contend is the correct time period based on their statute of limitations argument discussed *supra*.[12] Milton Oct. Decl. at ¶ 31-32. In *RSHT*—a class action involving ECOA and Title VI civil rights claims against a for-profit college that is the most analogous class settlement anywhere in the country to this one—the court approved a settlement amounting to 19% of the tuition at issue paid by class members.[13] In *Cullen v. Whitman Med. Corp.*, another class action similar to this one, the court approved a settlement for only 17% of the tuition at issue paid by the students.[14] 197 F.R.D. 136, 144, 148

---

[12] These figures are based on information shared between the Parties during settlement discussion and represent costs paid by the individuals who made up the original estimated class of 2,291. Now that the number of confirmed class members has decreased, *see* footnote 11, *supra*, the recovery likely represents a slightly larger percentage of the excess capstone costs paid by class members.

[13] *See* Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement, No. 3:12-cv-373, ECF No. 93 at 19 (July 16, 2023) ("settlement fund represents approximately 19% of the tuition that the Class Members paid to [Defendant]"); Order Granting Final Approval of Proposed Class Action Settlement, No. 3:12-cv-373, ECF No. 100 (July 25, 2013) (approving settlement).

[14] Just as the 31% here, the 19% and 17% figures both reflect the full recovery, *i.e.*, before any allocation for fees and costs.

(E.D. Pa. 2000). And in other cases, courts have approved class action settlements reflecting much lower percentage recoveries. *See, e.g.*, *MicroStrategy,* 148 F. Supp. 2d at 666 n.22 (collecting cases approving settlements with recoveries of 5% to 16%). The recovery here easily clears the reasonableness bar.

## 2.   The Incentive Awards for the Named Plaintiffs are Reasonable

Fed. R. Civ. P. 23(e)(2)(D) authorizes the payment of incentive awards to named Plaintiffs to ensure that the settlement "treats class members equitably relative to each other." *See* William B. Rubenstein, 5 Newberg and Rubenstein on Class Actions § 17:13 (6th ed.) (June 2024 Update) ("To the extent that the class representatives . . . took risks, or protected the class's interests through their work, it is surely equitable to provide them a modest extra payment from the class's recovery."). "To determine whether an incentive payment is warranted, the court should consider 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 483 (D. Md. 2014) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)). Here, the class members have benefitted tremendously from the named Plaintiffs' steadfast work on their behalf, and Plaintiffs should be compensated accordingly.

The four named Plaintiffs have all devoted substantial time and effort to the development and prosecution of the lawsuit. They have met with counsel in-person, by video, and telephonically on many occasions, searched for and provided documents, and subjected themselves to public attention as this case has attracted significant media interest, which resulted in unwelcome calls and outreach to some of the Plaintiffs. All four Plaintiffs traveled to New York to attend the May 4, 2023 mediation in person, and all met with mediator Lewis prior to the second mediation. After the Parties reached a tentative agreement on monetary terms, Plaintiffs

offered invaluable input during the lengthy negotiation of the non-monetary terms of the settlement agreement—advocating not only for their own interests, but those of the whole class. Carroll Decl. at ¶¶ 9-11; Charles Decl. at ¶¶ 9-11; Fair Decl. at ¶¶ 9-11; Fluker Decl. at ¶¶ 8-10. Further, in agreeing to the settlement, Plaintiffs Carroll, Charles, and Fair are forfeiting their individual state law claims under the Minnesota Prevention of Consumer Fraud Act, the Minnesota False Statement in Advertising Act, Minnesota Uniform Deceptive Trade Practices Act, and the common law for fraudulent misrepresentation. *See* First Am. Compl., Dkt. No. 47, at ¶¶ 63-68. These Plaintiffs are thus foregoing sums they could have obtained had they pursued their cases individually.

The $25,000 incentive awards for each of the four named Plaintiffs are reasonable. *See, e.g.*, *Binotti v. Duke Univ.*, No. 1:20-CV-470, 2021 WL 5366877, at *5-*6 (M.D.N.C. Aug. 30, 2021) (approving $65,000 incentive award and collecting cases with incentive awards from $85,000 to $300,000 per plaintiff)); *In re Titanium Dioxide Antitrust Litig.*, No. 10-CV-00318, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (approving $125,000 incentive award); *Helmick v. Columbia Gas Transmission*, No. 2:07-cv-00743, 2010 WL 2671506, at *3 (S.D.W. Va. July 1, 2010) (approving $50,000 incentive award in addition to regular distribution from settlement proceeds); William B. Rubenstein, 5 Newberg and Rubenstein on Class Actions § 17:8 tbl.1 (6th ed.) (June 2024 Update) (summarizing study showing mean incentive award of $24,517 per plaintiff in 2021 inflation-adjusted USD).

### 3. The Attorneys' Fees and Costs are Reasonable

Plaintiffs are seeking an award of $7,125,000 in attorneys' fees and expenses, out of the $28.5 million settlement fund. Courts in the Fourth Circuit typically use the percentage-of-the-fund method in calculating attorneys' fees in common fund cases. *See, e.g.*, *Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 462 (S.D.W. Va. 2010) ("Courts have increasingly favored the

percentage method for calculating attorneys' fees in common fund cases."). The Settlement

Agreement uses the percentage method and allocates 25% of the $28.5 million settlement

($7,125,000) to the law firm and the non-profit organization representing Plaintiffs. Settlement

Agreement at ¶ 12. This amount covers both fees and costs. The reasonableness of the proposed

award of fees and costs is addressed in greater detail in Section IV, *infra*, in which Plaintiffs

support their request in accordance with Fed. R. Civ. P. 23(h) and Fed. R. Civ. P. 54(d)(2).

## II.    A SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED UNDER RULES 23(a), 23(b)(2), AND 23(b)(3)

The Settlement Agreement provides that the settlement will be effectuated through class

action treatment, and that the Parties will support certification for this purpose. *See* Settlement

Agreement at ¶¶ 2-3, 16-17. For a class to be certified, it must meet the requirements of Fed. R.

Civ. P. 23. *Jonathan R. v. Just.*, 344 F.R.D. 294, 302 (S.D.W. Va. 2023). This requires that

Plaintiffs satisfy each of the four criteria provided in Rule 23(a)(1)-(4), but only one of three

subcategories of Rule 23(b). *Id.* Rule 23 should be given "a liberal, rather than a restrictive,

construction" along with "a standard of flexibility that will 'best serve the ends of justice for the

affected parties and . . . promote judicial efficiency.'" *Good v. Am. Water Works Co., Inc.*, 310

F.R.D. 274, 285 (S.D.W. Va. 2015) (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417,

424 (4th Cir. 2003)).

The proposed Settlement Class satisfies the criteria of Rule 23(a). The proposed

Settlement Class also satisfies Rule 23(b)(2) with respect to injunctive relief, and Rule 23(b)(3)

with respect to monetary relief. Certification under multiple subsections of Rule 23(b) is proper.

*See, e.g.*, *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997); *Fisher v. Virginia Elec. &

Power Co.*, 217 F.R.D. 201, 214 (E.D. Va. 2003).

The Court provisionally certified the Settlement Class and appointed undersigned counsel to represent the class in the Preliminary Approval Order. Plaintiffs submit that the Court should now make the certification and appointment permanent. The only development relevant to these issues since the Preliminary Approval Order is that, in response to the giving of notice, only one objection to the proposed settlement was received and only one person out of over 2,000 class members opted out of the class. This indicates that the members of the class approve of the work done by Plaintiffs' Counsel. Because the requirements of Rule 23 are met, the Court should grant final approval of the Settlement Class.

### A. Rule 23(a) is Satisfied

#### 1. Rule 23(a)(1) – Numerosity

The Parties' exchange of information during settlement negotiations and the Class Intake Lists provided by Walden to the Claims Administrator confirm that the class is composed of thousands of students. Milton March Decl. at ¶ 7; Milton Oct. Decl. at ¶¶ 20, 22. This easily satisfies the Rule 23(a)(1) requirement that "the class is so numerous that joinder of all members is impracticable." *See, e.g., In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (noting that "a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone"); *see also Santos v. E&R Servs., Inc.*, No. DLB-20-2737, 2021 WL 6073039, at *8 (D. Md. Dec. 23, 2021) (same).

#### 2. Rule 23(a)(2) – Commonality

To establish commonality, "a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Commonality is present when the claims of class members "depend upon a common contention . . . [that is] capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Only one such common issue of law or fact is needed

to satisfy commonality. *See, e.g., id.* at 359; *Fernandez v. RentGrow, Inc.*, 341 F.R.D. 174, 201 (D. Md. 2022). "This does *not* mean, of course, that the entire *case* must be decided by a single issue." *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 200 (E.D. Va. 2015) (emphases in original). Moreover, as recognized in the Fourth Circuit, "[m]inor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 53 (D. Md. 2020) (quoting *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997)).

Though only one is needed, here there are several common factual and legal questions that are central to resolving this dispute and capable of classwide resolution, satisfying Rule 23(a)(2). These include whether Walden systematically targeted Black, female, and nontraditional students through advertising and marketing; whether it systematically misrepresented the number of credits required to complete the capstone component of the DBA program, including through its website and standardized representations by enrollment advisors; whether doing so was predatory or, to the contrary, a justifiable business choice; whether ECOA applies to the conduct at issue; whether the targeting of nontraditional students disproportionately harmed Black and female students; and whether such targeting is a justifiable business choice. Cases like this, where Plaintiffs' allegations are based on Defendants' "standardized conduct," are especially appropriate for class treatment. *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 61 (E.D. Va. 2021), *aff'd sub nom. Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023). That is because such conduct allows key questions—e.g., did Walden systematically target based on race and gender— to be answered "in one stroke," *Dukes*, 564 U.S. at 350, for the whole class.

**Intentional Targeting of Black and Female Students.** Plaintiffs allege that as a result of Walden's deliberate targeting of Black and female students, the university's recipients of doctoral degrees in Business Administration are significantly more likely to be Black than recipients of such degrees at other universities. First Am. Compl. at ¶ 138; Milton March Decl. at ¶ 19. Similarly, 68% of its doctoral recipients in 2020 were women, significantly higher than the percentage of female doctoral recipients across universities nationally. First Am. Compl. at ¶ 160; Milton March Decl. at ¶ 20, Attachs. H, I. Plaintiffs allege that this resulted from Walden's purported practice of directing an overwhelming portion of its local advertising to markets with higher-than-average Black populations, demonstrated by data showing that it used approximately 90 to 100% of its local advertising budget in areas with an above-median percentage of Black residents. First Am. Compl. at ¶¶ 142, 146-49. According to Plaintiffs, the content of Walden's social media, website, and other media advertising also reflected its uniform targeting of Black and female students by prominently featuring Black people, explicitly announcing its top ranking in awarding doctorates to Black students, and promoting the suitability of its academic programs for mothers, wives, and working women. *Id.* at ¶¶ 151-52, 165-67; Milton March Decl. at ¶ 21 & Attachs. J, K.

Whether Walden intentionally targeted Black and female students to enroll them into its DBA program raises common questions of racial and gender discrimination.

**Intentional Targeting of Nontraditional Students.** Plaintiffs also allege that Walden uniformly targets nontraditional students. The university consistently advertised and marketed to nontraditional students through video and social media advertisements, as well as advertisements displayed on its websites. Many of its advertisements that appear on social media platforms and internet searches feature older students, students who are full-time employees, and students with

children. First Am. Compl. at ¶¶ 170-76. These advertisements coincided with Walden's messaging, in which the university describes itself as a university that is suitable for working professionals, parents, and older individuals. *Id.*; Milton March Decl. at ¶ 21.

Whether Walden knowingly targeted nontraditional prospective students through systematic marketing, and whether doing so disparately impacted Black and female students, raise common questions of gender and racial discrimination.

**Walden's False Representations Through Its Website.** Plaintiffs allege that Walden, through its website, knowingly understated the number of credits students were required to take for completion of the capstone portion of the DBA program. First Am. Compl. at ¶ 109; *see also* Milton March Decl. at ¶ 22 & Attach. L (Minnesota Office of Higher Education's Walden University Doctoral Program Review, Oct. 23, 2019) at 101 ("Given the average capstone credits students t[ook], it is likely that many students complete[d] their program with more than the minimum credits and therefore end[ed] up paying more than the minimum tuition costs."). Walden's academic catalogs, available on its website, indicated that nineteen or twenty capstone credits were required. Milton March Decl. at ¶ 18 & Attachs. B-G. But, Plaintiffs allege, Walden actually required students to complete many more capstone credits, resulting in, on average, over $30,000 in extra costs per student. First Am. Compl. at ¶ 16.

Plaintiffs allege that the consistent information on Walden's webpage about the number of credits required to complete the DBA program served as standardized information that Walden intended prospective and enrolled students to rely on. *Id.*, at ¶¶ 64, 85-86. *See, e.g.*, *Butela v. Midland Credit Mgmt. Inc.*, 341 F.R.D. 581 (W.D. Pa. 2022) (certifying class based on "common questions" concerning the "uniform conduct by [the defendant] with respect to every class member"). Information shared between the Parties during mediation confirms Plaintiffs'

31

allegations that Walden's own data made clear that, on average, students would likely have to enroll in more capstone credits than what Plaintiffs allege was the number of required credits stated on Walden's website. *See* Milton March Decl. at ¶ 9.

Whether Walden knowingly engaged in predatory misrepresentation of the number of capstone credits and thus the cost to complete the DBA program on its website raises a common question.

**Walden's False Representation Through Its Enrollment Advisors.** Along with the alleged standardized misrepresentations on its website, Plaintiffs allege Walden's enrollment advisors, or enrollment specialists, consistently communicated false information to prospective students to attract and ultimately enroll them for profit. First Am. Compl. at ¶¶ 95, 97; Carroll Decl. at ¶¶ 4, 6; Charles Decl. at ¶¶ 4, 6; Fair Decl. at ¶¶ 4, 6; Fluker Decl. at ¶¶ 3, 5. Even without discovery, documentary evidence shows that enrollment advisors served as sales agents for Walden to sell "our product" by establishing standardized, scripted ways to interact with prospective students. First Am. Compl. at ¶¶ 97-100; Milton March Decl. at ¶ 17 & Attach. A (internal Walden document titled "Overcoming Objections").

As Plaintiffs allege, the process began with a prospective student filling out an interest form on Walden's website. First Am. Compl. at ¶¶ 96, 197, 217. Then, according to Plaintiffs, an enrollment advisor would communicate with prospective students using standard talking points that offered enrollment advisors guidance on how to overcome anticipated objections from prospective students about credit requirements, time of completing the program, and costs. *Id.* at ¶¶ 99-101. Each named Plaintiff in this suit communicated with an enrollment advisor during her process of assessing doctoral degree options or enrolling at Walden, and each one has testified through her declaration that she was also provided the same or similar misleading information

from enrollment advisors regarding the amount of credit hours per semester to complete the DBA program and thus the cost of her education. Carroll Decl. at ¶¶ 3-4, 6; Charles Decl. at ¶¶ 3-4, 6; Fair Decl. at ¶¶ 3-4, 6; Fluker Decl. at ¶¶ 2-3, 5.

Whether enrollment advisors used uniform instructions from Walden to misrepresent the credit requirements and costs of the DBA program when speaking with prospective students to enroll them into Walden's DBA program, and whether this amounts to a predatory practice, are common questions that are at the center of Plaintiffs' claims. *See Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408 (S.D.N.Y.), *on reconsideration in part*, 293 F.R.D. 578 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) (finding that the defendant's uniform conduct weighed in favor of commonality).

Accordingly, the issues discussed in this section are common ones of fact and law that would drive the resolution of this suit absent settlement, satisfying the commonality requirement.

### 3. **Rule 23(a)(3) – Typicality**

"The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 58 (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)). The "class representative must generally be part of the class and have 'the same interest and suffer the same injury as the class members,' but typicality "does not require that the class representative's claims be identical to those of the class." *Id.* Instead, class representatives' claims must only "fairly encompass those of the entire class." *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560 (E.D. Va. 2016) (internal quotation marks omitted).

The evidence shows that the named Plaintiffs' claims are typical of the class. They were enrolled in Walden's DBA program during the class period; are female; are Black or biracial; were exposed to the standardized statements regarding the credit requirements and costs of the

DBA program on Walden's websites, which Plaintiffs allege were misrepresentations; and interacted with Walden's enrollment advisors. As alleged for the class, the named Plaintiffs assert that they relied on the purportedly false representations on Walden's websites and the misrepresentations of the university's enrollment advisors to enroll in the DBA program. All the named Plaintiffs, after completing the coursework phase of the DBA program, entered the capstone phase and took more capstone phase credits—and thus paid significantly more money—than Plaintiffs assert had been represented by Walden. Carroll Decl. at ¶¶ 5-8; Charles Decl. at ¶¶ 5-8; Fair. Decl. at ¶¶ 5-8; Fluker Decl. at ¶¶ 4-7. This is precisely what is alleged as to the class and demonstrates satisfaction of the typicality requirement.

#### 4.  Rule 23(a)(4) – Adequacy of Representation

"The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.'" *Id.* (quoting *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010)); *see also Nelson v. Warner*, 336 F.R.D. 118, 124 (S.D.W. Va. 2020) (noting that "[o]nly conflicts that are fundamental . . . and that go to the heart of the litigation prevent a plaintiff from meeting . . . the adequacy requirement"). Class Counsel's competence and experience is also a second factor in determining adequacy of representation. *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 558 (D. Md. 2006).

Adequacy is satisfied in both respects. First, no conflict exists between class representatives and other unnamed members of the class proposed, and the interests of the named Plaintiffs and the other students of the DBA program are aligned. There is a shared interest among class members in being properly compensated for the additional money they borrowed

and spent due to Walden's discriminatory targeting and in effecting changes to Walden's practices and policies regarding its DBA program.

Second, undersigned counsel have extensive experience in consumer, discrimination, and class action litigation. Furthermore, by their litigation of this case, counsel have demonstrated that they are able to zealously pursue the class members' interests and are firmly committed to doing so. *See Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 556 n.16 (E.D. Va. 2000) (observing that through the "voluminous pleadings [and] filings" plaintiffs' counsel met "their duties under this analysis," and that counsel "represent[ed] the class with the fervor due under Rule 23 to the absent class members.").

### B.  Rule 23(b)(2) is Satisfied

Rule 23(b)(2) concerns certification with respect to injunctive or declaratory relief. *See Dukes*, 564 U.S. at 360. The Settlement Agreement includes several forms of significant injunctive relief. *See* Settlement Agreement at ¶ 15. Thus, certification of a (b)(2) class is appropriate regarding these aspects of the settlement.

### C.  Rule 23(b)(3) is Satisfied

Rule 23(b)(3) certification generally applies to cases seeking significant monetary relief for a class. *Dukes*, 564 U.S. at 362 ("[W]e think it clear that individualized monetary claims belong in Rule 23(b)(3)."). It is appropriate here because the case satisfies the two relevant criteria: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23 identifies four (non-exhaustive) factors that are pertinent to this inquiry:

> (A) the  class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of a litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.* The factor in subsection (D) is not relevant regarding a settlement-only class. *Graham v. Famous Dave's of Am., Inc.*, No. CV DKC 19-0486, 2022 WL 17584274, at *6 (D. Md. Dec. 12, 2022) ("[D]istrict courts need not consider the fourth factor . . . when deciding whether to certify a class for settlement purposes only.").

"Courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations." *Reed v. Alecto Healthcare Servs., LLC*, No. 5:19-CV-263, 2022 WL 4115858, at *7 (N.D.W. Va. July 27, 2022). "Indeed, in actions for money damages under Rule 23(b)(3), courts usually require individual proof of the amount of damages each member incurred." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 428 (4th Cir. 2003). The common questions detailed above regarding commonality, such as whether Walden systematically targeted on the basis of race and gender, are the predominant issues pertaining to liability, and the resolution of those questions will serve as the basis for liability determinations as to each of the causes of action at issue. In any event, damages determinations will be simple and straightforward under the Settlement Agreement because they will be based on a pro rata calculation using objective data provided by Walden from its business records (with class members given an opportunity to correct, via submission of claim forms, any perceived errors in Walden's records).

The Settlement Class also satisfies subsection factors (A), (B), and (C), demonstrating that the class action device is superior. The "dominant[]" purpose of factor (A) is to provide for the "vindication of the rights of groups of people who individually would be without effective

strength to bring their opponents into court at all." *Pitt v. City of Portsmouth*, 221 F.R.D. 438 (E.D. Va. 2004) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 616-17 (1997)); *see also In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 162 (D.S.C. 2018) (finding that "the vast majority of class members have a *de minimis* interest in individually controlling the prosecution of their . . . claims because the monetary value of their damages would be dramatically outweighed by the cost of litigating an individual case"). The lack of economic resources and incentives for individual class members to bring their own suits are key considerations, *see Pitt*, 221 F.R.D. at 445-46, both of which are present in this case. Many of the same challenging factual and legal issues identified above would be present in individual, non-class litigation, in which claims and recovery would likely be under $100,000 for more than 90% of the individuals and under $50,000 for more than two-thirds. This would not justify the substantial cost required to demonstrate Walden's liability for damages. Given the costliness of individual litigation, this factor supports class certification.

For the factor in subsection (B), Plaintiffs are unaware of any other litigation concerning the controversy detailed in their complaint, apart from the only slightly overlapping and completed case addressed in footnote six. The factor in subsection (C) has been addressed and satisfied because Walden University, LLC and Walden e-Learning, LLC reside in Baltimore, MD, and both entities have their principal place of business in Baltimore, which is in this District. Defs.' Answer at ¶¶ 39-40.

Accordingly, all the considerations relevant to Rule 23(b)(3) establish that certification of a (b)(3) class for purposes of the monetary relief is proper.

### D.  Plaintiffs' Counsel Satisfy Rule 23(g) Requirements

Rule 23(g) requires the Court to appoint class counsel when it certifies a class. Plaintiffs' Counsel have meticulously and diligently investigated the potential class claims in this action; have substantial experience in discrimination, education, consumer, class action, and other complex litigation; are knowledgeable about the law relevant to this action; and have committed significant resources to representing the class. *See supra* at Section I.A; *infra* at Sections IV.B.1, IV.B.9; Milton Oct. Decl at. ¶¶ 4-6, 9-14, 18-20; Decl. of G. Schlactus ("Schlactus Decl.") (Ex. 4) at ¶¶ 14-18; Rothschild Decl. at ¶¶ 4-8, 10-14, 22-23. Accordingly, Class Counsel will continue to fairly and adequately represent the interests of the class through the final steps of the settlement process. *See* Fed. R. Civ. P. 23(g)(1) & (4).

## III.    ADEQUATE NOTICE HAS BEEN DISSEMINATED TO THE CLASS

Prior to finally approving the proposed settlement, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Because Plaintiffs request certification (in part) under Rule 23(b)(3), the notice must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Similarly, due process requires reasonable notice and the opportunity to be heard or withdraw from the class. *See McAdams v. Robinson*, 26 F.4th 149, 157–58 (4th Cir. 2022); *see also Good v. Am. Water Works Co., Inc.*, No. CV 2:14-01374, 2016 WL 5746347, at *9 (S.D.W. Va. Sept. 30, 2016) (explaining that the notice should not be "a long brief of the parties' positions" (citation omitted)).

Notice in accordance with these standards was accomplished pursuant to the procedures set forth in the Settlement Agreement, the Preliminary Approval Order, and the Order Modifying

Preliminary Approval. *See* Lange Decl. at ¶¶ 3-11, 16-20; Milton Oct. Decl. at ¶¶22-26. Walden provided to the Claims Administrator the records necessary to ascertain the identity and last known contact information of the class members, and the Claims Administrator conducted tracing to determine whether more up-to-date contact information was available. *See* Lange Decl. at ¶¶ 3, 6. Notice of the settlement was sent by the Claims Administrator to the individual class members in the form approved by the Court via first-class United States mail, email, and text. The rate at which attempts to provide notice were bounced, returned, or otherwise unsuccessful was favorable relative to other cases. *See* Lange Decl. at ¶ 11, 20. First-class mailing in conjunction with tracing satisfies Rule 23 and due process where, as here, the Parties have addresses, social security numbers, and phone numbers of the class members. *See Thorpe v. Va. Dep't of Corr.*, No. 2:20CV00007, 2023 WL 5038692, at *5 (W.D. Va. Aug. 8, 2023); *Minter v. Wells Fargo Bank, N.A.*, 283 F.R.D. 268, 275 (D. Md. 2012). Emails and texts made the notice process even more effective than the type of notice needed. The notice was provided to class members with adequate time for them to decide if they want to object or opt out. *See* Preliminary Approval Order at ¶¶ 15, 18; Order Modifying Preliminary Approval at ¶ 4(g), (j); Settlement Agreement at ¶¶ 27-28 (opt-outs due nine weeks after deadline for mailing of notice; objections and rescissions of opt-outs due eleven weeks after deadline for mailing of notice).

As the Court already determined in addressing the notice in the Preliminary Approval Order and the Order Modifying Preliminary Approval, the content of the proposed notice was also sufficient. As required under Rule 23(c)(2)(B) and Rule 23(e)(5), it described the case and terms of settlement, provided the class definition, told class members that they may appear through an attorney, told them that they may be excluded from the class or object to the settlement and how to do so, and explained the binding effect of a class judgment on class

members. The notice also described the claims process that will be utilized if the settlement receives final approval.

The notice satisfied the requirements of due process and Rule 23.

## IV. THE ATTORNEYS' FEES AND COSTS REQUESTED ARE REASONABLE AND SHOULD BE AWARDED ON THE BASIS OF THE PERCENTAGE OF RECOVERY METHOD

Pursuant to Federal Rules of Civil Procedure 23(h) and 54(d), and paragraph 11 of the Settlement Agreement, Plaintiffs respectfully request that the Court award 25% of the $28,500,000 monetary settlement ($7,125,000) for attorneys' fees and costs. Class Counsel in this case produced a significant benefit for the class by vigorously litigating the case and negotiating a common fund settlement of $28,500,000 plus additional nonmonetary relief. The amount requested in fees and costs is based on the preferred "percentage of recovery" method. The amount satisfies the twelve-factor test applied by courts in this Circuit to assess the reasonableness of a percentage award. And the amount satisfies a "lodestar crosscheck": Class Counsel's requested multiplier is well within the range approved by courts in this Circuit, and it is justified by the significant risks present and outstanding results achieved here. An award of attorneys' fees and costs in the amount of $7,125,000 should therefore be approved.[15]

### A. Fees Should Be Awarded Using the Percentage Method

When a settlement results in a common fund for the benefit of a class, "[t]here are two approaches used for calculating attorneys' fees within the Fourth Circuit: the percentage of the fund method and the lodestar method." *Dickey v. R.R. Donnelley & Sons Co.*, No. 1:18CV920, 2021 WL 1169245, at *3 (M.D.N.C. Mar. 26, 2021). The consensus among courts is that the percentage method is preferred. *Mills*, 265 F.R.D. at 260 ("[O]ther districts within this Circuit,

---

[15] Plaintiffs note that, in ruling on their request for fees and costs, the Court "must find the facts and state its legal conclusions under Rule 52(a)." Fed. R. Civ. P. 23(h)(3).

and the vast majority of courts in other jurisdictions consistently apply a percentage of the fund method for calculating attorneys' fees in common fund cases"); *see also In re Peanut Farmers Antitrust Litig.*, No. 2:19-CV-00463, 2021 WL 9494033, at *1 (E.D. Va. Aug. 10, 2021); *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984); *Manual for Complex Litigation* (Fourth) §14.121. This method "better aligns the interests of class counsel and class members because it ties the attorneys' fees award to the overall result achieved, rather than hours expended by the attorneys." *In re Peanut Farmers Antitrust Litig.*, 2021 WL 9494033, at *1; *see also Hess v. Sprint Commc'ns Co. L.P.*, No. 3:11-CV-00035-JPB, 2012 WL 5921149, at *2 (N.D.W. Va. Nov. 26, 2012); *see also Temp. Servs., Inc. v. Am. Int'l Group, Inc.*, No. 3:08-cv-00271-JFA, 2012 WL 4061537, at *7 (D.S.C. Sept. 14, 2012) ("The percentage method also is widely believed preferable in a case such as this one where the Plaintiffs agreed to pay counsel on a contingency fee basis.").

District courts in this Circuit have repeatedly preferred the percentage of recovery method. *See, e.g.*, *Krakauer v. Dish Network, L.L.C.*, No. 1:14-cv-333, 2018 WL 6305785, at *2 (M.D.N.C. Dec. 3, 2018); *Thomas v. FTS USA, LLC*, No. 3:13-cv-825 (REP), 2017 WL 1148283, at *3 (E.D. Va. Jan. 9, 2017), *report and recommendation adopted*, 2017 WL 1147460 (E.D. Va. Mar. 27, 2017); *Manuel v. Wells Fargo Bank, Nat'l Ass'n*, No. 3:14CV238 (DJN), 2016 WL 1070819, at *5 (E.D. Va. Mar. 15, 2016); *Archbold v. Wells Fargo Bank, N.A.*, No. 3:13-CV-24599, 2015 WL 4276295, at *5 (S.D.W. Va. July 14, 2015); *Deem v. Ames True Temper, Inc.*, No. 6:10-CV-01339, 2013 WL 2285972, *4-5 (S.D.W. Va. May 23, 2013). Circuit courts in other parts of the country are generally in accord. *See, e.g.*, *Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.*, 888 F.3d 455, 458 (10th Cir. 2017); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642-43 (5th Cir. 2012); *Carlson v. Xerox*

*Corp.*, 355 Fed. App'x. 523, 525-26 (2d Cir. 2009); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599-600 (7th Cir. 2005); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-50 (9th Cir. 2002); *In re Thirteen Appeals Arising out of San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995). The D.C. and Eleventh Circuits even mandate use of the percentage method. *See In re Equifax Inc. Customer Data Security Breach Litig.*, 999 F.3d 1247, 1278 (11th Cir. 2021) (citing *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991)); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 87–88 (D.D.C. 2013).

Class Counsel's fees should therefore be awarded here on the basis of the percentage of recovery method.

**B.  An Award of 25% of the Common Fund is Reasonable and Appropriate**

In determining the appropriate percentage to award, courts in the Fourth Circuit look at several factors, as outlined in *Barber v. Kimbrell's, Inc.*: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases." 577 F.2d 216, 226 n.28 (4th Cir. 1978); *see also Berry v. Schulman*, 807 F.3d 600, 618 (4th Cir. 2015) (affirming use of the *Barber* factors).

**1.  <u>Time and Labor Expended</u>**

Counsel have devoted over 6,275 hours to this case. Schlactus Decl. at ¶ 17. As described above, and among other things, Plaintiffs' Counsel conducted a thorough investigation of

Defendants' practices that spanned multiple years, briefed (and prevailed on) a contentious and complex motion to dismiss, and engaged in hard-fought settlement negotiations for more than half a year. Milton Oct. Decl. at ¶¶ 18-20. Class Counsel performed this work and achieved these results while being challenged at every turn by skilled defense counsel. As another court interpreting this factor found, Class Counsel here demonstrated "diligence, determination, hard work, and skill" to achieve a favorable result. *Savani v. URS Pro. Sols. LLC*, 121 F. Supp. 3d 564, 571 (D.S.C. 2015).

## 2.  <u>Novelty and Difficulty of the Questions Raised</u>

In this case, Plaintiffs' Counsel faced great risk pursuing a legal theory of discrimination that is much less common than others. A search of the Westlaw database indicates that the legal theory forming the basis of Plaintiffs' claims—reverse redlining—appears in just 124 federal court decisions, with many only referencing the term in passing. In contrast, class actions brought under other anti-discrimination statutes are much more common. For example, data from the Federal Judicial Center indicate that more than 250 employment-related civil rights class action cases were filed in 2023 alone. *See* Federal Judicial Center Integrated Database, *available at* https://www.fjc.gov/research/idb/interactive/24/IDB-civil-since-1988 (indicating that there were a combined total of more than 250 class actions filed in the "civil rights jobs" and "civil rights ADA employment" categories in 2023). Further, Class Counsel is familiar with only a handful of other cases asserting the reverse redlining model of discrimination, developed principally in the area of mortgage lending, in a higher education class action. Indeed, Defendants described the federal discrimination claims as "novel" in seeking to have them dismissed. *See* Defs.' Mem. in Supp. of Mot. to Dismiss (Mar. 23, 2022), Dkt. No. 35-1, at 18.

Plaintiffs are confident that these claims were properly asserted, but the briefing shows that the issues were not simple.

Plaintiffs' Counsel also took on this representation despite the great risk of recovering nothing in light of the difficulty in proving their claims. As discussed above in the Adequacy and Reasonableness sections, there are considerable legal hurdles that Plaintiffs would have to overcome to prevail in this case: (1) establishing a prima facie case of discrimination and generating a genuine dispute of material fact as to whether a jury could conclude that Walden discriminated on the basis of race and sex; (2) with respect to their ECOA claim, establishing that ECOA applies to the conduct at issue; (3) persuading the Court that a sizable portion of Class members' claims are not time barred; and (4) class certification. Plaintiffs' Counsel's decision to undertake this litigation—and their ability to achieve an adequate and reasonable settlement—in spite of these difficulties weighs in favor of the requested fee award.

### 3. <u>Skill Required to Properly Perform the Legal Services Rendered</u>

In assessing the skill required to properly perform the legal services rendered, courts look to counsel's abilities exhibited in the course of the litigation, their experience within the relevant field, and the quality of opposing counsel. *See Savani*, 121 F. Supp. 3d at 571; *Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2016 WL 2636289, at *5 (M.D.N.C. May 9, 2016); *Choice Hotels Int'l, Inc. v. Fisher*, No. 2:13-CV-23, 2015 WL 12748030, at *2 (N.D.W. Va. June 15, 2015).

Counsel's considerable experience in civil rights, higher education, and class action litigation is shown in the attached declarations. *See* Milton Oct. Decl. at ¶¶ 4-6, 9-14; Rothschild Decl. at ¶¶ 4-7, 10-14; *see also Mills*, 265 F.R.D. at 262 (noting counsel's experience in the subject matter of the case). Counsel submits that their skill in these areas is reflected in the

record. It is likewise reflected in the excellent results obtained for the class, which are discussed above and below with respect to factor eight.

Moreover, Plaintiffs' Counsel achieved this result against one of the nation's leading law firms. Latham & Watkins LLP is one of the "largest and most successful firms in the United States." *Oregon Laborers Emps. Pension Tr. Fund v. Maxar Techs. Inc.*, No. 19-CV-0124-WJM-SKC, 2024 WL 98387, at *6 (D. Colo. Jan. 1, 2024) (noting that the firm presented "formidable opposition"). In weighing the quality of opposing counsel, courts have found that the presence of a firm such as Latham as defense counsel weighs in favor of granting a requested fee award. *See, e.g.*, *id.*; *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 774 (S.D. Tex. 2008) (concurring with the observation that defense firms, which included Latham, represent the "cream of the American corporate law bar."); *Zilhaver v. UnitedHealth Grp., Inc.*, 646 F. Supp. 2d 1075, 1084 (D. Minn. 2009). According to public filings, lawyers at the firm charged as much as $615 to $1,680 per hour in 2021, and likely more today. *See* Fee Application, Dkt. 743 at 4–5, *NPE Winddown Holdings, Inc.*, No. 1:21-bk-10570 (Bankr. D. Del. Oct. 18, 2021). In light of these challenges, the result here—discussed above in the Adequacy and Reasonableness sections, *supra* at 18-26, and below with respect to factor eight—is remarkable.

### 4. <u>Attorneys' Opportunity Costs in Pressing the Instant Litigation</u>

Class Counsel devoted substantial time and resources to this case which could have been devoted to other matters. This work includes not only other contingent litigation cases, but also civil rights counseling matters on behalf of paying clients. The opportunity costs of pressing this litigation therefore weighs in favor of the requested fee award.

### 5. <u>Customary Fee for Like Work</u>

When plaintiffs' counsel accepts a case on a contingency basis, it is customary to charge one-third (33.3%) or more of any amount recovered for the client. And as discussed below with

respect to factor twelve, courts in this Circuit routinely award 33% of a common fund as attorneys' fees, including in cases with common funds significantly larger than the $28.5 million fund here. Class Counsel's requested award of 25% of the common fund is in line with or below the customary fee for like work.

On an hourly basis, the rates used to calculate Class Counsel's lodestar for the purposes of lodestar cross-check are customary for like work. Those rates are based on the Adjusted Laffey Matrix ("Laffey Matrix"), which "is used as a guideline for reasonable attorneys' fees in the Washington/Baltimore area." *Galvez v. Am. Servs. Corp.*, No. 1:11cv1351 (JCC/TCB), 2012 WL 2522814, at *5 n.6 (E.D. Va. June 29, 2012). Courts regularly approve class settlements where the lodestar cross-check is calculated using Laffey Matrix rates. *See In re Allura Fiber Cement Siding Litig.*, No. 2:19-MN-02886-DCN, 2021 WL 2043531, at *6 (D.S.C. May 21, 2021); *Brown v. Transurban USA, Inc., 318 F.R.D. 560, 576 (E.D. Va. 2016).* Instead of using current Laffey Matrix rates to calculate the lodestar, *see infra* Section IV.B.12, Plaintiffs' Counsel here are using the modestly lower Laffey rates applicable from June 2023 through May 2024, which covers the period when the Parties reached the Settlement and sought this Court's preliminary approval. Schlactus Decl. at ¶ 8. The customary rates that Plaintiffs' lead counsel Relman Colfax charges to paying clients are higher than those used here. *Id.* And the rates used here are well below the rates charged by lawyers working out of the same office and for the same law firm as counsel for Defendants. *See supra* at Section IV.B.3.

### 6.  <u>Attorneys' Expectations at the Outset of the Litigation</u>

Class Counsel undertook this case aware of the risks inherent in this litigation. "Courts across the country recognize that the risk of receiving no recovery is a major factor in awarding attorneys' fees, and it is the primary aspect of a contingency fee case that supports a percentage fee recovery." *Temp. Servs.*, 2012 WL 4061537, at *9. "The risk of no recovery in complex cases

of this sort is not merely hypothetical. Precedent is replete with situations in which attorneys representing a class have devoted substantial resources in terms of time and advanced costs, yet have lost the case despite their advocacy." *Savani*, 121 F. Supp. 3d at 572. Here, Class Counsel undertook substantial risks, including those inherent in any contingency fee case and those inherent to this case in particular, discussed above with respect to factor two.

At the same time, Class Counsel "clearly expected to be rewarded for [their] efforts (if successful) in the form of a significant attorney's fee for results obtained for the benefit of the Class." *Id.* The contingent nature of the litigation and Class Counsel's well-founded expectations at the outset of litigation support the requested fee award.

### 7.  The Time Limitations Imposed by the Clients or Circumstances

Neither clients nor circumstances imposed significant time limitations in this case. This factor is therefore not relevant to the fee award determination here.

### 8.  The Amount in Controversy and the Results Obtained

The settlement in this case achieves excellent results for the class, as discussed at greater length in the Adequacy and Reasonableness sections above. *See supra* at 18-26. As discussed in those sections, the Settlement Agreement not only provides an average recovery of thousands of dollars to each class member but also significant non-monetary injunctive relief. "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Doe v. Chao*, 435 F.3d 492, 506 (4th Cir. 2006) (quoting *Farrar v. Hobby,* 506 U.S. 103, 114 (1992)).

The result here is especially impressive given the infrequency of comparable legal claims, the high-powered defense mounted by Walden, and Walden's total exposure. In light of these challenges, the result here is remarkable: the settlement fund represents approximately 31% of the excess costs for capstone credits paid by class members who enrolled between 2008 and

2018 (Walden's maximum exposure), and 79% of the excess costs paid by those who enrolled between 2013 and 2018 (Walden's maximum exposure if they prevailed on their statute of limitations argument).[16] As detailed *supra*, this recovery would be a triumph in a more typical class action. Here, it is exceptional.

### 9.  The Experience, Reputation and Ability of the Attorneys

This factor counsels in favor of the requested fee award for the same reasons articulated with respect to factor three: Class Counsel's experience, reputation, and ability are evidenced not only by their considerable experience in civil rights and class action litigation, but also by the result achieved here.

### 10.  The Undesirability of the Case Within the Legal Community in which the Suit Arose

In assessing this factor, courts evaluate whether "responsibilities in this litigation which would have deterred many firms." *Savani*, 121 F. Supp. 3d at 574. First, the challenges particular to this litigation discussed with respect to factor two illustrate the challenges that would have deterred other firms from taking on this case. Second, the dearth of class actions brought under ECOA generally demonstrates the undesirability of similar cases. "Although Congress explicitly authorized class action litigation in enacting the ECOA, such litigation is extraordinarily rare." William B. Rubenstein, Newberg and Rubenstein on Class Actions § 21:5 (6th ed.) (June 2024 Update). That is because "the rewards of most ECOA cases likely do not exceed the costs of pursuing them" given difficulties in proving discrimination claims, especially on a class-wide basis. *Id.* Class litigation under Title VI is likewise difficult to pursue for the same reasons. Third, the risk of nonpayment in this case was substantial.

---

[16] As discussed in footnote 12, *supra*, the recovery percentage is likely slightly higher than this estimate as a result of the reduction in the number of confirmed class members discussed in footnote 11.

11. **The Nature and Length of the Professional Relationship Between Attorneys and Clients**

The Fourth Circuit has not elaborated on the significance of this factor, *see Barber*, 577 F.2d at 226 n.28; *see also Berry*, 807 F.3d at 618, and courts evaluating this factor have indicated that the absence of any relationship between plaintiffs and class counsel prior to the litigation weighs in favor of granting the requested fee award. *See Savani*, 121 F. Supp. 3d at 574; *Miller v. HSBC Fin. Corp.*, No. 3:08-CV-01942-MJP, 2010 WL 2722689, at *4 (D.S.C. July 9, 2010). Here, Class Counsel did not know any of the Plaintiffs until Class Counsel agreed to represent Plaintiffs in this case.

12. **Attorney's Fees Awards in Similar Cases**

Fee awards in similar cases in this Circuit support an award of one-fourth of the settlement fund. Courts in the Fourth Circuit routinely award a larger portion of a class action settlement fund in attorneys' fees. *See, e.g.*, *McAdams v. Robinson*, 26 F.4th 149, 162 (4th Cir. 2022) (final approval of 43% of common fund); *Galloway v. Williams*, No. 3:19-CV-470, 2020 WL 7482191, at *11 (E.D. Va. Dec. 18, 2020) (final approval of 33% of common fund); *Sims v. BB&T Corp.*, No. 1:15-CV-732, 2019 WL 1993519, at *3 (M.D.N.C. May 6, 2019) (same); *Deem v. Ames True Temper, Inc.*, No. 6:10-CV-01339, 2013 WL 2285972, at *6 (S.D.W. Va. May 23, 2013) (same); *In re Novant Health, Inc.*, No. 1:22-CV-697, 2024 WL 3028443, at *9 (M.D.N.C. June 17, 2024) (same); *Chrismon v. Pizza*, No. 5:10-CV-155-BO, 2020 WL 3790866, at *3 (E.D.N.C. July 7, 2020) (same); *Lamie v. LendingTree, LLC*, No. 3:22-CV-00307-FDW-DCK, 2024 WL 811519, at *2 (W.D.N.C. Feb. 27, 2024) (same); *Boger v. Citrix Sys., Inc.*, No. 19-CV-01234-LKG, 2023 WL 3763974, at *12 (D. Md. June 1, 2023) (same); *Alliance Ophthalmology, PLLC v. ECL Grp., LLC*, No. 1:22-CV-296, 2024 WL 3203226, at *14 (M.D.N.C. June 27, 2024) (same); *DeWitt v. Darlington Cnty.*, No. 4:11-CV-00740, 2013 WL

6408371, at *7 (D.S.C. Dec. 6, 2013) (preliminary approval of 33.33% of common fund); Final

Approval Order and Final J. at 6, *Moler et al. v. Univ. of Maryland Med. Sys.*, No. 1:21-CV-

01824-JRR (D. Md. July 22, 2021) (same); *Kruger v. Novant Health*, No. 1:14-CV-208, 2016

WL 676066, at *1–2 (M.D.N.C. Sept. 29, 2016) (final approval of 33.33% of common fund).

Courts have similarly approved fee award percentages like the requested amount here. *See, e.g.*,

*Feinberg v. T. Rowe Price Grp., Inc.*, 610 F. Supp. 3d 758, 771 (D. Md. 2022) (final approval of

25.7% of $13.6 million settlement fund); Order Granting Pls.' Unopposed Mot. for Att'ys' Fees

at 2, *Rodriguez et al. v. Riverstone Cmtys., LLC et al.*, No. 5:21-CV-00486 (E.D.N.C. Nov. 23,

2021) (final approval of 29.4% of settlement fund). This also holds true in cases with common

funds significantly larger than the $28.5 million dollar fund here. *See, e.g.,*; *Krakauer v. Dish

Network, LLC*, No. 1:14-CV-333, 2019 WL 7066834, at *7 (M.D.N.C. Dec. 23, 2019) (final

approval of one-third of $61 million settlement); *In re Celebrex (Celecoxib) Antitrust Litig.*, No.

2:14-CV-00361, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018) (final approval of one-third

of the $94 million settlement); *In re Titanium Dioxide,* 2013 WL 6577029, at *1 (final approval

of 33.33% of $163.5 million common fund). Class Counsel's requested award of 25% of the

common fund, inclusive of both fees and costs, is therefore reasonable.

### C.  A Lodestar Cross-Check Confirms the Reasonableness of the Requested Award.

A lodestar crosscheck further demonstrates that an award of $7,125,000 for fees and costs

is reasonable and should be approved. Courts using the percentage method often perform a

lodestar cross-check to confirm the reasonableness of the percentage award. *See, e.g.*, *In re Cook

Med., Inc., Pelvic Repair Syts. Prods. Liability Litig.*, 365 F. Supp. 3d 685, 701 (S.D.W. Va.

2019). As Judge Bennett has explained:

> Under the "lodestar" method, a district court identifies a reasonable fee award, or
> lodestar award, by multiplying the reasonable hours expended by a reasonable

hourly rate. The court may then adjust that award by employing a multiplier. The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar. Importantly, where the lodestar fee is used as a mere cross-check to the percentage method of determining reasonable attorneys' fees, the hours documented by counsel need not be exhaustively scrutinized by the district court. Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee.

*Fangman v. Genuine Title, LLC*, No. CV RDB-14-0081, 2017 WL 2591525, at *6 (D. Md. June 15, 2017) (citations omitted) (cleaned up).

Here, the lodestar for Class Counsel is $3,875,398. Counsels' hours and rates are summarized by timekeeper in two declarations attached hereto. *See* Schlactus Decl., Exhibit A; Rothschild Decl., Exhibit A. Counsel have devoted over 6,275 hours to this litigation. Schlactus Decl. at ¶ 17. The value of this time is calculated using the Laffey Matrix rates in effect from June 2023 through May 2024. Schlactus Decl. at. ¶ 8; Rothschild Decl. at ¶ 19. These figures include all time spent by attorneys, paralegals, and summer associates through September 30, 2024, for which Counsel would seek compensation were they to file a fee petition based on their lodestar. Schlactus Decl. at. ¶ 10; Rothschild Decl. at ¶ 21. These figures do <u>not</u> include an additional 433 hours, valued at $241,928, that Counsel devoted to the case but deducted in their exercise of billing judgment in the course of preparing this motion. Schlactus Decl. at ¶ 8; Rothschild Decl. at ¶ 19. Counsel have also expended $30,776.75 in out-of-pocket costs for which they would seek recovery were they to file a fee petition. Schlactus Decl. at. ¶ 11, 15; Rothschild Decl. at ¶ 22. Counsel have not been reimbursed for these expenses but do not seek a separate award of costs. *Id.*

The lodestar figure here is reasonable. As noted above, Class Counsel have diligently and efficiently litigated this case. "When performing a lodestar cross-check, courts may 'accept as reasonable counsel's estimate of the hours they have spent working on the case.'" *CASA de Md.,*

*Inc. v. Arbor Realty Tr., Inc.*, No. CV DKC 21-1778, 2024 WL 1051120, at *9 (D. Md. Mar. 11,

2024) (quoting *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 482-83 (D.Md. 2014)). The rates used

to calculate the lodestar are likewise reasonable. First, the rates used to calculate the lodestar are

based on the lower Laffey rates applicable to the period from June 2023 through May 2024

instead of current Laffey rates, although the use of current rates is appropriate given the timing

of when Class Counsel will be paid for their work. *See Missouri v. Jenkins by Agyei*, 491 U.S.

274, 284 (1989) (noting that "application of current rather than historic hourly rates" is

appropriate in calculating the lodestar amount because "compensation received several years

after the services were rendered . . . is not equivalent to the same dollar amount received

reasonably promptly as the legal services are performed, as would normally be the case with

private billings"). Next, as discussed in Section IV.B.5, *supra*, "[c]ourts in the Fourth Circuit

have previously determined that using Laffey and Adjusted Laffey rates is appropriate when

reviewing lodestar[s] in approving fee petitions." *In re Allura Fiber Cement Siding Litig.*, No.

2:19-MN-02886-DCN, 2021 WL 2043531, at *6 (D.S.C. May 21, 2021) (citing cases).

    The requested lodestar multiplier of 1.84 is reasonable. According to one study, the

average lodestar multiplier in this Circuit is 2.43. *See* Theodore Eisenberg & Geoffrey P.

Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical

Legal Stud. 248, 272 tbl.14 (2010). Bearing out this research, several courts in this circuit have

awarded fees with similar or higher lodestar multipliers than that requested here. *See In re*

*Peanut Farmers Antitrust Litig.*, No. 2:19-CV-00463, 2021 WL 9494033, at *7 (E.D. Va. Aug.

10, 2021) (awarding $34,250,000 to class counsel, resulting in a 2.92 multiplier); *In re Genworth*

*Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 845 (E.D. Va. 2016) (awarding $61,320,000 to class

counsel, resulting in a 1.97 multiplier); *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 790 (E.D.

Va. 2001) (awarding $27,600,000 to class counsel, resulting in a 2.6 multiplier). In light of the *Barber* factors discussed above, the lodestar multiplier here is reasonable.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully submit that the Court should enter an order granting final approval of the proposed Settlement Agreement, granting final certification of the settlement class, approving an award of fees and costs to Plaintiffs' Counsel in the amount of 25% of the settlement, and ordering the related relief set forth in the proposed order submitted herewith.

DATE: October 8, 2024                               Respectfully Submitted,

/s/   Alexa   T.   Milton
Alexa T. Milton #19990
Glenn Schlactus*
Tara K. Ramchandani*
Lila R. Miller*
Edward K. Olds*
RELMAN COLFAX PLLC
1225 19th St. NW Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
amilton@relmanlaw.com
gschlactus@relmanlaw.com
tramchandani@relmanlaw.com
lmiller@relmanlaw.com
tolds@relmanlaw.com

Eric Rothschild*
NATIONAL STUDENT LEGAL
DEFENSE NETWORK
1701 Rhode Island Ave., NW
Washington, D.C. 20036
eric@defendstudents.org

*Attorneys for Plaintiffs*

*admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 8, 2024, a true and correct copy of the foregoing

Plaintiffs' Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Final Approval

of Proposed Class Action Settlement and Certification of Class was served via CM-ECF on all

attorneys of record.

Date: October 8, 2024                    /s/ Alexa T. Milton
                                          Alexa T. Milton

                                          *Attorney for Plaintiffs*